Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2           CORPUS CHRISTI DIVISION
3

STEVEN T. VETTERS, INDIVIDUALLY  *
4  AND AS REPRESENTATIVE OF THE    *
    ESTATE OF SHARON G. VETTERS,    *
5  DECEASED, AND FOR AND ON BEHALF  *
    ALL THOSE ENTITLED TO RECOVER FOR*
6  THE DEATH OF SHARON G. VETTERS   *
    UNDER THE TEXAS WRONGFUL DEATH   *
7  AND SURVIVAL ACTS, ERIN VETTERS  *
    RUEL, STEVEN B. VETTERS, JOHN W. *
8  STOCKTON, AND HAZEL L. STOCKTON  *
                            *
9  VS.                      *    CA NO. 05-03
                            *
10  DAIMLERCHRYSLER CORPORATION     *
11  -------------------------------------------
12     THE VIDEOTAPED ORAL DEPOSITION OF
13            JOHN STILSON
14           October 13, 2005
15  -------------------------------------------
16        A P P E A R A N C E S
17  ATTORNEY FOR PLAINTIFFS:
18         MR. CRAIG SICO
          Sico, White & Braugh, LLP
19        802 N. Carancahua, Ste. 900
          Corpus Christi, Texas 78470
20
21  ATTORNEY FOR DAIMLERCHRYSLER CORPORATION:
22         MR. ROBERT SONNIER
          Clark, Thomas & Winters, P.C.
23        300 West Sixth Street, Suite 1500
          Austin, Texas 78701
24

ALSO PRESENT:  Mr. Robie Rowley, Videographer
25

REPORTED BY: REBECCA A. HINOJOSA, C.S.R.

PLAINTIFF'S
EXHIBIT
2

Page 2

1
2    I N D E X   T O   T E S T I M O N Y
                PAGE
3
4    Examination:
5       By Mr. Sonnier. . . . . . . . . . .    4
6       By Mr. Sico . . . . . . . . . . . .
7
     Re-examination:
8
        By Mr. Sonnier. . . . . . . . . .
9
10
11
12
           E X I B I T   I N D E X
13                         PAGE
14   44    Deposition notice            12
15   45    CD with photos from 9/6/05      19
16   46    CD with photos from 10/3/05     20
17   47    DVD with testing          20
18   48    Accident investigation report    42
19   49    Photo of vehicle         275
20   50    Copy of handwritten notes       307
21
22
23
24
25

Page 3

1        THE ORAL DEPOSITION OF THE WITNESS, JOHN
2    STILSON, was taken by MR. ROBERT SONNIER before me,
3    REBECCA A. HINOJOSA, a Certified Shorthand Reporter in
4    and for the State of Texas, on the 13th day of October,
5    2005, between the hours of 10:02 a.m. and 5:15 p.m., at
6    the offices of Sico, White & Braugh, LLP, 802 N.
7    Carancahua, Suite 900, Corpus Christi, Nueces County,
8    Texas, pursuant to the Rules and the following
9    stipulations and agreements of counsel, to-wit:
10       It is stipulated and agreed by and between
11   counsel and the respective parties hereto that the
12   deposition of the witness named in the caption hereto
13   may be taken at this time and place pursuant to
14   agreement, and that the said deposition or any part
15   thereof, when so taken, may be used on the trial of
16   this cause the same as if the witness were present in
17   Court and testifying in person.
18
19
20
21
22
23
24
25

Page 4

1        VIDEOGRAPHER:  We are on the record.
2    This is the videotaped deposition of John Stilson.
3    Today's date is October 13, 2005, and the time is 10:02
4    a.m.
5
6        JOHN STILSON,
7    having been first duly sworn, testified as follows:
8
9        E X A M I N A T I O N
10
11   BY MR. SONNIER :
12       Q    Sir, could you please state your name for the
13   record.
14       A    John Michael Stilson.
15       Q    Mr. Stilson, my name is Robert Sonnier.   I
16   represent DaimlerChrysler Corporation in a lawsuit
17   styled Vetters versus DaimlerChrysler Corporation, and
18   you're aware we're here to take your deposition in this
19   case today.
20       A    That's my understanding, yes.
21       Q    Okay.   It's my understanding, sir, that you
22   have been identified as an expert in this case by
23   plaintiffs; is that right?
24       A    If you under -- if that's your understanding,
25   then I guess --

Page 5

1        Q    Okay.
2        A    -- it's my understanding.
3        Q    Okay.
4        A    All right.
5        Q    So our understandings meet, correct?
6        A    That's right.
7        Q    Okay.  And also, and correct me if I'm wrong,
8    but it is further my understanding that you have been
9    retained as a consulting expert to specifically address
10   issues relating to the design, manufacture, marketing
11   of the transmission system in the 2002 Durango, which
12   is the Vetters's vehicle.
13       A    Well, yes, but more specifically the gear
14   selection system.
15       Q    Okay.
16       A    That's probably the term of art.
17       Q    Okay.
18       A    All right.
19       Q    So your focus, then, in this case is the gear
20   selection system on this particular vehicle?
21       A    Correct.
22       Q    Okay.  And just for clarification, obviously,
23   you're not a biomechanical expert, correct?
24       A    No.
25       Q    Okay.  You're not doing the accident

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 6

1   reconstruction in this case, are you?
2   **A   No.**
3   Q   You are not a -- a warnings expert in this
4   case.   Would that be correct?
5   **A   I'm not sure how the designation would work in**
6   **that category.   I do have opinions as expressed in my**
7   **report about warnings.**
8   Q   Okay.
9   **A   Okay.**
10   Q   And -- and I appreciate the amendment.
11   We'll -- I did see that in your report, and I will
12   cover that and ask you some specific questions about
13   it.   But generally speaking, and I -- like I said,
14   we'll go over them later, but you may have some
15   opinions with regard to informing consumers about
16   certain conditions that exist because of the design of
17   this system, correct?
18   **A   That's correct.**
19   Q   Okay.   You're not a human factors expert; is
20   that correct?
21   **A   I am.   I don't know if they've been -- I've**
22   **been designated that in this particular case, but it**
23   **will -- my human factors expertise will come to bear in**
24   **this case.**
25   Q   Okay.   And generally speaking, could you just

Page 7

1   tell us how your human factors area or -- of expertise
2   will come into play in this particular matter.
3   **A   Well, basically, it will be ergonomics.   It's**
4   **going to be the interaction of the person with the**
5   **system, humans with systems.   In this particular case,**
6   **obviously, the issue is the gear selection system and**
7   **-- but it also extends to how the humans interact with**
8   **that gear selection system in making decisions.**
9   Q   Okay.   You're not a statistician; is that
10   correct?
11   **A   I am, but I'm not going to be one in this**
12   **case.**
13   Q   Okay.
14   **A   Okay.**
15   Q   And since you brought the issue with regard
16   to -- to human factors, you are going to address, in
17   this case, generally how an operator interacts with
18   this gear selection system in this particular vehicle;
19   is that correct?
20   **A   Yes.   That would be one of the things that**
21   **I'll be addressing, correct.**
22   Q   Okay.   But in terms of the reconstruction of
23   this particular accident, I assume you're going to tell
24   me to go depose Mr. Locke who has been designated as
25   the accident reconstructionist in this case.

Page 8

1   **A   With the exception of the proximate cause**
2   **issue, that's true.**
3   Q   Okay.   And when you talk about proximate
4   cause issue -- well, let me ask you this:   Have you
5   reviewed Mr. Locke's report?
6   **A   No.**
7   Q   Okay.   Have you spoken with Mr. Locke?
8   **A   No.**
9   Q   Okay.   Do you know anything about his
10   opinions with respect to the reconstruction in this
11   case?
12   **A   No.**
13   Q   With regard to the human factors area, have
14   you done any studies regarding the shift habits or
15   characteristics of operators of motor vehicles?
16   **A   Over the years, yes, I have.   Going back to**
17   **the C802 investigations, all the -- all the**
18   **documentation by Ford, and then the National Highway**
19   **Traffic Safety Administration, and then independent**
20   **contractors to the automotive industry, as well as**
21   **NHTSA, who did all these studies.**
22   **In addition, in the course of the cases**
23   **that I was involved with, well, investigative wise, we**
24   **did studies.   One report came out of Minneapolis,**
25   **Minnesota, and another report -- other things that I**

Page 9

1   **have done randomly, I mean, just asked people**
2   **individually about some of their habits and reactions**
3   **to this kind of system, advised them of what I believe**
4   **was inherently wrong with the system, and -- and to get**
5   **their reactions as to what that meant to them, so I**
6   **have done that, but I haven't done it in the form of**
7   **where I did a study and published it, okay.**
8   Q   Okay.   And that was my next question.   Have
9   you ever published anything with regard to human factor
10   study regarding shift habits or characteristics of an
11   operator of a motor vehicle?
12   **A   Only -- only in the form of deposition and**
13   **trial testimony, --**
14   Q   Okay.
15   **A   -- that kind of publication.   No -- no formal**
16   **technical publication through any journals or anything.**
17   Q   Okay.   One thing I'm assuming you would tell
18   me is that you have done an analysis from a human
19   factors standpoint of shift characteristics with motor
20   vehicle operators in a particular case that you've been
21   hired to consult on.
22   **A   That's true, but it goes beyond that.   Like I**
23   **said, it extends into the C802 and then the -- up**
24   **through 1981 and then a post 1981 continued NHTSA**
25   **investigation of Ford and other automotive**

3 (Pages 6 to 9)

Page 10

1  manufacturers for what they used to call park to
2  reverse syndrome, and so those studies are all open
3  public record and I -- I've reviewed all of them.
4      Q.  Okay.
5      A.  Okay.
6      Q.  And when you talk about the C802, you're
7  talking about the -- NHTSA's investigation of the Ford
8  vehicles.  I -- I think the final deal came out
9  some -- like in 1980; is that correct?
10     A.  Yeah.  Of course, you understand that in that
11 particular process General Motors and Chrysler became
12 intimately involved in the -- in the investigation,
13 it's just that Ford had the highest compliment of
14 problems, but they -- NHTSA investigated GM and
15 Chrysler and the Japanese.
16     Q.  Okay.  And as a result of C802, the -- the
17 only recall that was issued was with respect to Ford
18 vehicles, correct?
19     A.  That's correct.
20     Q.  Okay.
21     A.  That's true.
22     Q.  And when you talk about your involvement with
23 C802, you're talking about reviewing the -- the
24 documentation from both NHTSA and the auto
25 manufacturers relating to that investigation?

Page 11

1      A.  That, and -- and then Ford internal
2  investigations that they did independently.  In other
3  words, which would not be part of the NHTSA record, but
4  they did internal investigations on their own, several:
5  shopping centers, fleet, their fleet environments where
6  they went out and tested their fleets, had people do --
7  even -- even company people.  They took out
8  secretaries, engineers, etc., and did surveys within
9  the corporation of -- of what they would probably be
10 directed at driver behavior, operator behavior.
11     Q.  Okay.  Did -- did you participate in any of
12 those studies when you were at Ford?
13     A.  Indirectly we did.  We -- I did those studies.
14 In other words, when -- when I was a development group
15 leader, I did studies like that at Ford Motor Company
16 and, yes, I did use employees for some of the work that
17 we working on the in the human factors area and in a
18 sign-off area.  We had vehicle sign-off.
19     MR. SONNIER:  I need exhibit stickers.
20     COURT REPORTER:  Craig.
21     MR. SICO:  Oh, sorry.
22     Q.  (By Mr. Sonnier)  I'm going to go ahead and
23 mark a couple of things real quick before I hand them
24 over to you.  I'm going to -- first of all, you
25 received the deposition notice for your deposition in

Page 12

1  this case?
2      A.  I don't know.  There's a yellow folder that
3  has all the pleadings, and if it's in there I got it --
4  I -- I received it, and if it's not, I didn't.
5      Q.  Okay.
6      A.  But I don't recall reviewing it.
7      Q.  Let me just show you this, Discovery Exhibit
8  No. 44.
9      A.  Okay.
10     Q.  I'm representing to you that's the deposition
11 notice that we served in this case relating to your
12 deposition here today, and having looked -- looked at
13 that right now, do you recall reviewing that?
14     A.  I did not review this.
15     Q.  Okay.
16     A.  I'm not saying I didn't get it.  I'm saying I
17 didn't review it.
18     Q.  Okay.  Now, Mr. Stilson, you brought your
19 file materials here with you today; is that correct?
20     A.  I did.
21     Q.  Okay.  Earlier, Mr. Sico produced to me a
22 couple of boxes of documents that I think were -- were
23 produced that are part of your file, and in going
24 through these two boxes it appears that what is
25 contained in those boxes would be documents that were

Page 13

1  produced by DaimlerChrysler in this litigation, other
2  records that either one of the parties have subpoenaed
3  or -- or ordered with respect to this matter, discovery
4  responses by the very -- by the two parties, and the
5  various deposition transcripts from this case.  You --
6  all of that material is part of your file, correct?
7      A.  Part -- part of the file that was copies from
8  the -- there's three boxes, but they have been -- Box 1
9  was -- has been incorporated into Box 3.
10     Q.  Okay.
11     A.  And the -- there's an index to all the file
12 material that is in the boxes, and they should be in
13 there.  The things that you probably don't have would
14 be -- what are the things I just got?  I just got a
15 copy of the photographs of my inspection, I got a DVD
16 of some testing an analysis that Mr. Sico provided to
17 me, and then I have the 2005 recall of the Wrangler and
18 Durango, and then there may be a couple of more
19 documents, plus the bucks, of course, that we produced
20 at the time of the tear down.  Those, of course -- one
21 of them's here, but the rest of them are at the
22 warehouse, but we showed them to the Chrysler expert
23 that was present, as well as the attorney, and advised
24 her that we might use them as trial exhibits.  Other
25 than that, we -- those boxes contain everything, except

4 (Pages 10 to 13)

Page 14

1    pretty much what I outlined for you.
2        Q    Okay.  Other than the -- the two bucks that
3    are exhibits that are not in the conference room with
4    us today, is there anything else that's part of your
5    file that -- that is not here?
6        A    Subject vehicle.
7        Q    Okay.  And you understand that's still over
8    at Mr. Sico's warehouse?
9        A    That's correct.
10       Q    Okay.  You mentioned photographs from your
11   vehicle inspection.  I know you first inspected this
12   vehicle at his warehouse on September 6th, 2005.  Would
13   that be accurate?
14       A    That's correct.
15       Q    And then you've seen that vehicle how many
16   other times after that date?
17       A    Twice.
18       Q    Okay.  Do you -- do you have the dates handy
19   on when the subsequent inspections took place?
20       A    Well, if you're talking about inspections,
21   just one.  It would be the tear-down of October 3rd,
22   2005.  I've seen the vehicle, obviously, at the
23   warehouse, responding to your question.
24       Q    Okay.  So in terms of doing an inspection of
25   this particular vehicle for purposes of your work in

Page 15

1    this case, you've -- you've done that on two different
2    occasions?
3        A    That's right.
4        Q    That would be the September 6th date and the
5    October 3rd tear-down?
6        A    That is correct.
7        Q    Okay.  And the photos that you have, they're
8    contained on a CD; is that correct?
9        A    That's right.
10       Q    And are those photographs that were taken both
11   on the September 6th vehicle inspection and October 3rd
12   inspection?
13       A    No.  The October 3rd -- that CD is only the
14   October 3rd.  The September 6th, I think, are in --
15   no.  And then these are -- these are photographs,
16   actually, off the CDs.  I have a book for the October
17   3rd.  The September 6th was taken by an independent
18   videographer.  I don't know that any photographs were
19   taken.  I think it was a videographer.  So there's a
20   videotape of that inspection, as I recall.
21       Q    And do you know who the independent
22   videographer was?
23       A    No.  It was -- they were retained by Mr. Sico.
24       Q    Okay.  And do you have a copy of that
25   videotape?

Page 16

1        A    I -- I don't know.  I don't see it in my
2    file.  I didn't -- it's not mine.  I didn't take it.
3    It may be Mr. Sico has that video, or whatever --
4    whatever, and it's -- it's his.  It's not mine.  He
5    may doing that as work product.  I don't --
6            MR. SICO:  Which video are you talking
7    about?  The --
8            THE WITNESS:  The September 6, 2005 where
9    we did the inspection.  We did a couple -- my
10   recollection, I thought we did a videotape of the some
11   of the conditions.
12           MR. SICO:  Right.  No.  I think it's in
13   your file.  I think when I looked through it this
14   morning, I thought I saw it in there.
15           THE WITNESS:  Okay.  I didn't see it, sir.
16           MR. SICO:  It's in a -- it's in the hard
17   cover, the one that Matt and I did was in the soft
18   cover.
19           THE WITNESS:  Oh!  Well, then, that's in
20   here.
21           MR. SICO:  It may be in your green file.
22           THE WITNESS:  No.  August 8, that's yours.
23           MR. SICO:  Right.
24           THE WITNESS:  Oh, here's September 6th.
25   I'm sorry.  There it is.  Thank you, sir.  I'm sorry.

Page 17

1        Q    (By Mr. Sonnier) Okay.  So you handed me a CD,
2    or DVD, excuse me.  It's 2002 Durango, or Dodge
3    Durango inspection; is that correct?
4        A    Yes.  And that would be, in fact, Mr. Sico's
5    videographer's copy to me of that inspection.  Thank
6    you, sir.
7        Q    Okay.  And when we say video, it's
8    actually -- it's actually --
9        A    DVD.
10       Q    -- formatted in a DVD, correct?
11       A    Right.
12       Q    Okay.
13           MR. SICO:  Craig and I -- and I just --
14   just so you know, I think I've got extra copies of both
15   of those for you.  I don't think they're in those
16   copies.  I think that's just his stuff, so if you
17   remind me at the break, I'll get you copies.
18           MR. SONNIER:  Okay.
19       Q    (By Mr. Sonnier) This -- the video or the DVD
20   that was shot in your inspection from the September 6th
21   inspection, did you direct the individuals shooting
22   this video as to what they were to tape?
23       A    In the areas of where I wanted specific
24   information related, I directed them, otherwise, no.
25       Q    Okay.  Is there sound associated with this, or

5 (Pages 14 to 17)

Page 18

1  do you know?
2     A  I don't know.
3        MR. SICO:  I think there is.
4     Q   (By Mr. Sonnier)  Okay.  Now, the October 3rd
5  inspection, the tear-down, you have some photographs
6  from that particular inspection; is that correct?
7     A  I do.
8     Q   And are those contained on a -- on a separate
9  CD or prints in a notebook?
10    A  I -- I was given -- I -- I was given the
11  prints, and I don't know if they -- I thought they were
12  also a CD.  Yeah, here it is.  I knew I had a CD.
13  There it is.  That's why I couldn't find it, it's in
14  here.
15       MR. SICO:  Extra copy of that for you, as
16  well.
17       MR. SONNIER:  Okay.  And everything that's
18  on here is -- the prints are in that?
19       MR. SICO:  That's what I asked him to do.
20  I can't promise you.  I didn't check it.
21       MR. SONNIER:  Okay.
22    A  That's the understanding, let's put it that
23  way.
24    Q   Okay.  Why don't I do this:  Just so I don't
25  get screwed up later on, --

Page 19

1     A  Yeah.
2     Q   -- I'm going to -- I'm going to put an exhibit
3  sticker on these.
4        MR. SICO:  Let me get copies right now.
5  Do you want to take a quick break?
6        MR. SONNIER:  We can do that.
7        MR. SICO:  Let me just do that so I'll get
8  your set.
9        MR. SONNIER:  Yeah.  We'll just put the
10  stickers on mine.
11       VIDEOGRAPHER:  Going off the record at
12  10:18 a.m.
13       (WHEREUPON AT THIS TIME A SHORT
14       BREAK WAS TAKEN.)
15       (WHEREUPON EXHIBIT NO. 45 WAS MARKED.)
16       VIDEOGRAPHER:  We are back on the record
17  at 10:24 a.m.
18    Q   (By Mr. Sonnier)  Okay.  Mr. Stilson, Craig
19  was kind enough to make some copies of some CDs here,
20  so I just want to make sure we have all that straight
21  so I know all the photos and CDs and whatnot that you
22  have as part of your file.
23       Discovery Exhibit No. 45 is -- is
24  labeled -- has a -- his firm's name on it and
25  everything.  Those are photographs from the September

Page 20

1  6th, 2005 inspection -- or not photographs, but
2  actually they're DVD.
3     A  Yes.
4     Q   Okay.
5     A  Correct.
6        (WHEREUPON EXHIBIT NO. 46 WAS MARKED.)
7     Q   (By Mr. Sonnier)  And Discovery Exhibit No. 46,
8  Mr. Sico has indicated to us that those -- or that CD
9  contains photographs that were taken at your October
10  3rd, 2005 inspection.
11    A  That's correct.
12       (WHEREUPON EXHIBIT NO. 47 WAS MARKED.)
13    Q   (By Mr. Sonnier)  Okay.  And then Discovery
14  Exhibit No. 47, I've put that sticker on the -- the
15  cover for this CD, but I've written No. 47 on it.
16  What -- what is that?  What's on that CD?
17    A  That's some testing that Mr. Sico did at the
18  scene of the accident with the subject vehicle and some
19  testing that was done by an attorney of Mr. Sico's
20  office again doing some -- to demonstrate the function
21  of the gear -- gear selection system on that date, or
22  near -- on or about that date.
23    Q   Okay.  And just for clarification, you were
24  not present at the vehicle testing of August 8th of
25  2005; is that correct?

Page 21

1     A  I was not.
2     Q   Okay.  You've reviewed this material, though?
3     A  I've reviewed it.
4     Q   Okay.  And who -- who partic -- I haven't
5  seen this, so I obviously have to ask you these
6  questions, but who conducted the testing on -- on the
7  vehicle?
8     A  Mr. Sico.
9     Q   Okay.
10    A  And Mr. -- and Matt --
11       MR. SICO:  Dotin.
12    A  -- Dotin.
13    Q   And I take it you didn't have any part in
14  directing this testing that they performed on the
15  vehicle at the scene.
16    A  I did not.
17    Q   Okay.  Now, the -- Okay.  So we've talked
18  about all the -- the videos or DVDs or photographs that
19  you've either taken or reviewed in relationship to your
20  work in this case, right?
21    A  That's correct.
22    Q   Okay.  Is there anything that you've reviewed
23  in -- in preparation for reaching your opinions in this
24  case other than the subject vehicle and the two bucks
25  that are not in this room today?  Anything that you've

6 (Pages 18 to 21)

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 22

```
 1   reviewed or relied upon that's not here other than
 2   those items?
 3       A   There's a small fixture that was shown to them
 4   to show how the brake light -- lock -- interlock system
 5   works.
 6       Q   And --
 7       A   That was shown to the Chrysler expert and the
 8   attorney at the time of the tear-down, as well.
 9       Q   Okay.   You said a small feature.
10       A   Small fixture.
11       Q   Fixture.   I'm sorry.   What -- what was the
12   fixture?
13       A   It has the cable and brake interlock with some
14   batteries to activate the solenoid as to how the pin
15   engages to -- and locks out the cable.   It's a
16   demonstrative aid.
17       Q   Okay.   Is that something that you brought with
18   you to that inspection?
19       A   Yes, it was at the tear-down.   It was at the
20   tear-down and they observed it and operated it.
21       Q   Okay.   And -- and just so I understand, since
22   I wasn't there that day, it's -- it's a cable that
23   contains the brake-shift interlock feature?
24       A   Well, it's -- it's -- it's a production cable
25   that has the interlock feature in the solenoid, --
```

Page 23

```
 1       Q   Okay.
 2       A   -- but it's -- it's so -- it's to show
 3   demonstratively how the pin engages the slot of the
 4   cable to lock it out, so it's electronically set up.
 5   It also has a brake light on it.
 6       Q   Okay.   And where did you purchase that from?
 7       A   Mr. Sico obtained that, and I believe that
 8   also came through Mr. Rosenblueth.
 9       Q   Okay.   Is there a part number on it or
10   anything?   If -- if I went and looked at it at the
11   warehouse, is there a part number or any identifying
12   mark on it that -- that I could find that you're aware
13   of?
14       A   I didn't -- I didn't really pay attention to
15   whether that has a part number on it or not, --
16       Q   Okay.
17       A   -- so I can't answer.   It may have, and I just
18   don't remember.
19       Q   Okay.   So it was just represented to you that
20   that was one -- an exemplar part that would have been
21   in this vehicle?
22       A   Well, it was represented to me and then, of
23   course, I've seen the -- we've got this buck, we've got
24   the other -- we got the second buck, and then we have
25   the subject vehicle, and then we have the draw -- I
```

Page 24

```
 1   have the design drawing, so it's all --
 2       Q   Okay.
 3       A   -- if it's not identical, it's substantially
 4   similar.
 5       Q   Where is the pin on that fixture?   I'm talking
 6   about the pin that inserts --
 7       A   It's inside the solenoid assembly.
 8       Q   Okay.   You mentioned there are three mock-ups
 9   that have been done in this case.   One is -- is in
10   here with us today.   Could you explain to me exactly
11   what that is we have over here?
12       A   It's a buck we call -- I would call it a buck,
13   a body buck.   It's -- it's got the steering column,
14   brake pedal assembly, the brake interlock system, the
15   cluster bezel, a brake light simulated, and then the
16   cable hardware from both the steering column, shift
17   mechanism down to the transmission and to the interlock
18   system, and then the transmission has been
19   disassembled, except -- and cut away for the purposes
20   of showing the inner mechanisms for the gear selection
21   system which incorporate the valve body, the linear
22   rooster comb, the shift -- outside shift manual, the
23   inner shift manual, and then the parking gear system,
24   and that's all demonstrated and shown on this buck.   And
25   the -- all -- and the cable attachments and everything
```

Page 25

```
 1   are all hooked up.
 2       Q   Okay.   So the -- the linkage is part of this
 3   exhibit, correct?
 4       A   That's correct.
 5       Q   Okay.   Who -- who built that buck?
 6       A   Mr. Rosenblueth's people, to my knowledge.
 7       Q   Gerald Rosenblueth?
 8       A   Yeah.   That's correct.
 9       Q   Okay.   As opposed to William Rosenblueth?
10       A   Yes.   Not Bill, Jerry.   Jerry.   My
11   understanding is Gerald, yes, or Jerry.
12       Q   Okay.   Do you know Jerry Rosenblueth?
13       A   I do.
14       Q   You've worked with him in other matters
15   before?
16       A   I have word with him previously.
17       Q   Okay.   And it's your understanding that he,
18   or someone in his shop, constructed this buck?
19       A   That's what I've been advised.   That's my
20   understanding.
21       Q   Okay.   And whether it was Jerry, or someone
22   in his office, is it -- is it your understanding that
23   it was built under his direction or supervision?
24       A   I was advised that that is the case.
25       Q   Okay.   Now, this particular buck that's --
```

7 (Pages 22 to 25)

Page 26

1 that's in the conference room this morning is one that
2 has parts that would have been present in the Vetters
3 vehicle, correct?
4 A That's correct.
5 Q This does not have any of the fixes, or what I
6 may refer to as alternative design parts?
7 A That is correct.
8 Q Okay. Have you spoken to Mr. Rosenblueth
9 about this case?
10 A No.
11 Q Okay.
12 A I have not.
13 Q Have you -- other than the bucks that -- that
14 he produced, or his office produced, have you reviewed
15 any of the material that he has produced relating to
16 this case?
17 A Nothing. Not spoke with him, nor have I seen
18 any of his writing or have I been present at any of his
19 inspections.
20 Q Okay. The exhibit here this morning
21 that's -- that's in the conference room with us, will
22 you be relying upon that to support your opinions in
23 this case?
24 A Sure.
25 Q Okay. Now, --

Page 27

1 MR. SONNIER: Craig, do you -- do you want
2 to put a sticker on it just so we --
3 MR. SICO: No, I don't. I mean, we're
4 offering it up so you can look at it today. I don't
5 want to make it a piece of evidence that I can't modify
6 it if there's a decision by the plaintiffs that they
7 need to modify it.
8 We can videotape it, you can take a
9 picture of it, whatever you need. I will tell you
10 this: The other one -- if you want to make the
11 distinction between the two bucks, the other one has a
12 tan steering wheel, this one has a black steering
13 wheel. That's the way I tell them apart.
14 MR. SONNIER: Okay. Can we get our
15 videographer just to pan over there just so if we have
16 questions later on --
17 MR. SICO: Sure.
18 MR. SONNIER: -- I want to make sure that
19 you and I are not talking about apples and oranges.
20 A Yeah. And by the way, so you know, you -- the
21 guy that was there, the Chrysler guy, took extensive
22 videos --
23 Q Right.
24 A -- of that buck, --
25 Q Right.

Page 28

1 A -- so you know.
2 Q Right.
3 A Those bags hanging on the side are extra
4 interlock switches in that part of the -- or, excuse me.
5 They're for the brake pedal switch. They're not part
6 of the cable system, so you know what they are.
7 They're just extras in case something happens.
8 Q Okay. The -- the light there on top of the
9 instrument panel, --
10 A That's the brake light --
11 Q -- that's --
12 A -- simulated.
13 Q -- the simulated brake light?
14 A Right.
15 Q Okay. Okay. Now, describe for us the other
16 two bucks that -- that have been prepared in connection
17 with this matter.
18 A Well, the -- the other two -- the one I
19 explained to you was the -- just the cable interlock
20 system, that's the other buck, and then the second buck
21 to this one with the -- what Mr. Sico described as the
22 brown steering wheel, it has three of the alternative
23 design fixes associated with -- with the defects
24 involved with the sub -- subject vehicle system. One
25 of them is the brake interlock functioning, second is

Page 29

1 the key interlock system functioning, the third --
2 third is the false detent condition is less likely to
3 occur on this -- on that because the -- the insert
4 plate has a tapered land toward the part which was
5 represent -- which was recommended by Ford back in
6 1974, and it has a higher tension spring for the roller
7 ball or cam -- for the cam system in the transmission.
8 The only thing that isn't in that
9 particular buck that may have to be, and that's why --
10 one reason I think Mr. Sico doesn't want to mark them
11 at this point is we -- the looseness in the cable. The
12 cable looseness is demonstrated on all of the -- both
13 these bucks, and we haven't addressed that issue yet on
14 the bucks at all. So that would be the -- the next
15 condition, and that would be that the -- the cable
16 looseness would be eliminated.
17 Q Okay. So I ended up writing down four
18 different things that are actually on this third buck.
19 No. 1 would be a functional brake interlock cable,
20 correct?
21 A Correct.
22 Q The second one would be a functional key
23 interlock system.
24 A Correct.
25 Q Third one would be a modified insert plate,

8 (Pages 26 to 29)

Page 30

1  which is in the steering column of the vehicle,
2  correct?
3    A  That's correct.
4    Q  And the fourth would be a higher tension
5  spring which is in the transmission behind what you
6  said was the roller ball --
7    A  Yeah.
8    Q  -- internal to the transmission?
9    A  Roller -- roller cam system for the linear
10  rooster comb.
11    Q  Okay.  And the one thing that's -- that's not
12  in that third buck that -- that you may need to deal
13  with at some point in time, if asked to do so, would be
14  to modify it such that you eliminate the looseness in
15  the shift cable.
16    A  Correct.
17    Q  And when you talk about the shift cable, are
18  you talking about the cable linkage from -- from the
19  steering column down to the transmission?
20    A  I am.
21    Q  Okay.  That's a cable system, correct?
22    A  Correct.
23    Q  Okay.  Let me -- let me ask you, then, a few
24  questions, I started to earlier, about your particular
25  inspections in this case.  So let me -- let me kind of

Page 31

1  get back to that.
2    My understanding is the first time you saw
3  this vehicle was on September 6th, 2005 in Mr. Sico's
4  warehouse.
5    A  That's correct.
6    Q  Okay.  Do you have, Mr. Stilson, anywhere in
7  your notes, a date on -- on which you were first
8  contacted about this case?
9    A  No, but it was last spring.
10    Q  Spring of 2005?
11    A  I believe so, or the end of 2004.  It was in
12  that time frame.
13    Q  Okay.  And who contacted you about this the
14  first time?
15    A  I believe it was Mr. Braugh or Mr. Sico, but I
16  can't remember.  They contacted me at that time.
17    Q  Okay.  Did they send you file materials at
18  that time?
19    A  No, because they told me that the trial at
20  that point had been scheduled for the summer, and I
21  take the summer off, my vacation, so I told them that
22  it was very unlikely that I could assist them at that
23  time and, as you know, since then there's been a
24  continuance so they called -- recontacted me and that's
25  how I got activated.  But -- and I don't remember

Page 32

1  exactly when in spring they contacted me.  I think it
2  was this spring.
3    Q  Okay.  So you weren't sent any file materials
4  when first contacted.  Do you know when you first
5  received any file materials relating to this matter?
6    A  Maybe.  It looks like the first communicative
7  letter in my file is September 7th of 2005.
8    Q  And let me take a look at that real quick.
9    A  And here's September 9th where they --
10  September 14th where they started sending me
11  information, --
12    Q  Okay.
13    A  -- so it's a continuous flow there.
14    Q  Okay.  So the -- the first correspondence you
15  would have received from them is, as you've indicated,
16  September 7, 2005, a letter addressed to you from Ms.
17  Reyes, who works with Mr. Sico, confirming that October
18  13th had been reserved for deposition regarding this
19  matter; is that correct?
20    A  Unless there's documentation elsewhere in --
21  in the individual file folder somewhere that didn't get
22  into this correspondence file, that would be the first
23  one that I -- that I'm showing you.
24    Q  Okay.  Does that letter indicate that any
25  materials were -- came with it?

Page 33

1    A  No, it doesn't.
2    Q  Okay.  The next correspondence, then, you
3  would have received is dated September 9th, 2005, which
4  happens to be the first date you actually saw the
5  vehicle in the warehouse, correct?
6    A  No.
7    Q  I'm sorry.
8    A  September 6th.
9    Q  You saw it the 6th.
10    A  Right.
11    Q  Okay.  I stand corrected.  Let me rephrase
12  that, then.  The -- the next correspondence you would
13  have received is September 9th, 2005, and it indicates
14  they were sending you some file materials for review,
15  correct?
16    A  That -- that's correct.
17    Q  And to your knowledge, that's the first time
18  you received any materials regarding this accident?
19    A  Well, officially received them, yes, --
20    Q  Okay.
21    A  -- or I had seen them before.
22    Q  You had actually looked at the vehicle three
23  days before this letter, correct?
24    A  Right.  And Mr. Sico had provided me with
25  the -- some information at that point, the police

9 (Pages 30 to 33)

Page 34

1  report, maybe some photos that he had, and I looked at
2  his information.
3  Q  Okay.  And I take it you would have looked at
4  that when you were down here looking at the vehicle?
5  A  Correct.
6  Q  Okay.
7  A  Well, yeah.  A day before that, maybe.  I
8  don't know, but it -- it was during that inspection
9  that I was first provided materials associated with the
10  police report, scene photographs, and information from
11  any discovery that had been going on, in other words,
12  and then I requested they send it to me, so you -- it
13  looks like she complied three days later, which is
14  pretty good.
15  Q  Okay.  Now, when you first inspected this
16  vehicle on September the 6th, 2005, do you know all
17  who -- excuse me.  Do you know who all would have been
18  present at -- at that inspection?
19  A  Mr. Brink, Mr. Sico, and a videographer
20  person.  I think that was -- and me.
21  Q  Okay.  Now, it's my understanding, in
22  reviewing your report, that you had the opportunity to
23  do some testing of the subject vehicle on that date.
24  A  That's correct.  Well, let's -- we gotta be
25  careful with those words.  I evaluated the system in

Page 35

1  its normal operation mode.
2  Q  Okay.
3  A  No.  There was no testing done, just I
4  evaluated it as if it was -- I was a -- a customer who
5  bought the vehicle and was operating it.
6  Q  Okay.  So -- and when you say you evaluated
7  the -- the systems, that would involve you getting in
8  the vehicle, cranking the engine, manipulating the
9  shift lever so you could evaluate the different gear
10  positions in the -- in the transmission, correct?
11  A  At some point, that's correct, that was done,
12  and that's on the videotape, --
13  Q  Okay.
14  A  -- I believe.
15  Q  I take it, then, as part of that first
16  inspection you would have evaluated the -- the shift
17  lever and the -- the insert plate which is in the
18  steering column, correct?
19  A  I would have done that through my normal
20  non-ob -- I can't observe it, but I can sense it.
21  Q  Okay.
22  A  It's a sensory condition, yes.
23  Q  Now, just so we're not confused later on.
24  Insert plate, I've also heard that particular component
25  referred to as a gate plate or shift gate.

Page 36

1  A  They use shift gate, gate plate.  Insert plate
2  is a Ford and NHTSA term, so that's fine.
3  Q  Okay.  But it's -- it's the metal component
4  within the steering column.  It's essentially situated
5  at the bottom end of the shift lever and there are
6  various notches in that component that are supposed to
7  represent different gear positions, correct?
8  A  Detent positions we call them, correct.
9  Q  Okay.  On your first inspection, did you also
10  have the opportunity to evaluate the parking system --
11  A  I did.
12  Q  -- of the vehicle?  And -- and I'm going to
13  break that down into two categories.  No. 1, you have
14  a -- a -- a park brake.  Some people refer to it as an
15  emergency brake.
16  A  Right.
17  Q  Do you know what I'm talking about?
18  A  I do.
19  Q  There's a -- a pedal that's kind of on the
20  left-hand side.  You depress it with one of your feet
21  and engage the park brake system of the vehicle,
22  correct?
23  A  I did evaluate that.
24  Q  Okay.  And to release that brake, I think
25  there's a handle you pull to release the brake,

Page 37

1  correct?
2  A  It's a lever, correct.
3  Q  Okay.  And did the park brake work?
4  A  It's functional.
5  Q  It's functional?
6  A  Right.
7  Q  Okay.  Meaning that if -- if applied, it -- it
8  can restrain the vehicle from movement?
9  A  Yes.  If you press hard enough on the parking
10  brake system, if you're capable of pressing hard
11  enough, yes, you can restrain this vehicle.
12  Q  Okay.  Now, I take it in this particular case
13  you're not critical of either design or performance of
14  the park brake in the Vetters vehicle.  Would that be
15  accurate?
16  A  No.  That's accurate.  I'm not critical of
17  that --
18  Q  Okay.
19  A  -- in terms of the parking brake --
20  Q  Okay.
21  A  -- as opposed to -- we can differentiate the
22  parking brake from the parking gear.  There's a
23  difference, --
24  Q  Okay.
25  A  -- so we use parking brake.

10 (Pages 34 to 37)

Page 38

1    Q   And now getting into the second part of the
2  parking system I'm going to refer to as, or direct your
3  attention to the park gear which is internal, the
4  transmission, and also the park pawl which is a related
5  component, correct?
6    A   That's correct.
7    Q   Okay.  During your inspection September 6th,
8  did you have the opportunity to evaluate the park gear
9  and the park pawl --
10   A   I did.
11   Q   -- function?
12   A   I did.
13   Q   Okay.  Did you also have the opportunity to
14  evaluate the function of the inner manual lever in the
15  transmission?  Some people refer to it as the rooster
16  comb.
17   A   I did.
18   Q   Okay.  Backing up to the -- to the park gear,
19  there's also something in the transmission that's
20  called the park apply rod.  Do you know what I'm
21  talking about?
22   A   I do.
23   Q   It's -- it's a component that extends from the
24  rooster comb to the -- the park pawl; is that correct?
25   A   The -- the rooster comb linear locking member,

Page 39

1  but that's attached to a cam plate, which is attached
2  to the rod.
3    Q   Okay.  Your evaluation of this particular
4  vehicle on September the 6th, 2005, was it done inside
5  the warehouse, or did y'all take the -- the vehicle
6  outside of the warehouse?
7    A   Most of it was inside, and then for a couple
8  of short tests it was outside, but very short.
9    Q   Okay.  The -- the evaluation you did on the
10  system inside the warehouse, that's a flat concrete
11  surface, correct?
12   A   In that inspection area, yes.
13   Q   Okay.  When you went outside, is it also a
14  flat concrete surface?
15   A   Some areas are flat, some are tapered, graded,
16  so --
17   Q   Okay.
18   A   -- that's why I went outside, one of the
19  reasons.
20   Q   Okay.  So one of the reasons you did some
21  evaluation outside is because of the -- the grade of
22  the slope --
23   A   That was one reason.
24   Q   -- of the vehicle?
25   A   The other reason is because of the engine

Page 40

1  fumes.
2    Q   Okay.  You didn't want to get carbon monoxide
3  poisoning, right?
4    A   I didn't want to kill everybody, yeah.
5    Q   Did you measure the slope outside where you
6  were doing the evaluation?
7    A   No, I did not.
8    Q   Okay.  Would you agree with me that the
9  surface where a vehicle is situated can affect or can
10  influence how and whether a vehicle moves in any
11  particular gear position?
12   A   Some surfaces, yes.
13   Q   Okay.  Getting back to your file.  In -- in
14  terms of the -- the work product that you have done in
15  this case, I kind of want to focus on that.  We've
16  already talked about the photographs that you took, and
17  I know there were photographs taken during your October
18  3rd inspection, correct?
19   A   Correct.
20   Q   And all of those photos, which are on a CD and
21  contained here on Exhibit No. 46, are those photographs
22  that you yourself took?
23   A   Some of them, others were taken by Mr. Braugh.
24   Q   Okay.
25   A   He wanted to take his own photographs, so --

Page 41

1    Q   Okay.
2    A   -- he did, and they're -- that's why they're
3  all contained in there.  Most of the photographs he
4  took were of the interaction of the shift lever and the
5  rooster comb, --
6    Q   Okay.
7    A   -- or, excuse me, the insert plate.
8    Q   The photographs that he took, were they taken
9  at your direction or suggestion?
10   A   Indirectly.  What happened is I had taken all
11  the photographs that I wanted to show certain specific
12  areas of the vehicle.  The one -- the most difficult
13  thing was to take a picture of the interaction of the
14  shift lever, the insert plate, because of the
15  environment, and so Mr. Braugh, attempted at the best
16  he could, being younger, more youthful and able to
17  contort himself underneath the instrument panel and the
18  seat, he took pictures as best he could of the
19  intera -- that interaction.  It doesn't show what I
20  would like to show, and that's why I recommended that
21  we have the steering column removed from the vehicle by
22  taking it at a Chrysler dealer or appropriate -- or --
23  that would be the best approach, and then have them
24  independently remove the steering column so we have a
25  clear picture of what the shift mechanism looks like,

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 42

1  like this buck here, and that's what I'm recommending
2  because you really can't get in, as you'll see from
3  even Mr. Braugh's photographs of the contortions, get a
4  good shot of the interaction of the shift lever and the
5  insert plate.
6      Q   Okay.  Has the steering column been removed
7  yet?
8      A   No.  We would do -- that will be done -- I
9  recommend it be done in joint -- jointly with the
10  defendants, --
11     Q   Okay.
12     A   -- but that's up to Mr. Braugh  or -- and Mr.
13  Craig Sico.
14     Q   Getting back to your work product in this
15  case, besides the photographs that you took, you also
16  produced a -- report that contains your opinions with
17  respect to this Vetters matter; is that correct?
18     A   At that time, that's correct.
19         (WHEREUPON EXHIBIT NO. 48 WAS MARKED.)
20     Q   (By Mr. Sonnier)  I have marked here,
21  and I'll show it to you, Discovery Exhibit No. 48.
22  I'll tell you that Mr. Sico also has it marked with his
23  internal numbers 3818.  Let me just show you this, and
24  just identify for the record whether this is your --
25  your report, and I'll also represent to you that back

Page 43

1  behind here is also your CV and testimony list.  So
2  could you please, sir, just thumb through that and
3  confirm that's what that particular exhibit contains.
4      A   (Witness complies.)  Yes, with the exception
5  that Exhibit 1 doesn't have a copy of my indexes.
6      Q   File index?
7      A   Right.
8      Q   Okay.   There is -- there's a file index here
9  behind what's marked Exhibit No. 1; is that correct?
10     A   That's correct.
11     Q   Whose is that?
12     A   I believe that was a record that was sent to
13  me by Mr. Sico.
14     Q   Okay.  And it contains his particular
15  document numbers in reference to a lot of these
16  entries; is that correct?
17     A   Yes, which would have been introduced into my
18  system, but he has them by Bates numbers so that's
19  probably why they --
20     Q   Okay.
21     A   Because most of documents that are in my file,
22  with -- except the working stuff, came from the Sico
23  Law Firm.
24     Q   Okay.  You have your own separate file index,
25  correct?

Page 44

1      A   That's correct.
2      Q   Could you put your hand on that real quick for
3  me?
4      A   Yeah.  Here's -- like, here's one.  Here's
5  what Box 1 was -- is.
6      Q   And is there another one?
7      A   Here's Box 2.  I want to be careful because
8  they integrated these two.  Let me just fix this.
9  Hang on.  And then Box 3 is underneath that.  Those
10  are my indexes.
11     Q   Okay.
12     A   My office's indexes.
13     Q   When we take a break, I'll probably just get a
14  copy of these.  For now I'm just going to leave them
15  right there, okay, in case you need to look at them or
16  I need to look at them.
17     A   Okay.
18     Q   Your report, you'd mentioned earlier that this
19  report does contain -- contain, excuse me, some of the
20  opinions that you have in this case.  My question is,
21  are there further opinions that you have relating to
22  this matter that are not contained in this report?
23     A   Yes.
24     Q   Okay.  This report was done before the
25  tear-down?

Page 45

1      A   Correct.
2      Q   Okay.  So I take it that the additional
3  opinions you have relating to this matter would be the
4  result of the work and your observations from the
5  tear-down.  Would that be accurate?
6      A   Basically, with the exception that there's
7  still, obviously, some discovery that came through.  So
8  with the addition of the combination of the discovery
9  and the tear-down, the -- those are -- would be the
10  extension of the opinions.  And as you know, I -- I
11  made that exception in my report, okay.
12     Q   Prior to inspecting this vehicle for the first
13  time on September the 6th of this year, did you examine
14  an exemplar vehicle?
15     A   No.
16     Q   Have you ever examined or evaluated an
17  exemplar vehicle?
18     A   Not 2002, no.  I've had other -- obviously,
19  I've had other vehicle cases where -- other models, but
20  not the 2002.
21     Q   Okay.  Have you evaluated any other Dodge
22  Durango vehicles relating to the shift selector system?
23     A   Yeah.  I've seen 2001, 2000.  There may be
24  some others, either through the course of rollovers
25  and/or issues that -- where I've investigated those

12 (Pages 42 to 45)

Page 46

1   issues and -- and at some point incorporated some
2   analysis of the park -- parking gear system.
3      Q   Okay.  So you've -- you think you've
4   evaluated 2000, 2001 model year Durangos?
5      A   I believe so.
6      Q   Okay.
7      A   And there might be some others.
8      Q   And specifically do you remember the names of
9   any of those matters that you could use as reference?
10     A   No, because they're investigations, and I
11  don't even know if I've been designated as an expert in
12  any of them, so I'd have to say no.
13     Q   Okay.  Of those other vehicles that you have
14  -- other Durangos that you have inspected or evaluated,
15  were any of them specific as to evaluation of the
16  transmission system or the gear selection system?
17     A   Indirectly, because although these vehicles --
18  the vehicles that -- and these inspections that I've
19  been discussing were not operational because they were
20  damaged, there were some vehicles that were exemplar,
21  so I might have evaluated in the course of that, not
22  intentionally to check it out, but obviously I would
23  have driven the exemplar.
24     Q   Okay.
25     A   Some of these cases have exemplar vehicles.

Page 47

1   That's -- that's what I'm informing you of.
2      Q   And in relationship to the opinions you have
3   in this particular case, are you relying upon anything
4   you saw or found relating to those other model year
5   Durangos in support of your opinions in this case?
6      A   Well, I think what it will boil down to is
7   the -- the fact that the 2001 doesn't have the brake
8   interlock and the 2002 does.
9      Q   Other than that particular point, are you
10  relying upon any other findings or conclusions you had
11  relating to the transmission systems --
12     A   Well, --
13     Q   -- of those other vehicles?
14     A   Of course, you -- you probably know, or if you
15  don't know, there was the Jeep Grand Cherokee case in
16  New Jersey.
17     Q   Haller?
18     A   Haller.  I received a lot of discovery in --
19  of what I believed to be a substantially similar
20  transmission similar to the 2001, and so I'm also aware
21  that if -- that there appears to have been a
22  significant number of changes made to the 42RE
23  transmission from the Grand Cherokee into this, what I
24  would call, new version of the Durango.
25          So if that's -- if I am correct in that,

Page 48

1   which I believe I am, then there's some differences
2   which I am aware of which I -- I've evaluated, and it
3   would be through Haller, and these other cases where
4   I -- I've found that there is no brake interlock on the
5   2000, 2001, but on the 2002 there is.  I have not done
6   anything with the transmission in those other
7   investigations, just the gear selection system.
8      Q   Okay.  Now, the Haller case, which was in New
9   Jersey, that was a Jeep Grand Cherokee, correct?
10     A   That is correct.
11     Q   Do you remember what model year it was?
12     A   I think that was in 1997 or 8 -- '98.
13     Q   Okay.
14     A   I think it was in '98.
15     Q   And was that one of the vehicles that was the
16  subject of the earlier recall regarding a secondary
17  detent system?
18     A   Yes, it was.
19     Q   Okay.  Did that vehicle, the Haller vehicle,
20  have the secondary detent system at the time of that
21  accident?
22     A   No.
23     Q   Okay.  That occurred prior to day of the
24  recall?
25     A   Correct.

Page 49

1      Q   Okay.  Is it your opinion that the
2   transmission system in the Haller vehicle is
3   substantially similar to the transmission system in the
4   Vetters vehicle?
5      A   In a sense of the -- the way that the system's
6   designed and operates, yes; as far as the configuration
7   of the parts, no.
8      Q   For example, the Haller vehicle, the Grand
9   Cherokee, the -- the shift lever is on the console,
10  correct?
11     A   That's correct.
12     Q   Okay.  Whereas, obviously, in Vetters it's on
13  the column?
14     A   Correct.
15     Q   Okay.  The -- the insert plate, or the gate
16  plate, those would be different, Haller versus Vetters.
17  Would that be accurate?
18     A   They're different in geometry, but in function
19  they're the same.
20     Q   And when you -- when you say the same in
21  function, what do you mean by that?
22     A   It's a shift gate.
23     Q   Okay.
24     A   The function is to identify gear -- a specific
25  gear so that the operator can use the shift lever to

13 (Pages 46 to 49)

Page 50

1  place the vehicle in that particular gear selection,
2  and whether it's a column shift or a -- a console
3  shift, the shift insert plate is performing the same
4  function, it's just different geo -- geometry and --
5  and shape.
6      Q.  So when you say --
7      A.  And -- and -- and -- well, geometry.  I said
8  geometry.  Different geometry and shape.
9      Q.  So when you say they're -- they're similar --
10  the shift selection system is similar, what you're
11  talking about is that it -- it performs the same
12  function.
13     A.  Correct.
14     Q.  Okay.  And --
15     A.  It's intended to perform the same function.
16     Q.  Okay.  Meaning that they are supposed -- they
17  are, by design, supposed to be different distinctive
18  gear positions?
19     A.  That's correct.  And the -- and the operation
20  of the -- of the insert or -- or plate has the same con
21  -- conceptual configuration.  In other words, you have
22  a lock gate for park, you have stop gates for the
23  interruption between each gear selection, --
24     Q.  Okay.
25     A.  -- depending on whether you're going --

Page 51

1  shifting from a low gear to park, or whether you're
2  shifting from park to low, have the same functionality.
3  And in -- in addition, they have a land between park
4  and reverse on the insert plate.  So what I'm saying is
5  functionally, they are substan -- and operationally,
6  they are substantially similar.  And by engineering
7  design, they're substantially similar.
8      Q.  You couldn't take the insert plate from the
9  Vetters vehicle, put it in the Haller vehicle and have
10  it operate; is that correct?
11     A.  You could if you re-configured the rooster
12  comb.  You can do that.
13     Q.  Okay.  But it's not the same part, correct?
14     A.  It's not the same part.  No question about
15  that.
16     Q.  Okay.
17         MR. SICO:  When you get a chance, take
18  just a quick break?
19         MR. SONNIER:  Sure you want to do that
20  now?  It's a good -- if you want to stretch, go right
21  ahead.  This is a good time to do that.
22         VIDEOGRAPHER:  Going off record at 11:02
23  a.m.
24         (WHEREUPON AT THIS TIME A SHORT
25         BREAK WAS TAKEN.)

Page 52

1         VIDEOGRAPHER:  We are back on the record
2  at 11:09 a.m.
3      Q.  (By Mr. Sonnier) Mr. Stilson, I want to now
4  cover some of the components in the transmission system
5  that -- that may or may not be in play in this
6  particular case, and I kind of want you to help me
7  understand what they are and -- and whether they may be
8  important to you in your evaluation.
9         First of all, we've already talked about
10  the -- the shift lever.  On this particular vehicle,
11  the shift lever is -- is mounted on the steering column
12  of the Vetters vehicle, correct?
13     A.  Correct.
14     Q.  And is -- I mean, just -- I mean, the jury
15  obviously is going to see photographs and whatnot, but
16  just for the record it's -- it's a handle that is
17  actually situated on the right-hand side of the
18  steering column.
19     A.  Yes.
20     Q.  Okay.  And at the end of that steering
21  column, there -- there is what is referred to as a
22  tang.
23     A.  Correct.
24     Q.  And that tang is a little metal component that
25  will go into, as -- as you move the shift lever,

Page 53

1  different gates within the inset plate?
2      A.  That's correct.
3      Q.  Okay.  Did you -- did you find anything
4  unusual or are you critical of the shift lever or the
5  tang on this particular system?
6      A.  I am.
7      Q.  Okay.  And -- and tell me about what your
8  criticism is.
9      A.  Well, the first one would be the packaging.
10  The handle is -- is -- unfortunately, there's --
11  there's a double edge sword to that one, but we'll --
12  we'll address that.  But first of all, it's -- it's --
13  when it's on the land between park and reverse its
14  proximity to the steering wheel is -- is very close.
15     Q.  Now --
16     A.  That's No. 1.
17     Q.  Okay.  Now -- and let me make sure I
18  understand that.  When -- when it's on the land,
19  you're talking about the -- the tang being on the --
20  the flat spot between the reverse and the park gates?
21     A.  Correct.
22     Q.  Okay.  And you said it's too close to the
23  steering wheel.  Are you talking about the lever
24  itself?
25     A.  The lever where you actually -- the operator

14 (Pages 50 to 53)

Page 54

1   actually would function or operate the shift lever is
2   too close to the steering wheel.
3      Q   Okay.  So -- and I understand, and I've
4   operated this thing before, but if I'm in gated park in
5   this vehicle, in order to get to gated park -- excuse
6   me.
7           I'm in gated reverse.  If I need to get to
8   gated park, I have to grab that shift lever and I have
9   to pull it towards me, towards the steering wheel, in
10  order to then move it up or -- like in a
11  counterclockwise direction to go towards the park gate,
12  correct?
13     A   That's correct.
14     Q   And your criticism is that this particular
15  lever, when you pull it towards you to overcome the
16  gate, is too close to the steering wheel.
17     A   Well, not that, but because of the defect that
18  you can put the shift lever on -- release the handle
19  and have it land on the -- or -- have it position
20  itself on the land and remain stationary between --
21  between park and reverse, the handle is too close to
22  the steering wheel at that point.
23     Q   Okay.  Did you take any measurements of how
24  close it is?
25     A   No.  I can demonstrate it right now on the

Page 55

1   buck.  I mean, it's -- I didn't do any tape
2   measurements, no.
3      Q   Okay.  And -- and when you say it's too chose
4   to the steering wheel, in -- in your mind that's a
5   hazard, or creates a hazard?
6      A   Under the conditions of the -- the defects
7   that we'll get to in this case, yes, it is a hazard.
8      Q   Okay.  And -- and why is it a hazard?
9      A   Because the person can inadvertently contact
10  the shift lever and force it into reverse or a powered
11  gear.
12     Q   The insert plate, we've already talked about
13  that.  It's mounted in the steering column, you know,
14  in very simplistic terms, at the end of the shift
15  lever.  If I'm to go --
16     A   Oh, I understand.  Where the tang is.
17     Q   Correct.
18     A   Let's go there because that's easier to
19  communicate.
20     Q   Okay.
21     A   Where the tang is, yeah.
22     Q   And if I look on this buck over here, I -- I
23  can see how that particular insert plate is mounted in
24  the orientation it has within the steering column,
25  correct?

Page 56

1      A   Correct.
2      Q   And what we have on the -- the buck over here
3   is the same as what is in the Vetters vehicle?
4      A   Geometrically, yes.
5      Q   Okay.  Now, it's also my understanding, and
6   we'll get into greater detail later, but you are
7   critical of the geometric shape of the insert plate.
8      A   Well, that, but the tang.  We -- we need to
9   get past the tang.
10     Q   Okay.
11     A   We started there and then we kind of shifted
12  back.  I have a criticism of the tang.
13     Q   Okay.
14     A   It's too wide.  That's a tube that's
15  flattened out in two spots and it's very common in
16  Chrysler design where they -- they flatten out the
17  tubing and configured the tang, and in this particular
18  case I believe it's too wide because it's too easy to
19  get on --
20     Q   In which direction --
21     A   -- it's too easy to get that wide tang on
22  this land.
23     Q   Okay.  Now, would you agree with me that it
24  is not too wide so that it is unable to insert in -- in
25  any of the gates for any of the various gears?

Page 57

1      A   I'd agree with that.
2      Q   Okay.  Your criticism of the width of the
3   tang is that it is wide to the extent that it allows
4   greater opportunity to hang up on the land on the
5   insert plate?
6      A   And remain there, that's correct.  Remain
7   there.  Remain stationary, right.
8      Q   Any -- any other criti -- criticisms of the
9   tang?
10     A   No.
11     Q   Okay.  Now, getting to the insert plate
12  itself.  You -- you are critical of the geometric
13  shape of the insert plate.
14     A   In certain areas, yes.
15     Q   Okay.  And would that be the gates, the --
16  the -- the part between the reverse gate and the park
17  gate?
18     A   No.  I have a -- I have a criticism of the
19  park gate, too.
20     Q   Okay.  Why don't you go ahead and tell it,
21  because I think I know where you're going, but why
22  don't you go ahead and just explain the criticism you
23  have of the insert plate.
24     A   Well, the criticism in the insert plate is,
25  No. 1, it's nota -- there's no positive engagement

15 (Pages 54 to 57)

Page 58

1  mechanism to assist the operator to ensure that they
2  get it into the park -- park lock gate, which goes to
3  human factors associated with shifting sequencing,
4  higher efforts, and bounce back where you hit the --
5  because this has a stop in the insert plate, the
6  operator hits that stop and then, in the process of
7  moving the lever, human factors have shown that you get
8  bounce back and the shift lever will actually end up on
9  the land between park and reverse. That's one. You
10 also go on the lock gate. I mean, there's -- but the
11 problem is there's not a positive detenting system
12 there, so that's -- that's a criticism.
13       The land between park and reverse is
14 problematic because of its shape. You can place this
15 vehicle in false park positions along that land. You
16 can -- and you can put the shift lever along there and
17 it will remain there, and there's no warning to the
18 operator that it's in those positions.
19    Q  Any other criticisms about the -- the insert
20 plate?
21    A  Possibly. I don't know whether in -- in
22 Haller, you know, the Carr's guys did the -- they do
23 their little -- well, maybe not. I don't know if they
24 can do that or not. They do in Haller. They go and
25 they measure the -- the coordination between the entire

Page 59

1  system. It hasn't been done in this case, but in
2  Haller I was very clear on my -- my criticisms of
3  the -- of the relationship of the insert plate to the
4  hydraulic system of the transmission.
5    Q  Okay.
6    A  So I have a direct criticism of how that
7  coordination occurs, so I don't want you to be unaware
8  that I do criticize the design of the insert plate in
9  relationship to how its correspondence relates to the
10 rooster comb and the bleed points of the hydraulic
11 system of the transmission.
12    Q  Now, with respect to the park gate itself, the
13 geometric size of the park gate, is it your opinion
14 that that should be wider?
15    A  Well, that's a catch 22 now. With the old
16 rod linkages, that was bad. That incorporated the
17 torsional bars that Ford and Chrysler and GM used to
18 use in the inner relationship between the chassis and
19 the engine and the body, how that would interact to --
20 to self shift the system. In addition, you have the
21 park blockage problem where you have feedback of the
22 gear selection system from park back to reverse.
23       Now, in the old days those systems had a
24 problem with the over travel of park where you could
25 shift past the insert and have -- with a cable system

Page 60

1  with the positive interlock, there's no need for that
2  stop plate being where it is. You could have a much
3  wider gap to ensure that that person gets it into lock
4  park without bounce back or -- or positioning problems.
5  So yes, I think they could have opened up the stop,
6  made this gate wider with this cable and interlock
7  system and -- and designed it in such a way that the
8  cable interlock would operate even though you had over
9  travel of the shift lever.
10    Q  Would you agree with me that it's a good idea
11 that you do have some stop gate at the -- at the far
12 side of the park gate?
13    A  I think you have to have that. The question
14 -- the balance is, there's a -- there's a -- you have
15 to design a balance between the rooster comb and the
16 insert plate. For instance, in Haller, they use that
17 -- they actually used the transmission rooster comb as
18 the stop rather than the shift lever, so you have to
19 balance that equation. You have to get both systems
20 operating to provide the best safety.
21       And in this particular case, this insert
22 plate in the transmission doesn't -- or not the
23 insert -- the rooster comb, linear comb, doesn't have a
24 lot of over travel potential. It's got a stop, too, so
25 there's a problem here. It's a dual problem.

Page 61

1    Q  Now, let me ask you this: With respect to
2  the -- the insert plate and the column, generally
3  speaking it's a fairly common design among American
4  auto manufacturers; is that correct?
5    A  It's substantially similar in all cases.
6  It's just a matter of how they stamp it, how -- the
7  angular correspondence, the depths, and all that, and
8  the way that they lock in the system.
9    Q  And this design has been around for quite a
10 while; is that right?
11    A  Since the '70s.
12    Q  Okay. Now, can you name for me any insert
13 plates in any other vehicle, any manufacturer, that you
14 believe are non-defective in design?
15    A  They -- there can't be non-defective because
16 of the in -- intrinsic false park defect. So the
17 answer is that's -- it's not that the insert plate by
18 itself is defective, it's the fact that the system has
19 an inherent false park defect which the insert plate
20 becomes part of -- an integral part of that because of
21 the way it's designed. So you can't separate these
22 components and say, "Okay, that's defective."
23       The insert plate is not defective in the
24 sense of the way it's -- how it's manufactured and
25 designed. It's defective because it allows the rest

16 (Pages 58 to 61)

1  of the system to have these other defects, primarily
2  the false park defect.
3      Q   So the insert plate in and of itself is -- is
4  not defective, but it is when you consider how it
5  interacts with other components within this park or
6  the -- the gear selection system?
7      A   That's correct in -- in this particular case.
8  There's been other cases of Ford where we've had insert
9  plates where the screws, under design, and they --
10  they've loosened up or they bent or broke. I don't
11  see that problem here, so my criticism is not
12  directly -- directed at the inset plate, per se, but
13  the false park system means that you have to change
14  this design to try to minimize the opportunity for
15  false park and/or inadvertent shift lever contact.
16      Q   One thing I did not ask you about earlier,
17  I'm kind of going in my own mind back upstream, there's
18  a -- a gear shift or gear indicator on the instrument
19  pane.
20      A   Correct.
21      Q   I've often heard it referred to as a PRNDL
22  indicator.
23      A   Yes.
24      Q   Okay. PRNDL being P, R, N, D, L, kind of an
25  acronym for the various gear --

1      A   Park, reverse, yeah.
2      Q   -- positions?
3      A   Correct.
4      Q   Okay. Now, NHTSA mandates that the gear
5  positions be in that sequence, correct?
6      A   That is correct. FMVSS 102, I think it is.
7      Q   102?
8      A   I think that's right.
9      Q   Okay. And that -- that's been in place for
10  sometime, correct?
11      A   Yes.
12      Q   Okay. This particular PRNDL indicator on the
13  instrument panel is an indicator that has those letters
14  that we described and it's -- it's electronic in
15  nature, correct?
16      A   Yeah. The distinction is that most of those
17  are -- are mechanical with letters systems and a
18  pointer. This is a electronic indicator.
19      Q   Okay. Like some -- if you -- if you go back
20  to '60s, '70s and -- and '80s, and even some early
21  '90s, there would be PRNDL indicator systems where
22  there would be letters in a window and there's like a
23  little orange or red flag or indicator that moves
24  across the -- the viewing area and indicates to the
25  operator what gear, supposedly, the vehicle is supposed

1  to be in, correct?
2      A   That's correct.
3      Q   Okay. And I think in the past you've been
4  critical of that type of indicator with the little
5  moving flag.
6      A   My criticism was that the -- they had a cable
7  that would stretch and it would indicate incorrectly
8  the -- the gear selection mode. That's one of them.
9  The second one is that there was no indicate -- well,
10  it's the same criticism I have of the electronic system
11  that -- is that there's no indication of false park
12  provided in the PRNDL. It doesn't tell you that you're
13  in false park.
14      Q   Okay. And -- and false park is not something
15  that is prescribed or even identified in FMVSS 102; is
16  that correct?
17      A   That's correct.
18      Q   Now, you have evaluated other vehicles with
19  substantially similar insert plates; is that correct?
20      A   That's correct.
21      Q   Okay. Have -- have you ever testified in any
22  previous matter that an insert plate like we have in
23  Vetters, or similar to what we have in Vetters, that
24  you do not believe we should change the geometric shape
25  of the reverse and park gates?

1      A   No. I think I've testified that there was no
2  necessary -- you didn't necessary -- you didn't have to
3  do that if you eliminated the false park. If you
4  eliminate the false park, you don't have to change
5  anything because the problem goes away, or if you -- if
6  you create a positive detenting system that always --
7  automatically forces two -- two conditions, lock park
8  and park detent in the transmission, you don't need to
9  do anything to the insert plate. That's what I've
10  testified to.
11      Q   Shift linkage, it's kind of the next
12  component. You've evaluated the shift linkage on this
13  vehicle, correct?
14      A   I have.
15      Q   And -- and I think you stated for us earlier
16  it's a cable linkage.
17      A   It is cable.
18      Q   Okay. Going further on down, internal
19  transmission we have the inner manual level or rooster
20  comb, correct?
21      A   Correct.
22      Q   And I think you said this earlier, but
23  obviously that's something you as an operator cannot
24  see.
25      A   Cannot see. That's one of my criticisms of

17 (Pages 62 to 65)

Page 66

1    the whole system, but that's -- that's on the record,
2    as you probably know.
3        Q   Okay.
4        A   I criticize the whole system because the
5    stylists control the company, and the stylists think
6    that this mechanical system is ugly and that the
7    operator shouldn't see the system, and I've said that
8    before.  If you showed them the system, they'd know
9    what they had and what gear they were in and they would
10   have a visual observation of what they've done.  But
11   that's just one way of getting rid of this problem.
12       Q   Describe for me the inner manual lever or
13   rooster comb in this Vetters vehicle.
14       A   Well, this one has a linear system which is
15   basically if you go back to the old C6 transmissions in
16   the early -- late '60s, early '70s, the C6, before it
17   went to the positive detent system, had a control valve
18   type system detenting where it was a linear system, and
19   all this is is a -- instead of a curved rooster comb, a
20   -- the detenser --the detent plate, or inner manual
21   lever, if you want to call it that, is linear, travels
22   linear, and the peaks and valleys are on a linear bar,
23   which -- which is operated by an outer manual lever
24   that the cable rotates and then the linear inner manual
25   moves forward aft and engages the cam roller or cam

Page 67

1    follower, cam lever spring that pops into the detent.
2        Q   The -- on the inner manual lever or rooster
3    comb in this vehicle, the different gear positions are
4    designated by detents in that component, correct?
5        A   That's -- that is correct.  That's the
6    design.
7        Q   And that's basically peaks and valleys across
8    this component, correct?
9        A   Correct.
10       Q   On this particular rooster comb in the Vetters
11   vehicle, can you describe for me or do you know that
12   the -- the shape of the detents for both park and
13   reverse?
14       A   Well, Chrysler did give us the drawings.  I
15   mean, I -- I -- describing them for you is sort of --
16       Q   Well, just to be the best of your knowledge, I
17   mean, describe it for me.
18       A   I guess the best way to try to define it would
19   be a block with -- with a -- with the top of it having
20   crests and -- and radii, for the radii is between each
21   crest and these little crests look like a triangle,
22   only they're not.  They're not perfectly shaped into a
23   triangle because they're radii.
24           But the -- if you think of the triangle,
25   tri -- a group of triangles cut out and inverted on top

Page 68

1    of this block, with the exception of geometrically
2    there's actually radii between the triangles or the
3    peaks, you've got the concept.  It's probably about --
4    physically about three inches long, maybe, and height
5    is about total -- total height would be probably about
6    three-eighths to a half inch.
7        Q   Okay.
8        A   So that's the physical concept of it and then
9    it has width.
10       Q   Between the -- the -- the park and reverse
11   detents, there's a -- a crest or a peak; is that
12   correct?
13       A   That's -- that's what we call it, yes.
14       Q   Okay.  Essentially, or pretty close to a
15   pointed peak; is that right?
16       A   You're getting there.
17       Q   Okay.  It -- the -- the point between the
18   reverse and the park detents on the rooster comb does
19   not have a flat land like you have described on the
20   insert plate; is that correct?
21       A   That is -- that is correct.  I would call it a
22   peak or a crest.  And the -- and the park has also a
23   deeper valley for the park position.  In other words,
24   it goes below the other --
25       Q   Okay.

Page 69

1        A   -- radii.
2        Q   And that's by design?
3        A   That's by design.
4        Q   Okay.  And you -- and you have previously
5    testified in other cases that it is preferable to have
6    a -- a deeper detent position on the park detent of the
7    rooster comb?
8        A   That's correct.
9        Q   Okay.  Now, you've examined other vehicles,
10   Chrysler, Ford, other -- other manufacturer vehicles
11   where you have evaluated a rooster comb that does have
12   a -- a flat land or an extended radius between the park
13   and reverse detents, correct?
14       A   I have.
15       Q   And you have been critical of the -- the
16   geometric shape between those detents because it's a
17   flat or an extended radius, correct?
18       A   Well, that -- that was Haller.  That's --
19   that was the 42E -- RE Chrysler in that Grand Cherokee,
20   and they had it all the way back into the '70s where
21   they had -- instead of a peak they have a flat -- it's
22   actually radius, but it's almost flat land between park
23   and reverse, that's correct, and I am very critical of
24   that.
25       Q   Okay.

18 (Pages 66 to 69)

1    A   That's a bad design, in my opinion.

2    Q   Okay.  And there are still vehicles

3  manufactured today that contain that type of rooster

4  comb, correct, or do you know?

5    A   Up -- the ones I've evaluated, G -- Chrysler

6  is still using that design, not on this transmission,

7  but on other transmissions.  As far as I know of,

8  Chrysler hasn't dumped that design, so all I can get

9  you through is 2000 -- 2001 or 2002, maybe.  That's as

10  far as they -- they extended out the information to me.

11    Q   Let me ask you this:  In those cases where

12  you've evaluated the -- the rooster comb where there is

13  a -- an extended radius or a flat peak between park and

14  reverse detents, you -- you have actually testified

15  in -- in some of those cases that the fix to the

16  system -- in order to eliminate a false park condition

17  in the transmission, there needs to be a peak, a

18  pointed peak between the park and reverse detents; is

19  that correct?

20    A   Not to eliminate it, to minimize it.

21    Q   Okay.

22    A   In other words, all you do -- everything you

23  do to this system is never going -- until you -- until

24  you create a -- there's two things that have to be

25  done.  There has to be a separate system, whether it

1  be electronic or -- or mechanical, I don't care, and

2  these are -- these are explained in patents that

3  already exist and that are in the -- in the United

4  States patent system and they've been presented in

5  Haller and I presented them to Ford, you have a system

6  that positively engages the parking position of the

7  linear rooster comb or the -- or -- or the rooster comb

8  that has the extended land.

9      Some -- there's -- there is an external

10  system that positively forces that system to engage

11  park detent.  In addition -- or you can have a system

12  where the -- the steering column insert plate and shift

13  lever has a positive device that positively locks in

14  the park lock system.

15      Now, if you don't get rid of that, all

16  you're doing is -- is continuously making it less

17  likely that false park will be achieved.  You're never

18  going to solve the defect, you're just going to make it

19  less likely for it to occur, and that's strictly in

20  relationship to powered park reverse.

21    Q   Okay.  Now, one -- one of your goals in -- in

22  designing a transmission system is to have a system

23  that pos -- positively engages the park detent,

24  correct?

25    A   And the lock -- and the lock gate, that's

1  correct.

2    Q   Okay.  And isn't it true that in the past you

3  have testified that by minimizing the land or

4  incorporating a pointed peak on the rooster comb

5  between the park and reverse detents you achieve this

6  positive engagement of park detent?

7    A   Well, no.  You never achieve it because I

8  can -- I can still put it in false park, but the

9  likelihood.  I'm -- the -- the probability of someone

10  getting it between park and reverse -- park and reverse

11  and staying there in false park is reduced as you make

12  a -- make this peak, A, higher, and, B, the crest much

13  more triangular.

14      The more triangular and peaked you make

15  that, the more difficult it is for false park to be

16  achieved.  It does eliminate it.  It can't eliminate

17  it.  It's inherent to the design.  You cannot -- you

18  cannot by itself in this system.

19      And I've had the GM systems that have

20  peaks that are no question, that they're peaks, and I

21  still put it in false park in front of the jury back in

22  1970, so -- or '80s, excuse me, so peaks and -- peaks

23  don't solve the problem, they just lessen -- lessen the

24  likelihood of false park occurring.

25    Q   Let me ask you this:  The next component I

1  was going to address is -- is the ball -- the plunger

2  ball.  I think you refer to it in your report, the ball

3  plunger detent.  There's --

4    A   That's -- that -- that system is on the -- the

5  ball plunger is actually part of the 42RE in this

6  transmission.  This is a -- this is the same as the

7  Ford.  It's the cam lever -- cam follower, so if it's

8  referred to that way, then that's -- it's not -- that's

9  not correct in this system.

10    Q   Okay.  The roller, or what -- whatever it is,

11  explain to us what it is that goes into and situates in

12  those various detents on the rooster comb --

13    A   So --

14    Q   -- as -- as someone is moving the system from

15  one gear to the next.

16    A   It's a cyn -- cylindrical roller on the end of

17  a cam lever spring.

18    Q   Okay.  And one of the criticisms you have in

19  this case is that the spring should have greater force.

20    A   As far as interaction force for detenting,

21  that's correct, it should be higher.

22    Q   You have park gear and the park pawl.  Are

23  you critical of either one of those components in this

24  particular vehicle?

25    A   Sure.

Page 74

1    Q   Okay.
2    A   You have -- you have the blockage problem
3    designed in again.
4    Q   Okay.  In your -- when you're talking about a
5    blockage problem, you're talking about the
6    configuration or the geometric shape of the park gear.
7    A   That's one problem.  The other problem is
8    that the -- that the -- the design into the -- again,
9    they don't have a positive engagement of the parking
10   pawl --
11   Q   Okay.
12   A   -- as configured with the -- what they call a
13   -- com -- a compromise for over travel because if the
14   -- if the pawl blocks against the land and the gear
15   tooth, then you could never go into park, so you have
16   to have a system that will -- allows that over travel
17   and still go into lock gate, but it doesn't park --
18   doesn't lock the pawl into park gear.
19   Q   Okay.  But if that gear rotates somewhat --
20   for example, if one of the tires begins to roll, that
21   park pawl will drop down into that notch and it would
22   be in secure park; is that correct?
23   A   If it's in lock park.  If it's the false
24   park, that means it's not fully engaged and you get --
25   that -- that can kick the system back in reverse.

Page 75

1    That's why that's bad design.
2    Q   Okay.
3    A   It's also feeding back through the linkage
4    mechanism.  When you block that pawl, that pawl system
5    is pushing back on that rod to try to force that
6    rooster comb from park back to reverse.  That's why
7    that's a problem.
8    Q   Let me -- let me -- let's talk about the --
9    the function of the park pawl and the park gear.
10   We've all gone out and we've -- we -- we've driven a
11   vehicle and pulled over on the side of a hill or a
12   slope, okay, --
13   A   Right.
14   Q   -- city street, and you bring the vehicle to a
15   stop with the service brake and you shift to -- to
16   gated park, and when you let your foot off the service
17   brake you feel that little bit of a roll.
18   A   A little roll back, yeah.
19   Q   You know what I'm talking about?
20   A   Sure.
21   Q   Now, that sensation that an operator feels,
22   what they are feeling is that park pawl dropping down
23   into the park gear, correct?
24   A   That is correct.
25   Q   Securing the vehicle?

Page 76

1    A   Correct.
2    Q   Because there's a series of -- I don't know if
3    you want to call them peaks and valleys, but there --
4    there are teeth on the park gear, and if you move the
5    shift lever to gated park it sends a signal through the
6    linkage through the rooster comb through the park apply
7    rod to have that park pawl engage the park gear,
8    correct?
9    A   Yeah.  There's a spring on -- in -- in a cam
10   which, when you push the rod the rooster -- if the
11   linear rooster comb or the inner manual lever, that rod
12   then is forced -- forces a -- a cam shape plunger to
13   force the pawl into the gear.  Now, if the gear is in
14   position where the -- the pawl tooth contacts the flat
15   part of the gear and can't engage the -- the gear
16   tooth, then the spring is compressed.
17       Well, that spring is also an assist
18   spring, so when the gear does rotate it will force the
19   pawl to pop into the tooth --
20   Q   Okay.
21   A   -- or -- or the land.  That's what -- that's
22   how it operates.
23   Q   So if -- if you're on a slight grade and you
24   reach what I'm going to call like an abutted situation
25   where --

Page 77

1    A   Right.
2    Q   -- the park pawl is abutted to the -- the park
3    gear.  You know what I'm talking about?  It's not --
4    it hasn't dropped down into the tooth.
5    A   Yeah.  You guys like abutted, I use blocked.
6    Q   Okay.
7    A   Okay.
8    Q   If I'm in gated park on the column and at the
9    rooster comb, that pawl, because of -- because of the
10   grade, the gears 's going to rotate somewhat because
11   the tires rotate and that pawl, because of the spring
12   force you've described, will drop down into latch park.
13   A   If you don't have it in park -- if you don't
14   have the parking brake on, that's true.
15   Q   Okay.
16   A   Okay.
17   Q   This -- I may have asked you this earlier.  I
18   know I asked whether you had evaluated the park brake
19   on -- on the Vetters vehicle, but when you were testing
20   or evaluating the Vetters vehicle would you agree that
21   if you engage the park brake, I mean, pick a number,
22   you know, 30 percent, 50 percent, and you leave the
23   vehicle in drive, any forward gear or reverse gear, if
24   you let your foot off the service brake, that park
25   brake will hold the vehicle even though it's in gear,

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 78

1  correct?
2      A   At idle, yes, I agree with that, --
3      Q   Okay.
4      A   -- or high cam idle.  That's true.
5      Q   Okay.  Okay.  Let's talk about the
6  brake-shift interlock system.  You've -- we've talked
7  about that somewhat.  That is a system in the vehicle
8  where if the operator is in gated park in the vehicle
9  and the engine is running, that operator is unable to
10 move the shift lever out of gated park unless he
11 depresses the service brake.  That's by design,
12 correct?
13     A   That's -- that's by design.
14     Q   Okay.
15     A   That's the intended function of the brake
16 interlock.  You are correct.
17     Q   Okay.  I mean, these started appearing and
18 manufacturers started putting these things in vehicles
19 when?  '80s?  Late '80s?
20     A   Well, it started with the Audi problem.
21 The -- the real -- the real attention that started this
22 whole thing was basically when the Audi sudden
23 acceleration issue started up, the industry responded
24 to that with the brake interlock system.  But in
25 addition, it also helps out the park to reverse

Page 79

1  syndrome, too.  So it's a combination of the two.  It
2  was to help the industry try to overcome those two
3  issues.
4      Q   Okay.
5      A   Sudden acceleration was the primary target.
6      Q   Okay.  So -- so by design, the -- the
7  brake-shift interlock feature in this Vetters vehicle,
8  by design, will operate once the operator achieves
9  gated park, correct?
10     A   It -- with the engine on, yes.
11     Q   With the engine on.
12     A   I -- I had to qualify.
13     Q   Okay.  The brake-shift interlock is not
14 something that would come into play if you were in
15 rever -- reverse or drive.  For example, if I'm in
16 reverse, I don't have to have my foot on the brake in
17 order to shift down to drive, do I?
18     A   No.
19     Q   And likewise, if I'm in drive I don't have to
20 put my foot on the brake to shift to reverse?
21     A   That is correct.
22     Q   Okay.  The -- the brake-shift interlock system
23 is only applicable when the operator is in gated park.
24 In order to get it out of gated park, you have to put
25 your foot on the brake which activates the system and

Page 80

1  allows you to pull it out of gated park.
2      A   No.  There's a tolerance there.
3      Q   What do you mean by that?
4      A   You don't have to be in gated park before it
5  engages.
6      Q   Okay.  Where -- where do you have to be before
7  it engages?
8      A   There's a range somewhere between the gate and
9  the -- the -- the edge of the land on park.
10     Q   What -- what mechanism or what component
11 within this system in the Vetters vehicle, the '02
12 Durango, activates the brake-shift interlock system?
13     A   Well, there's two.  The brake -- the brake
14 pedal and the solenoid.
15     Q   Okay.  And I'm saying -- I'm getting further
16 into it.
17     A   Okay.
18     Q   Okay.
19     A   I don't --
20     Q   Is there a sensor or something in the column
21 around the insert plate that once you achieve gated
22 park it sends a signal to the solenoid, "Hey, stick the
23 pin in, this system is now activated"?
24     A   Yeah.  In other words, the way it's set up,
25 it's electronic.  The solenoid is activated by the fact

Page 81

1  that you shift to a certain position in the -- in
2  insert plate and then that advises the solenoid to
3  remain engaged.  In other words, this is a -- a system
4  that's not off.
5      Q   Okay.
6      A   It's either on or it's off, and it's --
7      Q   And -- and the light switch, and I guess
8  that's what I meant, --
9      A   Right.
10     Q   -- the light switch that turns it on is in the
11 insert plate in the column.  Is that what you're
12 telling me?
13     A   The connector.
14     Q   The connector?
15     A   Yeah.  That's in that.
16     Q   Okay.
17     A   But the interlock system is -- is all
18 interactive with the brake pedal.
19     Q   Okay.  And -- yeah.  And I --
20     A   In other words -- in other words, it's self --
21 it's auto -- it's an automatic on when you get to park,
22 and to get it off you have to activate the power --
23 brake system, the service brake.  And if you don't
24 activate the service brake, then it -- if it's
25 functioning properly with the engine on and electronic

21 (Pages 78 to 81)

Page 82

1   -- electricity and the -- and ignition key, it will at
2   any time always remain positively locked in lock -- in
3   lock park, --
4   Q   Okay.
5   A   -- or in the vicinity of lock park.
6   Q   This brake-shift interlock system, have you
7   done an evaluation, when you're moving the shift lever
8   from reverse towards park, as to what -- at what point
9   the system -- the brake-shift interlock system is
10  activated?
11  A   Yes.
12  Q   And what -- what did you find?
13  A   It activates just before you get to park lock.
14  Q   Just before the tang drops down into park
15  gate?
16  A   Just before.  At the edge of -- in other
17  words, on the edge of the insert plate between park and
18  reverse, this system will in fact engage the pin into
19  the lock mechanism --
20  Q   And -- and how --
21  A   -- of the cable.
22  Q   -- and how did you determine that?
23  A   I determined it on the -- on the exemplars.
24  The subject vehicle, as you know, it was a
25  malfunction, --

Page 83

1   Q   Okay.  On --
2   A   -- so I couldn't --
3   Q   -- on the exhibits that we have here.
4   A   This one, the other one, and then the -- well,
5   these two bucks, this one and the other one, I can show
6   you that you can put this vehicle in -- the shift lever
7   on the land at edge of park and that it will still
8   be -- engage the brake interlock system.
9   Q   Okay.  And -- and how is it that you can
10  sense or tell that the brake-shift interlock system has
11  activated?
12  A   You can't.  You -- you release the brake
13  pedal and you can't move the shift lever till you hit
14  the brake pedal.  You must -- you must engage the
15  brake pedal to override the pin or release it.
16  Q   Mr. Stilson, have you ever testified that a
17  brake-shift interlock, its functioning properly, does
18  not solve the issue of false park?
19  A   I -- I'll testify to it in this case.  It
20  doesn't solve the issue of false park.  False park is
21  a defect, it is inherent, intrinsic and latent in all
22  the -- all these vehicles that I've inspected,
23  particularly this one.  Not all vehicles, but this
24  one, it's latent.
25       It does not eliminate the problem of false

Page 84

1   mark.  What it does is eliminates the proximate cause
2   issue of the vehicle potential for it going from park
3   to reverse.  That's what it does.  Re -- once you're in
4   park lock, or in the vicinity of park lock, the brake
5   interlock system removes the problem, but does not
6   eliminate  false park.
7   Q   Okay.  The -- you mentioned you -- you found
8   that the brake-shift interlock system in the Vetters
9   vehicle is not functional.
10  A   Absolutely.
11  Q   Okay.  And do you know why it's not
12  functional?
13  A   At this point in time, we haven't taken the
14  column out, but the best -- it's a manufacturing defect
15  that, from my observations at this point, it appears
16  that the housing was not properly coupled.
17  Q   Housing of what?
18  A   There's a -- the solenoid housing is separate
19  from the cable, and so then they have a -- a plastic
20  clip interlocks which lock it in so you can assemble
21  it, and it -- at least the top part is separated.  I
22  don't know if that's because it wasn't coupled at the
23  time of manufacture properly, or if the tab is broken,
24  or if the tab has become worn.  I don't know the
25  answer to that without taking it apart.  We haven't

Page 85

1   done that yet.  Any one of those three explain why
2   it's loose and the pin cannot engage the -- and retain
3   the -- the cable slot.  And it's, at this point, my
4   best -- it's my opinion that that's a manufacturing
5   defect.
6   Q   And -- and how are you able to arrive at that
7   conclusion?
8   A   Because it -- it appears that -- I know
9   Chrysler didn't design that tab not to -- to break or
10  -- or to -- to come out, so...
11  Q   Do you -- do you know when or how this housing
12  became not properly coupled, as you've described?
13  A   Well, based on the fact that this is an early
14  build, in other words, this vehicle was manufactured as
15  a -- one of the first productions at the plant, or in
16  early -- early introduction, and the fact that the --
17  the 2001 didn't have the interlock, but 2002 did, I
18  think it's because of, A, the inexperience of Job --
19  Job 1 start-up, plant problems, or -- and, two, the
20  people in the plant, problems with training them and
21  the inspectors to appropriately pick up this defect.
22       So the most -- at this point, until I take
23  this thing out and look at it and find out what the
24  failure -- exact failure mode is, the visual
25  observations of it are -- is that the -- the part has

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 86

1   separated.  Now, whether that's because it wasn't
2   properly connected at the time of manufacture of the
3   steering column, or whether that occurred as a result
4   of the failure of the tab at the plant, I don't really
5   care, but it would have -- it would have come out of
6   the plant that way.
7          There is also the possibility, and I'm
8   not -- I'm not ruling this possibility out, that over
9   time the tab broke because of the function of the pawl
10  park braking system slowly either worked itself loose
11  or wore the tab off.  That's a possibility, but I'm
12  not, at this point, barring additional examination of
13  the parts.  I'm not ruling it out, but I'm not saying
14  it's as probable as the manufacturing defect in the --
15  in the assembly plant.
16     Q   Is it your opinion most -- that the most
17  probable cause of this is some issue at the assembly
18  plant?
19     A   Well, we gotta understand this is a -- I think
20  this is a vendor part.  Steering column comes in
21  assembly.  They purchase an assembly, then they
22  install it, so it's a combination.  It would have left
23  the control of Chrysler's supplier in that condition
24  and then got through the system, then to the vehicle
25  and then to the plant, so it's a combination.

Page 87

1     Q   Okay.  What -- what  evidence can you point
2   to for me that -- that indicates or suggests that this
3   particular component was -- was separated when it left
4   the plant at Chrysler?
5     A   Because it's not locked.  There is -- this is
6   a maintenance free area, this is a -- the only reason
7   someone would go in there to work in this area would be
8   for repairs, and we have no information whatsoever that
9   anybody did any repairs in this area of the vehicle
10  from the time that it was built until time of the
11  accident, so it's a maintenance free.
12         Therefore, the  -- the condition that I'm
13  seeing could only have existed in that environment
14  where you have the -- the kick panel or the instrument
15  panel, under panel, which the Chrysler engineer and I,
16  for the first time, or, I'm sorry, Chrysler
17  representative and I for the first time took that off.
18  That's a protected area.  It's guarded by that panel.
19  Nothing can get in there to do this damage, therefore,
20  the most probable indication is -- taking all that into
21  consideration is that it was the -- it left the control
22  of Chrysler Corporation in that condition --
23     Q   Okay.
24     A   -- with the possibility that it could have
25  been wore -- wear over time and usage.

Page 88

1     Q   Okay.  So you can't just state -- you can't
2   state, based on reasonable engineering probability,
3   that it was in fact damaged before it came out of -- or
4   when it came out of the plant?
5          MR. SICO:  Objection.
6     A   I don't know.  I'm sorry.
7     Q   Let me restate.   I -- I'll restate that.
8     A   I don't know what that means.
9     Q   Okay.
10    A   Okay.
11    Q   You indicated, or have just told us that you
12  can't rule out the possibility that this tab somehow
13  failed or became separated after the vehicle left the
14  plant.
15    A   I can't rule it out because we haven't had the
16  opportunity to -- I didn't function it with the G --
17  with the Chrysler guy there.  He didn't function it.
18  We didn't change it.  We need to take the column out
19  and -- and/or do an evaluation that's on -- of the part
20  on the vehicle, so neither one of us -- we moved it,
21  but we didn't try to reengage it, and until that is
22  done, so I can't rule it out.
23         But I can tell you, looking at it in the
24  condition that it's in, and knowing that it's a
25  maintenance free, knowing that this is an early

Page 89

1   production build, knowing my experience at Ford Motor
2   Company and Chrysler with Job 1 start-ups and the
3   problems they have and the quality issues and the
4   training problems in getting these vehicles out from
5   the early productions, that this -- this is the kind
6   of thing that slips through, so I base my opinion
7   within a reasonable degree of engineering certainty,
8   lacking some other information that's not available at
9   this point, that most probably this existed at the time
10  it left the plant.
11    Q   So you assume that this brake-shift interlock
12  device was not functional as designed after it left, or
13  when it left the assembly plant?
14    A   That would be my opinion based on the
15  information and my evaluation and investigation at this
16  point, yes.
17    Q   You -- you mentioned, you know, early
18  production component and you mentioned inexperienced
19  personnel.  What -- what evidence have you seen in
20  this case allows you to conclude that there was
21  inexperienced personnel that was responsible for this
22  particular component?
23    A   Well, evidence would be the -- my -- as I
24  said, I work -- I went -- Chrysler and Ford Job 1, I --
25  I participated in probably, as I recall, ten launches,

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 90

1  different Ford and Chrysler plants, and I was drive
2  team captain at Kansas City, had to sign off the
3  vehicle for Ford Motor Company, and I can tell you that
4  this is -- during start-up, the training -- I -- I had
5  to go as the engineer, stay at the site and train these
6  people.  That's the job.  That's you why have
7  engineers from the corp -- at corporate level in --
8  joining in with Job 1 or start-up because you're there
9  to make sure that these people are trained properly.
10      Now, the assembly plant does train these
11  people, but this was a new system for that model and it
12  was an early introduction, and that's where, like I
13  said, my experience at Ford and Chrysler both is where
14  these kinds of problems slip through the system.  It's
15  just -- it's the way it happens.
16      I can tell you by experience we had
17  recalls at the Ford plants.  We had repairs at the
18  Ford plants.  We had all kinds of problems where this
19  kind of stuff slipped through even with trained
20  inspectors -- quote/unquote, "trained inspectors,
21  trained personnel."  Exactly the kind of problems we're
22  talking about here slip through and we had to recall
23  and redo at the railhead or go out and catch them in
24  the field because it's an early production model, and
25  that's the kind of problems you run into.  That's my

Page 91

1  experience.
2      Did that happen here?  Certainly nothing's
3  changed that I know of.  Quality assurance programs
4  and the -- and the  people who have testified for
5  Chrysler in terms of qual -- their representatives and
6  in-house guys hasn't indicated that there's any major
7  improvement in terms of Job 1 start-ups where these
8  problems don't occur.  They occur all the time.
9      MR. SONNIER:  Okay.  Let me object to
10  responsiveness.
11      Q   (By Mr. Sonnier) I may have asked a bad
12  question.
13      A   Okay.
14      Q   But what I specifically want to know from you
15  is what evidence, what document have you seen, what
16  statement have you seen, what person have you talked to
17  in this case that indicates that any of the personnel
18  that were responsible for releasing this particular
19  vehicle were inexperienced or lack training to identify
20  a problem with this bitsy?
21      A   Well, it -- I no -- I have no document or
22  testimony of anybody in this particular case.  It's
23  prior testimony and experience, correct.  At least I
24  have no testimony at this point.
25      MR. SICO:  Lunch is here whenever you get

Page 92

1  to a place.
2      MR. SONNIER:  Okay.  Yeah.  Let me get
3  through these --
4      MR. SICO:  Sure.
5      MR. SONNIER:  -- and can probably take a
6  break.
7      Q   (By Mr. Sonnier) Would you -- would you agree
8  with me that if there were evidence in this case, were
9  to be evidence in this case that the brake-shift
10  interlock feature on the Vetters vehicle worked
11  properly at some point after it left the plant, would
12  that affect your opinion as to when this thing became
13  nonfunctional?
14      MR. SICO:  Let me object to speculation
15  and an incomplete hypothetical.
16      Q   (By Mr. Sonnier) You can go ahead and answer.
17      A   That would depend on what the information was.
18  I mean, share that information with me I'd be glad to
19  review it and consider it.  I mean, I don't have it, so
20  at this point, --
21      Q   Okay.
22      A   -- you know, I -- I don't have the quality
23  inspection records of the vehicle at the plant at this
24  point through discovery.  I've advised Mr. Sico, of
25  course, that there are certain inspection procedures

Page 93

1  and quality assurance standards that -- that Chrysler
2  uses in the processing of a vehicle.
3      I have reviewed those, I reviewed them in
4  Haller.  I've read the PFs, I read the PSs, all the
5  standards associated with the design of the
6  transmission.  In general, those are generic.  Those
7  are not case specific, they're generic.  They apply to
8  any vehicle.  And from my reading and review of the
9  quality assurance, PS and PF standards, there's nothing
10  that would have prevented this condition from -- from
11  slipping through the plant.  It would have made it.
12  And if you have an inspection report or something that
13  overrides that, I'd be glad to look at it.
14      Q   Okay.
15      MR. SICO:  And I'm just going to state for
16  the record at this point, based on that question and
17  that answer, that we have sent out discovery in this
18  case asking for the kind of documents that would --
19  would address any kind of inspection.  We have not been
20  provided that to date and, even though we've sent out
21  requests, we wouldn't even need to under Federal Rules.
22  That would be germane to this case based on the
23  disclosures that have been made, and I believe it
24  unfair to ask those questions if, in fact, Chrysler's
25  withholding documents.  I've said my peace.  Go ahead.

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 94

```
 1          MR. SONNIER:  Okay.
 2      Q   (By Mr. Sonnier) Mr. Stilson, you are a
 3  consultant that at times when you're consulted on a
 4  matter you're asked to assume certain facts, correct?
 5      A   If I -- if I have no way of proving them, I'm
 6  given a legal hypothetical, that's true.
 7      Q   Okay.
 8      A   It has to be a legal hypothetical, though.
 9      Q   Okay.  I want you to assume with me that
10  someone were to come in here and say "I tested the
11  Vetters vehicle, and when I tested it the brake-shift
12  interlock feature was functional."
13      A   Okay.
14      Q   Would that change your opinion in this case?
15      A   I would have to know when, why and where.
16  Timing is -- I mean, if it's at the plant level, that
17  would -- that would be one thing.  Let me explain
18  something to that -- to that.  Let me address that as
19  this --
20      Q   Well, I --
21      A   It would have to be -- let me -- let me
22  address that.  It would have to be a particular type of
23  person because you cannot find this defect unless -- in
24  a conventional manner because if you always put your
25  foot on the -- on the brake, you'll shift and you won't
```

Page 95

```
 1  know that the brake interlock was malfunctioning, so
 2  you couldn't figure that out unless you did what was
 3  done in the subject vehicle, and that is start the
 4  vehicle and just move the shift lever out.
 5          Now, if somebody comes in and says that, I
 6  would weight that.  Definitely, I would weigh that.  In
 7  other words, I drove this vehicle, I started it up, I
 8  didn't -- I didn't hit the brake pedal and I tried to
 9  shift it and it was locked.  I would weigh that in my
10  -- but I'd have to know who that is, why it is, when it
11  and what it is.  I mean, I -- it would depend on who
12  that person was and what they did.
13      Q   Okay.  And that's what I'm asking.  I'm
14  asking you to assume --
15      A   Uh-huh.
16      Q   -- that someone specifically tested this
17  vehicle as to whether or not the brake shift interlock
18  was functional --
19          MR. SICO:  Okay.  I'm going to ask --
20      Q   -- and if they -- if they were to say it was
21  functional, would that cause you to change your
22  opinion?
23          MR. SICO:  Let me -- let me object and
24  request that you don't answer that hypothetical because
25  it is so incomplete the -- the information has not been
```

Page 96

```
 1  provided to you at what point in time and the -- the
 2  qualifications of that individual to test it.
 3          Any -- to the extent we've got some guy
 4  that Chrysler's found at a Jiffy Lube that says, "Yeah,
 5  I tested it one day," and all of a sudden wants to walk
 6  in, that would be different than a Chrysler engineer
 7  who's got a doctorate degree and did it.
 8          MR. SONNIER:  Craig, you -- we're in
 9  federal court.  You only need to object to form of
10  responsiveness without the speaking stuff.  If you'd
11  please keep it that way, it will go a lot faster.
12          MR. SICO:  All right.  Well, I'm going
13  to -- I'm going to request that you don't answer that,
14  and I'm allowed to do that to my own experts and my own
15  witnesses until the hypothetical is complete.
16      Q   (By Mr. Sonnier) Can you answer?
17      A   Yeah.  My answer would be basically lacking
18  sufficient information to make an appropriate
19  engineering judgment of what -- of what the -- that --
20  the facts associated with that testimony or -- or
21  statement.  I have no comment at this point.  I would
22  -- I told you, I would weigh it, definitely.  I would
23  give -- I would weigh it as to whether it was something
24  that's relevant and whether it has an affect on -- on
25  my opinions, but I would weigh it.
```

Page 97

```
 1      Q   Would you agree with me that if the
 2  brake-shift interlock feature in the Vetters vehicle
 3  functioned as designed and the operator let the shift
 4  lever in reverse, detented gated reverse, that the
 5  brake-shift interlock feature with not come into play
 6  in that particular instance?
 7      A   I'd agree with that.
 8      Q   Okay.  You mentioned key interlock.  You
 9  examined the keep interlock feature on this vehicle,
10  and I think you said it was nonfunctional.
11      A   It's defective.  It -- it violates FMVSS 105.
12      Q   Okay.  Tell -- tell us what you found with
13  respect to the key interlock.
14      A   You can put the key in and you can put this
15  vehicle in a -- the -- on the land between park and
16  reverse right near the edge of the gate and you can
17  take the key out, move the key, and that's just the key
18  defect.  The interlock defect is that the -- when you
19  engage the off position to remove the key, the key
20  interlock does not lock the steering shift lever.  It
21  won't lock it.
22      Q   Okay.
23      A   And -- and it -- because the pawl doesn't
24  engage the slot.
25      Q   Okay.  In the Vetters accident, I think we all
```

25 (Pages 94 to 97)

Page 98

1   agree the engine was running at the time of this event.
2      A   Correct.
3      Q   Okay.  And it was found running?
4      A   Correct.  We agree.
5      Q   And the key was in the ignition, correct?
6      A   We agree.
7      Q   Okay.  Would you agree with me that the issues
8   that you found with the key interlock on this vehicle
9   do not or did not have a causative factor in this
10  particular accident?
11     A   No, because that's another indication of
12  this -- this -- and this is an important one because
13  the fact that I -- and this is a -- in addition to the
14  factors that I considered in why this vehicle brake
15  interlock switch left the control of Chrysler
16  defective.  This key FMVS 105 system left this plant
17  defective and malfunctioning, so it got by the quality
18  assurance and -- and inspectors on the subject vehicle
19  at the time.
20         There's no question that this system, the
21  key interlock system, was defective when it left the
22  control of -- of Chrysler.  This can be traced
23  backwards.
24         Now, that -- does that defect which
25  violates a federal motor vehicle safety standard is a

Page 99

1   supportive evidence in this case that this brake
2   interlock was defective and left the same plant under
3   the same conditions because of the lack of proper
4   quality assurance and -- and Job 1 start-up, and that's
5   a -- a direct indication of two things:  One is bad
6   quality manufacturing defect; two, is -- and -- and
7   even as important is that the cable system was loose.
8   That's what allows this system to do what it does.
9         MR. SONNIER:  Objection, responsiveness.
10     Q   (By Mr. Sonnier) Mr. Stilson, I just want to
11  focus on the key interlock feature.  The fact that it
12  didn't function as designed, did that have anything to
13  do with this vehicle backing up and running over Ms.
14  Vetters?
15     A   As I stated, the --
16     Q   That in and of itself, just the key interlock?
17     A   Oh, just by itself?
18     Q   Yes.
19     A   It didn't interplay in the cause of
20  the vehicle -- of the reason that vehicle backed --
21  backed up as part of the accident scenario.  I agree
22  with that.
23     Q   Okay.  And that's what I'm asking.  I
24  appreciate that.
25     A   But I explain that so I don't want you to say

Page 100

1   that I didn't tell you what my opinion was going to be
2   at -- you know, I said I had new opinions, and that's
3   one of the new opinions that I would -- I -- I have is
4   what I explained to you about how the key interlock
5   defect interacts with the brake interlock defect.
6         I don't want -- I want -- I'm trying to be
7   open and disclose as much information as I can so that
8   you're aware of what I would testify to at the time of
9   trial.
10     Q   Okay.
11     A   Okay.
12     Q   But out of fairness, you -- you agree with me
13  that the -- the fact the key interlock didn't operate
14  as designed had no role in the vehicle backing up in
15  this particular accident.
16     A   That's where we -- that's where I have the
17  problem with the question.  It does have a role because
18  it's asymptomatic of the defect that created this --
19  the situation in the first place, and that's the brake
20  interlock malfunction as a role in that respect.
21         Now, when you -- if -- and I'm trying to
22  walk the line with you, so -- but if you say "Is it
23  directly related to the proximate cause of the reason
24  the vehicle backed up?"  I'd have to say no in the
25  sense of a direct relationship.  But indirectly, it's

Page 101

1   asymptomatic of the reason this vehicle backed up.
2         VIDEOGRAPHER:  There's five minutes of
3   tape remaining.
4      Q   (By Mr. Sonnier) The PRNDL indicator, I asked
5   you some questions about that earlier.  The -- the
6   indicator itself on the Vetters vehicle -- vehicle
7   functioned as designed.  Would you agree with that?
8      A   I -- I'm waiting to find that out because I --
9   as you see in this 9/6  videotape that I did, September
10  6, or October 3rd, I'm not -- I don't remember which
11  one it was, I think it was September 6th, you could put
12  this vehicle with illuminated reverse and have it in
13  false park --
14     Q   Okay.
15     A   -- on the crest.  I'm not sure that's
16  intended by design, and I need to find that out.  If it
17  is, then that explains part of the problems.
18     Q   Would you agree with me in this particular
19  case, on the Vetters vehicle, if the P is highlighted
20  on the PRNDL indicator on the instrument panel that the
21  vehicle, at that point, is in gated park?
22     A   That's one position where they will highlight
23  it.  It will also in false park just on the edge
24  before it gets in the lock gate, so it illuminates
25  there, too.

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 102

1  Q   So it's your opinion that the P will be
2  highlighted before an operator achieves gated park?
3  A   It can.   It's a -- it's a -- it's -- it's not
4  consistent in terms of that.   Sometimes it illuminates,
5  sometimes it won't.
6  Q   Did it on the Vetters vehicle?
7  A   It does on the Vetters vehicle.   It's not
8  consistent.   In other words, sometimes when you're
9  shifting, it'll illuminate just before you get into
10  park lock, sometimes it won't illuminate until you get
11  into park lock, so it's -- it's because of the lag in
12  the -- and the looseness in the cable.
13  Q   Let me ask you this:   In terms of the -- the
14  PRNDL indicator, where does the indicator that -- on
15  the instrument panel, the one the operator sees, where
16  does the signal come from telling you which letter to
17  highlight?   Is it --
18  A   The neutral safety switch.   As far as I know
19  of, it's the neutral safety switch, part of it.   It's
20  -- it's consequential to that electronic mechanism.
21  Q   And for -- for example, the vehicle on the --
22  on the instrument panel, the D --
23  A   Uh-huh.
24  Q   -- for drive is highlighted.
25  A   Correct.

Page 103

1  Q   Where does that signal come from?   Does it
2  come from the position of the shift lever on -- on the
3  insert plate in the column?
4  A   Well, indirectly.   What happens is you have a
5  relationship between the neutral safety switch and
6  that -- where that -- which is a requirement under
7  federal standards that it has to be in there, and that
8  device is electronic and that -- that device has the
9  purpose of preventing the vehicle from being started in
10  anything other than park and neutral.   And that also
11  has a direct electronic communication when you shift
12  the mechanism from park to reverse.
13      So the insert -- the shift lever is the
14  mechanism which is telling electronically the
15  electronic system where it's at, and that's the -- what
16  they call the neutral safety switch.
17  Q   Where is the neutral safety switch located?
18  A   I don't know on this one.   I haven't got that
19  far.   I'm waiting for -- I don't have any drawings.
20  Q   Okay.   Where is it typically located in
21  similar --
22  A   It can be on the trans -- on Fords and some
23  GMs on the transmission, sometimes in the column.
24  Q   Okay.   But -- but you're aware in this
25  vehicle, at least with respect to -- if I'm in drive or

Page 104

1  neutral, the -- the signal comes from the -- the insert
2  plate where the shift lever is on that particular
3  component.
4  A   Well, I think -- I think this has a column
5  neutral safety neutral switch is what you're saying
6  because what that is -- all that is is it's an
7  electronic device which makes electrical connection to
8  illuminate the bulb.
9  Q   Okay.
10  A   That's all it is when you move the lever.
11  It's not -- the lever is not doing anything other than
12  communicating to a device where to send electronic
13  signal to illuminate the bulb.
14  Q   Okay.   And that's -- and I probably asked a
15  horrible question.
16  A   Okay.
17  Q   What I'm getting at, the electronic signal is
18  picked -- there -- there's some device there on the
19  insert plate in the column that picks up that signal
20  that then tells the -- the light bulb to go on on the
21  R, or the D, or whatever gear you're in.
22  A   Well, I think it's more -- I think it's more
23  associated with -- connected to a shift lever system --
24  Q   In the column?
25  A   -- as opposed to the insert plate.   The insert

Page 105

1  plate is just a system that -- where you put it in a
2  gate position, it selects the gate.   But there's -- the
3  electronic system is a -- I believe it's associated
4  with the shift lever movement.
5  Q   Okay.
6  A   But I haven't studied that on this vehicle
7  yet.
8  Q   In the column?
9  A   I believe it's in the column.
10  Q   Okay.
11  A   I don't -- I didn't see it in the
12  transmission.
13      VIDEOGRAPHER:   Excuse me.   We need to
14  change tapes.
15      MR. SONNIER:   We can go ahead and do that.
16      VIDEOGRAPHER:   This is the end of Tape 1
17  at 12:15 p.m.   We're off the record.
18      (WHEREUPON AT THIS TIME A SHORT
19      BREAK WAS TAKEN.)
20      VIDEOGRAPHER:   This is the beginning of
21  videotape No. 2 of the deposition of John Stilson.
22  Today's date is October 13, 2005.   It is 12:46 p.m.
23  Q   (By Mr. Sonnier) Mr. Stilson, I -- I need to
24  back up for a second and revisit some questions I was
25  asking you about the brake-shift interlock feature on

27 (Pages 102 to 105)

Page 106

1  this vehicle.
2        You had told me earlier that the
3  brake-shift interlock feature on the Vetters vehicle,
4  as designed, if you do achieve gated park, the
5  brake-shift interlock should be functional as designed.
6    A  If your foot isn't on the brake pedal --
7    Q  Correct.  Now --
8    A  -- and the engine is running, yeah.
9    Q  -- now, I asked you some questions about when
10  the -- at what point in time the brake shift interlock
11  device becomes functional as someone is shifting into
12  -- into park, and I think you told me that -- that you
13  believe that it -- it's your opinion, based on your
14  analysis, that it -- it activates that brake as --
15  right on the edge of gated park on the insert plate; is
16  that correct?
17    A  Well, on the bucks -- on the Vetters -- on the
18  Vetters vehicle, it's not functional, but I did, and so
19  did the Chrysler guy, move the -- without -- as lightly
20  as possible the solenoid hosing to a position where it
21  wouldn't engage or relock the housing and then try to
22  see where that engagement point was, and it would
23  happen on the edge on the Vetters vehicle, but that's
24  -- that's not testing it as if the brake interlock
25  system was functional and in a functional mode.

Page 107

1        So on the Vetters vehicle, my -- my
2  initial analysis would be that it happens just before
3  park lock.  Now, that same condition occurs on the
4  bucks.
5    Q  Okay.  And in the course of your evaluation
6  of this system and evaluation of the brake-shift
7  interlock feature, specifically, did you take any video
8  or photographs that would depict the point in time
9  where the brake-shift interlock feature becomes
10  functional?
11    A  No, because it's -- the system is
12  nonfunctional on the Vetters vehicle.  I can't.
13    Q  Okay.  But what about on the buck?
14    A  No.  I -- I don't recall doing any videos of
15  the buck at this point.  None.  I -- I don't re -- I
16  don't recall ever demonstrating it with a videotape.
17    Q  If you achieve gated park on the Vetters
18  vehicle and the P is highlighted on the indicator on
19  the instrument panel and you take the shift lever and
20  you kind of, you know, wiggle it and it won't go
21  anywhere, you can tell it's in that gate, would you
22  agree that at that point in time the vehicle is in
23  secure gated park?
24    A  Well, the shift gear -- the gear lever -- the
25  shifting gear lever is, yeah.

Page 108

1    Q  Okay.
2    A  The gear shift lever is in gated park lock,
3  yes.
4    Q  Okay.
5    A  I agree with that.
6    Q  And -- and when the gear shift lever is in
7  gated park on the Vetters vehicle, would you also agree
8  that it's in locked secured park in the transmission?
9    A  No.  It could be blocked.
10    Q  Okay.  And if it's --
11    A  We talked about that.
12    Q  And if it's in a blocked condition, you're
13  talking about the park pawl being on top of one of the
14  little peaks on the park gear, correct?
15    A  That's the land, --
16    Q  Okay.
17    A  -- that peak.
18    Q  And if that vehicle were to move ever so
19  slightly, meaning the tires rotate, that would turn the
20  park gear, correct?
21    A  Should drop it into the gear.
22    Q  And then the park pawl would go into the
23  tooth, correct?
24    A  That is correct.
25    Q  Okay.  In -- in a situation where you have

Page 109

1  achieved gated park at the shift lever and the park
2  pawl is sitting there on top of the -- one of the
3  tooths or teeth on the -- on the rooster -- not the
4  rooster comb, but the park gear, would you agree that
5  that's not a hazardous condition at that point?
6        MR. SICO:  I am going to object to
7  speculation and an incomplete hypothetical.
8    A  I think the problem is with respect to powered
9  reverse engagement, that's not a hazard.  But with
10  respect to people's feet, or children, or other things
11  that are in the area of the tires rolling, I think that
12  could be hazardous.
13    Q  Okay.
14    A  The roll -- the roll back isn't just -- the
15  tire actually rotates.
16    Q  Okay.
17    A  The wheel rotates.
18    Q  Okay.
19    A  Okay.
20    Q  And in terms of rotating, in -- when it
21  rotates in -- the distance that tire would have to roll
22  before that park pawl engages the park gear and secures
23  the vehicle is a matter of inches; is that correct?
24    A  I didn't look -- I haven't checked that out on
25  this vehicle.  Some -- some are inches.  Less than a

28 (Pages 106 to 109)

Page 110

1  foot, that's for sure.
2      Q.   Okay.   When that tire begins to roll, though,
3  it's not going to roll across the street?
4      A.   No.
5      Q.   The park pawl is going to catch and stop it.
6      A.   The -- by design intent, if everything is
7  working properly, it will stop.
8      Q.   Okay.   Have you been to the accident scene?
9      A.   I have not.
10     Q.   I take it you've reviewed photographs of the
11 accident scene?
12     A.   Photographs and a video.
13     Q.   And --
14     A.   Part of that video recording of Mr. Sico is at
15 the scene.
16     Q.   Okay.   So you -- you've done -- you yourself
17 have not done any testing of the accident vehicle at
18 the accident scene, correct?
19     A.   I have not.
20     Q.   The inspections that we've talked about, the
21 first one on September the 6th of 2005 you indicated
22 you didn't do any testing, per se, but you did an
23 evaluation of the vehicle.   Describe for me the
24 evaluation that you conducted on the vehicle that first
25 time.

Page 111

1      A.   Well, I started out by looking at the
2  synchronization.   I always do that, documenting the
3  synchronization of the system.
4      Q.   And specifically synchronization of what?
5      A.   Of the gear shift lever and the insert plate
6  with the transmission detent.
7      Q.   So you want to know if I'm in reverse there at
8  the shift lever that I'm in reverse in the
9  transmission?
10     A.   Correct.
11     Q.   And likewise, if it -- if I'm in drive at the
12 shift lever, I'm in drive at the transmission?
13     A.   Correct.
14     Q.   And that applies -- did you evaluate each
15 individual gear?
16     A.   Each individual -- well, yeah.   I think I went
17 from one all the way up and back down, but I would have
18 to look at the videotape.   I did, yes.   I did -- at
19 some point I evaluated every gear.
20     Q.   Okay.   What other testing or evaluation did
21 you do of the vehicle at that time?
22     A.   Checked PRNDL to see how -- see if it was
23 properly indicating, checked the key interlock, checked
24 the brake interlock, checked the vehicle idle.
25     Q.   Let me stop you right there.   You -- you said

Page 112

1  the PRNDL indicator.   I think I heard you say earlier
2  that -- that based on your evaluation that the PRNDL
3  indicator was properly -- properly aligned in your
4  view.
5      A.   Well, the detents line up but, as I said, I
6  can -- I can put this vehicle, and it's on the
7  videotape, on the land between park and reverse and
8  it'll indicate reverse.
9      Q.   So when you say on the land, you're able to
10 put the tang of the shift lever on the land between the
11 park and reverse gates and the indicator itself still
12 shows reverse?
13     A.   That's correct.
14     Q.   Okay.
15     A.   And then I evaluated the engine on, all the
16 synchronization again, and then a bleed point between
17 park and reverse.   I evaluated that, plus I evaluated
18 the -- whether or not reverse -- if you engage reverse
19 that it powers every time, and I -- I evaluated what
20 sometimes is called break away.   I also evaluated --
21     Q.   What is that?
22     A.   That's that the -- the tires -- if you put it
23 in reverse, the vehicle will not remain stationary.
24     Q.   Okay.
25     A.   It's called break away because some vehicles

Page 113

1  you put it in reverse and it will remain stationary.
2  This one does not.
3      Q.   Meaning it would -- when you -- when you
4  engage reverse, take your foot off the service brake,
5  it will roll immediately --
6      A.   Correct.
7      Q.   -- on a -- on a flat or a downward sloping
8  surface?
9      A.   Well, a slope -- no.   Even upward sloping
10 within reason.
11     Q.   Okay.   Depending on the grade?
12     A.   Depending on the grade.
13     Q.   Okay.
14     A.   Now, the -- I also evaluated the parking gear
15 system to find out block -- to evaluate the blockage
16 condition and then -- let's see.   I -- I evaluated
17 ratchet.   That's what it was.   I -- I evaluated the
18 ratchet position.
19     Q.   Now, ratchet, I've also heard that referred to
20 in the past as like a ratchet point or even a tick
21 point.   Is -- is --
22     A.   Some people call it a tick point.
23     Q.   -- is that where you have a situation where
24 you are in hydraulic reverse, the vehicle is moving
25 rearward and you begin to move the shift lever towards

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 114

1  park and the park pawl begins to make contact with the
2  park gear?
3     A   Correct.
4     Q   And so the -- the noise you hear resulting
5  from the park pawl starting to engage the park gear
6  is -- is that noise created by that interaction?
7     A   It's the pawl ratcheting on the gear tooth
8  because if you're backwards in powered reverse, or --
9  or you are operating the vehicle at a high speed, you
10  drop that parking gear in, you're going to rip out the
11  whole system --
12    Q   Okay.
13    A   -- so it ratchets.
14    Q   Okay.
15    A   It's designed to do that.
16    Q   And that's the pawl kind of going up and
17  down --
18    A   Yeah --
19    Q   -- just bumping on those teeth without
20  engaging, correct?
21    A   Well, sometimes you get bumping, sometimes you
22  just get it contact and it'll just skip and you hear it
23  "Tick, tick, tick."
24    Q   By listening for -- and it's an audible sound
25  that you're -- you're trying to pick up, correct?

Page 115

1     A   Correct.
2     Q   And when you -- you're doing that, you're
3  evaluating the ratchet point, you are trying to
4  evaluate at what point the park pawl begins to make
5  contact with the park gear in park.
6     A   Or disengage.  What I do is there's two
7  points, there's two tick points.  One is when you --
8  from -- from park to reverse and the other one is from
9  reverse to park.
10    Q   Okay.  And you evaluate both ways?
11    A   Both of them, yeah.
12    Q   Now, you mentioned earlier with respect to the
13  PRNDL that you did notice a condition here where if the
14  tang is on the -- the land between gated park and gated
15  reverse the -- the PRNDL indicator still shows R.
16    A   That's correct.
17    Q   Okay.  And at that point you're also still
18  actually in hydraulic reverse in the transmission; is
19  that correct?
20    A   No.  You're in neutral.  That's the problem.
21  You're not in reverse, you're in neutral, hydraulic
22  neutral.
23    Q   Now, --
24    A   Depending on where that is.  In other words,
25  there's -- I -- there's -- as I say, there's a position

Page 116

1  between reverse edge and park edge on that land, and I
2  evaluated the positions between the -- those two edges
3  to try to find out what happens to the corresponding
4  hydraulic actuation and how the -- that coordinates
5  with the linear rooster comb in terms of where the ball
6  -- ball plunger will stay.
7        The ball plunger can be anywhere either
8  going up the reverse ramp to staying on the peak to
9  coming down the park ramp, --
10    Q   Okay.
11    A   -- and it will stay there.
12    Q   Now, when -- when an operator on the Vetters
13  vehicle achieves gated park on this system, that is
14  actually -- in the transmission, that's hydraulic
15  neutral, correct?
16    A   Yes.
17    Q   Okay.  So you -- basically, you have three
18  positions in the transmission:  You have neutral, you
19  have a forward gear, or you have a reverse gear,
20  correct?
21    A   Those would be the three drive modes, power
22  drive modes, that's correct.
23    Q   Okay.  And I probably used bad terminology.
24  Drive mode.
25    A   Okay.  That's right.

Page 117

1     Q   Okay.  Now, when you achieve a -- a point
2  where the P is highlighted on the PRNDL on this
3  particular system you are in gated park.
4     A   The -- the P -- the P will be highlighted when
5  you're -- the correct statement is the P is highlighted
6  or illuminated when you're in gated park, that is
7  correct.
8     Q   Okay.  And in this vehicle you do not have a
9  situation where the P is highlighted that you're not in
10  gated park?
11    A   Yes.
12    Q   Is that correct?
13    A   This vehicle does have that condition.
14    Q   Okay.  And how did you go about evaluating
15  that?
16    A   Just turn the key to start and move the lever
17  up and down.  That's part of the synchronization test
18  to look when the P comes on, when the comes off.  It's
19  very close, but it will be illuminated.  It's not in
20  lock park.
21    Q   At the steering column?
22    A   At the steering column.
23    Q   Would you agree with me that when the P is
24  highlighted on the PRNDL indicator that you are in
25  detented park in the transmission?

30 (Pages 114 to 117)

Page 118

1  A   For my testing, I haven't had a transmission
2  apart, but it's -- it's -- it felt to me like it was.
3  I'm telling you that we haven't -- we haven't -- we
4  haven't gone into the transmission on this vehicle, but
5  my -- my -- my sensing system said yes, it's in the
6  park detent.
7    Q   Your testing or evaluation back on September
8  6th, approximately how much time do you think you spent
9  with this vehicle that day?
10   A   The videotape would give you a pretty good
11  idea, but I think I -- I spent about six hours,
12  guessing.   It was all day.
13   Q   Okay.   Now, let me kind of turn to Ms.
14  Vetters's accident, if I could.   Is there any direct
15  evidence that you're aware of that indicates what Ms.
16  Vetters did and did not do with her vehicle prior to
17  this accident?
18   A   I would have to have a definition of direct
19  evidence because that --
20   Q   Let me -- okay.   Fair enough.
21   A   I don't understand.
22   Q   Let me ask you this:   You -- there were no
23  eye witnesses to this accident, correct?
24   A   That's my understanding.
25   Q   And Mrs. Vetters, after the accident, never

Page 119

1  made any statements to anyone about what she did or how
2  this accident happened, correct?
3    A   I have not been advised she did.
4    Q   Okay.   And so when I'm talking about direct
5  evidence, --
6    A   Okay.
7    Q   -- I'm talking about, you know, statements
8  or -- or someone seeing something, the accident
9  actually happening.
10   A   Okay.
11   Q   There's no direct evidence like that that
12  indicates what she did or did not do at any point
13  before this incident occurred, correct?
14     MR. SICO:   Objection, vague.
15   A   Not that I'm aware of, --
16   Q   Okay.
17   A   -- based on your definition.
18   Q   Okay.   Now, I think we all agree here that
19  the vehicle -- that the Dodge Durango was parked in the
20  garage that morning.   Are you aware of that?
21   A   I think -- I think that's the -- the -- would
22  be the basic custom and practice.
23   Q   Okay.   Are you aware her husband actually
24  testified that it was parked in her garage that --
25   A   No.

Page 120

1    Q   -- that night?
2    A   No, I haven't seen that.
3    Q   Okay.
4    A   I was told that that's her custom and practice
5  and that the husband always says that she does that.
6    Q   Okay.
7    A   That's all I've been told.
8    Q   Have you read his --
9    A   I haven't seen any testimony.
10   Q   -- have you read his deposition, by the way?
11   A   I have not.
12   Q   Okay.   Do you know if you even have it?
13   A   (Witness reviews document.) I have Steven
14  Vetters's deposition.
15   Q   Okay.
16   A   I have not read it.
17   Q   Okay.   Now, I think we probably also agree
18  that at some point she backed the vehicle out of the
19  garage.
20   A   Yes.   I think we have.
21   Q   That's something you assume, as well.
22   A   Yeah.
23   Q   Okay.   And the most likely scenario for
24  backing out of the garage would be to have started the
25  engine and put it in reverse gear, correct?

Page 121

1    A   Correct.
2    Q   Okay.   Now, are you aware of any direct
3  evidence on where Mrs. Vetters stopped the vehicle
4  before she exited?
5      MR. SICO:   Objection, vague and ambiguous.
6    A   I think the best evidence is that -- near the
7  sidewalk.
8    Q   And what evidence is that?
9    A   My understanding is that most probably she was
10  going to get the mail, which is custom and practice,
11  and the fact that there were letters found on the
12  street, so I think we have a pretty good indication
13  that she stopped the vehicle to go get the mail.
14   Q   Okay.   Are you aware of any direct evidence
15  as to exactly where she brought the vehicle to a stop
16  before she got out?
17     MR. SICO:   Objection, vague and ambiguous.
18   A   I have no direct evidence --
19   Q   Okay.
20   A   -- as you've defined direct evidence.
21   Q   Do you have an opinion on where she
22  stopped the vehicle?
23   A   Yeah.   I think the opinion is that basically
24  at this point that, as I said, it would be in the
25  vicinity of the -- of the -- of the sidewalk because

31 (Pages 118 to 121)

Page 122

1   she would probably use that to go to the mailbox as
2   opposed to backing too far and getting the vehicle
3   sticking out into the street because from what I saw at
4   the scene, the further she goes down that driveway, the
5   more the rear end of that vehicle is going to stick out
6   into the street.
7       Q   Okay.  Do you -- do you have an opinion as to
8   -- let me -- I may be asking you questions, and it's
9   not your area to address this, but is it -- is it your
10  assignment in this case -- are you the person
11  addressing the actions of Mrs. Vetters and exactly
12  where she stopped the vehicle before she exited?  Is
13  that something that you're handling in this case?
14      A   Within the scope -- first of all, I have to
15  assess how this system was operated prior to the
16  accident.  I'm not addressing specifically where the
17  vehicle was beyond the range I gave you, somewhere near
18  the sidewalk.  I'm also -- in terms of where the door
19  would be.
20          It would make sense that she's going to
21  park the door somewhere near the sidewalk, whether --
22  and the other thing is, is that this vehicle -- the
23  driveway is on a grade, so she would have to, at least
24  at some point, without the parking brake, set it into
25  park so it wouldn't roll.  So we know that it's on a

Page 123

1   ramp surface.  The other part of that equation is we
2   know that the door was open.
3       Q   Okay.  Let -- let me stop you.
4       A   The vehicle door was open at the time of this
5   -- at the rest position.
6       Q   Okay.  Let -- let me ask you this to kind of
7   back up here:  You said a ramp surface.  You're
8   talking about the slope driveway, correct?
9       A   Correct.
10      Q   Okay.  You don't know where within that
11  driveway precisely she brought the vehicle to a stop
12  before she exited, correct?
13      A   Well, not within inches, but I say in the -- I
14  think she -- she would have parked it in a general
15  vicinity where she would exit the door near the
16  sidewalk, I think that makes sense, --
17      Q   Okay.
18      A   -- to go to the mailbox.
19      Q   Are you aware, or can you point to any direct
20  evidence on how Mrs. Vetters moved or manipulated the
21  shift lever, if at all, before she exited the vehicle?
22          MR. SICO:  Objection, vague and ambiguous.
23      A   Well, we have direct evidence, physical
24  evidence.
25      Q   Physical -- physical evidence of what?

Page 124

1       A   That she obviously didn't have it in park
2   lock.
3       Q   Do you have -- do you have any, or -- or are
4   you aware of any direct evidence as to whether Mrs.
5   Vetters moved the shift lever at all before exiting her
6   vehicle to get the mail?
7           MR. SICO:  Objection, vague and ambiguous.
8       A   Well, direct evidence, again, we've -- we've
9   eliminated that.  I mean, there's no eye witness
10  testimony and there's no testimony from her because
11  shows's dead,  so -- and there's no statement from her,
12  so when you eliminate the direct evidence, I have no --
13  so we get through all that, I have no -- we have no
14  direct evidence that I've been advised of or aware of
15  as you defined it whatsoever, as you define it,
16  witness testimony or her statements.
17          When we get past that to the physical
18  evidence, we can discuss that at a little different
19  level.  But as far as direct evidence, we have to find
20  it.  I have none.  But physical evidence we have a
21  lot.
22      Q   Okay.  Let -- let me ask you, then, about
23  physical evidence.  What physical evidence do you have
24  that indicates where in this area she stopped the
25  vehicle?

Page 125

1       A   The fact that she was going to the mailbox and
2   the fact that the vehicle was backed up.  We know
3   that everybody agrees it was running, backed up, and
4   the fact that there was no reason for her to project
5   this -- the rear of this vehicle extensively into the
6   roadway.  It doesn't make any sense.
7       Q   Okay.  What physical evidence is there as to
8   how she moved the shift lever before exiting the
9   vehicle to get her mail?
10      A   The -- the condition of the system itself.
11      Q   And what is it about looking at the system
12  itself that tells you how Mrs. Vetters, on this
13  occasion, moved that shift lever?
14      A   Has -- this has the bounce back defect, and
15  this vehicle can be -- this shift lever can be inserted
16  at the edge of the park land or in false park and
17  remain there.
18      Q   Okay.  Was there any --
19      A   That's the positive.  And that vehicle must
20  have engaged at some point the parking system or --
21  because otherwise it would have rolled down the -- or
22  moved down the ramp so she couldn't exit the vehicle.
23      Q   Okay.  What is it about looking at the shift
24  mechanism in this vehicle that tells you Sharon Vetters
25  moved the shift lever to a particular spot before

32 (Pages 122 to 125)

Page 126

1  exiting her vehicle?
2     A  If she left it in reverse she couldn't exit
3  the vehicle.  The vehicle would have moved.  As soon
4  as she puts that vehicle in reverse, this vehicle is
5  going to move, especially on a ramp.  It's gone.  So
6  there's no way that she could have left this vehicle in
7  reverse on the parking ramp and exited that vehicle
8  without it backing up, so we know that didn't happen.
9  At least my opinion would be based on the physical
10  evidence that this vehicle, when it -- when it's put in
11  reverse, it always backs up immediately, and if it was
12  at high cam idle it's going to have -- it's going to
13  back up even faster.  So that fact alone tells me that
14  this vehicle could not have been re -- in reverse, --
15     Q  Now --
16     A  -- so, therefore, she had to have shifted the
17  lever, moved the lever, otherwise she couldn't have got
18  out of the vehicle.
19     Q  Okay.  So if the vehicle's left in reverse,
20  whether or not it moves in reverse can be dependent on
21  whether anything is blocking or introducing some
22  resistance to that vehicle moving in a rearward
23  direction.  Would you agree with that?
24     A  At some level I would agree with that, sure.
25     Q  Okay.  So if there were some obstruction

Page 127

1  behind the rear tires of this vehicle, for example, and
2  she left it in reverse, depending on the size or the
3  configuration of that obstacle it could prevent that
4  vehicle from moving rearward immediately even though it
5  is in reverse.
6     A  As I said before, there are so -- some
7  conditions that could prevent this vehicle from backing
8  up.  I agree.
9     Q  Okay.  Now, on -- on this vehicle, if -- the
10  Vetters vehicle, if you bring the vehicle to a stop on
11  a slope, such as the driveway at the Vetters's home,
12  and you achieve gated park and the park pawl's inserted
13  in the park gear to the extent it will hold the
14  vehicle, in order to get the shift lever to move out of
15  gated park and have that park pawl withdrawn from the
16  park gear, it would require an operator or some other
17  person to physically move that shift lever out of that
18  position.  Would that be accurate?
19     A  Yeah.  Absent some failure -- other failure
20  mode, that's true.  I have no -- I haven't looked in
21  the transmission, but the testing says that the parking
22  gear should have hold -- should hold.
23     Q  In fact, when you're on a slope, because of
24  the slope itself it introduces a little extra force to
25  the effect, it may even be a little harder to pull that

Page 128

1  park pawl out of park gear.  Would you agree with
2  that?
3        MR. SICO:  Objection, vague and ambiguous,
4  calls for speculation.  Go ahead.
5     A  Well, the testing that I've done that can
6  happen.  In other words, you -- because of the gear
7  load, side load.  Yeah, you can.  If there's enough
8  torque, it can increase the efforts of trying to shift
9  the shift lever to remove the park pawl from the gear.
10  But on this vehicle, the testing -- the ramp testing as
11  I said we did, I didn't -- it didn't indicate that
12  there was a significant increase in shift lever force.
13     Q  Now, the -- the ramp testing you did, what was
14  the grade?
15     A  I don't know.  I said I just did it, --
16     Q  Okay.
17     A  -- you know.  I didn't have the slope or grade
18  of the driveway at the scene, but the ones that I did I
19  didn't see a significant effort increase.
20     Q  Is there any physical evidence that you can
21  point to that tells us where the shift lever was on
22  this vehicle before she exited to get the mail?
23     A  Yes and no.  Physical evidence is that she --
24  it had to be in a parked position that restrained the
25  vehicle on -- on the grade if it's on the ramp because

Page 129

1  the vehicle would have -- if it was in reverse, it
2  would have backed up, and if it wasn't fully in park it
3  would have rolled down and ratcheted.
4     Q  Okay.
5     A  So we know that didn't happen because she
6  couldn't exit the vehicle without the vehicle moving.
7  Now, the other thing is that depending on the position
8  of the rear wheels relative to the roadway.
9     Q  But my question is --
10     A  That makes a difference as to how this vehicle
11  is going to operate, so we -- we have to take that into
12  consideration.
13     Q  My question is, though, what physical evidence
14  is there on the vehicle, or on Ms. Vetters, or -- or
15  whatever physical evidence at all tells us what gear
16  she was in or what position the shift lever was in
17  before she exits to get her mail?
18     A  I gave you that.
19        MR. SICO:  Objection, asked and answered.
20     A  The physical evidence is clear.  She couldn't
21  exit the vehicle through -- and open the door and exit
22  the vehicle if it was in powered reverse and/or not in
23  a parking gear on that ramp.  It -- the vehicle would
24  have moved.
25     Q  Okay.

33 (Pages 126 to 129)

Page 130

1   A   So --
2   Q   And --
3   A   -- that's what I'm telling you. There is
4   physical evidence. Physical evidence is that
5   physically at the scene you can't get this vehicle to
6   stay in reverse on the driveway ramp without either
7   being -- and -- and if it's not in park, it's going to
8   roll.
9   Q   And you're limiting that testimony or that
10  conclusion on the assumption that the vehicle -- all
11  four wheels are on the ramp -- on the slope?
12  A   That's exactly what I'm telling you.  I'm
13  saying when -- when you look at it that way, so that we
14  can eliminate.  The next step is as -- as the vehicle
15  gets further and further to that gutter how that
16  interacts with the system, and I have some opinions
17  about that, but that's in the course of this, I think,
18  discussion.
19  Q   Okay. Now, in the Vetters vehicle, if you
20  achieve fully gated park, this -- this shift lever,
21  this system doesn't jump out of park, does it?
22  A   No.  Not -- not in my opinion, no.
23  Q   Okay.
24  A   It won't.
25  Q   I don't know if I asked you this specifically

Page 131

1   earlier, but when the P is highlighted on the indicator
2   on the instrument panel is it your opinion at that
3   point the vehicle in lock secured park in the
4   transmission?
5   A   No. We've talked about that. You can -- you
6   can have an indication of park before you get it into
7   locked gate.
8   Q   When you -- in your --
9   A   And that includes bounce back.
10  Q   Okay.
11  A   That incorporates my bounce back opinion, so
12  you understand that.
13  Q   All right. In your report, you say "The
14  vehicle was in full gated park," and I'm looking at
15  page five, "and all safety systems were in place and
16  functional. The vehicle would not shift from park to
17  reverse unless Ms. Vetters depressed the brake pedal
18  and manually shifted from park to reverse."
19  A   If the brake interlock system was park -- was
20  working properly, that's correct.  That is correct.
21  Q   Okay.  Now, let's fo --
22  A   And again, you said that all the safety
23  systems were in place and functional, okay.
24  Q   Okay.  And -- and what safety systems are you
25  referring to there?

Page 132

1   A   The brake interlock.
2   Q   Okay.  Let's forget about the brake interlock
3   system for a second. I just want to focus on the gear
4   selection system --
5   A   Okay.
6   Q   -- of this vehicle.  If you're in fully gated
7   park, the vehicle will not shift from park to reverse
8   unless someone manually shifts out of park, correct?
9   A   On this vehicle, I'll agree with that.
10  Q   Okay.
11  A   That's not always true, but on this vehicle,
12  yes.
13  Q   Okay.  Now, in this vehicle --
14  A   And let's be careful with that. We're talking
15  about the shift lever locked in the insert plate gate.
16  Q   Yeah.
17  A   And let -- let me -- when you are saying gated
18  park we have to be careful with that because that
19  terminology can be misunderstood.  When I say gated
20  park, and you say gated park, we've been talking about
21  the shift lever released from the person's hand and in
22  the lock gate -- the tang is in the lock gate -- fully
23  in the lock gate park on the insert plate.  If we
24  agree with -- if that's what you're saying by gated
25  park, we are in agreement.

Page 133

1   Q   Okay.
2   A   Okay.
3   Q   Yeah.  And I was -- I was just reading your
4   report here and you used the term fully gated park, --
5   A   That --
6   Q   -- so that's what I'm asking about.
7   A   Yeah.  That's why I defined it for you.
8   Q   Yeah.
9   A   Fully gated park means that that shift lever
10  is fully in the insert plate, the tang is in the --
11  fully in the insert plate --
12  Q   Now, --
13  A   -- and locked in park.
14  Q   -- when you're in fully gated park, as you
15  said, the vehicle would not shift from park to reverse
16  unless it's manually shifted out of gated park,
17  correct?
18  A   I agree with that.
19  Q   And if you're in fully gated park up there on
20  the insert plate, you're also in the detented park in
21  the transmission, correct?
22  A   I believe that to be true.  Again, I
23  haven't -- we didn't take that apart, but from my
24  inspections -- well, let's put it this way:  By di --
25  design intent that should be true.  In other words,

34 (Pages 130 to 133)

Page 134

1 that's the intended design synchronization. My sensory
2 system, I believe that that's true in the transmission,
3 but we haven't taken it apart to evaluate it, but I
4 think if we did we'd find out that yes, if you had it
5 fully gated park, the ball detent would be in the full
6 park detent in the transmission.
7     Q    Now, in -- in your evaluation of this vehicle,
8 did you determine, when -- when moving the shift lever
9 from reverse gear towards park, when hydraulic reverse
10 drops out in the transmission?
11    A    Yes.  The bleed point, I evaluated that.
12 It's on the videotape, and I don't remember where it
13 was.  I'd have to go back and review the tape.
14    Q    You'd have to look at the tape?
15    A    But I can tell you that it's -- it's greater
16 than plus or minus one-eighth detent.
17    Q    And what do you mean by that, plus or minus
18 one-eighth?
19    A    Ford Motor Company had a specification to try
20 to solve the -- the bleed point problem, which they
21 were aware -- aware of, and they added to their valve
22 body and the -- and the manual valve a -- the assembly
23 plant to try to control this.  The specification was
24 plus or minus one-eighth detent.  That means a full
25 detent is from, for instance, reverse to park.  That's

Page 135

1 full detent to full, that's one detent.
2        So what the specification allowed, it
3 would be plus or minus one-eighth of a detent.
4 One-eighth of the total travel is acceptable for
5 hydraulic shut off of reverse without any bleeding.
6    Q    So if you're leaving reverse, you could go
7 one-eighth of the distance towards park --
8    A    That's correct.
9    Q    -- and you -- and still be in hydraulic
10 reverse?
11    A    Up to that point.
12    Q    Up to that point?
13    A    Right.
14    Q    And after that point?
15    A    It shuts off.
16    Q    It goes in hydraulic neutral?
17    A    Hydraulic neutral and it shuts off and there's
18 no bleed, that's correct.
19    Q    Okay.  Now, on this particular vehicle, the
20 Vetters vehicle, you said you did determine when
21 reverse drops out and the shift reversed towards park.
22 Based on -- on your evaluation, where is the -- the
23 shift lever on the insert plate when you achieve
24 reverse release?
25    A    I don't remember that.  I -- I documented it,

Page 136

1 but my recollection is -- I can tell you it's more than
2 -- more than one-eighth detent.  In other words,
3 one-eighth of the travel distance, whether it be
4 angular or linear.  I don't care how you do it.  But
5 it's -- it's more than one-eighth of the -- it's more
6 than one-eighth, and I think -- my recollection is that
7 I think it was -- it -- minimum was one-third, maximum
8 was one half.
9    Q    When you say more than one-eighth from the
10 reverse detent, where would the tang be in relation to
11 the insert plate when reverse drops out?
12    A    I couldn't observe that.  Remember?
13    Q    Can you tell from your evaluation?
14    A    It's very difficult because you can't see it.
15    Q    Do you --
16    A    You can -- you can guess at it, like I said.
17 I -- my -- my -- my evaluation, without being able to
18 observe it, or do it instrumentally like FAA does, or
19 Exponent, would be -- or Lee Carr now -- would be -- I
20 said it -- my recollection was one-third to one half of
21 the distance on the land which would be the detent.
22    Q    So you do think the tang is on what you call
23 the land between park and reverse detents when you have
24 reverse release?
25    A    Oh, absolutely.  Absolutely.  No question

Page 137

1 about that.
2    Q    Now, when you have -- when you achieve reverse
3 release in that movement from reverse towards park,
4 what is the position of the rooster comb in the
5 transmission, or do you know?
6    A    I understand.  It's either on the pink -- it's
7 either on the peak or it's on the ramp between the peak
8 and reverse.
9    Q    Either on the peak meaning on the top of the
10 -- the very top of the peak, --
11    A    Very top of the peak.
12    Q    -- or on the down slope into the park detent?
13    A    That's correct.  Now, I haven't had -- like I
14 said, we haven't had a chance to look at that
15 transmission operation.  It could be the ball is past
16 the peak toward park, but obviously I can't see that.
17    Q    Okay.
18    A    And it's --
19    Q    And I'm assuming in your evaluation you have
20 some feel and you can -- you can feel and approximate
21 where that ball is on -- on the -- on the rooster comb
22 when you're doing that evaluation.  Is that how you're
23 able to determine that?
24    A    I was able to determine it, but the problem is
25 this has loose cable.  That's one of the defects in

35 (Pages 134 to 137)

Page 138

1  this system, a very loose cable, and that loose cable
2  has problem of allowing you to manipulate the lever
3  without moving the transmission system.
4      Q   But -- but when you're --
5      A   There's a delay.
6      Q   -- but when you're moving the lever and you
7  eliminate the looseness from the cable, can't you get
8  that feel and determine where the ball is on the
9  rooster comb?
10     A   Well, you can from detent to peak, but in
11 between there, you know, it's -- how far up and down
12 the ramp it is, there's no way to configure that.  I
13 mean, there's -- you'd have to be there sitting there
14 with a video camera actually looking at that ball
15 riding up and down.
16         Between the detent and the peak,  there's
17 no question, and you can -- you can use shift lever
18 travel as percentage detent, or you can use it as
19 linear, I don't care, or angular.  It doesn't matter.
20 But there's -- my recollection, between one-third and
21 one half detent rotation on -- with the shift lever on
22 the land that there was hydraulic reverse bleed, or it
23 engaged.
24     Q   Let me ask you this:  With respect to a shift
25 from reverse towards park, and again trying to identify

Page 139

1  where things are when you -- when you, you know, notice
2  reverse dropout, where is the park pawl in relation to
3  the park gear when you have reverse release in the
4  transmission?
5      A   I didn't control that.  I allowed that to
6  flow.  In other words, it could have been blocked or it
7  could have been engaged.
8      Q   Okay.
9      A   I don't --
10     Q   That's something you just don't know?
11     A   Well, I could -- all I do is push the vehicle
12 backwards, but it was -- it's not important to my
13 evaluation at that point.  That's not -- that's not an
14 important part of that evaluation of hydraulic reverse,
15 but all you have to do is push the vehicle backwards or
16 forwards and it'll drop in if it's -- if it's blocked,
17 and if it's unblocked it'll just -- it won't move.
18     Q   Okay.
19     A   So that's -- that's how I do it.
20     Q   Well, when you -- when you are moving the
21 shift lever from reverse towards park and you sense
22 reverse release in the transmission, can you also
23 evaluate the position of the park pawl to the park gear
24 at that point in time?
25     A   You can only do that from -- from the reaction

Page 140

1  of the vehicle.  If you're -- if you're in reverse
2  hydraulic reverse or bleed at that point, the vehicle
3  -- you have to have your foot on the brake pedal
4  because the vehicle would be backing up.  It's not in
5  park.  The park pawl is disengaged.
6          Now, that's when you get to the ratchet
7  point, and the ratchet point is where the vehicle is in
8  fact in reverse and the parking pawl would in fact
9  start or be in partial engagement, --
10     Q   Okay.
11     A   -- and that happens on this vehicle.
12     Q   And I think you said that earlier.
13     A   Yeah.
14     Q   When you -- when you reach the ratchet point,
15 which is where the park pawl begins to contact the park
16 gear, --
17     A   Right.
18     Q   -- you're still in hydraulic reverse.
19     A   Yes, or even -- it'll -- in this vehicle, you
20 can get it to actually start to engages at the tooth.
21     Q   Okay.  The -- you may have answered my -- my
22 question in another way, but -- so that means -- since
23 you've evidence the ratchet point, would it be accurate
24 to say that the park pawl has at least begin -- begun
25 to engage the park gear when you have release dropout?

Page 141

1      A   Hydraulic release, and that's -- that test is
2  a -- is a verification that you have -- you have
3  greater than one-eighth -- plus or minus one-eighth
4  detent for hydraulic reverse disengagement.
5      Q   Now, --
6      A   That's an absolute fact.  It proves that
7  it -- that's what happened.
8      Q   -- when you have reverse release in the
9  transmission in that shift from reverse towards park,
10 at the moment of reverse release do you -- what is
11 indicated on the PRNDL indicator, or do you know?
12     A   Sometimes the light is off, sometimes it's on.
13 As I said, the light will remain on when you can have
14 the false park peak to peak.
15     Q   So on -- which letter would be on?
16     A   Well, no.  There's a position between there
17 where there's no letter on.  Both are off.
18     Q   So you're -- you're able to achieve a position
19 on the PRNDL where neither the reverse or park is
20 highlighted?
21     A   That's correct.
22     Q   Okay.
23     A   And it will stay there.
24     Q   But -- but my question is:  When you reach
25 the point of reverse dropout, what letter's indicated

36 (Pages 138 to 141)

Page 142

1  on the -- on the PRNDL indicator?
2     A   Again, I'd have to go back and review the
3  videotape.  My recollection was that I thought, as I
4  said, I could get the vehicle on the peak with reverse
5  indicated, and I can't recall whether the vehicle was
6  backing up at that point.  I'd have to go back and
7  review the videotape.  I did that test.
8     Q   When the park pawl begins to engage the park
9  gear, where is the PRNDL indicator?  What's
10 highlighted?
11    A   Same -- same answer.  It's a variable because
12 of the -- the lag and looseness in the cable.  You can
13 get it either with the reverse light on or the reverse
14 park light boat off -- both off.  There's a -- there's
15 an in between position where you can have the system in
16 that condition, park pawl either locked or partially
17 engaged, and no illumination.
18    Q   So -- so what you're telling me is, and you've
19 seen it, when the park pawl begins to engage park gear,
20 you've seen it where the reverse light is -- is still
21 on and you've seen it where none of the lights are on?
22    A   That's correct.
23    Q   Okay.  I got you.
24        Now, when the park pawl begins to engage
25 the park gear for the first time, where is the shift

Page 143

1  lever on the insert plate?
2     A   We talked about that.  It's a variable.  It
3  can be one-third to one half, depending on the --
4     Q   Like one-third distance from reverse --
5     A   Towards park.
6     Q   -- towards park?
7     A   Or half.
8     Q   Or half --
9     A   Right.
10    Q   -- of the distance between reverse?
11    A   Depending on how you -- how you -- if you move
12 the shift lever and then engage the lag and then
13 retighten it, it makes a change in the system.
14    Q   Now, when you -- when you say one-third or one
15 half the distance, I -- I guess I need your reference
16 point because you have been using the reverse -- the
17 reverse gate.  Are you talking about the edge of the
18 reverse gate, the edge towards park, or are you talking
19 about the center of the reverse gate?
20    A   Not -- the detent, not the gate.  The detent
21 in the transmission.
22    Q   Well, you -- you've been using gate.  You've
23 been using the word gate, and that's why I asked you
24 about gate.
25    A   No.  No.  You asked me where it was on the

Page 144

1  gate on the insert plate.  I'm saying detent is based
2  on the transmission detents.
3     Q   I understand.  Let me re-ask my question --
4     A   Okay.
5     Q   -- and maybe we'll clear this up.  When the
6  park pawl begins to engage the park gear, where is the
7  tang on the insert plate?
8     A   My recollection is one-third to one half, the
9  detent in the transmission.  There is no detent in the
10 insert plate, except for park.
11    Q   I understand that.
12    A   Right.
13    Q   But can you quantify where it is on the shift
14 lever when you began the -- to have the pawl contact
15 the park gear?
16    A   I don't remember.  I didn't measure the
17 angular trail, so I can't answer that.  I don't know.
18 I'd have to go back and do it.
19    Q   Okay.
20    A   I do it to the detent and the transmission
21 because that's the one that's controlling the hydraulic
22 bleed or hydraulic engagement.
23    Q   And when -- when you were talking about
24 measuring the distance in the reverse detent, is it
25 from the bottom of the valley?  Is that where your

Page 145

1  reference point is?
2     A   It's -- it's the bottom of the valley in the
3  sense of the cam follower achieving a detented
4  centering position because you can take the shift lever
5  and move it and the -- you can tell that the
6  transmission detent is secured.  That's what I'm
7  talking about.
8     Q   Okay.  So --
9     A   So those are the --
10    Q   -- you're talking about from the point where
11 it's secure?
12    A   Secure.
13    Q   And hypothetically I guess what we could do is
14 draw a line right down the middle pointed to the bottom
15 of that valley, correct?
16    A   Right.  And you'll see me move the shift.
17 I've been asked that before.  They asked me why I was
18 manipulating the shift lever back and forth.  The
19 reason is to make sure that the ball team has -- ball
20 detent in the transmission is detented, that's why.
21    Q   Okay.
22    A   Not to change anything, just to make sure it's
23 in, and that's how you check it --
24    Q   Okay.
25    A   -- without doing instrumentation.

37 (Pages 142 to 145)

Page 146

1    Q   So if I understand you correctly, when the --
2   when you first noticed the park pawl begin to engage
3   the park gear, the ball on the rooster comb is
4   one-third to one half distance from a fully seated
5   reverse detent?
6    A   Yeah.  I think it's closer to one half detent.
7    Q   And would that be at the top of the peak --
8    A   Close.
9    Q   -- of the detent?
10   A   Pretty close.
11   Q   Okay.   Somewhere either at the peak or on the
12  reverse side of the detent?
13   A   You've got it.
14   Q   Okay.  I understand now.  The rooster comb or
15  inner manual lever in this transmission selects the
16  hydraulic position of the valve body and operates the
17  park gear system, is that correct, I mean, generally
18  speaking.
19   A   Indirectly it does, but it's the cam -- it's
20  the hydraulic -- what used to be called the manual
21  lever, but now they use -- Chrysler went to that cam
22  plate where you have the pin in slot that follows the
23  cam, so that system is what selects the hydraulic
24  control mode and the valve body.
25   Q   Okay.   Well, the -- the rooster comb in this

Page 147

1   Vetters vehicle moves in relation to the roller or the
2   ball, correct?
3    A   Yes.  And that -- but that moves the cam
4   plate.  It moves the hydraulic manual valve.
5    Q   The rooster comb.  The movement of the rooster
6   comb --
7    A   Moves the plate --
8    Q   -- moves --
9    A   -- the cam plate --
10   Q   -- the cam plate --
11   A   -- which moves the manual --
12   Q   -- which moves --
13   A   -- valve that sets the hydraulics.
14   Q   Okay.
15   A   That's why I say it's not a -- it's not a
16  direct one to one.
17   Q   I -- I understand.
18   A   Okay.
19   Q   So I think indirectly the rooster comb selects
20  the hydraulic position --
21   A   Indirectly it does.
22   Q   -- in the -- in the transmission.
23   A   Correct.
24   Q   And it also operates the park gear system --
25   A   That is correct.

Page 148

1    Q   -- through the park apply rod.
2    A   Correct.
3    Q   Okay.   When you're moving this shift lever on
4   the Vetters vehicle from hydraulic reverse towards
5   park, would you agree that there's nothing about the
6   system that causes someone, an operator, to stop the
7   shift movement between park and reverse?
8    A   I'd agree that there's nothing in the system
9   that prevents that.
10   Q   Okay.  For example, there's not a stop, for
11  example.
12   A   That's correct.
13   Q   Now, as I understand that C802, one of the
14  problems Ford had at that time with that certain
15  transmission, or transmissions, was there was what
16  engineers refer to as a double force peak.
17   A   Right.
18   Q   Do you know what I'm talking about?
19   A   At least.   Yeah, at least a double force.
20   Q   So when -- when you get -- when you're moving
21  out of hydraulic reverse, you would encounter a force
22  and then the force would drop off and then another
23  higher force, and it's that higher force was sending a
24  signal to the operator that he had achieved gated park
25  when, in fact, he had not achieved gated park.

Page 149

1    A   That was one of the allegations, yes.
2    Q   Okay.   Okay.  Let's -- well, let me ask you
3   this:  On the Vetter -- I have not asked you this.
4   When you're -- when you're shifting this shift lever on
5   the 2002 Durango, as you move out of hydraulic reverse
6   into gated park, can you actually feel the tang go down
7   into the park gate?
8    A   Can I?
9    Q   Yeah.
10   A   Oh, yeah.
11   Q   Okay.
12   A   I can, yeah.
13   Q   Is that something that is detectable by an
14  ordinary user of this product?
15       MR. SICO:  Objection, speculation.
16   A   I think that this is detectable, that a -- the
17  average person can detect that the shift lever is
18  locked.
19   Q   Okay.
20   A   I think that's certainly detectable.  Whether
21  they've got it in the -- they don't know anything about
22  this locked gate.  See, that's the problem.  The --
23  the -- that's why I hesitated on my response.
24   Q   Okay.
25   A   The assumption is that the person knows

38 (Pages 146 to 149)

Page 150

1  there's a slot there.  They don't know.
2      Q   Okay.
3      A   They have no concept of what that system looks
4  like.  They're just manipulating the shift lever.
5      Q   Okay.  But there is --
6      A   And if they -- if they get it in there and
7  they try to pull it down, yeah, they'll know about it.
8      Q   Now, when you achieve, when you're actually
9  going into gated park, there is -- there's -- the
10 system is giving you some feedback that you've actually
11 gone into a -- a notch there.  You can sense that,
12 correct?
13     A   I can.  Would the average person?  Not
14 necessarily because they don't even know what -- that
15 there is a notch.  They just know that when they let go
16 of the shift lever, if they try to pull it down, it
17 won't go down.
18     Q   Okay.
19     A   Okay.
20     Q   But, I mean, most people when they are
21 shifting to park, for example, they're -- they're
22 looking for a defined space where the -- the lever will
23 stay there and you can move it back and forth and it
24 won't -- it won't move, correct?
25     A   Well, yeah.  That's false park.  You just

Page 151

1  defined it.  That's what can happen.  You can put the
2  system -- the person can shift this towards -- from
3  reverse into park, drop it on the land, it'll stay
4  there and it looks like it's -- and the ve -- vehicle's
5  in neutral.  That's part of the problem.
6      Q   Okay.  Well, I'm -- I'm not talking
7  about that.  I'm talking about when the tang drops into
8  the park gate on the -- the insert plate in -- in the
9  column.  That is something you can sense, correct?
10     A   I can, yes.
11     Q   Okay.
12     A   Absolutely.
13     Q   And you would expect operators can sense that
14 as well, don't you?
15     A   I don't know.
16         MR. SICO:  Objection, speculation.
17     A   I -- I don't -- they don't understand what a
18 notch is.  I do.  I know -- I know the design, I've
19 studied it, I understand that, I've seen the drawings,
20 I've taken it apart.  I don't think an operator has
21 any concept of what an insert plate looks like.
22     Q   Okay.
23     A   The average consumer, --
24     Q   Okay.
25     A   -- and that's why I complain.  Why don't you

Page 152

1  just show it to them?  Let them look at it.  If they
2  see these notches, they'll put it in there.
3      Q   Okay.
4      A   It's so simple, but --
5      Q   Now, you raise --
6      A   -- that's way it goes.
7      Q   -- a good point.  In fact, you've testified in
8  the past that with respect to insert plates that the
9  only type of insert plate or gate plate that is not
10 defective in any vehicle is one that can actually be
11 seen by the operator; is that correct?
12     A   Well, it's not that it's not defective.  It's
13 still defective, but you just -- what you're doing
14 is -- it's got false park.  That insert plate, no
15 mater what you do to it, intrinsically, latently, has a
16 defect in it called false park.
17         The difference is that you've -- you've
18 let the operator know that there are particular
19 positions where you put the shift lever where it will
20 operate the vehicle, and one of them is this slot that
21 you keep -- you say they should know it's there.  No,
22 they don't know it's there, but if you show them
23 there's a slot -- and I'll give you a good example of
24 that.
25         If you look at Mercedes, the old Mercedes,

Page 153

1  which probably was the first one, Audi's, they have a
2  gate for the shift lever on the column on the console.
3  They have a little gate just like the insert plate, and
4  so they know.  You go "Cha Chi" and you slip -- you
5  slip it over in reverse and it locks into that insert
6  plate.  That's showing them the gated positions in the
7  insert plate visually on the console, and they do that.
8         They have that shift pattern on Audi's,
9  they had it on Volvo's, Mercedes, then they started to
10 integrate that to try to prevent this problem so that
11 that was a quote/unquote "visual connection" between
12 the driver and the insert plate.  That still doesn't
13 tell you that you have it in the insert plate in the
14 vehicle that's underneath all that beautification by
15 the stylist.
16     Q   Okay.
17     A   So I'd like to just show -- why don't you just
18 show the people this insert plate?  It's -- if it's so
19 ugly, I'd rather have something ugly than killing
20 people.
21         MR. SONNIER:  Let me object to
22 responsiveness.
23     Q   (By Mr. Sonnier) You've introduced the term
24 false park here during the deposition, and I -- I want
25 you to explain to me what false park is.

39 (Pages 150 to 153)

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 154

1     A    False park is a position of the vehicle where
2    you -- you -- the person can shift the -- the shift
3    lever between park and reverse, that the engine
4    transmission will be disconnected and in a neutral
5    mode, and that the shift lever can be placed on the
6    land between park and reverse and remain there.    That
7    is false park.   Then there's classic false park, which
8    is different, but that's false park.
9         Q    Now, you've used false park in your report
10   with respect to the Vetters vehicle.
11        A    Correct.
12        Q    When you use that term false park, is that the
13   definition that you just gave me?
14        A    Yes.  And then there's the classic false park
15   definition.
16        Q    What is that?
17        A    That's where you have the -- false -- classic
18   false park is where you have the rooster comb of the
19   transmission on the peak between park and reverse
20   detents, the park pawl -- parking pawl is blocked from
21   the parking gear and the shift lever is between park
22   and reverse on the land somewhere and the vehicle is in
23   hydraulic neutral.   That's classic false park.
24        Q    And classic false park, you said rooster comb
25   and I don't think I caught what you said after that.

Page 155

1    Is that when the ball is resting on the peak between
2    park and reverse detents?
3         A    That's classic false park.
4         Q    And you're talking about the old rooster?
5         A    Or -- or in Chrysler you've got -- well, you
6    don't have a peak.   That's the problem.
7         Q    Okay.
8         A    On the old rooster comb, you don't have a
9    peak, but in the Ford and GM where you have that peak
10   the classic false park is on the peak on the rooster
11   comb in the transmission between park and reverse.
12        Q    Okay.  Vetters --
13        A    That's one of the elements.  I gave you the
14   rest.
15        Q    Okay.  The -- the rooster comb on the -- the
16   Vetters vehicle, it does have a peak, correct?
17        A    Yes.
18        Q    Okay.
19        A    It does.
20        Q    Now, -- so false park, as defined by you, is a
21   position where an operator can shift the lever between
22   park and reverse, the transmission is in hydraulic
23   neutral, and the shift lever stops between the park and
24   reverse gates on the insert plate and that lever can
25   remain in that position, correct?

Page 156

1     A    Yes, and the ball detent will remain in that
2    position.  That is -- that is possible on
3    transmissions, but the concept of the peak in the
4    classic park to reverse eliminates the potential to
5    either shift forward or backwards if it's not on -- if
6    it's on the ramp.
7         Q    Let me ask you this:  When this vehicle is in
8    a configuration where you say it's in false park, what
9    is indicated on the PRNDL indicator located on the
10   instrument panel?
11        A    Well, I got it in reverse.  As I said, I put
12   it in -- on -- on the detent.  I put it on the crest of
13   the rooster comb and the shift lever was between park
14   and reverse, and whether or not the -- the transmission
15   was in block, I didn't care.  It could have been
16   blocked or unblocked, but if it would have been blocked
17   that would have been cla -- classic false park.
18        Q    Okay.  So what you're saying is when you
19   achieve this false park position on this vehicle, the
20   PRNDL indicator is still highlighted with the R.
21        A    Yeah.  And it's in neutral.
22        Q    And it's in hydraulic neutral?
23        A    Yes.
24        Q    Okay.  Now, I think you answered this, but
25   you don't know where the position of the rooster comb

Page 157

1    is at that point in time.
2         A    What point in time?
3         Q    When you -- when you're in this false park
4    mode as you've defined.
5         A    Well, I know when it's on peak.  I can't tell
6    where it is exactly.  I can tell you which side it's
7    on.
8         Q    Which side is it on?
9         A    When -- when what?
10        Q    When you're in false park as defined by you
11   that we've just been discussing.
12        A    Generally, on this vehicle, the particular
13   vehicle, the way I found is that if the bleed point
14   doesn't actuate at one half, then you can put it in a
15   position where it's not-- where it's on the ramp
16   between reverse -- or between the peak and reverse.  I
17   think we talked about that before.
18        Q    Okay.  So in --
19        A    Remember when you said you understood when I
20   said peak and down the ramp?
21        Q    In your false park mode, the -- the rooster
22   comb is in a position where the ball is on the -- the
23   ramp on the -- the reverse side of the ramp, reverse --
24        A    Correct.
25        Q    -- side of the peak?

40 (Pages 154 to 157)



**Page 158**

1    A   That's when the -- that's when they hydraulic
2    bleeds at one-third, that's correct.
3        Q   And just to clarify, I think you said this
4    before I asked you about the rooster comb, but at that
5    point you don't know exactly where the park pawl is in
6    relation to the park gear.
7        A   No, because it could have been blocked or it
8    could have been partially engaged.  I didn't care.  I
9    wasn't evaluating where that was.  I was evaluating
10   the -- the known conditions.  I would have had to push
11   the vehicle backwards to -- to answer that, but the --
12   the answer -- the answer is clear on this vehicle.
13       It's in hydraulic reverse when it's
14   ratcheting, therefore, this vehicle has a hydraulic
15   engagement when the park system is engaging, so that --
16   that tells -- that sets up the defect that I -- that
17   I've defined as a defective hydraulic bleed.  There's
18   no question that this vehicle is defective.
19       As soon as you get this park pawl
20   ratcheting with reverse engaged, you've already got the
21   hydraulic defect.  That system should have shut off
22   way before that.
23       MR. SONNIER:  Let me -- let me object to
24   responsiveness.
25       Q   (By Mr. Sonnier) Let me kind of be more

**Page 159**

1    particular here, and I can do that by going through
2    your report.  This report we've marked it as Discovery
3    Exhibit 48.  Is there a date on here?  Do you know when
4    you prepared this report?
5        A   No.  There is no date.
6        Q   Do you know what day it would have been?
7        A   Actually, no, I don't.  I'd have to go back
8    and figure out when I sent this to Mr. Sico with a
9    letter.  There's a cover little, I think, that went to
10   Mr. Sico.
11       Q   Is that a part of your working file over here
12   somewhere?
13       A   I didn't see it.
14       Q   Okay.
15       A   Or it was faxed, one or the other.  But I
16   don't have a date on it, no.
17       Q   Okay.  Going through this -- and do you have
18   a copy in front of you?
19       A   Yeah.
20       Q   Okay.  We'll just -- I'll just -- instead of
21   us handing paper back and forth, you refer to your
22   copy --
23       A   Okay.
24       Q   -- and I'll refer to mine.
25       A   All right.

**Page 160**

1        Q   And if there's some discrepancy you let me
2    know.
3        A   All right.
4        Q   You note here in the background that this
5    accidents was investigated by the Corpus Christi Police
6    Department, correct?
7        A   Correct.
8        Q   And I take it you haven't talked to anyone at
9    the police department about this accident.
10       A   I have not.
11       Q   Okay.  You -- you note that the
12   investigator -- investigating officer had a narrative
13   in his report, correct?
14       A   Correct.
15       Q   And you actually recount that language here in
16   your report.
17       A   I do.
18       Q   Okay.  Let me just ask you in a roundabout
19   way:  Did you rely on the officer's report in reaching
20   your opinions in this case?
21       A   Just for factual information.
22       Q   Okay.
23       A   Vehicle identification and the scene, stuff
24   like that.  Not his opinions, no.
25       Q   Okay.  Now, getting down to that very next

**Page 161**

1    paragraph after you recount what the -- the narrative
2    was from the officer, you say "Based on the
3    depositions, physical evidence, photographs and witness
4    statements, Mrs. Vetters started the vehicle, backed
5    down the driveway near the mailbox, shifted the vehicle
6    into park, exited the vehicle to retrieve her mail, and
7    the vehicle backed up in powered reverse with a right
8    steering wheel input."  Did I read that correctly?
9        A   Yes.
10       Q   Okay.  And we've already talked about the
11   idea that we agree she backed out of her garage in
12   hydraulic reverse, correct?
13       A   Correct.
14       Q   I mean, otherwise she would have had to push
15   the vehicle, and that doesn't make any sense, does it?
16       A   Could have taken it out of park and rolled.
17       Q   Okay.
18       A   She didn't have to do anything.  All she has
19   got to do is take her foot off the brake.  I mean, you
20   can think of all these different things.  That's not
21   an opinion, by the way.
22       Q   Okay.  Going down here at the bottom of that
23   page, preliminary opinions, this is when you get into
24   kind of the -- the meet --
25       A   Yeah.

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 162

1   Q   -- of your report.  You state that "The
2   following opinions and conclusions are based upon a
3   reasonable degree of scientific and engineering
4   certainty and the information available."  The
5   information available that you're talking about,
6   would -- would that be documents and statements and
7   depositions, things that are contained in your file?
8   Is that what you're referring to?
9   A   Yes.  What I had at the time of the report.
10  That would be -- that would be the available
11  information.  I think you saw the letters.
12  Q   Yeah.
13  A   So the report had to be after those dates when
14  I received the materials because I had those materials
15  available at the time I wrote the report.
16  Q   Okay.  Then you go on to state, you know, "My
17  inspection of the subject vehicle" --
18  A   Right.  So it's after that.
19  Q   -- "examination of exemplar vehicles/bucks."
20  And talking about exemplar vehicles/bucks, we've
21  already talked about three exhibits or bucks produced
22  by Mr. Rosenblueth, correct?
23  A   Yes.
24  Q   And those are -- those are things you're
25  relying on to support your opinions in the case,

Page 163

1   correct, --
2   A   That's correct.
3   Q   -- those three exhibits?
4   A   I am relying on them as a portion of my
5   opinion, yes.
6   Q   And -- and the exemplars, you haven't
7   independently evaluated a 2002 Dodge Durango in the
8   Vetters case, correct?
9   A   That's correct.
10  Q   Okay.
11  A   Not an exemplar, no.
12  Q   Now, you say --
13  A   Exemplar means exem -- other vehicles.
14  Q   Other vehicles.
15  A   Correct.
16  Q   And that -- that's when we get into talking
17  about the Grand Cherokee, and -- and I think another
18  earlier model --
19  A   Yes.
20  Q   -- Durango that you talked about earlier,
21  correct?
22  A   That's correct.
23  Q   Okay.  Now, the testing of exemplar
24  components, are you talking about the components in
25  the -- the bucks that we've been discussing?

Page 164

1   A   Yes, but that doesn't exclude testing of other
2   exemplar transmissions, okay.
3   Q   Okay.
4   A   But we discussed previously.
5   Q   Back up for a second.  You agree that
6   operators of motor vehicles can make mistakes.
7   A   Sure.  They're humans.
8   Q   I mean, you've testified many, many times
9   that -- that certain accidents may be the result of
10  operator error or operator mistake.
11  A   Absolutely.
12  Q   Okay.  Turn to the next page.  You talk
13  about you're relying on discovery materials for
14  supporting basis, da, da, da.  I guess discovery
15  materials would be those items that Mr. Sico provided
16  to you that were produced in this case, correct?
17  A   Well, that and the stuff in Haller --
18  Q   Okay.
19  A   -- that's relevant to this case.
20  Q   Okay.
21  A   I don't want to exclude that.
22  Q   And -- and that get back -- gets back to just
23  the general concept about having different positions
24  for various gears in the transmission.
25  A   Oh, no.  That establishes Chrysler's safety

Page 165

1   policy because of their responses to NHTSA in the -- in
2   the response.  That establishes foreseeability and
3   notice to Chrysler of the defective condition.  I
4   mean, there's more than that.
5   Q   Okay.
6   A   All right.
7   Q   What -- what else?
8   A   The standards that were provided that are
9   generic in -- in Haller, which I can't use.  I think
10  they're under protective order.  I can't apply them to
11  here in the sense of using them, but I sure remember
12  them.  The PF and the PS and the corporate FMEA, the
13  corporate testing program.
14          As I said, one of my opinions is that --
15  that this vehicle is defective, one of the reasons is
16  because Chrysler doesn't have the test for false
17  detent.  They never developed an FMEA for false
18  detent.  They don't even admit that the false detent
19  has any relationship to these vehicular defects and --
20  and injuries.
21          So my point is all that adds up and comes
22  out of not only Haller, but out of other Chrysler cases
23  I've had, their C802 responses to the government, and
24  that gives you all the information you need to know
25  about foreseeability notice, the Chrysler safety policy

42 (Pages 162 to 165)

Page 166

1    as it relates to -- in general how they're designed,
2    their design process, how they go about designing this
3    transmission system, and why that design process is
4    flawed and why it explains this defect, the lack of an
5    FMEA, the lack -- or a proper FMEA, the lack of design
6    validation. All those things interact and they're part
7    of my opinions, so I don't want to -- but all that
8    information doesn't come from this file, okay.
9        Q    Okay. I got you.
10       A    All right.
11       Q    Now, moving on down you have a bunch of
12   separate lettered --
13       A    Yes.
14       Q    -- points, and I'll go through those to the
15   extent I have questions about them.
16       A    Okay.
17       Q    Of course, A is, you know, kind of the
18   catchall deal up front, obviously, but you believe
19   there's a -- the 2002 Dodge Durango is unreasonably
20   dangerous and defective due to defects associated with
21   automatic transmission gear selection system and the
22   brake-shift interlock system?
23       A    Correct.
24       Q    I read that correctly, didn't I?
25       A    You did.

Page 167

1        Q    Okay. Now, the manufacturing defects that
2    you're referring to, that is specific as to the
3    brake-shift interlock device, and we've already talked
4    about that, correct, about the tab?
5        A    No. The key interlock system and the loose
6    cable.
7        Q    Okay.
8        A    Right.
9        Q    So the key interlock issue and then the --
10       A    Looseness in the --
11       Q    -- loose cable or slack of the cable?
12       A    Looseness in the cable, yeah.
13       Q    Okay. Tell me about that. We -- I mean, we
14   didn't get into depth about that earlier, so why don't
15   you tell me what your complaint is with respect to
16   the -- the cable or the shift linkage in this vehicle.
17       A    You can -- you can have bounce back where you
18   can put the -- the cable allows you to put the shift
19   lever -- gear shift lever on the end -- edge of the
20   land between park and reverse with the system in park,
21   but it's not in park.
22       Q    And when you say on -- on the edge, you have
23   the -- the tang on the edge right before it drops off
24   into the park gate in the column, correct?
25       A    That's correct.

Page 168

1        Q    Okay. And you said you can be there, but yet
2    what? Not --
3        A    It's not locked, but it's in park.
4        Q    In park where?
5        A    In the transmission.
6        Q    Okay. And -- and in -- in your mind, why is
7    that a defective condition?
8        A    Because there's no way that a person should be
9    able to, because there's looseness in the cable
10   linkage, have that lever stay there without
11   intentionally placing it there. In other words, this
12   is not my intention, this is unintentional bounce back
13   positioning of the shift lever on the land between park
14   and reverse as opposed to the person intentionally or
15   mistakenly putting it there, --
16       Q    Okay.
17       A    -- which you talked about previously where I
18   say "Yeah, there is driver error." Some people do
19   have driver error --
20       Q    Some --
21       A    -- where they knowingly and intentionally --
22   if they knowing and intentionally put it in false park,
23   or a park that's not in park lock, assuming they know
24   that, that can be driver error. But if they -- if the
25   system allows them to put it there and they don't know

Page 169

1    it's there, then the system's at fault.
2        Q    When you talk about bounce back, are you
3    talking about a situation where the operator moves the
4    shift lever from any other gear towards gated park and
5    they -- the tang goes over and hits the park stop on
6    the insert plate where it doesn't -- the tang doesn't
7    fall down into the notch, it bounces back and rests on
8    that peak or on the -- on the land between
9    the park and reverse gates?
10       A    Yeah, the way it works --
11       Q    Is that what you --
12       A    -- is that -- that's right. The person
13   speeds -- shifts it up, hits that land, and then if you
14   let go of that handle it should automatically engage
15   park lock. That's my position of the system. No
16   matter what you do, when you -- as soon as you hit that
17   stop and you let go of that handle, it should
18   automatically engage the park lock.
19           In this system, if you do that and you let
20   go of the handle and because of your movement of your
21   hand and the slack in the system because of the loose
22   cable, you can let go of the handle and it'll bounce
23   back and land on that edge and not be in lock park.
24   That should never be able to happen on a system unless
25   you intentionally do that.

43 (Pages 166 to 169)

Page 170

1    Q   How are you able to achieve that bounce back
2  position?
3    A   Just take it, put it in drive or reverse,
4  shift it up, hit the stop, and just do what a person
5  would, let go of the handle.   Sometimes it'll go in
6  the slot, sometimes it'll bounce back and land on the
7  land because the cable is loose and it doesn't force it
8  into the locked gate.
9    Q   And how do you --
10   A   And also because of the park.   The other
11  problem is you have the effort problem where you have
12  the park pawl blocked.   You get the feedback through
13  the system and the cable will actually help assist it,
14  your handle, because you're getting feedback.
15   Q   And how do you --
16   A   It's a push cable.
17   Q   -- how do you determine in a bounce back
18  situation that the tang comes to rest in a position
19  other than gated park?
20   A   How do I do it?  Oh, I just --
21   Q   How -- how do you determine that it's in a
22  position other than gated park?
23   A   Well, I can do it two ways.   I can look at it
24  usually and see that the shift lever is closer to the
25  column, that's one, and staying there; No. 2 is because

Page 171

1  you just touch it and it will pop into the gate.   You
2  hit it and -- or move it and it will go down into the
3  gate.   That's how I determine it.
4    Q   Okay.  Have you done any studies to determine
5  the frequency with which an operator of this system can
6  achieve a bounce back position and the tang comes to
7  rest in a position other than fully gated park?
8    A   Have I done a study?  No.
9    Q   Now, when you're on the edge of the land, as
10  -- as you have described in this bounce back position,
11  what you're saying is in the transmission you're
12  already in park, --
13   A   That's correct.
14   Q   -- but -- but the shift lever itself is not in
15  gated park.
16   A   That's correct.
17   Q   Okay.  So the -- the park pawl would either
18  be abutted or blocked, as you called, or actually
19  inserted into the -- the park gear itself?
20   A   Yeah.  Depending on the terrain and -- and
21  what we talked about.   In other words, if it's on
22  level ground, it could be blocked or it could be
23  engaged, depending on the -- the grade or ramp.  You
24  couldn't do that because it would -- it would -- it
25  would cause roll back and lock it up.

Page 172

1    Q   Now, specific defects, and you address this in
2  point No. E down here where we've talked about the
3  false park position between the park and reverse.
4    A   Right.
5    Q   You say park and reverse detents.   Do you
6  mean to say park and reverse gates?
7    A   No.   The -- the false park position is -- is
8  associated with the detents in the transmission.   The
9  shift lever lands where it lands, but the -- on the
10  insert plate, but the rooster comb position, if it's on
11  the peak, that's false -- that's classic false park.
12   Q   When -- when you say on the peak, you mean
13  literally resting on the top of that pointed peak?
14   A   Correct, literally.
15   Q   Okay.  You would agree with me that that is
16  a -- the -- I guess the chances or the likelihood of
17  someone actually achieving that position are fairly
18  remote.
19   A   I don't agree with that.
20   Q   You think it can be done when someone's not
21  intentionally trying to put it there?
22   A   Oh, I know it can be done without somebody
23  intentionally doing it.
24   Q   And how do you know that?
25   A   Because I have evaluated thousands of

Page 173

1  transmissions over the last 23 years and I can put it
2  on every one of them.   I can put it on your Haller
3  vehicle with the fix in it.
4    Q   And how do you know it's on the --
5    A   And that's got peaks -- plastic peaks.  I can
6  put it on there.   I can put that in false park.
7    Q   Okay.  How do you know it's on the top of the
8  peak on the rooster comb when you can't see the rooster
9  comb?
10   A   Because I can -- I do it more than once.  I
11  don't do it just once.   I do it more than once, and I
12  can -- once I get the feel for it, I can put it in
13  almost every time.   But I'm -- I will give -- I'll
14  grant you this, that it is more difficult with the peak
15  than the old rooster comb to get it to go into false
16  park.   I'm not -- I will tell you that.
17   Q   On the Vetters rooster comb?
18   A   That is true.  I won't -- I won't tell you
19  that it is more difficult, but you can get it in, and
20  you can do it unintentionally or intentionally.   But I
21  -- I agree, it is more difficult.
22   Q   Now, point No. 2 here on E, you say
23  "Relatively flat land on inner shift plate allowing
24  placement of gear shift lever between park and
25  reverse."   That's where we're talking about the gate

44 (Pages 170 to 173)

Page 174

1  plate --
2     A  Yes, the land --
3     Q  -- in the column, correct?
4     A  -- between park and reverse on the insert
5  plate, that's correct.
6     Q  Okay.
7     A  Shift -- see, they -- they also call it shift
8  plate.
9     Q  Okay.
10    A  Okay.
11    Q  Now, point No. 3, "Uncontrolled hydraulic
12  bleed position between park and reverse detents."
13  Let's -- let's discuss that a little bit because
14  you've -- you brought up the bleed condition earlier,
15  but we -- I haven't asked you any questions about it.
16  What -- what are you talking about when you say there's
17  a hydraulic bleed condition on this vehicle?
18    A  Hydraulic bleed just means that there's a --
19  between the point of neutral -- hydraulic neutral and
20  transmission on idle where the transmission is
21  disconnected from the engine drive mechanism.  That's
22  hydraulic neutral.  They're totally disconnected.
23        Reverse means that you have full hydraulic
24  engagement where the entire hydraulic system is at full
25  pressure in the -- in the valve body and powered

Page 175

1  reverse is engaged in the transmission and the engine
2  and transmission are connected in powered reverse.
3        Hydraulic bleed is a point where you can
4  -- where the valve is sitting setting, and because of
5  the design, hydraulic fluid will -- will bleed at a
6  specific flow rate and pressure and then will engage
7  reverse over time.
8     Q  Does a bleed condition exist in every
9  automatic transmission vehicle?
10    A  Pretty much.
11    Q  And -- and why is that?
12    A  Because the -- the tolerances and the design
13  of the hydraulics and the quality control perimeters
14  and the build variations prevent a shut-off without
15  tolerance -- hydraulic shut-off without a tolerance.
16    Q  Now, --
17    A  That's why.  Because of its build variations
18  and tolerances and design of the control mechanisms
19  where every part has tolerance, and -- and those
20  tolerances add up and so when -- when -- when the land
21  of the spool valve is supposed to shut off the -- the
22  port of the valve body, whether it's a hole or a slot,
23  it doesn't completely cut it off or there's tolerances
24  and tapers that -- that allow hydraulic bleed.
25    Q  How are you -- on -- on the Vetters vehicle,

Page 176

1  how are you able to determine the point at which you
2  can get hydraulic bleed?  Describe -- describe how you
3  went about finding that.
4     A  Engine on, hydraulic reverse.  There's two
5  ways, I told you, park to reverse, reverse to park.
6  You take it from reverse, you move the shift lever very
7  slowly towards park, and there will be a point where
8  there will be neutral.  Then you go do the same thing,
9  you establish from park, you go towards reverse and you
10  will get to the point where it will engage reverse, so
11  you have the engagement and disengagement range and
12  they're not aligned.
13        See, when you go to park to reverse, it's
14  different when you go to reverse and park on this
15  system because of the lag and -- and tolerancing and
16  the mechanical linkage.
17    Q  So what you're saying in -- in -- let's
18  isolate --
19    A  Yeah.
20    Q  -- the movement when you're going from
21  reverse towards park.  You said you moved the shift
22  lever slowly.
23    A  Right.
24    Q  Un --
25    A  Very slow.

Page 177

1     Q  -- until you get to a point where you reach
2  hydraulic neutral or, another way of saying it, you
3  have reverse dropout.
4     A  If you want to say that, that's fine.
5     Q  Okay.
6     A  I -- I call it disengagement.
7     Q  Okay.  We'll use your term, then.  So you're
8  moving it slowly from reverse towards park and you have
9  reverse disengagement.
10    A  Correct.
11    Q  And you can actually -- the operator can feel
12  that, correct?
13    A  Oh, yeah.
14    Q  Okay.
15    A  You'll sense it right away because your foot's
16  on the brake, the vehicle will -- when you take your
17  foot off, the vehicle will remain stationary.
18    Q  Okay.  Do you --
19    A  That's neutral.
20    Q  Assuming it's on a flat surface?
21    A  Yeah.  I understand.
22    Q  Okay.
23    A  Of course.
24    Q  Now, are you saying that you move it so slowly
25  that just after you get to that reverse release point

45 (Pages 174 to 177)

Page 178

1 that valve is still not completely closed, therefore
2 allowing hydraulic fluid to continue to get into that
3 area?
4     A.  No.  No.  That's not -- what I'm trying to do
5 is I have to get the engagement/disengagement point to
6 get the rage of where a bleed could occur.  That's how
7 I set up to determine where -- where the range of
8 hydraulic bleed could occur.  Between those two points,
9 when I just defined on the shift insert plate and on
10 the transmission, you can get hydraulic bleed, so what
11 you do is you put that -- you hold that shift lever in
12 that position and -- and the vehicle will be in
13 neutral, and then all of a sudden it will slowly bleed
14 and back up --
15     Q.  And why is it bleeding?
16     A.  -- over time.
17     Q.  Why --
18     A.  Because the tolerant -- the -- the spool valve
19 in the -- in the manual -- spool valve in the
20 transmission cannot, in that position, shut off the
21 port -- hydraulic port that directs the fluid to the
22 clutches and the bands in the transmission, so it will
23 engage with enough pressure.  It slowly bleeds into
24 reverse and then normally what happens when that bleed
25 starts and the vehicle starts to move it will go into

Page 179

1 full hydraulic reverse then.
2         That's not always true, but most -- more
3 than -- more vehicles that I've tested have gone into
4 power -- full power reverse than not, so there's a
5 higher percentage that will, but some of them don't.
6 Some of them stay in hydraulic bleed and will back up
7 slowly.
8     Q.  How is it that you're able to identify that
9 there is a bleed condition?
10     A.  I just did that.  I told you.
11     Q.  Is it because --
12     A.  I --
13     Q.  -- it's not moving at one point and then
14 after an undefined period of time it begins to move?
15     A.  Yeah.  I mean, if you put the vehicle in
16 neutral and it sits there and the -- and the
17 transmission engine are disengaged and then all of a
18 sudden you don't do anything else, but you hear --
19 you'll hear the engine in the vehicle start to lug
20 because the hydraulic pressure is starting to kick in
21 and it's starting to engage the clutches of the
22 transmission which loads the engine, and then you'll
23 all of a sudden see the vehicle back up.
24     Q.  And the --
25     A.  I mean, that's hydraulic bleed.

Page 180

1     Q.  -- and the way you're able to evaluate that
2 and achieve it is, as you've described, you're bringing
3 that lever slowly over to where you -- you just get to
4 the point where you have reverse release, correct?
5     A.  Well, I know that the range, and I get the
6 reverse release and then I move the lever into slightly
7 more and leave it there and if it will stay there.  It
8 has to stay there.
9     Q.  Okay.
10     A.  You can't, you know, hold it there.  Some
11 vehicles you have to do that because it will pop back
12 in reverse.
13     Q.  Okay.
14     A.  But if you hold it there and it stays -- and
15 if you let go of the handle and it stays there, remains
16 stationary, and then all of a sudden it starts to back
17 up because of bleed, then you've got the A hydraulic
18 bleed point, not necessary -- you don't have them all
19 because there's more than that, but that's one of them.
20 I told you what the range is.
21     Q.  And you -- and you -- in order to -- to define
22 this you have to purposely find that area where you can
23 achieve that bleed condition, correct?
24     A.  Well, as -- as -- as a scientific evaluation
25 to figure out where it is to see if it has it, that's

Page 181

1 what you do.  And once you find that it has it, it has
2 it, so all you have to do is somebody has to put it in
3 that position and it will hydraulically bleed
4 eventually.
5     Q.  Okay.  Now, in -- in the case of an ordinary
6 operator, just take anybody that, you know, that you
7 know or have experience with or have evaluated in the
8 past, would you agree that it is not typical for a
9 person operating a 2002 Durango --
10     A.  Excuse me.
11     Q.  -- to have a shift movement which is very slow
12 and intentionally if they're attempting to achieve
13 secured park?
14         MR. SICO:  Objection, calls for
15 speculation.
16     A.  It depends on the person.  I think that the
17 average age -- young age person, no.  I think they
18 don't have any trouble.  They go -- they just shift
19 it.  There's no slow shift.  I -- it depends on the
20 age of the person, it depends on the position of the
21 person, it depends on what they're doing, how attentive
22 they are.
23     Q.  Now, when you -- when you reach -- getting
24 back to the reverse towards park movement.  When you
25 find that area where you get a bleed-on condition,

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 182

1   where is the tang on the insert plate?
2      A   Somewhere between park and reverse.  I'd have
3   to go back and go through the video to figure that out.
4      Q   Can -- and --
5      A   Or go back to the vehicle.  It's still on the
6   vehicle.
7      Q   And how would you -- I mean, looking at the
8   video, what -- what would you be looking for to -- to
9   define where it is?
10     A   I think I stated it.
11     Q   So you verbally stated it on there?
12     A   I think I did, yeah.
13     Q   Okay.
14     A   That's my recollection, yeah.
15     Q   Okay.  And -- and you said between park and
16  reverse.  It's on the flat part of the insert plate
17  between park and reverse gates.
18     A   I knew it was on the flat between park and
19  reverse, but where you're asking me I don't remember.
20     Q   Okay.
21     A   It's definitely between park and reverse on
22  the land.  No question about that.
23     Q   And -- and what -- what about on the rooster
24  comb, where -- where would the -- the ball be when
25  you're able to achieve this bleed-on condition?

Page 183

1      A   As I recall, between one-third and one half
2   detent.  That's my recollection, not without going
3   back and reviewing the whole video.
4      Q   Now, point 4 here you talk about, let's see,
5   lack of a positive detent gear selection system such as
6   increasing spring tension and elimination of the
7   hydraulic bleed position.  I guess my question is,
8   what -- what do you mean by positive detenting gear
9   selection system?
10     A   Positive detenting means automatic detenting,
11  passive.
12     Q   To -- to the layperson, how -- how would you
13  explain that?
14     A   They have -- they don't have to do anything
15  other than shift the gear to P and it's automatically
16  in the locked park position or the gated park position.
17  It's there.  It's an automatic thing.  The person
18  doesn't have to rely on what they do, the system does
19  it for them, --
20     Q   Okay.
21     A   -- which makes a lot of sense to me.
22     Q   What -- so what you're saying is you want a
23  system where the individual wants to go to lock secured
24  park, they move it that direction, they see P
25  highlighted on their indicator, their visual indicator,

Page 184

1   and that that, by God, is lock secured park.
2      A   Absolutely, in the transmission.
3      Q   In the transmission.
4      A   Right.  Absolutely locked park.  It's --
5   it's there, it's going to stay there, and it's
6   automatic.
7      Q   Now, can you tell me what vehicles are out
8   there today that have this positive detenting gear
9   selection system that you propose or think should be in
10  this vehicle?
11     A   I haven't seen it.
12     Q   Now, increase spring tension.  You talk about
13  the spring -- well, you tell us.  What spring are you
14  talking about?
15     A   The cam levers ball roller cam detent on the
16  rooster comb -- linear rooster comb on this case.
17     Q   What -- what -- the -- the spring in the
18  Vetters vehicle, what kind of force or what -- how
19  would you quantify that in terms of the spring tension
20  or spring force?
21     A   I think Rosenblueth measured that, and it's
22  quantified two ways.  One is free length and two is
23  engaged and -- or it's engaged at two spots, one is
24  engaged in detent and one is as it moves up the rooster
25  comb peak the force increases on the cam lever spring,

Page 185

1   so you have to increase that --
2      Q   Okay.
3      A   -- so it snaps in.
4      Q   And what --
5      A   And we did that on the -- on the other buck.
6      Q   Okay.
7      A   I think it's a 15 pound or 12 pound versus the
8   production.
9      Q   So the alternative design that you would
10  propose, that spring should have a tension or force of
11  12 to 15 pounds?
12     A   No.  I think that's -- I -- again, Jerry did
13  that, so I'd have -- he -- he's going to be deposed and
14  he'll give you that information.
15     Q   Okay.
16     A   I don't have that information at this point.
17     Q   Well, let me ask you, do you have an opinion
18  on what kind of spring should be in this system that
19  would be --
20     A   Yes.
21     Q   -- not defective?
22     A   Yes.  Greater than the one that's in the --
23  higher than the one that has been produced, OEM by
24  Chrysler.  It definitely has to be higher.
25     Q   What is the spring force on the OEM spring in

47 (Pages 182 to 185)

Page 186

1 this vehicle?

2    A  I told you, I don't know yet.

3    Q  You just haven't measured it or you just don't

4 know?

5    A  Well, the -- I didn't get the drawing for this

6 cam roller. That would be on the drawing, or it's a

7 spec -- it could be a specification.

8    Q  Is there any way --

9    A  It could be one of the specifications. I

10 don't -- the answer is I don't know because I don't

11 have the spec. It could be on a spec. It should be

12 specification SF or PF. The specification of Chrysler

13 should say that there should be X pounds or should be

14 on the assembly drawing that the spring force should be

15 X pounds, and it should be a check.

16    Q  Is there any way you can quantify what the

17 alternative design would be? Would it be 10 percent

18 more, 50 percent more, 100 percent more?

19    A  I could with the -- with the caveat that I

20 have to get the specification for the maximum shift

21 efforts that Chrysler allows the product because that

22 may have to be adjusted because they may not be

23 aligned. In other words, if Chrysler spec says that

24 the shift effort from park to reverse can't exceed 15

25 pounds, let's say, or 20 inch pounds, whatever --

Page 187

1 whether they want to talk about torque, whether they

2 want to talk about force, if that's the spec, then we

3 have to align the rooster comb spring force to that

4 effort so that it doesn't exceed the Chrysler spec or

5 we have to increase the Chrysler spec, which is what

6 Ford did and Chrysler did on the -- Chrysler had to do

7 that on their recall for the Jeep Cherokee, they had to

8 change their specs. So until I get that information,

9 I don't have a recommendation, and I haven't received

10 it.

11    Q  Okay. So if -- if the shift force required

12 to move the shift lever from one position to another is

13 higher, would you recommend that the spring force be

14 higher?

15    A  Only if it — there -- you gotta do it within

16 a human factors range. You can only go so high and

17 then the people are going to have a problem because

18 it's going to be hard for them to shift.

19    Q  Okay. And do you know why --

20    A  And that's been all defined. Ford defined

21 that, GM defined it, NHTSA defined that in C802, and we

22 did that when I was at the company.

23    Q  And the problem with the Ford and C802 is they

24 had too -- too much force was required for an operator

25 to move the shift lever in certain positions, correct?

Page 188

1    A  That was part of it, but the problem is when

2 they kept increasing it, they had a problem with the

3 blockage which forced it backwards. They -- the

4 blockage was -- was -- was a big problem for Ford

5 because it would kick the shift -- it would self shift

6 the system out of park into reverse. That's pretty

7 bad.

8    Q  The next point you have in here, lack of a

9 proper FMEA. Tell us what you mean by that.

10    A  If they did a proper FMEA they would have

11 found everything that I just talked about as -- in

12 terms of identifying it as a potential defect --

13    Q  Identifying --

14    A  -- or failure -- or potential failure

15 analysis. They would have found the -- they would

16 have found the problem of the housing failure, the tab

17 failure, or the -- or the lack of assembly gate for the

18 brake interlock, they would have found the defect in

19 the key -- ignition key, they would have found the

20 defect or failure mode of the loose cable, they would

21 have found the false park, they would have defined.

22         Each one of these variables, they would

23 have set up a test procedure for it and they would have

24 established the risks associated with if they don't fix

25 that problem what's going happen to people, or

Page 189

1 potentially what could happen to people, and then -- or

2 in terms of the hazard to the user, and this would have

3 been turned around a long time ago.

4         Unfortunately, I can tell you that I've

5 looked at Ford, GM, Chrysler and Japanese FMEAs and

6 they don't even consider false park. It's not even in

7 the equation. They don't consider bleed point. It's

8 not even in the equation. It's a reason to be safe --

9    Q  So basically, --

10    A  -- because it meets the federal standard.

11    Q  -- in -- in a nutshell, what you're saying is

12 they should have some procedures or policies in place

13 to -- to be able to identify potential failures or

14 potential hazards presented by their design, be it

15 false park, loose cable; a broken tab on a housing for

16 a solenoid, things of that nature like you've discussed

17 here so far, correct?

18    A  Yeah. And I'll point you to the FMEA that

19 Chrysler, GM and Ford co-published in the SAE. It's an

20 SAE procedure and they published it, and it says

21 exactly what I just said, that the engineer should

22 consider any conceivable failure mode and -- on the

23 system that -- that could pose a hazard or unnecess --

24 unreasonable risk to the user.

25         Now, it wasn't too much of a brainer to

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 190

1  figure out that the false park was posing a risk to the
2  consumer.
3      Q   Let me ask you this:  The next point you --
4  you reference a defective ignition and steering lock
5  mechanism which allows removal of the ignition key with
6  gear selection in false park and a steering wheel
7  rotation with the ignition key removed.
8          We talked about that, I guess, at length
9  earlier, and as we sit here today you don't exactly
10 know why that is not operating as designed in the
11 Vetters vehicle, correct?
12     A   Why the ignition key can be removed?
13     Q   No.  Why there is an issue with that system.
14         MR. SICO:  Objection, vague.
15     Q   (By Mr. Sonnier) Do you know what caused it?
16     A   I'm sorry.
17     Q   Well, let me ask it --
18     A   We're losing.
19     Q   -- a different way.
20     A   Yeah.  I lost you.
21     Q   Let me -- the key interlock system, okay, --
22     A   Okay.
23     Q   -- you identify that it doesn't work in -- in
24 Vetters vehicle.  It doesn't work as designed.
25     A   That is -- no, it doesn't work in accordance

Page 191

1  with the Federal Motor Vehicle Safety Standard, and I
2  don't know if it's de -- obviously, it's designed in a
3  way that it can allow the key to be removed.
4      Q   Allow the key to be removed when the shift
5  lever is in some position other than --
6      A   Park lock.
7      Q   -- gated park?
8      A   Yeah.  And understand that that's different
9  from the -- the defect of -- of the -- not locking out
10 the gear selection system --
11     Q   Okay.  So --
12     A   -- with the -- with the key out.  That's
13 different.  This is a different one.  This is where
14 you can remove the key, take the key out.
15     Q   Okay.
16     A   Okay.
17     Q   When the -- when the engine's not running and
18 it's in a -- in a gear other than park?
19     A   No.  With the engine off, with the shift lever
20 on the edge of the insert plate not in fully gated park
21 you can take the key out.  That's a defect.  That
22 violates FMVSS 105, as well.
23     Q   Okay.  What you're saying is a non-defective
24 system you should not be able to remove the key when
25 the engine's off unless the shift lever is in fully

Page 192

1  gated park.
2      A   That is correct.
3      Q   Okay.  Is there any other -- you're talking
4  about the steering lock mechanism.  Is there a defect
5  with respect to the steering lock mechanism?
6      A   No, because it -- it was running.  I mean...
7      Q   Okay.
8      A   The reason that I considered that was the --
9  whether the engine was running at some point or not was
10 a -- was a function of the facts, and once I got all
11 the information the steering would not be locked with
12 the vehicle running, okay, so...
13     Q   Point 7 is brake-shift interlock.  It's either
14 a defective one or a total absence.  You've determined
15 that this Vetters vehicle does have a brake-shift
16 interlock feature, correct?
17     A   Oh, definitely.  Absolutely, yes.
18     Q   But it's -- it does -- it does not function as
19 designed?
20     A   It doesn't function and it's defective, yes.
21     Q   Okay.  Now, you've indicated -- I'm looking
22 down at Point J, "DaimlerChrysler, the automotive
23 industry in general, and independent safety researchers
24 identified the hazards of sudden, unexpected shifting
25 into powered reverse and the hazard of being able to

Page 193

1  shift gears without depressing the brake pedal in at
2  least the 1980s."  What are you relying on in -- in
3  support of that?  I mean, what studies, what
4  investigations?
5      A   As far -- as far as the first part of that
6  paragraph, that's -- that goes all the way back to C802
7  and customer complaints, both for GM and Chrysler and
8  lawsuits that were occurring.  Remember, Ford wasn't
9  the only one that was getting hammered with C802, it's
10 just that they had the most frequent and NHTSA
11 concentrated on them.  There's prior notice about
12 this problem all the way back before the recall, which
13 goes back into the '70s.
14         And then the -- to shift gears without the
15 depressing the brake pedal, well, we know that the --
16 that the gear interlock system would prevent that,
17 okay.
18     Q   Now, --
19     A   They knew that back in the 1980s when the
20 sudden acceleration issues were occurring with Audi and
21 other vehicles, GM, Ford.  All -- all those vehicles
22 were not only investigated by NHTSA, certain models,
23 not all their vehicles, but certain models, but also
24 lawsuits and NHTSA concerns with sudden acceleration.
25 They knew that the brake interlock system was a

49 (Pages 190 to 193)

Page 194

1  solution to preventing not the only sudden
2  acceleration, but would have a positive effect on the
3  park to reverse if it was done right.
4      Q.  Now, point L here, "DaimlerChrysler was aware
5  of the false park position syndrome prior to production
6  of the subject vehicle."  What do you base that on?
7      A.  C802, lawsuits, OSIs, con -- customer
8  complaints that go back into the time frame of the
9  '70s.
10     Q.  So what -- what you're saying is there had
11 been complaints by customers where they have complained
12 that they shifted or thought they shifted to park but
13 yet the vehicle rolled into powered gear --
14     A.  That's one.
15     Q.  -- and they thought it was in secured park?
16     A.  That's one, and then the C802 NHTSA
17 investigation established, and I had -- and we might as
18 well just go with me.  I mean, I had depositions with
19 Chrysler before and told them what this defect is
20 before this one.  So they're on notice of
21 foreseeability just because I told them, so add me in
22 there, too.
23     Q.  M, "DaimlerChrysler violated the industrial
24 safety standard of hazard prevention.  "What -- what
25 are you referring to?

Page 195

1      A.  I define that, I think, in the paper.
2  It's -- it's -- yeah, page five.  It goes into that
3  pretty detailed, I think.
4      Q.  Okay.  Down there at the bottom of the page?
5      A.  Yeah.
6      Q.  Okay.  I got you.
7      A.  Okay.
8      Q.  Now, point O down here, "DaimlerChrysler
9  properly failed to warn the users of the 2002 Durango
10 of -- of the hazards," and when you talk about hazards,
11 I'm assuming you're talking about what you have defined
12 as a false park condition and the non-operation of the
13 bitsy in -- in this particular vehicle.
14     A.  Well, actually, hazard is -- is park -- a
15 vehicle going into power -- sudden unexpected powered
16 reverse.  That's -- that's the hazard.  The defects
17 are -- explain why it's hazardous, but the hazard is
18 that this vehicle goes into sudden unexpected powered
19 reverse.
20     Q.  Okay.  Do you agree that an owner's manual
21 is -- is one place, and a good place, to give operators
22 instructions and -- and warnings with respect to, you
23 know, the operation of a motor vehicle?
24     A.  Well, I think it's -- I think it's a good
25 place to go to to add information for the -- the owner.

Page 196

1  Unfortunately, I think that Lee Carr and everybody
2  agree that it doesn't work.
3      Q.  Okay.
4      A.  Everybody agrees.  All the experts, even for
5  -- for Ford and GM and Chrysler admit that the owner's
6  manual just doesn't work in terms of warning.  It does
7  in some areas, but some areas it doesn't.  It's not
8  that effective, unfortunately.  That's why it's
9  important to follow that -- the stand -- safety
10 standard of hazard prevention so that -- because
11 warning is the minimum level of safety obligation of a
12 manufacturer.
13     Q.  Now, you've -- you've testified in other cases
14 that warnings should consist of language in an owner's
15 manual.  You've advocated that, correct?
16     A.  I'm an advocate.  I believe that you should
17 put it in the owner's manual.  There's no question that
18 you should do that.  The effectiveness of it is what
19 I'm telling you is not -- is -- is what the problem is.
20     Q.  Okay.  And I understand.  You're -- I mean,
21 obviously, you're not a psychologist or psychiatrist
22 and you haven't gotten into that part of a warnings
23 issue, correct?
24     A.  Yeah.  As far as the -- the phraseology or
25 the wording of it, I'd have to use those people because

Page 197

1  I think they're more qualified to convey information to
2  a user.  But as far as the -- the rest of it, the
3  standards, the SAE and the ASME standards of how the
4  warning should be prepared, sized, lettered, colored,
5  designated, I'm an expert in that.  But as far as the
6  wording, I'd have to have to some help.
7      Q.  Now, you --
8      A.  I can do it, but I need some help.
9      Q.  Okay.  You've testified in the past that both
10 Ford and GM should put language in their owner's manual
11 advising operators that whenever they exit a vehicle
12 they should shut off the engine, set the park brake and
13 make sure that the vehicle is in secured park.
14     A.  Well, I've testified -- my testimony is that's
15 true, but I -- you -- you explain to them what that
16 means by secured park.  That's the problem.  That kind
17 of language -- I can go this far:  That kind of
18 language is what causes the problem.
19          When you say secured park, what does that
20 mean?  That could mean that the vehicle is stationary.
21 That's a problematic term.  But certainly the language
22 should be a minimum that says that, but then it should
23 be defined as to what that means --
24     Q.  Okay.
25     A.  -- by secured park.

Page 198

1   Q   You -- you've advocated before, even in other
2   cases with other vehicles, that there should be
3   language in the owner's manual advising persons that if
4   they're going to exit their vehicle, they better shut
5   the engine off, correct?
6   A   Oh, I think that's -- I'm an advocate that
7   that's a good idea, --
8   Q   Okay.
9   A   -- but know, of course, that that's not
10  reasonable for all people, but certainly it's a good
11  thing to do in the owner's manual.   No question.
12  Q   And you've also advocated in -- in other
13  matters that an operator should -- each and every time
14  they intend to exit a vehicle should set the park brake
15  and -- and that that -- an owner's manual should
16  contain language to that effect.
17  A   I think that's a -- a perfectly good
18  recommendation.  Unfortunately, as I said, it doesn't
19  work.
20  Q   Now, that would especially be true having a
21  language in there about setting the park brake if
22  someone's going to exit the vehicle and leave the
23  engine running, correct?
24  A   Yeah.  I think that's true.  I think if -- I
25  think that the -- the issue is that you shouldn't --

Page 199

1   knowing the parking -- knowing the gear selection
2   system or parking gear selection system is defective,
3   you -- you should have an alternate system, and the
4   only other alternate system on this vehicle is a
5   parking brake system.
6   Q   Well, another good reason to -- to tell owners
7   about shutting down the engine and setting the park
8   brake is because owners can make mistakes in their
9   shifting of a vehicle; is that correct?
10  A   That one's hard to understand, other than -- I
11  have a real tough problem when people talk about that
12  because, you know, the industry designs in a latent
13  defect and then they say it's the person's fault for
14  positioning it there.  I don't understand that, but
15  okay, that's just me.  Maybe I have a problem
16  understanding.
17      But when you design a defect into a
18  vehicle and people put it there, I guess I -- I don't
19  understand how you can look at the person and say,
20  "Well, you shouldn't have done that."
21  Q   Well, if -- if a manufacturer recognizes that
22  operators can make mistakes in shifting a vehicle,
23  given that, do you think it's a good idea that they
24  should put in the owner's manual that the operator
25  should shut down the engine and set the park brake

Page 200

1   before exiting the vehicle?
2   A   It's not only a good idea, it's required under
3   the minimum -- minimum obligation of the hazard
4   prevention.  It's a -- it's an obligation.  They have
5   to do that.
6   Q   Okay.  As a matter of fact, are you aware that
7   almost every state, I think maybe 49 states, in fact,
8   have laws that operators operating motor vehicles
9   should, before exiting the vehicle, shut down the
10  engine, set the park brake, and ensure that the vehicle
11  is in park?
12  A   If they are, then they got a real problem
13  because they're going to put a lot of employees out of
14  work because some employees can't operate.  They can't
15  work and do that.  It's impossible.  If you look at
16  some of the conditions that occur where employees are
17  forced to do their job and they can't do what that
18  says, then I think they got a problem, but that's my
19  own impression.
20  Q   Okay.
21  A   I know -- I know that there are jobs where the
22  employees can't do what that law says.  So if that is a
23  law, it's unusual.
24  Q   Okay.   My question is, are you aware that
25  there are many states that do have that law?

Page 201

1   A   I have not seen that law citation or statute.
2   I have not seen it.
3   Q   Now, going back to the report.  I'm down at Q.
4   We've already talked about the hydraulic bleed
5   restricted to one-eighth detent --
6   A   Right.
7   Q   -- detent motion total.  That's -- what you're
8   talking about, there should be a tolerance there for
9   one-eighth movement within the reverse detent.  Beyond
10  that, should be designed to ensure that there is no
11  hydraulic bleed in the system.
12  A   That's correct.
13  Q   Okay.  Now, Point R here, --
14  A   Okay.
15  Q   -- you indicate "DaimlerChrysler has withheld
16  or misrepresented information and material relevant to
17  the federal government or agency's determination of
18  adequacy for the pertinent safety standards or
19  regulations."  What -- what -- what are you saying
20  Chrysler has withheld or misrepresented?
21  A   Well, their representatives in Haller, and all
22  the cases I've ever had with them, state the -- the
23  fact that they meet the federal standard makes the
24  vehicle reasonably safe --
25  Q   Okay.  So --

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 202

1    A    -- without -- without stating that the -- the
2    standards are in fact minimum regulatory standards,
3    they're intended to be exceeded, that vehicles that
4    meet the standards have -- they have been advised that
5    these vehicles are defective, that they do back up,
6    that they -- there is a park to reverse occurrences
7    that happen, and that the misrepresentations are that
8    they -- that Chrysler and the automotive industry says
9    that it meets the federal standards, therefore it's
10   reasonably safe.  I don't agree with that.
11   Q    Okay.  So when you're talking about withheld
12   or misrepresented information, you're -- you're --
13   you're talking about statements by the manufacturer
14   that the vehicle meets federal motor vehicle safety
15   standards?
16   A    Yeah.  That's their defense.
17   Q    And you claim that -- that this Vetters
18   vehicle does not meet federal motor vehicle safety
19   standards with respect to the transmission system.
20   A    105, yeah.
21   Q    Okay.  And 105 being specifically what?
22   A    The brake.
23   Q    The brake-shift interlock?
24   A    No, the key.
25   Q    The key interlock.  I'm sorry.

Page 203

1    A    Yeah.
2    Q    I misspoke.
3    A    That's okay.
4    Q    Would you agree with me that the transmission
5    selector system on this vehicle did comply with federal
6    motor vehicle safety standards?
7    A    As far as the gear PRNDL, yes, I agree with
8    that, and the portions of 105.  I agree with that.
9    Q    Now, if you get in here, Point S, is just
10   further discussion, I think, about the accident and
11   some other points, but you indicate here, and I'm
12   reading on from the third sentence, "Incoming mail from
13   her mail box, her glasses and cell -- cell phone were
14   found in a blood pool in which she came to rest."
15        You're talking about the debris or items
16   that were -- that actually appear in the photographs
17   you've reviewed, correct?
18   A    Yes.  In the police photographs I saw these
19   items in the blood pool, yeah.
20   Q    Okay.
21   A    Or near -- in or near them, yeah.
22   Q    Okay.
23   A    There was also shoes --
24   Q    Okay.
25   A    -- that were --

Page 204

1    Q    There are two shoes, --
2    A    Yeah.
3    Q    -- or sandals, rather?
4    A    Right.  Sandals, actually.  Sandals, yeah.
5    Q    Okay.  Now, the second paragraph there under
6    Part S, you recite that the investigating officer re --
7    officer's report reflects that the vehicle was parked
8    in the driveway when it slipped into reverse.  Just
9    like yourself, would you agree the officer could not
10   define or tell us exactly where that vehicle was
11   positioned before it began to move rearward?
12   A    Well, I don't know what information he has, so
13   I don't know.  I'm saying that I can't, maybe he knows
14   something I don't.
15   Q    Okay.
16   A    I'll leave it at that.
17   Q    By the way, have you read his deposition, do
18   you know?
19   A    I haven't --I haven't read it, no.
20   Q    Officer Fernandez.
21   A    No.  But if he says he has no -- no further --
22   more information than I do, I don't -- I don't see how
23   he could place the vehicle.
24   Q    Okay.  Now, you also state here "The report
25   also states that Mrs. Vetters attempted to get back

Page 205

1    into the vehicle."  Let me ask you, I know this is the
2    officer's statement, but do you have an opinion as to
3    whether or not Mrs. Vetters attempted to get back in
4    this vehicle?
5    A    I do.
6    Q    And -- and what's your opinion?
7    A    I think she did.
8    Q    And what do you base that on?
9    A    The -- the position of the shift lever and
10   steering wheel.
11   Q    Okay.
12   A    The steering wheel was turned to the right.
13   Q    Position of the shift lever being found in
14   reverse, --
15   A    Right.
16   Q    -- correct?
17   A    Steering wheel turned to the right.
18   Q    And the steering wheel turned to the right.
19   A    And then there's some fin -- there's some kind
20   of prints on the sill rearward of the door opening.
21   Q    Okay.  Do you know when -- those -- those
22   prints -- like this vehicle is, I guess, sort of dusty
23   or dirty.
24   A    Yeah.
25   Q    Maybe it hadn't been washed before this

52 (Pages 202 to 205)

Page 206

1  accident, but there's -- there's some markings on there
2  that are consistent with a hand, or fingers, or
3  something.
4      A   That's what it looks like to me.
5      Q   Okay.  Do you know, based on your
6  investigation in this, as to when those prints were
7  placed on that door?
8      A   Well, I can't say that I know.  That would be
9  100 percent.  But within a reasonable degree,
10  certainly you can't -- you can't rule out that that
11  mark wasn't made by her attempting to get in the
12  vehicle when she slipped, or whatever happened to her
13  and she fell out of the vehicle.  You can't take that
14  away from it, so if you can't discount it, then you
15  can't -- then you can't say it didn't exist, so
16  certainly it can't be ruled out that that's not a piece
17  of in evidence this case, just like the two hand prints
18  at the -- the deck lid can't be ruled out.
19      Q   Okay.  And also --
20      A   That -- that has nothing to do with this
21  accident in the since of -- those are hand prints, and
22  I'm not going to testify --
23      Q   From closing the lift gate?
24      A   -- that she -- yeah, that the vehicle backed
25  over, but that, I think, is from closing the lift gate.

Page 207

1  But it's -- it's important because she might have done
2  that either that day or the -- it had to be recent
3  because if you're driving that vehicle, especially down
4  by the sill, you're going to cover it up, and that
5  looked pretty fresh.
6      Q   Okay.  And would -- would you agree with me
7  with respect to the hand prints on -- on the sill of
8  the door there that you can't rule out that those were
9  placed there the evening before when she shut her door
10  to go into the house for the evening?
11      A   I can't rule it out, but fingerprints?
12      Q   Okay.
13      A   What the heck is her hand doing?  And it's
14  smudged, it's not a clear print.  It's not -- I mean,
15  it's -- it's smudged, so I -- okay.  It could have
16  happened, but --
17      Q   Well, my point is you can't rule that out, can
18  you?
19      A   I can't rule it out, but that means I can't
20  rule out that it didn't happen on the day, so we're
21  laying -- we're laying ground work here that somebody
22  can't say it didn't happen --
23      Q   Yeah.
24      A   -- and somebody can say it did.  The question
25  is, somehow she -- she got run over by this vehicle.

Page 208

1  I don't think -- I don't think anybody is going to
2  argue that.
3      Q   Okay.  Well, likewise, --
4      A   So where was she when she got run over?
5      Q   -- do you know whether she closed the door
6  after exiting -- exiting the vehicle to go to the
7  mailbox?
8      A   The door's open at the scene.  Mind
9  understanding is the door was open as -- when the
10  vehicle was found, so I think I wrote in here, didn't
11  I, when -- when you were going through there you didn't
12  finish it.  It said the police said the door was
13  closed.
14      Q   Okay.  You just said it was open.  Was it --
15  was it found open or was it found closed?
16      A   The scene photos show it open.
17      Q   Okay.  Do you know who opened that door, or
18  how it became opened?
19      A   I don't -- my -- if that condition was -- is
20  representative of the vehicle at the rest without
21  anybody doing anything with the vehicle, then that
22  means she's the only one that could have done that
23  because she was the only person there, so she opened it
24  and left it open.
25      Q   Okay.  If --

Page 209

1      A   Now, did she close it?  I -- I have no
2  information.
3      Q   To say one way or the other?
4      A   No.  I have information that says it was open.
5  I don't have information that says it was closed.
6      Q   Okay.  If -- if the testimony in this case
7  from the lady that came upon the scene that was jogging
8  in the neighborhood, the neighbor, the husband, the
9  officer, the EMTs that arrived at the scene, if they've
10  all testified that the door was found at rest position
11  in the closed position, would you dispute that?
12      A   No.  And the vehicle still could have had it
13  open, but when it hits the -- as the vehicle goes, it
14  closed the door, so it doesn't -- it doesn't take it
15  out of the equation.
16      Q   So the inertia of the impact with the curb --
17      A   Or her.
18      Q   -- or -- or coming to rest in the yard could
19  have actually caused the door to close?
20      A   Or her, yeah, closed the door, --
21      Q   Okay.
22      A   -- or when it hit the gutt --  when it hit the
23  gutter.
24          MR. SICO:  Do you -- yeah.  Its been a
25  while.

53 (Pages 206 to 209)

Page 210

1    MR. SONNIER:  Yeah.  We haven't take a
2  break in a while.  Let's do that.
3    VIDEOGRAPHER:  Going off the record.
4    (WHEREUPON AT THIS TIME A SHORT
5    BREAK WAS TAKEN.)
6    VIDEOGRAPHER:  This is the beginning of
7  videotape No. 3 of the deposition of John Stilson.
8  Today's date is October 13th, 2005.  It is 2:58 p.m.
9    Q   (By Mr. Sonnier) Mr. Stilson, earlier we were
10  talking about a situation that you referred to as a
11  bounce back condition --
12    A   Right.
13    Q   -- where, you know, you're shifting from a
14  gear towards gated park and the tang contacts the park
15  stop the insert plate and when you let it go you
16  contend that the tang can actually bounce back and --
17  and end up resting on the land --
18    A   Sure.
19    Q   -- on the insert plate.  And you said you did
20  an evaluation of that condition, correct?
21    A   Yes.
22    Q   How many -- how many times did you attempt to
23  do that on this Vetters vehicle?
24    A   I don't remember, but it was more than once.
25    Q   Was it more than twice?

Page 211

1    A   Yes.
2    Q   Was it more than five times?
3    A   I don't think so.
4    Q   So more than once, less than five times?
5    A   Correct.  And by bounce back, I told you, you
6  don't have to -- it doesn't mean you necessarily
7  completely let go of the handle.  You just don't go
8  like that.  You hit it and then you -- your hand
9  actually -- the explanation is your hand actually
10  reacts to that stop and what you'll do is you'll take
11  the handle and you'll let go of it slowly and it will
12  bounce, and the bounce back is that it will land on
13  that plate.
14    Now, you could probably throw it up there
15  and let -- 100 percent let that happen.  I -- that's
16  not the test that I did.  I did the other one, --
17    Q   Okay.
18    A   -- which is the operator test.  That's what an
19  operator would do.  They would hit the stop and then
20  their hand, as it comes off the shift lever, they think
21  it automatically drops into the slot because they hit
22  the stop, but where actually the way their hand comes
23  off it lands on the land.
24    Q   So when you're doing your test, what you were
25  doing -- would you characterize your shift movement as

Page 212

1  a normal shift movement towards gated park?
2    A   Correct.
3    Q   And your intention is to get it into gated
4  park?
5    A   My intention is to put that thing in gated
6  park.
7    Q   Okay.  And you said you did this more than
8  once, but less than five times, --
9    A   Right.
10    Q   -- so between two and five times you attempted
11  to do this, correct?
12    A   That's right.
13    Q   Okay.
14    A   On the Vetters vehicle, yeah.
15    Q   On the Vetters vehicle.  And how many times
16  were you able to achieve a situation where the tang
17  ended up in a position other than fully gated park?
18    A   Every time after a while.  I mean, it's
19  just -- you get the feel of the -- when you hit the
20  stop, you get the feel after a while of the -- how you
21  -- how you release the lever.
22    Q   You said every -- every time after a while.
23  You didn't do it more than four times, correct?  You've
24  already said that.  You did it less than -- you did it
25  less than five times, or attempted to do it less than

Page 213

1  five times.
2    A   Well, that's my recollection.  I don't know
3  how many times I did it, but I think it was less -- I
4  think it was less than five, or five or less.
5    Q   Okay.  And is it your testimony that you
6  achieved a situation -- a bounce back situation and the
7  tang ended up somewhere other than gated park in each
8  one of those instances?
9    A   One I -- once I learned how to do it, yeah, on
10  this system, yeah, every time.
11    Q   So you -- so you -- you were attempting to see
12  if you could get it to -- to bounce back on that -- on
13  the land, as you've described, correct?
14    A   Yeah.  That's just like a false park.  I'm an
15  expert.  I'm an engineer.  I want to see if the system
16  will do it.
17    Q   Okay.
18    A   See, the first thing you have to make a
19  determination is the system capable of doing that?  And
20  the second thing is, if it does, what conditions does
21  it happen?  And so I evaluate both.
22    Q   And you said one --
23    A   When you -- when you say intentionally, I
24  wasn't intentionally trying to find it.  I was trying
25  to -- intentionally trying to find out if it existed on

54 (Pages 210 to 213)

Page 214

1   the subject vehicle.
2       Q   The first time you did it, were you able to
3   achieve a situation where the tang was in a position
4   other than gated park?
5       A   I don't remember the sequence.
6       Q   Do you --
7       A   I just remember doing a normal shift and then
8   I wanted to see if -- if I released the handle in what
9   I call a conventional operator's man -- manner, and the
10  difference -- distinction is very positive in the sense
11  that what -- what can be thought of of a person hitting
12  the stop and then intentionally shifting into the gear
13  -- knowingly, intentionally taking -- being cognizant
14  that they hit the stop and now they take the lever and
15  they force it or drop it into park.  That's one way you
16  can shift that system.  There's no question about that.
17      Q   So one way you can shift it -- what you're
18  saying is you can hit the -- hit the park stop at
19  the -- on the other side of the park gate and ride it
20  down where the tang does rest in fully gated park?
21      A   That is certainly one way you can do that.
22      Q   Okay.
23      A   There's nothing that prevents you to do that,
24  and you can do that.
25      Q   Okay.

Page 215

1       A   The question is -- is that my experience has
2   been that you can hit that stop and there's a bounce
3   back.  It -- it -- what it does is the lever bounces
4   back and it starts to feed back backwards, and you --
5   if you let your hand go of the lever, which everybody
6   thinks it's going to drop in, instead it lands on that
7   edge, and that -- I don't remember how many times it
8   happened, or how many times it didn't do it, but I know
9   that I tested for it between two and five times.
10      Q   And --
11      A   And I -- and I -- and in those testing I was
12  successful in getting it to do that.
13      Q   But you don't think you were successful each
14  and every time, correct?
15      A   Not at first, no, --
16      Q   Okay.
17      A   -- because it takes a while to get the feel
18  for the system.  I mean, it's a --
19      Q   I think you said once you learn how to do it,
20  it was -- it was easy to accomplish that position,
21  correct?
22      A   Oh, yeah, because then you know how -- you
23  know -- you can feel in your hand that the lever's
24  bouncing back.
25      Q   So --

Page 216

1       A   You know that its chances of hitting that spot
2   get greater.
3       Q   What -- what is it --
4       A   You can feel it.
5       Q   -- exactly that you learned that a -- that
6   allowed you to achieve that position on the land?
7       A   That this system doesn't have an automatic
8   park lock.
9       Q   Well, now --
10      A   A person has to manually put it in.
11      Q   But -- but physically what did you learn, as
12  the person moving the shift lever, to be able to change
13  your conduct the next time in order to get it to come
14  to rest on the land?
15      A   Nothing, just keep doing it till it happened.
16  In other words, you're letting it happen.  It has
17  a -- a chance of when you let go of the handle -- it's
18  supposed to.  This system is supposed to automatically
19  engage the slot with the return spring.
20          If you let go of that handle, that --
21  that -- that system has a return spring that engages
22  that shift lever.  It's supposed to automatically pop
23  it into the slot, the -- the problem is it doesn't
24  happen because of what I just told you, and that's what
25  the evaluation is for.  Can you get this system, if you

Page 217

1   let go of it, so that it will bounce back and land on
2   the land?  And yes, it will.
3       Q   Now, on the day of this accident, in all
4   honesty, you don't know what Ms. Vetters did on this
5   vehicle with respect to shifting after she came to a
6   stop but before she exited the vehicle, correct?
7       A   Well, I have more of a view of what she didn't
8   do than what she did.
9       Q   Okay.  You know --
10      A   We know what she didn't do.
11      Q   -- you know she didn't achieve gated park.
12      A   We know that she didn't put the shift lever in
13  gated park.
14      Q   Okay.
15      A   That's one -- there is a possibility that --
16  that -- by the way, on this vehicle where she could
17  have done that, it still happens, but I don't think
18  it's probable.
19      Q   Now --
20      A   She can still have that in gated park because
21  the interlock system failed and inadvertently contact
22  that lever and pull it out of park into reverse.  She
23  can do that.  That can -- you can do that, but her --
24      Q   Okay.
25      A   -- I don't think that is probable.

55 (Pages 214 to 217)

1    Q    Okay.

2    A    Certainly, -- certainly, you can do it in this

3    system because the park interlock -- brake interlock is

4    defective.

5    Q    So what you're saying is it's not as probable

6    she achieved gated park and then upon reentering the

7    vehicle touched the shift lever causing it to go out of

8    gated park into hydraulic reverse because the bitsy

9    wasn't functioning properly.

10   A    Yeah.  I don't think that's probable.  She

11   never got it into gated park.  I think that is more

12   probable.  It makes more sense.

13   Q    You think it's more likely she did not achieve

14   gated park in this instance?

15   A    In this instance, based on the information I

16   have.

17   Q    You don't know what Ms. Vetters's shift habits

18   were in terms of when she's shifting to park whether

19   she's one that -- that lets her hand ride it down into

20   gated park, do you?

21   A    Do I know that?  I couldn't know that, no.

22   Q    Okay.

23   A    I don't know that.  I'm just telling you about

24   the average person.

25   Q    Okay.

1    A    The average operator.  I don't know -- I

2    don't know what happened, what her custom and practice

3    was.

4    Q    Now, getting back to your report, and forgive

5    me for -- I don't want to go over all this because

6    we've talked about many of these things, so I don't

7    want to waste your time.

8         You basically have come up with -- in your

9    report, you -- you kind of come up with two different

10   accident scenarios, correct?  And I'm -- I'm looking on

11   page five --

12   A    Okay.

13   Q    -- kind of right there in the middle of the

14   page --

15   A    Yeah.

16   Q    -- there.  No. 1 being the gear selector was

17   positioned between park and reverse and self shifted to

18   reverse.

19   A    Right.

20   Q    That's what you were referring to a minute

21   ago.  That's the most likely scenario in this accident,

22   correct, in your opinion?

23   A    No.  I don't think this was in false park.

24   That's not the more probable one.  The more probable

25   one is it was not in false park.

1    Q    Not in false park?

2    A    Not in false park as I've defined it for you.

3    Q    Okay.

4    A    The transmission was in park detent, in my

5    opinion, in this case.

6    Q    Okay.  Well --

7    A    That's not false park.

8    Q    In park detent.  You're talking about detent

9    in the transmission on the rooster comb?

10   A    I am.

11   Q    Okay.

12   A    I think it was in park detent as the most

13   probable scenario.

14   Q    Okay.  And in that position where is the

15   shift lever?

16   A    In the -- you're talking about in the

17   scenario?

18   Q    Yeah.  In -- in that most probable scenario.

19   A    It's on the -- it's on edge or on the land

20   between park and reverse because of the -- that

21   condition can be achieved.

22   Q    Okay.  So let's get -- get back to this,

23   then.

24   A    Uh-huh.

25   Q    And actually, I want to back up to that

1    previous paragraph because there's a couple of things.

2    I'm reading here, "In the above scenario, it is likely

3    Ms. Vetters would have been seated in the vehicle when

4    shifting occurred and it is unlikely that she would

5    have been dragged under the vehicle, run over and

6    suffered fatal injuries."  You're talking about after

7    she reentered the vehicle?

8    A    Yeah.  I don't think there is a -- I don't --

9    what I'm trying to say is I don't think it's reasonable

10   to expect that she got in the seat --

11   Q    Okay.

12   A    -- and then was thrown out of the vehicle.

13   Q    Okay.

14   A    I don't think that makes any sense, --

15   Q    Okay.

16   A    -- but that's my -- that's my opinion, right.

17   Q    Okay.  Okay.  Your next sentence there, it

18   states "Assuming that the vehicle was merely left in

19   reverse when she exited the vehicle, the vehicle would

20   have moved rapidly rearwards and would not have allowed

21   Mrs. Vetters to reach her mailbox and return to the

22   vehicle prior to its movement out of the driveway and

23   across the street."

24        Now, in -- in that particular scenario,

25   what you're talking about is a situation where all four

Page 222

```
1   of the tires are situated on the slope part of the
2   driveway, correct?
3      A  No. There's only -- from what I -- what I'm
4   understanding is there's only a very specific position
5   in that gutter where this vehicle can be stopped and
6   allowed to remain in reverse meaning it would have to
7   be right there. That's one position in this whole --
8   one position out of this whole scenario where this
9   vehicle can be left in reverse and back up.
10  There's potentially one position in this whole system
11  where that could happen, whereas, there's multi
12  positions where the vehicle could be left and achieve
13  the scenario that I'm talking about that I have an
14  opinion on.
15     Q  Okay. Well, I'm talking about this sentence
16  here. You're saying "Assuming that the vehicle was
17  merely left in reverse when she exited vehicle, the
18  vehicle -- vehicle would have moved rapidly rearwards."
19     A  Okay.
20     Q  That's a situation where all four of the tires
21  are on the slope part of the driveway, correct?
22     A  No. I've said that they also could be
23  partially in the road or they could be in the gutter --
24  partially in the gutter.
25     Q  Okay.
```

Page 223

```
1      A  Okay.
2      Q  And when you say partially in the gutter, what
3   tires and exactly where in the gutter?
4      A  The rear tires in the gutter. Well, from my
5   understanding from Mr. Sico and their testing is
6   there's only -- from the deposition, I think, of
7   the in-house representative, I can't think of his name
8   right now, or -- or from somebody to Mr. Sico, the
9   indication is there's only one position that that
10  vehicle will remain in -- in reverse and not move, and
11  so the deal is that she has to either push her foot out
12  or lean against the B pillar to get the vehicle to move
13  or push her foot on the gas pedal.
14     Q  Okay. And --
15     A  Because you're not going to get this vehicle
16  to move out of reverse potentially in one of the areas
17  of the gutter. That vehicle has to be in that
18  particular position.
19     Q  When you say in -- in a testing, you're
20  referring to the testing Mr. Sico did?
21     A  Either that or you guys did.
22     Q  Well, you said the testing he did.
23     A  He did some testing that's on that
24  videotape --
25     Q  Okay.
```

Page 224

```
1      A  -- that shows you.
2      Q  The videotape that you told us about earlier
3   that you -- you have reviewed, correct?
4      A  Oh, I reviewed that videotape.
5      Q  Okay.
6      A  His testing showed that it always goes to the
7   gutter.
8      Q  Do -- do you -- is it common for you as a
9   consultant to rely on testing that the lawyers do in a
10  case?
11     A  It depends on whether it's relevant or not.
12  The judge will make that decision.
13     Q  Okay.
14     A  If the judge thinks it's a -- he's an officer
15  of the court. If the judge think it's admissible, then
16  I'll -- I'll look at it; if not, then no. But it
17  certainly is a piece of information.
18     Q  Okay. And again, you have not been out there
19  at the scene with this vehicle to test it yourself,
20  correct?
21     A  I have not, at this point, done that.
22     Q  And -- and you are not saying that there is
23  not a place whatsoever out there at this accident scene
24  where it can be left in reverse yet remain stationary?
25  You're not saying that?
```

Page 225

```
1      A  No, I haven't said that. I said there may
2   be -- there's a potential for the gutter position where
3   you possibly could put this vehicle and it might remain
4   stationary. That's possible.
5      Q  Okay. So when you're -- when you're talking
6   about if a vehicle's left in reverse, it would move
7   rearward rapidly, --
8      A  This one does.
9      Q  -- that -- that's assuming that there's --
10  there's nothing obstructing the tires preventing it
11  from rolling, correct?
12     A  Yeah. That's right.
13     Q  Okay.
14     A  Yeah.
15     Q  Now, the next paragraph, "Likely scenarios,
16  gear selector was positioned between park and reverse
17  and self shifted to reverse," and what you told me
18  earlier is that you believe under this scenario No. 1,
19  the transmission is in the park detent, meaning it's in
20  the park detent at the rooster comb, correct?
21     A  No. One is -- one is where you're in false
22  park. We didn't -- we didn't go to which one.
23     Q  Well, you said No. 1 was not false park, so --
24     A  Did I?
25     Q  Yeah.
```

57 (Pages 222 to 225)

Page 226

1    A   I thought we were up on this upper paragraph,
2   not the lower paragraph.  That must be my fault.  I'm
3   sorry.
4    Q   That's okay.  Well, let's -- let's go through
5   this, then.
6    A   Okay.
7    Q   The paragraph "Thus, the likely accident
8   scenarios."
9    A   Okay.
10   Q   You have --
11   A   I was on the up one.  I was on the up one.
12   Q   Okay.
13   A   Okay.  I'm sorry.
14   Q   I think -- I think they probably relate to an
15   extent, but I think the previous paragraph you're kind
16   of ruling out some issues when we talk about leaving it
17   in reverse and being --
18   A   Yeah.  That's what I thought we were talking
19   about.
20   Q   Okay.
21   A   But I'm sorry.
22   Q   So let me -- let me direct you, then, to the
23   paragraph that starts --
24   A   All right.
25   Q   -- "Thus, the likely accident scenario."

Page 227

1    A   Okay.
2    Q   Okay.  Basically, you have one, two, and
3   three here, correct?
4    A   Right.
5    Q   So let's just take them one a time.  No. 1,
6   "Gear selector was positioned between park and reverse
7   and self shifted to reverse," and I think you told me a
8   few minutes ago that you believe this is the most
9   likely scenario in this particular accident.
10   A   No.
11   Q   Is that not correct?
12   A   No, that's not correct.
13   Q   Okay.
14   A   That -- that -- what that means -- the self
15   shifting into reverse, my position is that I believe
16   she put it in park lock in the transmission or detent,
17   but it wasn't in fully gated park in the shift lever
18   and inadvertent contact was made and -- because the
19   brake interlock was defective and it went down into
20   reverse.  That's -- that's the most likely scenario
21   that -- that I have at this point based on all the
22   information, physical evidence, and -- and what I --
23   what I know at this point.
24        This particular one would be if the -- the
25   brake interlock system was functioning properly on the

Page 228

1   day of the accident.
2    Q   You're talking about No. 1?
3    A   Yeah.  If it was functioning properly, then --
4   then this vehicle had to be in a false park.
5    Q   Okay.  So if bitsy functioning properly you
6   had to have what you term a false park condition?
7    A   Yes.  Correct.  On this vehicle, yes.
8    Q   And -- and that's scenario No. 1 in that
9   paragraph, correct?
10   A   That's correct.
11   Q   Okay.  So let me just make sure.  I'm going
12   to ask you a couple of questions about that to make
13   sure I understand your -- your theory and basis for
14   that.  Assuming the bitsy is function -- functioning
15   properly, the false park would be a situation where the
16   tang on the shift lever is positioned where?
17   A   On the land between park and reverse
18   somewhere.
19   Q   And where would the -- the rooster -- position
20   on the rooster comb be?
21   A   Most probably the peak, or near it.
22   Q   On top of the peak?
23   A   Yes, or near it.
24   Q   And when you say near it, to which side?
25   A   Generally, it would be the more -- the common

Page 229

1   hydraulic would be towards the reverse side.
2    Q   The reverse side.
3    A   Right.  We talked about that.
4    Q   Okay.  And in -- in that position, where is
5   the park pawl in relation to the park gear?
6    A   Could -- most probably blocked or partially --
7   or partially engaged.  What we have is we probably
8   would have a partially engaged position.  That would
9   be most probable.
10   Q   And why would you think it's most probable
11   that there's a partially engaged condition with the
12   park pawl?
13   A   That's to hold the vehicle.
14   Q   Because you're somewhere other than the --
15   A   Right.
16   Q   -- with the tires on the bottom of that
17   trough?
18   A   If it's in the -- if it's in the trough, it's
19   a potential that it would make it less likely for the
20   parking -- parking ball to be engaged because it might
21   not have to.  But again, we're looking at options here.
22   Q   Okay.  Now, to carry out this No. 1, then,
23   tang is on the land on the insert plate, the rooster
24   comb, the ball is either on top of the peak or on the
25   reverse side of the peak, park pawl is either blocked

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 230

1    or more probably partially engaged --
2        A   Correct.  It would be partially engaged, yeah.
3        Q   -- on the slope in the driveway, and where
4    would the PRNDL indicator be?  What -- what would be
5    indicated on the PRNDL indicator in this position?
6        A   I don't know.  I'd have to test that one.  I
7    don't remember whether that's the position where the
8    reverse is -- light is still on or in between.  I'd
9    have to go back and check that.
10       Q   Now, in this particular scenario, --
11       A   When I say I don't know, I say I don't
12   remember.  There's a difference.
13       Q   Okay.  Would you -- would you have that
14   information in your notes?
15       A   It's in the -- it's on the tape.
16       Q   On the DVD?
17       A   Yeah.
18       Q   Okay.  Now, in this particular scenario, what
19   would cause, in your opinion, the vehicle to move
20   rearward?
21       A   Hydraulic bleed and/or vibration, which is --
22       Q   Engine vibration?
23       A   Yeah.
24       Q   And this would be a situation where there was
25   no striking or inadvertently hitting the shift lever,

Page 232

1    drive shaft.
2        Q   But the --
3        A   You -- what would have to happen is the
4    parking pawl would have to stop that.
5        Q   The -- the park gear, though, is separate and
6    apart from the clutches and the other components of the
7    transmission, --
8        A   Oh, yeah.
9        Q   -- correct?
10       A   They have nothing to do with each other.
11       Q   Okay.   So then how is it that the turning of
12   the clutches, the engagement of hydraulic reverse
13   causes the park gear to rotate and kick the park pawl
14   out?
15       A   Wait a minute.  We're missing some points
16   here.  First of all, that reverse -- that gear
17   rotates.
18       Q   And when it -- when it rotates, even so
19   slightly because of the forces of the spring, the park
20   pawl is actually going to go further into the park gear
21   as opposed to out.
22       A   Well, that's the --
23       Q   Isn't that true?
24       A   That's -- that's called the spring force.
25   No, because it's -- no, because the park -- the pawl

Page 231

1    correct?
2        A   That's right.  This would be a self shift.
3    That was what I was qualifying.
4        Q   Just a self shift?
5        A   Self shift, yeah.
6        Q   In this particular scenario, how can you
7    explain how the park pawl disengages from a partially
8    engaged position at -- at the park gear?
9        A   Because the -- of the shift.  The vehicle
10   isn't in reverse, it's in neutral, so the partial
11   engagement, the gear isn't moving.  But once you put
12   that vehicle in reverse, the gear moves, it kicks it
13   out.  That's what it's supposed to do.  That's what
14   ratchet is.
15       Q   How -- how does --
16       A   And it might have ratcheted.  It might have
17   even been at the ratchet point when -- as it went down
18   the driveway, I'll never know, but that's certainly an
19   explanation.
20       Q   What -- what forces are present on either the
21   park pawl or the park gear to force the pawl out of an
22   engaged or partially engaged position?
23       A   The torque of the engine trying to rotate the
24   -- the gear.  The vehicle's in reverse, the -- the
25   clutches and the bands want to -- want to rotate the

Page 233

1    has gone its full travel which you -- I know what
2    you're saying, but you're thinking there's blockage
3    here.  It's not the full blockage where the -- the
4    pawl has been compressed to its maximum amount for the
5    return spring.  It's -- it's to a point in the park
6    engagement system where the pawl has only engaged a
7    fraction or a percentage of the tooth.
8        Q   And how can you quantify?  I mean, ten
9    percent?  Five percent?
10       A   I don't know.  I can't quantify that.  I mean,
11   if I could do that, I could go to Las Vegas and make
12   billions of dollars.  I can't do that.
13       Q   Okay.  Now, when -- when the -- and I'm
14   assuming since the vehicle is on a slope, the tires --
15   there -- there's some torque there; there's some force
16   which causes the park gear to -- to want to rotate,
17   corrected?
18       A   Absolutely.
19       Q   But what you're saying is the park pawl is
20   partially engaged --
21       A   Uh-huh.
22       Q   -- and it's -- it's preventing that park pawl
23   from continuing to rotate.
24       A   That's correct.
25       Q   Okay.  And that's what holds it there while

59 (Pages 230 to 233)

Page 234

1  she goes to the mailbox?
2     A   While she gets out.
3     Q   Okay.
4     A   That'll -- and that'll do that.  The vehicle
5  will do that --
6     Q   And --
7     A   -- because it's not engaged in reverse.  It's
8  in engaged in neutral.
9     Q   And there's -- there's more force on the park
10  gear and the park pawl in that situation versus if the
11  vehicle were situated on a -- on a perfectly flat slab.
12  Would you agree with that?
13     A   I agree.  Well -- yeah, I'd agree with that.
14  Sure.
15     Q   Okay.
16     A   Of course.  Absolutely.
17     Q   So again, what -- what is it, given that
18  additional force that's now present on the park gear
19  and the park pawl, that allows the park pawl to be
20  kicked out of the park gear?
21     A   Well, let's try 800 to 1000 RPMs at idle.  Why
22  don't we try that?  That's what that engine wants to
23  run at.  I mean, you think that park pawl's going to
24  stop that?  Okay.  Go ahead.  It won't.
25     Q   But that --

Page 235

1     A   It's going to flip that thing.
2     Q   But the RPMs on the engine and the gears,
3  you've already told us, is separate and distinct from
4  the park gear system, correct?
5     A   No.  Once that vehicle wants to rotate -- once
6  that -- once that vehicle -- the vehicle is in park,
7  but it's not in reverse, but it goes into reverse
8  through hydraulic bleed.  That -- as soon as that --
9  that engages the drive shaft, the prop shaft's going
10  backwards.  The parking gear is trying to prevent
11  that.  It's not.
12         It's going -- it's going to -- it's either
13  going to do one of two things.  It's either going to
14  pop into park and the shift lever is going to pop into
15  park and the ball detent is going to fall into park so
16  that it takes the reverse out of the system, or more
17  probably it's going to go into reverse, which is what
18  it always does, and now it's in full reverse and the
19  parking gear, once that parking ball detent moves into
20  full hydraulic reverse and the powered reverse, this
21  vehicle is backing up.  It's taking it -- the parking
22  gear --
23     Q   It's backing up, but the pawl is still holding
24  it, correct?
25     A   It's going to try, but it can't do it.

Page 236

1     Q   That's your testimony?
2     A   That's my testimony.
3     Q   And --
4     A   That's ratchet, and I'll show you ratchet
5  everyday of the week.
6     Q   -- did you -- did you do any testing or any
7  videotape that -- that shows that?
8     A   Have I done that?  On other cases I have, not
9  this one.
10     Q   Have you done it on the Vetters vehicle?
11     A   No.
12     Q   Okay.
13     A   I have not done that.
14     Q   Now, let me -- without spending all day on
15  that scenario, let's talk about scenario No. 2 here on
16  page five.  "The failure or absence of the brake-shift
17  interlock a loud the vehicle to be inadvertently
18  shifted from park to reverse upon attempted reentry
19  into the vehicle," da, da, da.  I'm assuming this is
20  the one where you're focused on the brake-shift
21  interlock feature and it not working on this vehicle;
22  is that correct?
23     A   Yes.
24     Q   Okay.  In scenario No. 2 where's the vehicle
25  parked, or stopped, rather?

Page 237

1     A   Somewhere by the sidewalk and the door.  It
2  could be anywhere in that vicinity because she's going
3  to get out to go to the mail, so --
4     Q   Are all four tires on the slope part of the
5  driveway?
6     A   Could be.  Could be partially near the
7  gutter, could be past the gutter.
8     Q   Okay.
9     A   Don't know.  I don't know.
10     Q   Okay.  And that's what I'm just -- I'm
11  curious --
12     A   Yeah.  I know.
13     Q   -- as to whether or not you have an opinion.
14     A   I don't -- I don't -- well --
15     Q   Could -- could the rear tires be in the -- the
16  bottom of that trough?
17     A   They could be, sure.
18     Q   Okay.
19     A   But not in -- not in certain -- not in the
20  position to where it can't get out of the trough if
21  it's in reverse.  That's not going to happen and,
22  therefore, that didn't happen.
23     Q   Okay.  Now, the other thing I asked you
24  about --
25     A   And so we understand that.  In other words, if

60 (Pages 234 to 237)

Page 238

1  it's in reverse and it's in the trough and it can't
2  back up, it can't back up. So Ford's position that she
3  left it in reverse and it didn't back up, how did it
4  back up? So I -- I look at it pretty distinctively in
5  terms of both of our -- your -- your expert's positions
6  or your -- your client's positions and my positions.
7       If it's in -- if it's in reverse and it's
8  in a ditch and it doesn't back up, how does it suddenly
9  back up? So now you got to create a situation where it
10 backs up.
11 Q.  Okay.
12 A.  You know that.
13      MR. SONNIER:  Let me object to
14 responsiveness. I've probably asked a bad question.
15 Q.  (By Mr. Sonnier) Scenario No. 2, you said, you
16 know, the vehicle may or may not be on the slope.
17 Where is the shift lever in scenario No. 2?
18 A.  It's on the edge of the land or near the edge
19 of the land between park and reverse -- next to park.
20 Excuse me.
21 Q.  So on the edge of the land either to one side
22 or the other?
23 A.  No.  It's on -- towards park.
24 Q.  Towards the park side?
25 A.  Park.

Page 239

1  Q.  But the tang is resting on the -- the flat
2  space up there?
3  A.  That's correct.
4  Q.  And where is the PRNDL indicator in this
5  scenario?
6  A.  Most probably either --
7  Q.  -- or -- or do you know?
8  A.  Well, it's -- it could be indicating P but,
9  again, it could be blank.  Most probably it's
10 indicating P because the -- the shift lever went all
11 the way to park.
12 Q.  Now, you had indicated to us earlier that in a
13 situation where you have the tang up on the land on the
14 insert plate closer on the edge almost in the park
15 gate, that in that position, based on your evaluation,
16 the -- the indicator showed either R or was blank.
17 A.  No.  No.  No.  That was false -- that was
18 the peak from reverse.  No.  If you're -- if you're up
19 on the edge of P going into park, it can be -- the park
20 can be illuminated without it being in locked park.
21 That's what I told you.
22 Q.  Okay.  So where is the rooster comb in
23 scenario No. 2?
24 A.  Park -- dark detent.
25 Q.  And where is the park pawl in relation to the

Page 240

1  park gear?
2  A.  At that point it would be fully engaged or
3  blocked and it rolled back when she got out.  Either
4  way it's engaged.
5  Q.  So either fully -- fully engaged or -- or
6  partially engaged such that it's preventing the vehicle
7  from moving?
8  A.  Well, she obviously got out of the vehicle, so
9  she took her foot off the brake and it would have
10 automatically engaged the park gear in full lock park.
11 Q.  So in a -- in a situation where if you assume
12 the vehicle is parked on the slope, that all four
13 wheels on a slope part of the driveway, the park pawl
14 would either be fully engaged or partially engaged --
15 A.  No.
16 Q.  -- and some -- somehow has to restrict the
17 movement of the park gear, correct?
18 A.  It's fully engaged in this scenario because
19 the park de -- the ball detent is in full park at the
20 transmission, therefore, the parking gear pawl is fully
21 engaged.
22 Q.  Okay.  So what -- what happens in scenario
23 No. 2?
24 A.  She returns the vehicle and -- and in
25 attempting to get inside inadvertently makes contact

Page 241

1  with the shift lever in some way, which I don't know.
2  I can't explain that, but I can tell you that's what
3  happened based on the fact that the steering wheel is
4  turned to the right, which is good evidence that she
5  might have reached for the steering wheel and slipped
6  or used that as an entry mode, which some people do,
7  or, two, in the process of getting in she slipped and
8  hit the steering wheel and the shift lever and that's
9  why you see it in the -- in the right turn mode.
10 Q.  Okay.  Now, if she's reentering the vehicle
11 and -- and does nothing more than grab or -- or touch
12 the steering wheel, that's not going to cause the shift
13 lever to move, is that correct, out of the gated --
14 A.  No.
15 Q.  -- out of the gated park?
16 A.  It's not the steering wheel, it's her hand.
17 Q.  I understand.
18 A.  The steering wheel -- okay.  All right.  All
19 right.  So any of the --
20 Q.  We'll get to that in a second.  But just
21 merely either touching the steering wheel with her hand
22 or bumping the steering wheel with her hand is not
23 going to cause the shift lever to go out of gated park
24 in this scenario, correct?
25 A.  It depends on where she does it.  If she does

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 242

1  it up here by the shift lever, yeah, and up at the top
2  and the steering wheel rotates down, yeah, --
3      Q    But I'm --
4      A    -- she's going to knock it out.
5      Q    -- but I'm saying she doesn't hit the shift
6  lever.
7      A    Oh.
8      Q    I'm talking about just touching the steering
9  wheel only.  Touching the steering wheel --
10     A    No, I don't think -- touching the steering
11 wheel I don't think alone would -- would cause the
12 vehicle to go into -- not from this position, no.
13     Q    Okay.  In this particular scenario, it would
14 be your opinion that she somehow makes contact with the
15 shift lever causing it to -- to go out of park, out of
16 detented park?
17     A    That's correct.
18     Q    Okay.
19     A    Absolutely.
20     Q    And what -- what witness are you aware of that
21 has testified that saw her hand or any part of her body
22 hit the shift lever?
23          MR. SICO:  Objection, speculation,
24 argumentative.
25     A    I -- I don't have any witness testimony to

Page 243

1  that effect.
2      Q    Okay.  What -- what direct evidence do you
3  have that she had any kind of inadvertent contact or
4  purposeful contact with the shift lever in this
5  scenario?
6      A    The best evidence -- I'm sorry.
7          MR. SICO:  Objection, vague.  Go ahead.
8      A    The best evidence we have is the vehicle was
9  found in reverse.  That's the best piece of evidence
10 that everybody has.  How did it get into reverse if
11 she put it in park?  So I understand your position, but
12 you understand I don't agree with it, I didn't agree
13 with it in Haller, I didn't agree with it in all the
14 rest of them where your experts are -- and Chrysler
15 said that the woman left it there, the person left it
16 in reverse.  I'm sorry.  I don't agree with that.  I
17 don't think it's logical nor does it make any sense for
18 a 58-year-old elementary school teacher to leave a
19 vehicle in reverse.
20          MR. SONNIER:  I object to responsiveness.
21     Q    (By Mr. Sonnier)  And -- and -- the scenario
22 No. 3, you just said a combination of the two
23 scenarios.
24     A    Right.
25     Q    Can you expand on that or tell us what you're

Page 244

1  talking about there?
2      A    Yeah.  I mean, what happens in the -- in the
3  combination is that the -- all the defects are present
4  and any one of them could have -- the false park, the
5  inadvertent contact, any one of those could have caused
6  this to happen.
7      Q    So -- so basically what you're saying is you
8  can't rule out No. 1 scenario or No. 2 scenario.
9  They're -- they're both likely scenarios.
10     A    No.  I -- that's where I was before we did the
11 tear-down.  Now that we got the tear-down, I'm -- I'm
12 saying that the most probable one is -- this is before
13 the tear-down -- most probable one is two.  With one
14 it's a possibility.  It's -- it's there.  It could.  If
15 -- if -- again, if -- if somehow more information is
16 forthcoming that changes two, then I'll change two to
17 one, but right now the most probable is two with the
18 information -- all the information.  Now, this was at
19 the time of the report.
20     Q    Okay.
21     A    Yeah.
22     Q    Now, going to the next page, Mr. Stilson, page
23 six, you talk about hazards that can occur with vehicle
24 in false park.  Let me -- let me back up here for a
25 second.

Page 245

1          The -- accident scenario No. 1 is a false
2  park condition, correct?
3      A    Correct.
4      Q    That's assuming a properly functioning
5  bitsy --
6      A    That's correct.
7      Q    -- or brake-shift interlock system.
8      A    That's right.
9      Q    Okay.  No. 2 is not a false park situation.
10 It's a -- a -- she did achieve gated or detented park
11 and absence of the bitsy resulted in, you know, shift
12 lever moving out of -- out of detented park, correct?
13     A    Yeah.  The defective brake interlock system
14 allowed the vehicle to be inadvertently contact the
15 shift lever and cause it to go back.
16     Q    Okay.
17     A    It didn't self shift in that scenario.  You
18 understand that.
19     Q    Yeah.  Actually, --
20     A    Two it doesn't self shift.
21     Q    -- in scenario No. 2 it has to -- you agree
22 the only way it comes out is an operator, a dog, a cat,
23 somebody --
24     A    Yeah.
25     Q    -- moves that shift lever, touches that shift

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 246

1  lever.
2     A  Most probably she would have to touch the
3  shift lever.
4     Q  Okay.  And did you -- in your analysis, have
5  you measured the amount of force that would be required
6  to take or to move that shift lever out of detented
7  park?
8     A  Only subjectively.  I haven't done it with
9  any measurement devices, but I told you I took it out
10 and tested it to my satisfaction.
11    Q  Okay.  And what -- what's your conclusion on
12 the force necessary to move it from that position into
13 hydraulic reverse?
14    A  It's not -- it can be done.  It's not
15 excessive.  There's nothing stopping it from moving.
16    Q  Okay.
17    A  It's going to move.
18    Q  In here back on page six again you talk about
19 powered vehicle movement rearward, that little b, that
20 paragraph underneath there.  This is a discussion
21 about determining whether a false park exists.
22       You say "This can occur due to a tolerance
23 lag between the shift lever forward movement and the
24 transmission rooster comb," and that's -- that's what I
25 want to explore because we haven't talked a lot about

Page 247

1  that.  Tolerance lag, what do you mean by that?
2     A  That's the -- the cable link.
3     Q  That's the -- the linkage from the -- from the
4  column down to the transmission?
5     A  The cable -- the cable and its mounting
6  system.
7     Q  Okay.
8     A  All of that.  The -- the way the cable is
9  mounted to the hardware and the way -- and the cable
10 itself.  From the -- from the gear shift selector down
11 the transmission there's a -- it's loose.
12    Q  Why --
13    A  It's excessive looseness in this case.
14    Q  -- why is it loose?
15    A  Because of the way it's designed.
16    Q  And what is it the design that causes it
17 to be loose?
18    A  The connection.
19    Q  I mean, is it designed to be loose or is it
20 something that occurs after a certain amount of use
21 with the vehicle?
22    A  Well, the way it's designed it's going to get
23 worse over time because of usage, but it -- in the very
24 beginning it has some looseness, but that gets worse
25 with operation.

Page 248

1     Q  And why does it get worse over time with
2  usage?
3     A  Because of the plastic parts, the -- the way
4  it's pinned at the -- well, I'm -- this one I'll show
5  you.  It's a little easier because it's hard to
6  describe.
7        These -- these are the bucks that were
8  built.  It starts at the pin connection right here, and
9  this pin connection has looseness in and out and
10 somewhat fore and aft, and then you --
11       VIDEOGRAPHER:  Is it possible to turn that
12 towards the video because I can't --
13       THE WITNESS:  Yeah.  I'll --
14       VIDEOGRAPHER:  -- see what you're showing
15 over there.  Thank you.
16    A  This -- this shift cable, the way it's pinned
17 on, has side to side and up and down movement that
18 allows some looseness in it.  That's the beginning of
19 it.  This particular part right here, connection where
20 the solenoid connects to the brake interlock system is
21 loose to the bracket and this bracket connection right
22 here has flexibility.
23    Q  But what you were wiggling there by the
24 solenoid, that doesn't go to the transmission, does it?
25    A  Where?

Page 249

1     Q  The -- the wire you held right next to the
2  solenoid, does that go to the transmission?
3     A  Oh, this is part of -- this is part of the
4  looseness in the cable system.  When you -- when you
5  engage the -- the brake interlock, this system locks it
6  up.  But when it's on the land, which is -- I'm going
7  to show you the defect right here -- I'm on the land
8  right now and that brake interlock is engaged.  That's
9  why this is defective, but we'll get to that later.
10       And if you -- if you let that brake
11 interlock system engage itself so that you can't pull
12 it out, but you can put it on the land, you can flex
13 this whole system and that's looseness.  This bracket
14 has flex in it, this connection is loose right here.
15       You can see the -- can you get that on?
16 This tolerance where this connector right here is loose
17 and allowing sloppiness, and then you go down here,
18 there's two valleys down here.  I will switch it
19 around for you.
20       Okay.  Here's one.  Can you see the
21 looseness in this cable connection here at the bracket?
22    Q  And you -- you're referring to the connection
23 again, right?
24    A  The connection, right.
25    Q  Okay.

63 (Pages 246 to 249)

Page 250

1    A   And that allows the cable to shift.  And then
2   you have the same lateral pin looseness here, but it's
3   not as bad as the transmission, and then when you get
4   down here this -- I don't know if you can pick that up
5   because I got to take a hold of it -- there -- I can
6   move this cable that far with my finger and the cable
7   is moving because the lever moves.
8    Q   And -- and what are the consequences of -- of
9   that which you just showed us?
10   A   When you shift, this is a push cable so that
11  it takes -- when you initially shift it, it takes out
12  the lag because this system pushes that.  This travels
13  further -- the shift travels further in the motion than
14  the cable end by the transmission and you get more
15  motion.  But when you let go of the system, you get it
16  back, and that's the bounce back where you just hit the
17  edge and it bounces back.  I just did it there.
18   Q   So primarily what you're focused on in -- in
19  saying that there's lag in the system because of the
20  design, the -- the connections -- the way in which the
21  connections are done introduces slack or lag into the
22  system, correct?
23   A   Yeah, because the cable sections have a
24  freedom of motion that allows the cable transfer
25  pushing it from one spot to another, there's lost

Page 251

1   motion.  When you first start to shift, it pushes.
2   You get lost motion between there and what happens at
3   the transmission and it keeps going, keeps going, and
4   then when it snaps into park you get that motion back,
5   the looseness, and then it allows you to shift the --
6   move the handle shift lever back onto the false --
7   false park or land -- that's not the false park
8   position, but it's false park in terms of the system is
9   not in park.
10   Q   And this cable is attached up in the column to
11  a particular point, correct?
12   A   Yeah, the shift lever.
13   Q   Okay.  And --
14   A   Shift lever -- actually, it's not the shift
15  lever itself, but the shift lever pawl plate.
16   Q   And the -- the shift cable at the transmission
17  end is attached to a particular point, correct?
18   A   Well, there's a -- the fixed point of the
19  transmission, then there's the flexible point at the
20  outer manual lever.
21   Q   Okay.
22   A   There's two connections, so I don't know which
23  one you're talking about.
24   Q   So that there's a -- Okay.  Well, the end of
25  the -- I'm just referring -- the cable itself, there's

Page 252

1   a connection at the end of the cable and the
2   transmission, correct?
3    A   That's correct, the lever.
4    Q   It is attached to a fixed point.
5    A   It's supposed to be fixed, yes.  I'll put it
6   that way.
7    Q   Okay.  Let me back up for a second.  Your
8   two accident scenarios.  We were talking about one,
9   this is the false park deal --
10   A   Yes.
11   Q   -- where you say she achieved -- somehow
12  achieved what you call false park, that it went into
13  powered reverse either due to bleed of hydraulic fluid
14  or vibration from the engine, correct?
15   A   Where are you at?  On page six?
16   Q   No.  I'm not looking at anything in
17  particular.  I'm -- I'm?
18   A   Oh!
19   Q   I'm looking back at my notes, but yeah.
20   A   I thought you were -- I thought you were
21  quoting me.  Okay.
22   Q   Back -- back on page five, --
23   A   Yeah.
24   Q   -- scenarios one and two we've already talked
25  about, --

Page 253

1    A   Yeah.
2    Q   -- and you said No. 1 is -- is where you
3   believe she achieved what you call a false park
4   position, --
5    A   Correct.
6    Q   -- and -- and it assumes a properly
7   functioning brake-shift interlock.
8    A   Yes.
9    Q   I just want to make sure I've identified what
10  you believe precipitated the vehicle going into powered
11  reverse is either a bleed condition of the -- of the
12  fluid or vibration from the engine which resulted in a
13  self shift of the lever.
14   A   Well, a bleed, yeah.
15   Q   Okay.  It could be either bleed or vibration?
16   A   Because the -- the cable is loose enough that
17  it can -- it can -- the lever can move slightly, or the
18  -- or the manual valve can move.  Either way, it's
19  moving towards reverse bleed.
20   Q   Now, getting over to page eight, and I'm just
21  wrapping up your report here, --
22   A   Okay.
23   Q   -- you -- you're discussing self -- or, excuse
24  me, the shift synchronization issue --
25   A   Yes.

64 (Pages 250 to 253)

Page 254

1    Q   -- between the steering column insert plate
2  and a linear transmission manual detent, and you've
3  identified several issues here, correct?
4    A   Right.
5    Q   The first one being "The operator feels a
6  different detent position than is -- that is longer in
7  duration than the other detents."  Now, what you're --
8  the different detent position, you're talking about a
9  detent position at the rooster comb in the
10  transmission.
11    A   No.  This is the -- this is the -- the
12  steering column and the transmission manual detent.
13    Q   Okay.  So --
14    A   This is the shift -- insert plate.
15    Q   Okay.  So maybe another way of saying would
16  be the operator feels a different detent gate that is
17  longer in duration than the other detents in the
18  transmission?
19    A   Yeah.  If you'd like to look at it that way,
20  that's fine.
21    Q   Okay.  I just want to make sure that -- that I
22  understand what -- what detents or gates you're talking
23  about because --
24    A   No.  That is true of the rooster comb, too.
25  I wasn't referring to that, but that happens to be true

Page 255

1  also of the rooster comb because the -- there's a
2  further drop, a greater drop down the reverse or the
3  park ramp and there's a little room in there for it to
4  roll forward, so they're probably -- it's probably true
5  of the rooster comb, too, but it's more directed at the
6  insert plate, or as you call the gate.
7    Q   Okay.  Now, point 2 here you say, "Movement of
8  the shift lever handle to park requires a longer
9  motion."  That's saying because there's lag in the
10  cable, you have to go further over to the park gate in
11  order or before you achieve detented park in the
12  transmission at the rooster comb.
13    A   Yeah.  You're going to over travel.  In other
14  words, you -- you can over travel.  At some points you
15  can, depending how you do the -- how the shift
16  mechanism is left, you can have over travel.
17    Q   Have -- have you measured or is there any way
18  you can quantify the amount of what you call lag in
19  this system?
20    A   I don't know.  Most probably we'd have to
21  take apart the transmission on the subject vehicle or
22  do some -- some serious instrumentation to figure out,
23  without looking at the inner manual and knowing the
24  exact positions.  FAA or Carr's people think they can
25  do it with their systems.

Page 256

1    Q   Let me ask you this:  Would you agree it's
2  critical that park gate be separate from the other
3  gates, other gears?
4    A   Oh, yeah.  I think you have to isolate it --
5    Q   Okay.
6    A   -- one way or another, whether you use a gate
7  or whether you would use a positive system that just
8  locks it in through either a solenoid, or electronic,
9  or a mechanical device that -- that it's just like a
10  dead bolt, it locks it out.
11    Q   Okay.
12    A   I don't care how you do it but, yeah, it has
13  to be isolated.
14    Q   You want it to be isolated --
15    A   Yes.
16    Q   -- so that the -- the operator has some
17  feedback.  There has to be more of a purposeful
18  posi -- you know, movement to get it in the park
19  position where the vehicle would be secured.
20    A   Well, I don't think that so much as it is that
21  you want the -- you want the operator to know that they
22  have achieved a disengagement and locking of -- well, I
23  use the -- Chrysler's words are clear.  They define
24  park in their manual.  They say park is where the
25  vehicle engine has been disengaged and the transmission

Page 257

1  is fully locked.  I mean, that's -- that's what you
2  want.
3    Q   Okay.  And, in this particular system, when I
4  shift the lever from reverse, or any other gear,
5  towards gated park and I achieve gated park and that
6  tang drops down in the -- in the gated park deal in the
7  column, I am also in detented park in the transmission
8  and the park pawl is --
9    A   That is --
10    Q   -- is either fully engaged or partially
11  engaged, correct?
12    A   No.  At that point, if it's -- if it's full
13  park detent, it's fully engaged, --
14    Q   Okay.
15    A   -- or -- or blocked.  It's one or the other.
16    Q   Okay.
17    A   It's either in or out.
18    Q   So another -- another way of saying it, --
19    A   There's no partial.
20    Q   -- and I'll use your terminology, when I --
21  when I achieve gated park in the -- at the shift lever
22  and the tang drops down in the -- in the park gate in
23  column, I am in detented park in the transmission and
24  the park pawl is either fully engaged or it's where the
25  end of it is on the top of one of the teeth on the park

65 (Pages 254 to 257)

Page 258

1  gear.
2    A  That's correct.
3    Q  Okay.
4    A  It's blocked, yeah.
5    Q  Okay.
6    A  It's one or the other.
7    Q  No. 4 here -- that point No. 4 you say "The
8  detent into park is not as crisp as the other positions
9  because the ball plunger is not snapped into the park
10  detent." What do you mean by that?
11    A  The -- from the crest to the park detent in
12  the -- in the rooster comb, it's not a snap on this
13  vehicle.  You don't feel a snap.  The -- the
14  distinction is on this -- on the other buck where we
15  have the higher force cam lever spring it snaps in
16  because the force is greater.  This doesn't have a
17  snap feel, at least it doesn't for me.
18    Q  Okay. And ball plunger, what are you talking
19  about?  What's the ball plunger?
20    A  That's the cam follower.  That's the cam
21  lever, cam follower.
22    Q  There's a paragraph down here after these
23  numbered items.  I need to go through that for a
24  second.  "It is also possible, due to hand motion
25  function, that when the operator hits the stop on the

Page 259

1  manual lever it will rebound with their hand and
2  release the lever on the flat land." That's what
3  you've been talking about in terms of rebound, correct?
4    A  That's what I'm talking about.
5    Q  Okay.  And you say, "When this happens, if
6  the engine is not turned off and the key removed, the
7  driver may not recognize the position," correct?
8    A  That's correct.
9    Q  And then you say, "These tactical factors were
10  found in several consumers studies." What tactical
11  factors are you talking about?
12    A  The fact that the person can do what I said in
13  the first sentence.
14    Q  Okay.
15    A  That was -- that was uncovered that it can
16  happen in -- with this type of transmission.  In a
17  substantially similar transmission NHTSA found that
18  out.
19    Q  Okay.  Now, the --
20    A  By the way, so the did manufacturer.  They
21  found it you could do it too.
22    Q  Down at the bottom of the page you're talking
23  about I think the insert plate again, which is in the
24  steering column.  Talking about flat land between
25  reverse and park notch, and you go on to say, "The park

Page 260

1  notch appears deeper than all others with a width
2  greater than the rectangular shaped lock tang." What
3  do you mean by that?
4    A  I'm not -- I can't find that. Is it the last
5  sentence?
6    Q  That last paragraph, yeah.
7    A  "The design of the system allows the tang to
8  rest on flat."
9    Q  No, page eight.   Page eight.
10    A  Yeah.
11    Q  Are you on page eight?
12    A  Yeah. I'm on the last paragraph.
13    Q  It says, "There is a flat land between the
14  reverse and park notch."
15    A  Yeah.  That the -- the slot is -- the -- the
16  park lock, as you call it, the -- the park lock slot,
17  the tang is narrower than the slot, so there -- in
18  other words, you can move the -- the lever, hit the
19  stop to slide down and there will be a gap.
20    Q  Okay.
21    A  Okay.
22    Q  And so the -- the width of the tang is
23  narrower than the opening?
24    A  Yeah.  You asked me that about the first part
25  of the deposition.

Page 261

1    Q  Okay.
2    A  "Is the width of the....
3    Q  And it has to be that way so the tang can
4  insert --
5    A  Exactly.
6    Q  -- into the gate, correct?
7    A  Yeah.  You want to make sure it gets in.
8    Q  But you also say here "The park notch appears
9  deeper."  Are you talking about deeper in --
10    A  Depth.  It is deep.
11    Q  In depth?
12    A  It's deeper than any other detent.
13    Q  Okay.  And you want it to be that way,
14  correct?
15    A  With this system you'd have to have it that
16  way.
17    Q  Okay.
18    A  There's no choice.
19    Q  You're -- you're not critical of the fact that
20  this park gate is deeper than the other gates in the
21  system?
22    A  No, I'm not critical of that.
23    Q  Okay.  In fact, you've previously testified in
24  other cases that you prefer to have a deeper park gate
25  on the insert plate in the column, right?

66 (Pages 258 to 261)

Page 262

1   A   That is correct.
2   Q   Do you believe that an operator has
3   responsibility to ensure a vehicle's in secured park
4   before the exiting the vehicle when they leave the
5   engine running?
6   A   I think they have a responsibility to believe
7   that they've done that.
8   Q   Okay.   This particular vehicle, the Vetters
9   vehicle, has several cues or indicators that could
10   cause a person to know what gear they're in, the first
11   being the PRNDL indicator itself, correct?
12   A   No, because we showed that's defective.   You
13   could have it in the land and not be in the parked
14   gate -- locked gate and still have it illuminated, so
15   that's a defect.
16   Q   Okay.   Let's talk about the alternative
17   design that you brought up earlier.   No. 1, you talk
18   about a different geometric configuration of the insert
19   plate in the -- in the column.   And --
20   A   Well, at this point, to shortcut that, if the
21   manufacturing defects are eliminated, we don't need all
22   that for this -- for the purposes of this case -- the
23   issues in this case.
24   Q   Okay.
25   A   In other words, as it relates to the issues,

Page 263

1   the brake interlock manufacturing defect and the key
2   defect manufacture -- the key lock are defective
3   and -- and, therefore, that's what is the proximate
4   cause of why this vehicle backed up in powered reverse.
5   So if the brake interlock, those manufacturing defects
6   didn't occur, we wouldn't have this accident, --
7   Q   Okay.
8   A   -- so that's my position.
9   Q   Well, let -- let me ask you this: --
10   A   If we have to go -- we have to go one step
11   beyond that, then there would be other things that we
12   have to do.
13   Q   Let -- let me ask you this:  you -- you
14   indicated earlier that the -- the fact the key
15   interlock was not functioning on this vehicle as -- as
16   found by you is not a direct cause of Mrs. Vetters's
17   vehicle backing up at the scene of this accident on
18   that date, correct?
19   A   It's not a direct cause, but it certainly is a
20   sub -- a substantially contributing factor because it
21   establishes the -- the quality defects getting through
22   the plant, it establishes that the system cable linkage
23   is defective, which is contributory, and that the --
24   the key -- the person can put it in that position,
25   remove the key and think that's in lock park and it's

Page 264

1   not.
2   Q   Let me -- in this accident scenario, did the
3   nonfunctioning key interlock cause Mrs. Vetters to back
4   up?
5   A   I don't know.   That's a legal question.   I'm
6   not going there because that's -- my opinion is that
7   it's a substantially contributing factor.   Whether it
8   caused it or not, I think that's a legal issue, really.
9   That's a tough one.   It really is.
10   Q   Well, from an engineering standpoint, knowing
11   the systems, the fact the key interlock didn't work
12   didn't cause the vehicle to back up in powered reverse.
13   A   Well, I think the way I look at it is if I
14   shoot you with a bullet and you die, it doesn't matter
15   if I stab you in the chest, okay.
16   Q   Okay.
17   A   If I stab you in the chest, you fell down, I
18   walked up and blow your brains out because you're
19   incapacitated, it's a substantially contributing factor
20   that I could walk up and blow your brains out, so I
21   think, yeah, the -- the knife didn't kill you, but the
22   gun did, but they're still causally related to you --
23   what happened to you, --
24   Q   Okay.
25   A   -- so that's kind of the way I'm looking at

Page 265

1   it.
2   Q   So you -- assuming there was a properly
3   functioning brake-shift interlock in this vehicle, --
4   A   Okay.
5   Q   -- and assuming the -- and assuming the -- the
6   key interlock was not functioning as found by you,
7   would this accident still happen?
8   A   I don't think so because I don't think she
9   could have got it out.   I don't think the cable defect
10   would be there.   I think they would have -- see what
11   I'm trying to say?   The cable defect is -- is
12   associated with the key interlock, okay.   So if we get
13   rid of the cable defect where you can put this system
14   on the -- on the edge and -- and engage the brake
15   interlock, you should -- you can engage it, but in this
16   case it was malfunctioning.   I think the key interlock
17   is -- is directly associated with the cable link, so I
18   think all those three defects mold together to get --
19   Q   How -- how is the key interlock -- what does
20   that have to do with the positioning of the shift lever
21   in this accident?
22   A   Just a minute.   I'll show you on this buck.
23   I can put this particular system --
24       MR. SICO:  You gotta turn the key on.
25       THE WITNESS:  I will.  I will.

67 (Pages 262 to 265)

Page 266

1     VIDEOGRAPHER:  Do you need to turn that
2  towards me?
3     THE WITNESS:  Yeah.  Let me put it towards
4  you.  That's not what I was trying to do.
5     A   Okay.  I'm on -- right now I've got the system
6  in full park and this lever is on the land on the edge
7  of the insert plate right now.
8     Q   When you -- when you say in full park, what do
9  you mean by that?
10    A   Everything is in park.  The -- here.  This
11 gear -- come over here.  The pawl gear is fully in the
12 park gear, the detent of the rooster comb was fully in
13 the detent, but this lever is sitting on top of the
14 insert plate on this vehicle right now.
15    Q   Okay.  And --
16    A   That's where it's at.
17    Q   -- is the PRNDL indicator on?
18    A   No.  I can't tell you what that is on this
19 thing because --
20    Q   Does it operate on this buck?
21    A   No.  I don't have that.  But I can tell you
22 what happened to the subject vehicle in this position.
23      Now, when you have this vehicle in this
24 position and you put it totally in park lock, you're
25 supposed to be able to, if it's locked, start it and

Page 267

1  move the key.  Okay.  So I can move the key because
2  it's in full park.  Let's put it on the land so you
3  can park in reverse.  Here's your key.
4      Now, if an operator is driving this
5  vehicle and they can take this key out with this system
6  in this false park position or this defective position
7  where it's not fully engaged, that becomes a habit
8  forming thing where they leave it there and they don't
9  even know it and they take the key out.
10      That's not supposed to happen.  They
11 can't get that key out of there unless that vehicle is,
12 by law, in a fully parked detented position, so that's
13 No. 1.  And No. 2 is this little lever here is you turn
14 it, now it's -- this is the way that this vehicle
15 operated on the day of the accident is if you turn this
16 key to the locked position, it can't lock out the gear
17 shift system because this was malfunctioning.
18      Now, that's an indication, again, of a --
19 a quality defect that got through the plant.  So I --
20 I mean, I'll -- I guess the judge is going to have to
21 decide how that relates to overall causation.  I think
22 they are substantially contributing factors to the
23 accident.  That's what I think.  Now, whether that's
24 a proximate cause, I don't know.
25    Q   Sir, you -- you can't say based on an

Page 268

1  engineer, whether that was a proximate cause of this
2  accident or not, can you?
3     A   Not without a -- a definition of what
4  proximate cause is in the statute.  I'd have to
5  understand that much better.  But my understanding of
6  proximate cause is that substantially contributing
7  factors are a part of proximate cause.
8     Q   Okay.
9     A   Okay.
10    Q   Was the key in Ms. Vetters's vehicle found in
11 or out of that key slot?
12    A   I don't know.  No one told me.
13    Q   Okay.  If -- if --
14    A   I assume the engine was running, so the key
15 was in it.
16    Q   Okay.  And you have no evidence that she ever
17 removed the key at any point during this accident event
18 or scenario, do you?
19    A   No, but it's symptomatic.  As I said, it's a
20 contributing factor because the fact that that can
21 happen is a consequence that this whole gear selection
22 system is defective.  It's a -- it's a symptom.
23    Q   So you're saying because one thing's bad, the
24 whole thing must be bad?
25    A   No, because one thing's bad contributed to the

Page 269

1  fact that it happened.  If one -- one thing bad helped
2  contribute to the -- to the reason why this whole thing
3  occurred, it's a symptom of why she -- she had a cold,
4  but all of a sudden she died of pneumonia.
5     Q   Is the fact the key interlock didn't work,
6  does -- does that impact how she shifted this lever on
7  the day in question of her accident?
8     A   Yeah, because she can -- she can leave it in
9  that edge and pull the key out.
10    Q   But do you have any evidence in this case that
11 she ever pulled the key out?
12    A   I don't care if she pulled the key out on this
13 day.  She got used to being able to -- she is not
14 supposed to be able to pull that key out if that
15 system's on that ledge, which means if Chrysler
16 designed and -- and manufactured a product where she
17 could leave it on the ledge and take the key out, that
18 means she can get it in that position where it can be
19 inadvertently contacted and the brake interlock doesn't
20 work.
21      It -- it's a symptom that -- where the
22 person has a cold and developed pneumonia, and that's
23 the way I'm looking at.  Now, if that's proximate
24 cause, that's proximate cause.
25    Q   The -- we started out this little exchange

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 270

1  talking about the insert plate --
2     A   Yeah.
3     Q   -- on the column and, my question is, do you
4  believe that that insert plate in and of itself is
5  defective in this vehicle?
6     A   Not in and of itself.  It's the system.  The
7  whole system has to be -- as we went through it, and I
8  think you went through it in detail and rigorously, the
9  whole system contributes to the entire defective
10  condition that makes it reasonably dangerous, not just
11  that insert plate, no.
12     Q   Okay.  Now, you also have a buck that you've
13  looked at constructed by or at the direction of Mr.
14  Rosenblueth that has a modified insert plate, correct?
15     A   Correct.
16     Q   Have you ever tested that modified part in a
17  production vehicle?
18     A   No, I have not.
19     Q   Okay.  We talked about an increased spring in
20  the transmission earlier.  You think it should be
21  greater than whatever the OEM spring is.
22     A   I think that would be a good idea, yeah.
23     Q   Have -- have you ever tested a heavier load
24  spring in a production vehicle?
25     A   Yes.

Page 271

1     Q   Okay.  Have you ever tested in a 2002
2  Durango?
3     A   No.
4     Q   You've tested in a 45 RFE transmission?
5     A   That, and that was Ford's fix -- part of
6  Ford's fix to the C6 and C4.
7     Q   Wait a minute.  I'm asking about Chrysler's
8  45 RFE transmission.
9     A   It's part of the fix in the -- in the -- in
10  the Jeep case.
11     Q   Okay.
12     A   Yes.
13     Q   Have you -- in the Jeep case you think there
14  was a heavier -- heavier load spring in the
15  transmission?
16     A   It was -- no.  It was added.  There as a
17  spring added to the column which really -- all the --
18     Q   Mr. Stilson, I'm not talking about the column,
19  I'm talking about in the transmission.  You've
20  testified at length today about a spring behind the
21  roller ball that is associated with the rooster comb in
22  this vehicle inside the transmission, and you believe
23  that this particular system should have had a heavier
24  load spring than what was in their OEM, and my question
25  to you is, have you ever tested a heavier load spring

Page 272

1  in a 45 RFE transmission for a Chrysler vehicle?
2     A   I told you that.  I was trying to tell you,
3  that's right.  The heavy loaded spring, you didn't say
4  that it's at the rooster comb.
5     Q   Well, I did, but the record will speak for
6  itself.  So now that you've heard --
7     A   Well, my --
8     Q   -- my question, can you answer the question?
9     A   Yeah.  The answer is that I don't -- I don't
10  recall that they increased the spring load at the
11  rooster comb.  They increased the overall system
12  spring load, --
13     Q   Has --
14     A   -- and I have evaluated it.
15     Q   -- has -- has John Stilson tested a heavier
16  load spring in a 45 RFE transmission?
17        MR. SICO:  In the rooster comb?
18        MR. SONNIER:  In the rooster comb.
19     A   I believe I have, but not at the rooster comb.
20     Q   Okay.  What spring have you tested?  What --
21     A   They added a separate spring to the column
22  lock, and that -- that increased the spring load of the
23  whole system.  That's why I said I have tested it and
24  I know what it does.
25     Q   And where does --

Page 273

1     A   Chrysler recommended that as a fix.  By adding
2  the extra spring load and the detent, that was their
3  solution to the -- to the recall of the Jeep.
4     Q   And -- and where is that spring?
5     A   It's in the added -- well, there were two of
6  them.  One was the recall kit and the second was the
7  final production kit where they -- the spring is on
8  the --
9     Q   You're talking about the spring on the plunger
10  to --
11     A   Yeah, where it pops into the -- you know,
12  there's a little -- it's similar to this, it's a cam
13  spring, and in the -- in the console mechanism they
14  added the spring detent roller that popped into the
15  detents on the production and the -- and the field fix
16  for the -- for the recall kit, so that added more
17  spring tension to the shift sequence, --
18     Q   And --
19     A   -- so indirectly I have evaluated it.
20     Q   And the -- the Dakota does not have that
21  particular shift mechanism -- I mean, excuse me, the
22  Durango, the '02 Durango does not have the same shift
23  mechanism as that found in the Jeep Grand Cherokees
24  that you've been talking about?
25     A   No.  I'm talking about the console, that's

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 274

1 correct.

2 Q  Right.  They're -- they're different.

3 A  They're different in the sense that they're a

4 different location.  They do the same -- they perform

5 the same function.

6 Q  And they have different hardware, too, don't

7 they?

8 A  Well, this one does.  This was a -- this was

9 a waste of hardware, but that's okay.  A lot of money

10 spent on that for nothing.  It didn't fix the problem.

11        MR. SONNIER:  Objection to responsiveness.

12 Q  (By Mr. Sonnier) The shift lever is not the

13 same, is it?

14 A  No, it's different.

15 Q  The -- the insert plate is completely

16 different, correct?

17 A  In terms of what we talked about.  We had

18 talked about that.  I said geometrically and shape

19 wise, they're different, but functionally and

20 operationally they're the same.

21 Q  The -- on the Grand Cherokee, it requires a

22 different motion by the operator to shift park versus

23 what you have to do with this Durango on the column,

24 correct?

25 A  I'd agree with that.

Page 275

1 Q  There are some photographs here that I was

2 going to show you.  These are my photographs.  I -- we

3 started talking about this earlier, but I got

4 sidetracked and did not show you these.  I'd like to

5 do so.

6        MR. SONNIER:  I am going to mark this as

7 Exhibit No. 49 -- Discovery Exhibit No. 49.

8        (WHEREUPON EXHIBIT NO. 49 WAS MARKED.)

9 Q  (By Mr. Sonnier) Just take a look at that, if

10 you could, sir.

11 A  Okay.

12 Q  I'll represent to you that's the Vetters

13 vehicle in the Vetters's driveway out there when --

14 when my experts --

15 A  Okay.

16 Q  -- inspected and tested this vehicle.

17 A  Okay.

18 Q  Do you see in that particular photograph where

19 the rear tires are -- are placed?

20 A  I do.

21 Q  Okay.  And we -- we've talked about, you

22 know, possibilities or, you know, there's obviously

23 many different locations the vehicle could have been

24 stopped by her before she exits to go retrieve the

25 mail, correct?

Page 276

1 A  Yes.

2 Q  And -- and based on everything we've read from

3 the, you know, witness testimony, statements and all

4 that, you can't rule out that she stopped the vehicle

5 in that position before she exited to retrieve the

6 mail; is that correct?

7 A  I can't rule that that's a potential position.

8 No, I can't rule that out.

9 Q  Okay.  Do you know whether -- if the vehicle

10 was in that position, as shown in Discovery Exhibit No.

11 49, if you leave the transmission in hydraulic reverse,

12 whether it will remain stationary for, you know, a

13 period of time?

14 A  I don't know.

15 Q  Okay.  If it were to remain stationary for a

16 period of time, would that surprise you?

17 A  Depends.

18 Q  On what?

19 A  What it took to get it into this position.

20 Q  Okay.  Would you agree with me, Mr. Stilson,

21 that you can't rule out that Ms. Vetters stopped the

22 vehicle in the position as shown in Discovery Exhibit

23 No. 49 and that she exited the vehicle leaving it in

24 reverse before she went to retrieve the mail?

25 A  I can't rule it out as a possibility, but I

Page 277

1 would never address it as a probability, but certainly

2 I can't rule it out as a possibility.

3 Q  Okay.

4 A  I would not do that.  I weighed that.  I

5 considered it.

6 Q  And in terms of its not a -- not being a

7 probability, what do you base that on?

8 A  I just -- it's -- I've never had a case where

9 a person who survived this -- these park to reverse

10 instances ever left the vehicle in reverse, the person

11 who lived who could be here and say, "I -- I shifted it

12 into park and I got out and it backed up."

13 Q  Okay.

14 A  Those -- that's the testimony.  It's sworn,

15 it's under oath, and the witness testimony validated

16 that the vehicle was either in full reverse or in

17 part -- or not -- between park and reverse at the time

18 that they came and -- and shifted the vehicle, so that

19 testimony is -- stands on the record.  I've never had

20 a case where a live witness has -- to an accident has

21 ever said they left the vehicle in reverse, that's No.

22 1.  No. 2 --

23 Q  Let me -- let me ask you this before you get

24 off that topic --

25 A  Sure.

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

1  Q  -- and then I'll let -- I'll let you --
2  A  Sure.
3  Q  -- continue on with that answer.
4  A  Sure.
5  Q  But you would agree with me, and I think you
6  acknowledged earlier, that witnesses can make
7  mistakes, --
8      MR. SICO:  Objection.
9  Q  (By Mr. Sonnier) -- both in what they do and
10  their perception.
11      MR. SICO:  Objection, argumentative.
12  A  I can never argue that, but they're under
13  oath.
14  Q  Okay.
15  A  I mean, I even make mistakes, not -- not
16  because I'm under oath, but because I'm not perfect,
17  I'm human being.  But my mistakes I try to make very
18  small and minimal.
19  Q  Okay.
20  A  But I would not make the mistake of not
21  knowing that I left -- left the vehicle in reverse.
22  I'll assure you that.
23  Q  Okay.
24  A  That's what I wouldn't make.  I mean, I just
25  can't comprehend a 58-year-old -- another thing, I

1  Q  When you say a known defective condition,
2  known by who?
3  A  Chrysler.
4  Q  And -- and what -- what -- what do they know?
5  What is it that, you know, you have reviewed or seen in
6  this particular matter that indicates to you that
7  Chrysler knew there was a defective condition in Ms.
8  Vetters's vehicle?
9  A  What is Jeep?  What is C802?  What is -- what
10  did they -- Chrysler did nothing to change the
11  situation, except put a brake interlock into it.  They
12  didn't do anything.  This system is just like every
13  other system that's like this.  It's substantially
14  similar.  It has a false park and a -- the syndrome of
15  the intrinsic design defect.  It's latent and it's
16  intrinsic.  It's designed in and you can't get it out
17  unless you do something different, as I explained to
18  you, therefore, this system is known to have this
19  defect.  I don't care whether Chrysler denies it or
20  not.  It doesn't matter to me that they deny it.
21      The OSIs, the number of allegations,
22  NHTSA, the fact that they admitted the Jeep was a
23  defect, even though they -- they -- they said that they
24  went out and recalled it because of -- of customer
25  satisfaction, they -- they accepted that -- that this

1  can't comprehend a 58-year-old elementary school
2  teacher leaving a vehicle in reverse and thinking
3  that -- that this is a safe situation.  I just can't
4  comprehend that.
5      But, obviously, you said it's possible,
6  and it's -- people do that by -- mistakenly, but I
7  can't comprehend a 58-year-old elementary school
8  teacher who takes care of third graders and has a
9  husband who's going to commit suicide, that basically
10  when they get out of that vehicle and leave it in
11  reverse they are committing suicide or they could hurt
12  somebody else because this vehicle could back up.
13  That's No. 2.
14  Q  Okay.
15  A  No. 3 is --
16      MR. SONNIER:  Object to responsiveness,
17  but go ahead and finish.
18  A  You asked my reasons, I'm giving you --
19  Q  No. I understand.
20  A  Those are my reasons.  All right.
21      No. 3 is that this vehicle has a known
22  defective false park and park to reverse syndrome
23  condition, and we found the manufacturing defects that
24  established why this can happen, which makes it more
25  probable than not that those defective conditions.

1  system had a defect or they wouldn't have recalled it
2  and they wouldn't have gone through the pain and
3  suffering of paying all that money to fix a problem
4  that doesn't exist.
5      I've got letters all the way back into the
6  '60s that prove that Ford was knowledgeable of this
7  defect -- false defect -- detent problem and
8  contributed -- continues all the way up through the
9  C802, Chrysler's OSIs.  The knowledge and
10  foreseeability of this defect is -- is apparent.
11      Now, you want -- you want to throw all
12  that away and say, "Well, she just left it in reverse,"
13  that's fine with me.
14  Q  Now, you --
15  A  That's okay.
16  Q  -- you're aware that there are engineers out
17  there with a good educational background, lengthy
18  experience, both with auto manufacturers and then
19  outside engineering firms that disagree with your
20  position.
21  A  Oh, I'm well aware of that.
22  Q  Okay.
23  A  They have a right to their opinion.
24  Q  Now, by the way, there's no investigation on
25  the 2002 model year Dodge Durango by NHTSA; is that

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 282

1    correct?
2        A   No.  I think I showed you -- oh, I showed you
3    that 2005 recall, didn't I?
4        Q   No.  My --
5        A   I know.  I just want to make sure I was -- I
6    answered your question.
7            MR. SONNIER:  Objection, form.
8        A   But I want to make sure you have that.
9        Q   My question is --
10       A   Okay.
11       Q   -- are you aware of whether NHTSA's ever
12   opened an investigation on the 2002 Durango relating to
13   the transmission system?
14       A   I haven't -- I have not heard of that.
15       Q   Okay.  Have you ever written any letters to
16   NHTSA suggesting that they open an investigation into
17   the transmission system of the 2002 Dodge Durango?
18       A   No.  I contacted them directly.
19       Q   On -- with reference to this vehicle?
20       A   No.  This was back in original Ford
21   investigations with NHTSA.  I contacted -- Mr. Hornicle
22   and other people at that time were on the
23   administration and I advised them.  I contacted 60
24   Minutes.  I advised a lot of people about this problem
25   and approached a public interest deal to try to get

Page 283

1    people aware, knowledgeable of the -- of the hazard.
2        Q   My question is:  Have you ever contacted
3    NHTSA specifically regarding anything relating to the
4    transmission system of the 2002 Durango?
5        A   Not yet.
6        Q   Now, I don't know that -- you -- you mentioned
7    some OSIs or other similar incidents earlier.  Let me
8    -- let me kind of ask you that.  Are you aware of any
9    -- any other complaints relating to transmission system
10   of a 2002 Dodge Durango or the 45 RFE transmission?
11       A   I'm aware that Mr. Sico said that he -- there
12   are other OSIs.  That's all I can tell you.
13       Q   Okay.  I think he's --
14       A   I don't have them.  If -- if I do, I don't
15   remember reading them yet.
16       Q   Okay.  He may -- may -- I think I've seen it
17   somewhere, --
18       A   Okay.
19       Q   -- but he may have sent you some materials,
20   you know, little excerpts, or whatever, from the NHTSA
21   database regarding transmission related issues.
22       A   Okay.
23       Q   What you're telling me, you just haven't
24   reviewed it up to this point.
25       A   I haven't -- I haven't gotten there.

Page 284

1    There's 68, Dodge Durango complaints to NHTSA PR, and
2    that's 68 in my file.  I haven't got there yet.
3        Q   Okay.  That's fine.
4        A   But I -- I know they're there and I've been
5    advised by Mr. Sico that -- that in his impression
6    there are OSIs, but I have to go there.
7        Q   Okay.  So since you haven't reviewed that
8    material, I'm -- I'm assuming you haven't inspected any
9    of those other vehicles that are subject of those
10   complaints.
11       A   That's true.  And again, I -- I'm not --
12   we're looking at a unique situation of a manufacturing
13   defect in this case, --
14       Q   Okay.  Have you --
15       A   -- so I don't expect to find what we're
16   looking at here.
17       Q   Okay.  Have you contacted any of the owners or
18   persons involved in any of those complaints?
19       A   I haven't, no.
20       Q   Okay.  Do you believe that there are any
21   transmission systems out there in any production
22   vehicle that are non-defective?
23       A   I don't know.  I haven't evaluated them all.
24       Q   Okay.  Of those that you have considered over
25   the years, is there any that you believe are

Page 285

1    non-defective in design?
2        A   The ones that I've evaluated, no.  I mean, the
3    ones that I've evaluated I found a design defect of
4    some form.  Now, whether they are reasonably
5    dangerous, that's another question, but I certainly
6    have found the defects.
7        Q   Are there some where you have found defects in
8    the design of the transmission system, yet concluded
9    that it was not unreasonably dangerous?
10       A   Under the conditions of that accident, yeah.
11   Sure.
12       Q   Okay.  So it's dependent on the condition of
13   the accident as to whether or not it's an unreasonably
14   dangerous product?
15       A   Law says proximate cause.  I don't say it, I
16   just follow the law.
17       Q   No.  My question is, --
18       A   I follow the law.
19       Q   -- is it dependent on -- on the circumstances
20   of the particular accident as to whether or not you
21   believe it's unreasonably dangerous?
22       A   Only as it relates to the legal premise of
23   proximate cause.  I mean, if it's not a proximate
24   cause, it doesn't matter.  It's not unreasonably
25   dangerous in the view of the law, not me.  I -- it

72 (Pages 282 to 285)

Page 286

1  doesn't matter what I say.  Whether it's not or is,
2  the law says it's not unreasonably dangerous if there's
3  no proximate cause.
4      Q   Okay.  So off the top of your head, you — you
5  can't name for us any transmissions that you consider
6  to be non-defective.
7      A   I'm not aware of any that -- that are out
8  there, but I can't.  I haven't evaluated the -- all of
9  the transmissions that are out there.  But the ones
10  that I've reviewed, they meet the federal standards and
11  they're designed substantially similar to the subject
12  one, the ones I've evaluated and, yeah, they're
13  defective.  Are they unreasonably dangerous?  It
14  depends.
15      Q   And does that include Ford vehicles?
16      A   Sure.
17      Q   GM vehicles?
18      A   Sure.
19      Q   Toyota?
20      A   Sure.
21      Q   Okay.
22      A   Some of them.  Not all of them.  The ones that
23  I've evaluated, remember.
24      Q   Okay.
25      A   The ones I evaluated.

Page 287

1      Q   How many transmission related matters have you
2  been hired to consult on --
3      A   Oh!
4      Q   -- over the past 20 years?
5      A   In the old days, it was a lot.  Not anymore.
6  I haven't -- I kind of -- Simon Tamiyu (sic), as you
7  know, died, and so I -- I'm -- I'm sure they're going
8  to start coming back to me to help them out in terms of
9  making a determination to whether the -- the
10  performance of the vehicle was proper, but used to be I
11  had -- I don't know.  I was probably running maybe 10,
12  15 cases a year, but over the last five years it's been
13  sparse.  I think I've only had maybe three or four in
14  the last five years that I've worked on.
15      Q   Now, I'm not going to go through your CV at
16  length here, but I do want to ask you a couple of
17  questions, if I could.  You note in here regarding
18  previous employment you -- you've been employed by Ford
19  Motor Company, by Chrysler Corporation at different
20  points in time.
21      A   Right.
22      Q   When you were with Chrysler Corporation, was
23  it part of your job duties at any level to -- to work
24  on or be -- to work on transmission systems in their
25  vehicles?

Page 288

1      A   Yes.
2      Q   And tell us the role you played at Chrysler
3  with respect to transmission systems.
4      A   I worked -- I worked on A 904 and A 707 or
5  727, one or the other, developing performance testing.
6  I worked at the Chrysler proving ground and at the
7  transmission laboratory, which consisted of tear-downs,
8  testing, dynamometer testing, vehicle testing.
9      Q   So when you say you -- with the A 904 and the
10  A 727 or A 707, whichever it was, --
11      A   I think it was 727.
12      Q   -- you -- you worked developing performance
13  testing for transmission systems — for those two
14  transmission systems.
15      A   Well, develop and evaluating.  It was
16  evaluation.  It was a design validation system.
17      Q   And --
18      A   But there was design there, too, because the
19  development people could make suggestions to the design
20  people for changes.
21      Q   Okay.  Did -- did you ever design or
22  participate in the design of a specific transmission
23  system in any Chrysler vehicles when you were employed
24  at Chrysler?
25      A   Not -- not -- well, we were -- we -- when I

Page 289

1  was there, we were evaluating some friction material,
2  so in that sense, yeah, the clutches and a new -- a
3  new transmission oil, so not in the development of the
4  mechanical systems, but the -- those two I did, yeah.
5      Q   Okay.  Now, with respect to your employment
6  at Chrysler, did you ever design or participate in the
7  design of any of the gear selection systems
8  transmissions on Chrysler vehicles?
9      A   I think the only involvement I had would have
10  been the PRNDL cluster bezel because I worked on the
11  instrument panel design part of the cluster bezel.
12      Q   So --
13      A   That would be it.  I wasn't involved in the
14  gear selection system, except for maybe the PRNDL.
15      Q   And would that be the design of the instrument
16  panel itself?
17      A   Yeah.  That was integral with the instrument
18  panel subsystems, yeah.
19      Q   So that involved like placement of the  — of
20  the PRNDL indicator, the -- the electronic part of it?
21      A   Visibility, all the standards and the fact
22  that it meets the sequencing --
23      Q   Okay.
24      A   -- of 102 and the fact that it -- it operates
25  and it indicates properly, things like that, yes.

73 (Pages 286 to 289)

Page 290

1    Q.  Okay.
2    A.  But I didn't work directly on the -- on the
3  gear selection system beyond the interaction at that
4  level.  In other words, you -- we worked as system
5  engineers, so we had to make sure that if the shift
6  lever was in drive, that the PRNDL indicated drive.
7    Q.  And that's before the performance testing, or
8  would that be part of the performance testing?
9    A.  No, that's after.  I worked for instrument
10  panel after that.
11    Q.  Okay.  With respect to -- you said you
12  developed performance testing at Chrysler.  Did that
13  concern the transmission systems of those two systems
14  you identified earlier?
15    A.  Well, as I said, the clutches in the
16  transmission fluid, yeah.
17    Q.  What did you do with respect to the
18  clutches?  What was your involvement?
19    A.  We were testing a new -- we were testing a new
20  oil and a new clutch material -- well, friction
21  material.  I don't remember the specifics of the whole
22  thing.
23    Q.  So --
24    A.  We were testing a new friction material for
25  the disk plates, and I think it was paper as opposed to

Page 291

1  gritty, so we were evaluating whether or not the paper
2  waffle, they call them the waffle plates, whether or
3  not they could give you the proper performance for
4  shift quality, run away, other things.
5    Q.  Did you -- when you were at Ford, did you ever
6  design or participate in the design of a gear selection
7  system on any of the Ford vehicles?
8    A.  Not directly.  Again, I was their system
9  interaction, but I wasn't directly involved with the
10  design, no.
11    Q.  The 45 RFE transmission that was in Ms.
12  Vetters's vehicle, do you agree with me that that
13  system can be used in a safe manner?
14    MR. SICO:  Objection, form, incomplete
15  hypothetical.
16    A.  I need to understand the format.  You mean by
17  itself or with a system?
18    Q.  The system as it was in Ms. Vetters's vehicle
19  as designed, can it be used safely?
20    MR. SICO:  Same objection.
21    A.  I don't see it as a probability because they
22  don't have a lock out for park detent.
23    Q.  Okay.
24    A.  You can -- you can self shift.  That system
25  can self shift.  So unless there's something done to

Page 292

1  correct that problem, I don't think it's going to work.
2  I can't see how you can make it work if you can't -- if
3  you can't positively block out the park detent.
4    Q.  Let me -- let me ask you --
5    A.  It means the transmission can shift backwards.
6    Q.  -- let me ask you this:  Are you aware of
7  whether Mrs. Vetters ever had any other incidents where
8  the vehicle unintentionally moved rearward?
9    A.  I'm not aware of any.  If they happened, I
10  haven't been told of it.
11    Q.  Okay.  So she was able to drive this vehicle
12  as much as she drove it.  I think she -- are you aware
13  she was the primary driver of this Durango?
14    A.  I was told that --
15    Q.  Okay.
16    A.  -- because I asked that, yeah.
17    Q.  And are you aware -- I think the mileage on
18  that vehicle right now is somewhere around 39,400
19  miles.  Does that sound about right?
20    A.  Yeah.  That's the mileage.  Yes.  Right.
21    Q.  Okay.  So as far as you know, that vehicle
22  had been driven at least that amount of miles and there
23  was not one other incident similar to what she had last
24  December.
25    A.  As far as I know of, that's correct.

Page 293

1    Q.  Okay.
2    A.  With that vehicle, yeah.
3    Q.  Your wife actually drove a Durango at one
4  point in time; is that correct?
5    A.  She did.
6    Q.  Do you remember what model year it was?
7    A.  2001.
8    Q.  Okay.  Did it have the same transmission as
9  Ms. Vetters's --
10    A.  No.
11    Q.  -- vehicle?  What -- what was different about
12  it?
13    A.  It had the pre -- it didn't have the
14  interlock.  It doesn't have the brake interlock, and
15  it probably had the different rooster comb and -- and
16  shifting system --
17    Q.  Okay.
18    A.  -- in the transmission.
19    Q.  Do -- do you know that?
20    A.  Well, I know what Chrysler said that 2001 they
21  switched to 2001 from the rooster comb that was in
22  basically all their vehicles and the manual valve
23  system to 2002 was all new, so I can only tell you what
24  they say.  I haven't gone and taken it apart.
25    Q.  Okay.  And where -- where did you obtain that

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 294

1  information?
2      A   I think the -- through Mr. Sico, through the
3  representative, either Chrysler representatives or
4  through the -- some information he received --
5      Q   Okay.  Let me ask you --
6      A   -- through discovery, through the discovery
7  process.
8      Q   Okay.  Let me ask you this:   On your wife's
9  2001 Durango, did you make any modifications to the
10  gear selection system in that vehicle?
11     A   I did not.
12     Q   Okay.  Do you know whether your wife's 2001
13  Durango had the same insert plate in the column as Ms.
14  Vetters's vehicle?
15     A   No.  I -- as far as I know of it didn't, based
16  on, again, the same information that they redesigned
17  all that --
18     Q   Okay.
19     A   -- because they put the brake interlock in
20  and they redesigned the whole insert system, as far as
21  I know.
22          MR. SONNIER:  I think I am getting close
23  to the end here guys.   I am just -- why don't we take
24  a little break --
25          MR. SICO:  Okay.

Page 295

1          MR. SONNIER: -- and let me go through my
2  notes.  I may very well be finished, --
3          THE WITNESS:  All right.
4          MR. SONNIER: -- but if you can give me, I
5  mean, like three or four minutes.
6          VIDEOGRAPHER:  Going off the record at
7  4:29 p.m.
8          (WHEREUPON AT THIS TIME A SHORT
9          BREAK WAS TAKEN.)
10          VIDEOGRAPHER:  We're back on the record at
11  4:37 p.m.
12     Q   (By Mr. Sonnier) Mr. Stilson, a couple of
13  follow-up questions.  Earlier, you know,  we were
14  talking about the lag in the system and you were kind
15  enough to go over there and -- and show us on the buck
16  some of the things that you had identified on the
17  Vetters vehicle, and one of the things that you
18  emphasized with respect to your analysis of the lag in
19  the system is the connection points for the -- the
20  shift cable, correct?
21     A   The lateral movement, yeah.
22     Q   Okay.
23     A   And some little flex, yeah.
24     Q   What changes, if any, would -- would you
25  recommend to reduce or eliminate lag in the system

Page 296

1  because of that?
2      A   Well, first of all, I would take this cable
3  and I would identify, like I did, all the causes of why
4  this flexing of the sheath that the cable slides
5  through allows it to move.  I would first identify all
6  of them and then I would restructure the bracketry and
7  the cable so that -- to remove the flexure.  That's
8  all you can do.  Nothing wrong with the cable.  The
9  cable is a -- is a very good system, by the way.
10     Q   So the cable itself you don't have an issue
11  with, it's just the connections where the cable is
12  attached to various parts?
13     A   Well, we gotta be careful because the cable
14  has the connectors that connect to the bracketry so
15  it's a system, but the cable itself I have no problem
16  with.  The cable is okay.
17     Q   And it's the cable itself -- when you
18  manipulate the shift lever, it's the cable itself that
19  moves from the shift lever down into the transmission,
20  correct?
21     A   Yes.  The cable, but the -- it's the
22  compliance, we'll call it, in the system that allows it
23  to move.
24     Q   Okay.  And --
25     A   That's part of it.  Now, the other piece of

Page 297

1  that puzzle is whether or not the -- that particular
2  cable was changed or altered from its length.
3      Q   Okay.  You mean the -- the cable in the
4  Vetters vehicle?
5      A   At -- at production.
6      Q   Okay.  Whether it meets design specs?
7      A   Right.
8      Q   Okay.
9      A   We gotta lot -- we got some quality issues
10  here, and what I'm worried about is that this
11  particular cable came into the plant and either wasn't
12  to print or -- or it was early specification and it was
13  -- it was a little long and allows this motion.
14     Q   Okay.
15     A   That's another possibility.
16     Q   Okay.  As we sit here today, you just can't
17  comment on -- on whether that's the case or not?
18     A   I don't know.  I've looked at the drawings,
19  but they don't give me enough information to make that
20  determination for the Job 1 cable.
21     Q   Okay.  Now, you're saying you'd redo the
22  bracketry on this.  What exactly would you do to the
23  brackets?
24     A   I showed you that -- how that bracket moves,
25  and I -- I'd structure it so that the -- this is a cam

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 298

1 lever bracket, they can fix that. They can increase
2 gage, they can change the material, or they can add
3 gussets on the side, form gussets so that it won't
4 flex.
5    Q   Okay.
6    A   That's easy.
7    Q   All automatic transmission systems with a --
8 with a cable system like this would have brackets used
9 to attach the cable to various parts, correct?
10    A   I agree with that.
11    Q   Okay.  Are there any brackets you've observed
12 on any other system that you believe are adequate or --
13 or would be non-defective in your -- in your view?
14    A   I'd have to go back and check the Haller
15 vehicle.  There was a pretty heavy duty bracket that
16 attached the transmission on that Haller system --
17    Q   Okay.
18    A   -- which got rid of the flexure.  There was
19 no -- that one -- the Haller vehicle didn't have this
20 problem.  You couldn't remove the key with the system
21 in park.
22    Q   Now, just with respect to the -- the lag in
23 the system and the -- the shift cable itself, what
24 you're saying is the lateral movement -- or lateral
25 movement is introduced in the system because of the --

Page 299

1 the brackets that you identified.
2    A   You mean for the connectors?  No.  That's
3 because there's a pin with a -- a bushing that just
4 slides over that and snaps in.
5    Q   You're talking the brackets that connect?
6    A   Yeah.  That's a bracket.  That pan -- let
7 me -- let's go to the column.  The column has an
8 aluminum lever that's connected to the shift lever
9 that's connected to a pin, and there's flexure in that
10 system.  It's a mechanical system.  It has a certain
11 amount of flex.
12    Q   Flexion in the -- in the pin or -- or the
13 cable itself?
14    A   The whole system.  Not the cable, but the pin
15 connection to the cable end.  That whole system has
16 flexure in it because it's mechanical.  It has a
17 certain amount.
18    Q   And you think because there is some flexion
19 there that that can cause lag in the shift cable itself
20 and affect its function?
21    A   It contributes to it.  It doesn't cause it by
22 itself, but all that stuff adds up.  Everything is
23 adding up in there to let that cable.
24    Q   Is there any way, or -- or have you quantified
25 or in any way measured the amount of lag in this system

Page 300

1 created by the connections and brackets that you've
2 been talking about?
3    A   Not yet, but we talked about, again, taking
4 the column out, and at that point in time
5 if -- if I have -- if my schedule allows me, I'd like
6 to be there and I can make some of these
7 measurements --
8    Q   Okay.
9    A   -- when we remove the cable from the vehicle
10 with the column, the subject vehicle we're talking
11 about.
12    Q   Now, we've also talked about this concept
13 about bounce back when you -- the operator's moving the
14 shift lever into gated park.  Is there any design
15 changes that you would recommend to eliminate or
16 reduce -- or to reduce that particular issue?
17    A   Well, one way is to -- it would be to move the
18 stop.  I told you to make it deeper.
19    Q   Would that -- would it -- would that mean
20 making the -- the gate itself wider?
21    A   Yes.  Over travel so you can shoot -- shoot
22 the lever past the part in the -- in the shift lever
23 and in the transmission so that it -- it locks it
24 into -- you prevent the bounce back because it can't
25 ever land on the land.  That's one way.

Page 301

1       The other way is to have the pos --
2 external, mechanical, or electronic positive engagement
3 system that forces the shift lever always into the lock
4 gate position so it -- and the other way is eliminate
5 the lag or the loose -- looseness in the linkage in the
6 linkage mechanisms so that you can't -- once that
7 handle's in there, it's locked in there.
8       Of course, you understand all this is
9 predicated on the fact that the park interlock system
10 or the brake interlock system malfunctioned.  Had that
11 not happened, the system wouldn't have backed up.  You
12 can't knock it out of park.
13    Q   Now, let me ask you this:  You -- you
14 mentioned another thing you could do with respect to
15 the bounce back issue is introduce external -- an
16 external engagement system.  What do you mean by that?
17    A   Like a dead bolt.  A system that forces the
18 lever into the slot so it can't be left on a position
19 that's not locked.
20    Q   And -- and where would this ball -- where
21 would this thing be located?
22    A   Right where the shift insert -- well, on that
23 system, if I was locked into using that system, which I
24 wouldn't use, but let's assume that I had to, you would
25 have to mount it somewhere in the column area so that

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 302

1  it either mechanically or electronically forced the
2  shift lever down into the lock plate -- lock gate
3  position.
4      Q   Are you aware of any other automatic
5  transmission system that has such an external
6  engagement system?
7      A   I haven't seen it, me personally.
8      Q   Okay.  Are you familiar with SAEJ915?
9      A   I am.
10     Q   What is it?
11     A   I don't remember.  I -- I know about it.  I
12 don't remember what it is right now.  I'd have to go
13 back and look at it.
14     Q   Okay.  Basically, it's SAE recommended
15 practice with respect to manual control sequence.
16     A   I might have it here.  I just don't know.  I
17 haven't looked at it for a while.  I'm familiar with
18 it.
19     Q   Do you agree that the Vetters transmission
20 system as designed complies with and meets SAEJ915?
21     A   Not without going back and looking at 915 and
22 -- and making an evaluation, no, I wouldn't.  I
23 haven't done that.
24     Q   Okay.  Have you ever written any articles or
25 papers regarding transmission systems?

Page 303

1      A   No.
2      Q   Have you ever published any articles relating
3  to transmission systems?
4      A   Hundreds of depositions, that's it, --
5      Q   Okay.
6      A   -- and reports.
7      Q   And those would be depositions and reports
8  given in the context of a -- of a lawsuit?
9      A   That's correct.
10     Q   Okay.
11     A   And then, of course, trial testimony, so...
12     Q   Okay.  But in terms of -- I'm talking about
13 publications, like articles that you've written that
14 have been peer reviewed by other engineers.  Have you
15 done anything like that in your career?
16     A   Every one of my -- well, if you're talking
17 about like through technical organizations as opposed
18 to through personal injury product litigation, no, I
19 haven't done that.
20     Q   Either technical, you know, deals or
21 educational institutions.
22     A   Yeah.  I understand.  No, I haven't done
23 that.
24     Q   Okay.  Are you on any SAE committees
25 regarding transmission design?

Page 304

1      A   I'm not, no.
2      Q   Have you ever been?
3      A   No, I'm not.  I don't have time for that.
4      Q   The -- obviously, since you were hired as a
5  consultant in this case, you charge Mr. Sico some money
6  for your time and work in this matter, correct?
7      A   I do.
8      Q   You don't work for free, do you?
9      A   No.
10     Q   How much do you charge Mr. Sico an hour for
11 your time in this case?
12     A   $500.
13     Q   And is there any difference in your hourly
14 rate on whether you're looking at vehicles or reviewing
15 documents versus giving deposition or trial testimony?
16     A   No.
17     Q   Okay.
18     A   Same fee.
19     Q   So no matter what you do, if you're working on
20 the Vetters matter, for example, you charge him $500 an
21 hour for your time?
22     A   That's correct.
23     Q   Okay.  Do you know how many hours you've
24 spent working on the Vetters lawsuit since you were
25 retained?

Page 305

1      A   No, but it -- you can see from the work, the
2  report, inspection, the tear-down, and then getting
3  prepared for the deposition, reviewing material.
4  That's it.
5      Q   Okay.
6      A   So I don't know.  I'm sure -- I'm not even
7  sure all the invoices have been sent out for my time
8  because it's been so quick, but I have no problem with
9  Mr. Sico releasing, if he desires -- if it's his desire
10 to, my invoices to you.  I have no problem.
11     Q   Okay.  Do you maintain, back in your office,
12 you know, copies of invoices that you send to him?
13     A   Oh, yeah.  My accountant does, sure.
14     Q   Okay.  Do you maintain, or your accountant
15 maintain, a -- a document that contains the amount of
16 time that you have in this particular matter?
17     A   Well, in the form of the invoicing.  That's
18 the way -- that's it.  When invoice goes out, it would
19 say "Inspection, four hours, six hours," or whatever it
20 was, and then it would be the charge, $500 and -- plus,
21 all the -- all the fees, --
22     Q   Okay.
23     A   -- all the expenses.
24     Q   An invoice generated, you have a copy of it
25 and you send a copy to Mr. Sico?

77 (Pages 302 to 305)

Page 306

1    A   Right.
2    Q   Is that pretty much the way it works?
3    A   That's the way it works.
4    Q   Okay.
5        MR. SONNIER:  Yeah, I don't have those.
6        MR. SICO:  Let me have -- if you --
7        MR. SONNIER:  At some point, you know, if
8    you can just send them to me.
9        MR. SICO:  I don't know if we've got, at
10   this point, any or not.
11       THE WITNESS:  I don't know.
12       MR. SONNIER:  Okay.
13   Q   (By Mr. Sonnier) I'll just ask -- I'll ask you
14   to check, you know, --
15   A   Sure.
16   Q   -- and make sure that you send those to -- to
17   Mr. Sico and he'll make sure that they get to me.
18   That's fine.
19   A   Believe me, if they are sent to Mr. Sico,
20   they're going to be.
21       MR. SICO:  That's what I figured.
22       THE WITNESS:  It's an oversight.  Thanks
23   for reminding me.  Supposed to be already sent out.
24       MR. SICO:  They may be.
25   Q   (By Mr. Sonnier) I -- just for identification

Page 307

1    purposes, I'm going to go head and mark a couple of
2    these just so --
3        (WHEREUPON EXHIBIT NO. 50 WAS MARKED.)
4    Q   (By Mr. Sonnier) Discovery Exhibit No. 50 is
5    -- is -- I'm telling you is a copy of your --
6    A   Where are my notes?
7    Q   -- your notes.
8        MR. SICO:  She's copying them.
9    Q   (By Mr. Sonnier) Emily took them.
10   A   Oh, sure.
11   Q   She -- she already copied them.
12   A   Right.  She probably didn't realize she was
13   supposed to give them back, my original.
14   Q   Just take a look at those and identify that
15   for me.
16   A   Exhibit 50 is a copy of my handwritten notes
17   of October 3rd, 2005 at the time of the tear-down.
18   Q   And does this cover both of the inspections?
19   A   No, just October 3rd.
20   Q   Do you -- do you have any notes from your
21   September inspection?
22   A   No, the videotape.
23   Q   All you have is a videotape which -- which I
24   already have, correct?
25   A   You have it, yes.  You have marked it as an

Page 308

1    exhibit.  That's the 9/6/05 20002 --
2    Q   Yeah.
3    A   -- Dodge Durango inspection.  That's in
4    there.
5    Q   No. 45.
6    A   It's very lengthy.
7    Q   Do you know how long it is?
8    A   I started to watch it and I fell asleep, so
9    it's pretty long.
10   Q   Okay.  You've also handed me and we've had
11   copies made of your file index.  Your file basically
12   consists of three department boxes, correct?
13   A   It did.  Right now it shipped in two because
14   one was so small it fit in three.
15   Q   Okay.
16   A   Yes.
17   Q   And --
18   A   And we put -- in other words, you put the
19   contents of Box 1 in Box 3 so we could ship it easier.
20   Q   And these indexes contain a list of all the
21   materials that you have in this file, the Vetters file?
22   A   Other than what I described, that's -- that's
23   obviously a living document.  It's as of the time that
24   it was printed up.
25   Q   Has it -- and do you know when these were

Page 309

1    printed or prepared?
2    A   They're pretty recent.
3    Q   Like within the last week or two?
4    A   Yeah.  I think that would be pretty -- those
5    are inclusive pretty much of all the material I have,
6    other than I described.  The videotapes, the
7    photographs, the -- the CD and the -- the DVD, and the
8    2005, and I think the notice, and things like that
9    advise you that that just got recently put into my
10   file.
11   Q   Okay.
12   A   And you have copies of everything that I have
13   now, as far as I know of.
14   Q   Okay.  When you -- when you did your
15   evaluation on this particular vehicle and you put the
16   -- the shift lever in a -- in a place where you call
17   false park, which is where the tang is resting
18   somewhere on the park gate between reverse and -- and
19   park, how are you able to identify where the tang is on
20   that insert plate?
21   A   Feel.  You can move it back and forth to see
22   where it is, relative position in the slots.
23   Q   Okay.
24   A   That's all you can do -- well, without
25   instrumentation, that's all you can do.  Excuse me.

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 310

1    Q   Okay.   Now, this particular system is -- is
2   capable of -- well, let me -- let me put it to you this
3   way:   Would you agree that an operator is capable of
4   placing this particular gear selector system in gated
5   secured park?
6    A   Sure.
7    Q   And you assume, given the number of miles on
8   this particular vehicle, that Mrs. Vetters was able to
9   accomplish that?
10    A   Sure.
11    Q   Okay.   Hundreds if not thousands of times.
12   Would that be a fair assumption?
13    A   I don't know her driving habits.   I would say
14   that if she wanted to do it a thousand times, she gets
15   to do it a thousand times.
16    Q   Okay.   You'd expect there would be a pretty
17   high number just given the mileage on the vehicle,
18   correct?
19    A   Actually, this is a -- for this occurrence,
20   it's pretty low mileage.
21    Q   Okay.
22    A   Most -- most vehicles are higher mileage than
23   this.   This and Haller were two of the lowest mileage
24   vehicles I've had where this defect has come into play
25   so quickly.

Page 311

1    Q   Now, one of the complaints that I think I
2   heard you -- you talk about earlier with respect to
3   your term false park mode on this system is when you --
4   when you have a situation where the tang ends up short
5   of gated park that you are in detented park in the
6   transmission, --
7    A   That's correct.
8    Q   -- correct?
9    A   That's right.
10    Q   And when you're in detented park in the
11   transmission, it also means you either have a fully
12   engaged park pawl or at least a pawl that's abutted to
13   or touching the park gear.
14    A   That's correct.
15    Q   Okay.   And is it your testimony that if you
16   have a condition -- a bleed condition where the
17   transmission fluid is -- is going into the reverse gear
18   that when it engages reverse gear it can cause the --
19   the detent ball at the rooster comb to go up and over
20   the peak into hydraulic reverse?
21    A   No, that's not my testimony.   That's not my
22   testimony because it wouldn't --
23    Q   No.   I'm asking you if that's what happens.
24    A   No.   Not -- if it's in park detent, you have
25   to -- that's -- that's a mechanical system.   You have

Page 312

1   to move, unless there's a severe cable looseness or
2   lag, extreme severity, you can't get the cam lever
3   roller ball in -- from park detent into reverse without
4   moving some linkage -- some linkage.   You've got to
5   move some.
6    Q   Okay.   And that's -- and that's where I was
7   going, and probably you stated it better.   So this
8   vehicle cannot move rearward in hydraulic reverse when
9   the ball is in the park detent in the transmission; is
10   that correct?
11    A   Not on this vehicle.
12    Q   Is that another way of saying --
13    A   That's another way of saying -- not on this
14   vehicle, no, that won't happen.
15    Q   Okay.
16    A   That can happen, but not on this vehicle.
17    Q   Okay.   So the -- the only way that it's going
18   to move rearward in hydraulic reverse is if something
19   physically causes that ball to pull out of the -- the
20   park detent into the reverse detent?
21    A   Well, there's several ways.   You can -- we've
22   had door slams, tailgate slams, inadvertent contact --
23   omitting bleed now, we're forgetting about bleed -- hit
24   -- hit -- vibrating the steering wheel, engine
25   vibration, very -- those kinds of conditions can cause

Page 313

1   that system to -- with the shift lever unlocked to
2   cause that ball detent, the roller detent, if you want,
3   in the park detent to shift to reverse.   You can do
4   that with those kinds of conditions, but it has to be
5   some kind of disturbance.
6    Q   And -- and that disturbance being what
7   exactly?
8    A   Door slams, tailgate slams, people getting in
9   and out, inadvertent contact, vibration.   There's --
10   I've done them all and I can get it to self shift
11   without the shift lever in park lock slot.   It will
12   go.
13    Q   Okay.
14    A   I'll get it, but it depends on what -- the --
15   the condition.   Usually that happens with it blocked.
16    Q   Do you know how much force it takes to take
17   the detent roller ball out of the park detent?
18    A   Not on this vehicle.   I haven't measured it.
19   That's why if we take -- when we take the cable off, I
20   can put a force gage and measure it.   I haven't -- I
21   haven't done it.
22    Q   Okay.
23    A   And there's a spec on the transmission.   I
24   don't know what that is.
25    Q   Okay.   It takes some amount of force.   Up to

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 314

1  this point in the case, you just haven't quantified
2  that yet, correct?
3     A  I have not quantified it,  but there's no
4  question there's a -- a force or -- you have to apply
5  force to the manual -- outer manual lever to get this
6  thing to shift.  There's no question about that in my
7  mind.
8     Q  And can engine vibration or door slam be a
9  force introduced into this vehicle that can cause the
10  outer manual lever to move thereby also moving the
11  detent ball out of the detented park position?
12     A  With the pawl blocked and under certain
13  conditions I think you could do it, but it would -- it
14  would require some conditions.
15     Q  Okay.  And those conditions would be, again,
16  what?
17     A  False park.  Classic false park and block
18  pawl.
19     Q  But -- but where does the force come from to
20  move the ball out of the detent position?
21     A  Well, with that one it's gravity.  You start
22  with gravity.  Let's cut the weight of gravity on it
23  that starts right now.  The handle is trying to fall
24  down, so that's No. 1.  No. 2 is the impact force.
25  It's a dynamic impact.  It's impulse, momentum

Page 315

1  straight up.  You can -- you can close the door and I
2  can cause that shift lever on -- on many vehicles to
3  move.
4     Q  Okay.
5     A  That's all it takes.
6     Q  In closing the door on the Vetters vehicle,
7  were you able to get that lever to move?
8     A  I can't try.
9     Q  You didn't try it?
10     A  Never tried.  I don't have any evidence that
11  the door was closed that day, —
12     Q  Okay.  So —
13     A  -- so what's the point?
14     Q  -- in -- in the -- on the Vetters vehicle,
15  you don't know whether, for example, closing a door can
16  cause that shift lever to move off the land into gated
17  reverse.
18     A  I don't know, and the only way I would do that
19  would be if Mr. Sico asks me because he has some reason
20  for me to do it.  There's no reason to do it.  There's
21  no evidence the door was slammed on the day of the
22  accident before the vehicle moved, so what's the point?
23  But I don't know.  I haven't done it.
24     Q  Okay.
25     A  If he asks me to do it, I'll do it.

Page 316

1        MR. SONNIER:  Okay.  We're done.
2        THE WITNESS:  Okay.
3        MR. SICO:  Not quite.  I've got just a
4  few myself.
5        THE WITNESS:  Okay.
6        MR. SONNIER:  Should have known.
7           EXAMINATION
8  BY MR. SICO:
9     Q  Mr. Stilson, I have just a few questions for
10  you.  First I want to start with Exhibit No. 49,
11  Discovery Exhibit No. 49 to this case, and just tell
12  you that I think that picture represents the Vetters
13  vehicle in reverse with the vehicle -- with the motor
14  running, and -- and presume that for me, okay.
15     A  Okay.
16     Q  Because I think there's some videotape that
17  we'll see of that that Mr. Koepele and another
18  gentleman did.  If in fact the vehicle -- the Vetters
19  vehicle is running and in reverse and it is abutted
20  against the blacktop of the road in that valley and
21  it's not moving, okay, --
22     A  Okay.
23     Q  -- is there some -- some fact related to that
24  that helps you rule out a probability that that's how
25  the car was on the morning in question?

Page 317

1     A  Well, two things.  First of all, if that were
2  true, then the reverse light would be on because if you
3  put this in reverse, the reverse -- backup light would
4  be on in the vehicle, and I can't make out one way or
5  another whether that's true.
6     Q  Well, I'm asking you to presume it's on.
7     A  But assume -- assume that's true, okay.  Well,
8  no, because now you have -- if this vehicle is stuck
9  now, you've gotta have some disturbance to unstick it.
10  Something's gotta happen to make it move out of that
11  position because it doesn't have the -- the required
12  torque and engine.
13        It's -- what -- what you're looking at is
14  what is sometimes referred to as breakaway.  There's a
15  certain amount of force that has to be delivered to the
16  vehicle to force the tires to overcome the blockage.
17     Q  I will tell you that I was there that day and
18  there was force applied by the manner of placing the B
19  pillar down the middle of one of the expert's backs and
20  they pushed against the car to get it to move.  Are
21  you aware of any evidence in this case, using the
22  definition direct evidence or other, as to whether or
23  not somebody, or Mrs. Vetters, pushed that vehicle in
24  some respect or created any other disturbance?
25        MR. SONNIER:  Objection, form.

80 (Pages 314 to 317)

Page 318

1    A  I don't have any evidence one way or another
2  what that -- that that -- that would have occurred, so
3  I don't think that Ms. -- I can tell you this:  What
4  you said is true.  I don't think Mrs --
5    Q  Vetters?
6    A  -- Vetters was over there pushing on the B
7  pillar.  I can assure you that.
8    Q  Okay.
9    A  That's -- that's about what I'm going to say.
10   Q  All right.
11   A  I won't say that -- that -- that it's not
12  possible, but I don't think she's over there pushing on
13  the B pillar.
14       VIDEOGRAPHER:  I have five minutes of tape
15  left.
16       MR. SICO:  Okay.
17   Q  (By Mr. Sico)  Earlier there was a discussion
18  about inexperience with regards to the folks that may
19  have evaluated this car coming off the -- the assembly
20  plant or the assembly form.
21   A  Yeah.
22   Q  What do you mean by that kind of inexperience?
23  Are you talking about somebody that's been on the job
24  two weeks or some other kind of inexperience?
25   A  No.  They weren't experienced with this

Page 319

1  system.  They had -- this system was new for 2002
2  production, so they had to become familiar with it in
3  the change from -- there's a -- there's a time when the
4  2001 stops and the 2002 starts to be integrated in the
5  line during Job 1.
6    Q  Okay.
7    A  And so what -- what -- that line integration
8  where they start to shift the systems, those people are
9  inexperienced with that new system, not with what
10  they're doing.  These are assembly people.
11   Q  Okay.
12   A  They're not inexperienced in assembly
13  operations, they're inexperienced with that new system.
14   Q  On page five of your report, you all talked
15  about three scenarios at length and you've -- I think
16  you've testified that you believe that what's most
17  probable, based on what you know today, is scenario No.
18  2.  And first off, is that right?
19   A  Well, in the sense of the specific defect of
20  the brake interlock -- shift interlock --
21   Q  Okay.
22   A  -- failure mode that's correct.
23   Q  Now --
24   A  And the system in park at the transmission and
25  parking pawl engaged and the -- the park lever not

Page 320

1  fully in park, yeah, that's -- that's basically
2  scenario No. 2 now.
3    Q  Okay.  If some information comes forward in
4  this case that we don't have now that suggests that
5  that is no longer the most probable scenario, what do
6  you believe the most probable scenario would then be?
7    A  We'd have to go to one.  We'd have to go to
8  the false park position where the vehicle was in a
9  position between park and reverse where it was capable
10  of retaining the vehicle, the parking pawl was capable
11  of retaining the vehicle on the ramp and it was in the
12  parking -- the park and the parking rooster comb was
13  not in -- was in the false detent position.  It was
14  not -- it was either on the peak, or close to it, and
15  then that shift lever was between the park and reverse
16  land.
17   Q  Okay.
18   A  That would be a false park position.
19   Q  All right.
20   A  It doesn't have to be the classical park --
21  false parks, but it certainly is a false park position.
22   Q  Last question I have for you is the -- the
23  solenoid coupler, or coupling I guess is what I'll call
24  it, I'm not exactly sure what the full name for it
25  is -- where on the subject vehicle it is unclipped --

Page 321

1    A  Uh-huh.
2    Q  -- and it no longer makes contact.  You're
3  familiar with that?
4    A  Sure.
5    Q  Okay.
6    A  The interlock.
7    Q  After your review of the bucks and the
8  material and -- and the subject unit in this case, if
9  in fact -- well, do you have an opinion as to whether
10  or not there could have been a time when on the Vetters
11  vehicle that actually -- that assembly might have
12  worked and then later on, through stress or some other
13  reason, it may no longer work properly?
14       MR. SONNIER:  Objection to form.
15   A  Sure.  That's a possibility.
16   Q  What -- what would your opinion be?
17   A  My opinion would be that based on the fact
18  that I see the condition that it's -- that it's
19  separated, that if -- if it wasn't built that way and
20  improperly clipped, that there -- that the retention
21  system had to somehow fail, otherwise it wouldn't be
22  where it is.
23       MR. SICO:  Thank you, sir.  Pass the
24  witness.
25       RE-EXAMINATION

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 322

BY MR. SONNIER:

1  Q   Did you -- real quick, and I think we'll be
2  done.  On -- on the housing of the solenoid, the -- you
3  referred to it as a coupler.  You -- you noted earlier
4  that you found some damage to that, correct?
5  A   No.  I -- it appears to me that they just
6  didn't interlock it.
7  Q   It's pulled -- it's kind of pulled away?  The
8  outside cover's pulled away?
9  A   The -- the cover has a little snap tab and
10  it's -- it's not engaged.
11  Q   The tabs are not engaged?
12  A   Well, either that or it's failed.  I don't
13  know which because I --
14  Q   Okay.
15  A   -- I can't get in there to see it.
16  Q   Other than that, did you see any other
17  markings or conditions with the solenoid or the -- the
18  housing for the solenoid?
19  A   Within my visibility observing range, which
20  was very difficult on that to look at, I didn't see
21  anything beyond that, but of course I'm not -- I -- at
22  this point, until we take it out -- that's why I want
23  to take it out.  Either we're going to remove the
24  cable or we have to remove the whole steering column

Page 323

1  because I -- I do want to look at that and find out, if
2  I can, why it separated.
3  Q   Do you know whether anyone had ever taken the
4  cover or the shroud off of the steering column prior to
5  you inspecting this vehicle?
6  A   My -- well, do I know means do I know for a
7  fact?  I don't know for a fact, but I know that there's
8  no information that says that somebody did.  There's
9  no repairs or information in the maintenance records
10  that I was provided that would say somebody would take
11  that off --
12  Q   Okay.
13  A   -- for any reason.
14  Q   Did -- did you take it off during your
15  inspection of September the 6th, your first inspection?
16  A   No.  I -- Mr. Koepele --
17  THE WITNESS:  Is that who was there?
18  MR. SICO:  No.  I think he's talking about
19  your first one.
20  Q   (By Mr. Sonnier) I'm talking about your first
21  inspection on September the 6th.
22  A   Oh, of course not.
23  Q   The first time you looked at it.
24  A   I did no destructive testing whatsoever.
25  Nothing.  I didn't do anything.

Page 324

1  Q   Okay.  You didn't take that cover off?
2  A   Absolutely not.
3  Q   Okay.
4  A   I waited.
5  Q   You were asked about disturbances to the
6  vehicle, and that to -- to get a certain, you know,
7  thing to happen to cause it to go into reverse in a
8  hydraulic mode it may require something like closing a
9  door, bumping the vehicle, opening a door; is that
10  correct?
11  A   Some external disturbance.  It would require
12  that.  Other -- omitting hydraulic bleed.  You don't
13  need that with hydraulic bleed, but you do that to self
14  shift into reverse on this vehicle, on this system.  I
15  agree with that.
16  Q   Okay.  So a disturbance that could -- that
17  could cause that to move would -- would be opening,
18  closing a door?
19  A   Those are the potential systems that -- that
20  in my experience, over the years of testing these types
21  of systems with this kind of a rooster comb, this kind
22  of a hydraulic valve system, this kind of a gear shift
23  system --
24  (AT WHICH TIME THE WITNESS'S CELL PHONE
25  RINGS.)

Page 325

1  A   -- sorry -- that would be a scenario that
2  would explain why it can do that.
3  Q   Do you agree with me, that if -- if the
4  vehicle's in a configuration where it's left in reverse
5  but there's some obstruction behind the rear wheels,
6  that depending on the configuration of the obstruction
7  you can do something to the vehicle to cause it to
8  overcome that obstruction?
9  MR. SICO:  Objection, in -- incomplete
10  hypothetical, vague, ambiguous.
11  A   I guess my problem is you're talking about
12  inertia here.  This is not a -- this is not a shift
13  lever where you're applying a force or slamming a door.
14  You're -- you now have inertia.  You gotta overcome the
15  inertia of this vehicle to make it roll --
16  Q   Okay.
17  A   -- over this system.  You have to physically
18  force this vehicle because if reverse isn't going to
19  get it over, you have to provide -- or somebody has
20  to provide some power or energy, and I -- I -- it's
21  just -- it could be done.  It can be done, but it's
22  not something that is commonplace.
23  For instance, I'll give you a good
24  example.  There's videotapes that I've done where we --
25  the way we measure just -- just to show it, the

82 (Pages 322 to 325)

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

Page 326

1  difference between a -- a blocked park and full park
2  engagement of the parking pawl, we have two people push
3  this car backwards on level ground, two.
4      Q   This car meaning -- which car are you talking
5  about?
6      A   The vehicles that I've tested.  It takes two
7  people to push, sometimes it takes two people to push
8  that vehicle backwards to show that it in fact is on
9  ground.
10         MR. SICO:  I think you're out of tape.
11         MR. SONNIER:  I have just got a couple
12  more.
13     A   So you've got one or two people pushing hard
14  and I have tried, and I have to tell you I have to push
15  hard and -- with my feet or push hard with my hands to
16  get the vehicle that -- to -- to simply move backwards
17  enough to do that little click into park.  It's not an
18  easy prospect.
19     Q   Okay.  Now assuming --
20     A   That's the inertia of the vehicle.  Now this
21  is stuck.
22     Q   Assuming the vehicle is in fully gated
23  reverse --
24     A   Sure.
25     Q   -- at the column and in the transmission, the

Page 327

1  force that it would take to overcome an obstacle
2  depends on the size of the obstacle, correct?
3      A   I wouldn't argue that.  I can't argue that.
4      Q   Okay.  For example, if I'm on a surface and I
5  put this vehicle out there and I put, you know, a 2 x 4
6  behind the wheels, that may be something that could
7  obstruct movement of the vehicle even though it's left
8  in hydraulic reverse.
9      A   Oh, they do that in dealerships.  They --
10  they put -- they're supposed to block out the wheels
11  when they work on the vehicle.
12     Q   Okay.  But you agree with me that something
13  like a 2 x 4 could be an obstruction introduced to
14  prevent it from moving rearward when left in hydraulic
15  reverse.
16     A   Well, I'd rather see a 4 x 4, but 2 x 4 will
17  obstruct it.
18     Q   Okay.  On the other hand, if I put a smaller
19  item back there, it may not take as much force to
20  overcome in order to get it to continue rearward in
21  hydraulic reverse.
22     A   I wouldn't argue with that.
23         MR. SONNIER:  Okay.  That's all I have.
24         THE WITNESS:  Okay.
25         MR. SICO:  We're done.

Page 328

1
2      (The deposition concluded at 5:15 p.m.,
3  on 10/13/05.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 329

1
2         _____
3         JOHN STILSON
4  STATE OF TEXAS
5  COUNTY OF _____
6      SUBSCRIBED AND SWORN to before me by said
7  Witness, JOHN STILSON, on this the _____ day of
8  _____, 2005.
9
10
11         _____
        Notary Public in and for the
        State of Texas
12
13
        _____
14     Typed or Printed Name of
        Notary Public
        My Commission Expires: _____
15
16
17
18
19
20
21
22
23
24
25

83 (Pages 326 to 329)

## Page 330

WITNESS CORRECTION SHEET

The witness, JOHN STILSON, states he wishes to make the following changes or corrections in his testimony as originally given:

Page _____, Line _____
  Now reads: _____
  Should read: _____
  Reason for Change: _____
Page _____, Line _____
  Now reads: _____
  Should read: _____
  Reason for Change: _____
Page _____, Line _____
  Now reads: _____
  Should read: _____
  Reason for Change: _____
Page _____, Line _____
  Now reads: _____
  Should read: _____
  Reason for Change: _____
Page _____, Line _____
  Now reads: _____
  Should read: _____
  Reason for Change: _____
  (Attach additional pages, if necessary.)

_____
JOHN STILSON, Witness

STATE OF TEXAS *
  SUBSCRIBED AND SWORN to before me by the said witness, JOHN STILSON, on this the _____ day of _____, 2005.

_____
Notary Public in and for the
State of Texas

_____
Typed or Printed Name of
Notary Public
My Commission Expires:

## Page 331

REPORTER'S CERTIFICATE

I, REBECCA A. HINOJOSA, a Certified Shorthand Reporter in and for the State of Texas, hereby certify that this deposition transcript is a true record of the testimony given by the witness named herein, after said witness was duly sworn or affirmed by me.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Further certification requirements, if any, pursuant to the Rules will be certified to in the Supplemental Certificate after they have occurred.

SUBSCRIBED AND SWORN to on this the _____ day of _____, 2005.

_____
REBECCA A. HINOJOSA, CSR
Certification No.: 3937
Expiration Date: 12/31/2006
Firm Registration No. 53
500 Frost Bank Plaza
Corpus Christi, Texas 78470

## Page 332

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

STEVEN T. VETTERS, INDIVIDUALLY   *
AND AS REPRESENTATIVE OF THE      *
ESTATE OF SHARON G. VETTERS,      *
DECEASED, AND FOR AND ON BEHALF   *
ALL THOSE ENTITLED TO RECOVER FOR *
THE DEATH OF SHARON G. VETTERS    *
UNDER THE TEXAS WRONGFUL DEATH    *
AND SURVIVAL ACTS, ERIN VETTERS   *
RUEL, STEVEN B. VETTERS, JOHN W.  *
STOCKTON, AND HAZEL L. STOCKTON   *
                                  *
VS.                               *  CA NO. 05-03
                                  *
DAIMLERCHRYSLER CORPORATION       *

REPORTER'S CERTIFICATE OF FILING
VIDEOTAPED ORAL DEPOSITION OF JOHN STILSON
October 13, 2005

I, REBECCA A. HINOJOSA, Certified Shorthand Reporter in and for the State of Texas, do hereby certify, pursuant to the Rules and/or agreement of the parties present, to the following:

Certify that $ _____ is the charge for the preparation of the completed original deposition and any copies of exhibits, which is hereby taxed against and payable by the plaintiff.

I further certify that the original deposition was submitted to the witness on _____, 2005, that same was to be examined and signed by the witness within _____ days of said date and _____ was _____ was not returned to CERTIFIED REPORTING AND VIDEO, Certified Shorthand Reporters, by _____, and the attached witness Correction Sheet contains changes, if any, made by the witness, and that the original/certified copy of the original deposition, together with copies of all exhibits, if any, was delivered to _____ on _____, 2005.

I further certify that the following includes all parties or counsel of record at the time of taking said deposition:

## Page 333

Mr. Craig Sico, Counsel for Plaintiff(s)
Mr. Robert Sonnier, Counsel for Defendant(s)

I further certify that a copy of this certificate was served on all parties or their counsel named herein.

WITNESS MY HAND, this the _____ day of _____, A.D. 2005.

_____
REBECCA A. HINOJOSA
Certified Shorthand Reporter
Certificate No. 3937
Expiration Date: 12/31/2006
Firm Registration No. 53

500 Frost Bank Plaza
Corpus Christi, Texas 78470
Phone: (512) 883-3400

CERTIFIED REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470