Stephen T. Vetters          Vs.   Daimler Chrysler Corporation
                    James R. Lock

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

STEPHEN T. VETTERS,          )
INDIVIDUALLY AND AS          )
REPRESENTATIVE OF THE ESTATE )
OF SHARON G. VETTERS,        )
DECEASED, AND FOR AND ON     )
BEHALF ALL THOSE ENTITLED TO )
RECOVER FOR THE DEATH OF     )
SHARON G. VETTERS UNDER THE  )
TEXAS WRONGFUL DEATH AND     )
SURVIVAL ACTS, ERIN VETTERS  )
RUEL, STEVEN B. VETTERS, JOHN)
W. STOCKTON, AND HAZEL L.    )
STOCKTON,                    )
PLAINTIFFS,                  )
                             )
vs.                          )          CIVIL ACTION
                             )          NO.2:05-CV-00003
DAIMLER CHRYSLER             )
CORPORATION,                 )
DEFENDANT.                   )          JURY


ORAL VIDEOTAPED DEPOSITION
JAMES RAYMOND LOCK
October 14, 2005



PLAINTIFF'S
EXHIBIT
2

    ORAL VIDEOTAPED DEPOSITION OF JAMES RAYMOND LOCK,
produced as a witness at the instance of the Defendant
and duly sworn, was taken in the above-styled and
numbered cause on the 14th day of October, 2005, from
9:01 a.m. to 10:55 a.m., before Laurin Rainer, Certified
Shorthand Reporter in and for the State of Texas,
reported by computerized stenotype machine at the

Stephen T. Vetters          Vs.   Daimler Chrysler Corporation
James R. Lock

|  | Page 2 |
|---|---|
| 1 | offices of A AA Werlinger & Associates, 1716 Briarcrest |
| 2 | Drive, Suite 601, Bryan, Texas 77802, Firm No. 328, |
| 3 | pursuant to the Federal Rules of Civil Procedure and the |
| 4 | provisions stated on the record or attached hereto. |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES |
| 2 | FOR DEFENDANT: |
| 3 | Mr. G. Robert Sonnier |
|  | Clark, Thomas & Winters |
| 4 | Post Office Box 1148 |
|  | 300 West 6th Street, 15th Floor |
| 5 | Austin, Texas 78701 |
| 6 | Telephone: (512)472-8800 - Fax : (512)474-1129 |
|  | E-mail: grs@ctw.com |
| 7 | VIA TELEPHONE FOR PLAINTIFFS: |
| 8 | Mr. Matt Dotin |
|  | Sico, White & Braugh, L.L.P |
| 9 | 900 Frost Bank Plaza |
|  | 802 N. Carancahua |
| 10 | Corpus Christi, Texas 78740 |
|  | Telephone: (361)653-3300 - Fax : (361)653-3333 |
| 11 | E-mail: mdotin@swbtrial.com |
| 12 | ALSO PRESENT: |
| 13 | Mr. Doug Overstreet, Legal Video Specialist |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 4 |
|---|---|
| 1 | INDEX |
| 2 | PAGE |
| 3 | Appearances ........................................... 3 |
| 4 | JAMES RAYMOND LOCK |
| 5 | Examination by Mr. Sonnier ................... 5 |
| 6 | Signature and Changes ............................. 86 |
| 7 | Reporter's Certificate ............................. 88 |
| 8 | |
| 9 | EXHIBITS |
| 10 | NO.  DESCRIPTION                            PAGE |
| 11 | 1   Notice of Deposition .......................... . 7 |
| 12 | 2   Collision Research Associates |
|  | Summary Report ................................. 8 |
| 13 | |
|  | 3   Curriculum Vitae of Mr. Lock ................ 9 |
| 14 | |
|  | 4   Collision Research Associates |
| 15 | 2005 Fee Schedule ............................. 9 |
| 16 | 5   Diagram ........................................ 56 |
| 17 | 6   Color Diagram .................................. 60 |
| 18 | 7   Cross Section:  Pintail Drive and Driveways .. 63 |
| 19 | 8   Steer Angle Calculations ..................... 67 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 5 |
|---|---|
| 1 | THE VIDEOGRAPHER:  Okay.  We're on the |
| 2 | record.  October 14th, 2005.  It's 9:01 a.m., beginning |
| 3 | of Tape 1.  Would the court reporter please swear in the |
| 4 | witness? |
| 5 | JAMES RAYMOND LOCK, |
| 6 | having been first duly sworn, testified as follows: |
| 7 | EXAMINATION |
| 8 | BY MR. SONNIER: |
| 9 | Q.   Sir, could you please state your name for the |
| 10 | record? |
| 11 | A.   James Raymond Lock. |
| 12 | Q.   Mr. Lock, my name is Robert Sonnier.  I'm a |
| 13 | lawyer that represents DaimlerChrysler Corporation in -- |
| 14 | in the Vetters case; and you and I met for the first |
| 15 | time when you walked in this morning, correct? |
| 16 | A.   Yes, sir. |
| 17 | Q.   Okay.  Do you understand I'm here today to take |
| 18 | your deposition in this case since you have been |
| 19 | identified by the plaintiffs as an expert witness in |
| 20 | this matter? |
| 21 | A.   Yes, sir. |
| 22 | Q.   Okay.  You've given numerous depositions |
| 23 | before.  So, I'm assuming you've been through this spiel |
| 24 | many times, correct? |
| 25 | A.   I have. |

October 14, 2005
(979) 774-4000    A AA Werlinger & Associates    Firm Number: 328

Stephen T. Vetters              Vs.    Daimler Chrysler Corporation
                        James R. Lock

| Page 6 | Page 7 |
|---|---|

**Page 6**

1  Q.  Okay.  And, Mr. Lock, it is my understanding
2  that you have been identified as an expert witness who
3  will address accident reconstruction in this particular
4  matter.  Would that be correct?
5  A.  Yes, sir.
6  Q.  Okay.  And you're aware that plaintiffs have
7  identified a man by the name of John Stilson, who was
8  deposed yesterday and who is a consultant that is
9  addressing specific defect allegations, primarily the
10  design of the transmission system in the Vetters
11  vehicle.  You're aware of that?
12  A.  Yes, sir, I am.
13  Q.  Okay.  And -- and just so -- so I'm clear here
14  and -- and have a good understanding of your role, you
15  are not going to offer any opinions and will not be
16  addressing any issues regarding the design and
17  performance of the transmission system of the Vetters
18  vehicle; is that correct?
19  A.  You are correct.
20  Q.  Okay.  You're not a biomechanical expert,
21  correct?
22  A.  I am not.
23  Q.  And you're not going to be offering any
24  biomechanical expert opinions in this case?
25  A.  No, sir.

**Page 7**

1  Q.  Okay.  It is my understanding also that you
2  have produced an expert report in this particular
3  matter; is that right?
4  A.  I have.
5  Q.  Okay.  I've -- I've gone through that to some
6  extent.  We'll address it here in a moment, but let me
7  do a couple of housekeeping matters first.  I'm going to
8  mark a couple of exhibits before we get started.
9  MR. SONNIER:  I'm just going to take
10  these.  Matt, we just have regular exhibit stickers.
11  So, I'm just going to mark on these.  I'll identify them
12  on the record.
13  Q.  (BY MR. SONNIER)  Mr. Lock, I'm -- I'm marking
14  Exhibit No. 1.  It's going to be attached to your
15  deposition.  It's a notice of your deposition here
16  today.
17          (The following exhibit was marked for
18          identification:  Exhibit No. 1)
19  Q.  (BY MR. SONNIER)  Take a look at that, sir; and
20  tell me whether you've seen that before.
21  A.  I have.  I have a copy of that here in my
22  notebook with me.
23  Q.  Okay.  So, you -- you have reviewed Exhibit No.
24  1?
25  A.  Yes, sir.

| Page 8 | Page 9 |
|---|---|

**Page 8**

1  Q.  Okay.  And attached to the back of this notice,
2  there's a subpoena duces tecum where you were asked to
3  produce certain material; is that correct?
4  A.  Yes, sir.
5  Q.  And you've reviewed that?
6  A.  I have.
7  Q.  And you have produced to the lawyers that hired
8  you documents in response to this subpoena duces tecum;
9  is that correct?
10  A.  I have.
11  Q.  Okay.  And it's your understanding that
12  Mr. Sico has actually provided me with a copy of your
13  files; is that right?
14  A.  Yes, that's what you told me this morning.
15  Q.  Okay.  And I'm going to -- I'm going to go
16  through that because there's certain documents I will
17  want to ask you some questions about.  For housekeeping
18  purposes, I'm also going to mark as Exhibit No. 2 a copy
19  of your report in this matter.
20          (The following exhibit was marked for
21          identification:  Exhibit No. 2)
22  Q.  (BY MR. SONNIER)  Take a look at Exhibit No. 2,
23  and tell me whether or not that is a copy of the report
24  that you authored in respect to this matter.
25  A.  Yes, sir, it is.

**Page 9**

1  Q.  Okay.
2  A.  Typographical errors and all.
3  Q.  Okay.  I'm going to mark the next one as
4  Exhibit No. 3.
5          (The following exhibit was marked for
6          identification:  Exhibit No. 3)
7  Q.  (BY MR. SONNIER)  Up on top of Exhibit No. 3,
8  it says:  "Curriculum Vitae, James Lock."  Is that your
9  CV?
10  A.  Yes, sir.  I've updated it since this one, and
11  I have a copy of that here in my notebook.
12  Q.  Okay.  Off the top of your head, what's -- what
13  has been updated or what -- what changes are --
14  A.  Primarily just the one meeting and symposium
15  that I attended, and I think that's the extent of it.
16  Q.  Okay.  I'm marking Exhibit No. 4.
17          (The following exhibit was marked for
18          identification:  Exhibit No. 4)
19  Q.  (BY MR. SONNIER)  Thumb through that real
20  quick.  Tell me what that is.
21  A.  What you've got here is a copy of my 2005 fee
22  schedule and a copy of my trial and deposition list that
23  I have a more current copy of in my notebook.
24  Q.  Okay.  Maybe when we take a break, what we'll
25  do is -- is get our court reporter or someone here in

October 14, 2005
(979) 774-4000    A AA Werlinger & Associates    Firm Number: 328

Stephen T. Vetters          Vs.    Daimler Chrysler Corporation
James R. Lock

## Page 10

1  this office to make a copy of your updated CV and
2  updated deposition and trial testimony list.  Would that
3  be fair?
4      A.   Sure.  And -- or they could just copy these
5  last two pages because we just --
6      Q.   You just add on?
7      A.   We just add onto it.  So, on the testimony
8  list, the last two pages will bring you up to date.
9      Q.   Okay.  Let me do this.  I -- I'm going to go
10 through your -- your file here for a second; but let me
11 ask you this:  You have a copy of your entire file in
12 front of you here this morning, correct?
13     A.   I do.
14     Q.   Okay.  And as part of your file, does it also
15 contain a CD or maybe two CD's that have photographs and
16 a video on it?
17     A.   Yes, sir.
18     Q.   Okay.  And you -- my understanding -- and I
19 looked at these last night, but there's one CD.  It --
20 it contains a video that you took during your vehicle
21 inspection of the subject vehicle, correct?
22     A.   Yes.
23     Q.   And then there's a separate CD that has
24 photographs of -- still photographs of both the vehicle
25 and the scene where this incident occurred, correct?

## Page 11

1      A.   Yes, that's what my file contained several days
2  ago when it was copied; and what I brought today for the
3  depo is another CD that basically has almost every page
4  that's in this notebook on it.
5      Q.   Okay.  So, you've -- you've -- you've scanned
6  every --
7      A.   Including the photographs and everything.
8      Q.   Okay.  You've scanned everything and put it on
9  a CD?
10     A.   Yes, that's what we do on all our cases now is
11 every page is scanned.  Occasionally, right before a
12 depo, I may add a few things.  In the -- in the rush,
13 they don't get scanned first; but this one CD or DVD
14 should contain the entire file.
15     Q.   Okay.  Mr. Lock, let me ask you this:  What --
16 hang on a second.  You have organized your file in terms
17 of putting material in there that, for example,
18 plaintiffs' attorneys produced to you, which would
19 include discovery -- documents produced in discovery,
20 deposition transcripts, police records, medical records,
21 things of that nature, correct?
22     A.   Correct.
23     Q.   And as -- as part of your file, do you have the
24 discovery responses from Chrysler --
25     A.   Yes.

## Page 12

1      Q.   -- as part of your file?  Okay.  Do you also
2  have discovery responses that were served by plaintiffs
3  in this case?
4      A.   Yes.
5      Q.   Okay.  Now, you're aware that there have been
6  several depositions taken in this case, correct?
7      A.   Yes, sir.
8      Q.   Okay.  Matter of fact, I count -- excluding
9  Mr. Stilson yesterday, I think there were seven
10 depositions taken.
11     A.   That's what I have, seven depos.
12     Q.   Okay.  Have you reviewed all those depositions?
13     A.   I have.
14     Q.   Okay.  And I also saw in your file where you
15 actually summarize those depositions and -- and make
16 notes or -- or prepare a summary of your review of those
17 depositions; is that correct?
18     A.   I have for some of them, but not all of them.
19 I haven't summarized Mr. Vetters' and Dr. Johnson's; and
20 I don't know if I -- I don't recall if I did
21 Dr. Fernandez or not.
22     Q.   Okay.
23     A.   But I have their depo in here, and I have
24 highlighted the sections of their depo that would be
25 taken out and put into a summary.

## Page 13

1      Q.   Okay.  So, what you do, you'll go through and
2  you'll read a deposition transcript, you highlight
3  certain things, and then the items that are highlighted
4  will eventually make their way into a summary when you
5  prepare it?
6      A.   That's correct.
7      Q.   Okay.  Do you prepare the summary, or does
8  someone in your office prepare that?
9      A.   One of my assistants types it once I do the
10 highlighting.
11     Q.   Do you know when you were first contacted about
12 this case?
13     A.   Yes, sir, April 25th, 2005.
14     Q.   And who was it that contacted you about this
15 matter?
16     A.   Mr. Dotin.
17     Q.   And do you have, like, some kind of intake
18 sheet or information sheet that you fill out when a
19 lawyer first retains you to consult on a matter?
20     A.   Well, I have this front sheet of my notebook
21 that is transient in nature.  It -- it changes as work
22 gets completed on a case.
23     Q.   Okay.  For example, Mr. Dotin, in this case,
24 would've contacted you, told you he -- he's got a matter
25 that he would like you to -- to look at, and he'd give

4 (Pages 10 to 13)

Stephen T. Vetters              Vs.    Daimler Chrysler Corporation
                    James R. Lock

## Page 14

1  you basic information like the name of the case, where
2  it's filed, the vehicle involved, just basic facts like
3  that, correct?
4      A.    Yes.
5      Q.    And -- and then those facts at -- at some point
6  make it into your little summary sheet that you keep in
7  the front of your file, correct?
8      A.    That's correct.
9      Q.    Okay.  Do you recall what Mr. Dotin first told
10 you about this particular accident?
11     A.    I don't have a -- a recollection of our
12 conversation of -- of what he told me; but I know from
13 the work that was done on the case, ultimately what he
14 asked me to do was to examine the vehicle, examine the
15 scene, and to do a reconstruction concerning the path of
16 travel, and to locate and document the physical geometry
17 of the accident scene so distances and the -- the layout
18 of the scene could be frozen.
19     Q.    Okay.  Now, it's my understanding and -- and --
20 and correct me if -- if I'm mistaken here, but in doing
21 the -- the accident reconstruction part of -- of this
22 case, you're not going to comment on specifically what
23 Mrs. Vetters did and did not do prior to the time the
24 vehicle moved rearward and -- and struck her.  Would
25 that be accurate?

## Page 15

1      A.    Well, no, it wouldn't be because there's
2  certain things that -- that I think we know that she did
3  through the evidence.
4      Q.    Okay.
5      A.    And that -- that is, for example, backing her
6  car out of the garage where she normally kept it,
7  stopping her car in the driveway, walking to the
8  mailbox, and picking up a postcard and some other items
9  out of the -- out of the mailbox, and then moving back
10 towards her vehicle as it was moving rearward.
11     Q.    Okay.  And you make a good distinction.  I -- I
12 appreciate you pointing that out.  Then would -- would
13 it -- in terms of -- I'm assuming there's certain things
14 we can agree on like the vehicle started out in the
15 garage, she somehow backed out of the garage and stopped
16 somewhere in the driveway street area, correct?
17     A.    Yes.
18     Q.    Okay.  And I understand you accept those facts
19 and -- and I don't think there's going to be a big
20 dispute on some of that, but in -- in terms of what
21 Mrs. Vetters did in -- in shifting the -- the shift
22 lever after she brought the vehicle to a stop or whether
23 she shifted the shift lever, items like that, you're not
24 going to address; is that correct?
25     A.    Well, there's no way that I would know what she

## Page 16

1  did precisely because there's no documentation of any
2  kind through either electronically, mechanically, or
3  visually.
4      Q.    Oh, okay.  And that, I guess, kind of gets --
5  gets into another point.  There were no eyewitnesses to
6  this accident; is that correct?
7      A.    That's correct.  That's my understanding.
8      Q.    Okay.  And you've reviewed the officer's depo
9  and a couple of witnesses' that came on the scene after
10 the fact; is that right?
11     A.    I have.
12     Q.    And you're aware from their testimony that none
13 of those individuals actually witnessed this event.
14 Would that --
15     A.    They --
16     Q.    -- be correct?
17     A.    No, they witnessed the aftermath of the event.
18     Q.    Okay.  After she had already been struck and
19 the vehicle came to rest?
20     A.    Correct.
21     Q.    Okay.  And are you also aware that Mrs. Vetters
22 herself never gave a statement to anyone about what
23 happened?
24     A.    It's my understanding from reading the medical
25 records and the physician's depos that she was unable

## Page 17

1  to.  So, she -- she never verbally described the event.
2      Q.    Okay.  I'm going to -- I'm going to kind of go
3  through your file piecemeal here just to make sure I
4  have an understanding of -- of what you have in it.
5  There is a -- a document in here.  It's several pages
6  long.  It appears to be like a -- I don't know if it's
7  an invoice, but it keeps track of -- of the time that
8  you and other persons in your firm have spent working on
9  the Vetters file; is that correct?
10     A.    Yes.
11     Q.    Okay.  You'll record who did the work, when it
12 was done, hours spent, things of that nature?
13     A.    Correct.
14     Q.    Okay.  I don't know if you have it in your file
15 now --
16     A.    I do.
17     Q.    -- but do -- do you have any idea or can you
18 tell us to date how much time you have put into the
19 Vetters matter?
20     A.    I would have to go through this time slips
21 listing, if you're interested in what I personally have
22 done.
23     Q.    Well, I'll tell you what.  Instead of taking up
24 time to do that, because you -- we don't need to go
25 through all that, but the documents you here -- have

5 (Pages 14 to 17)

Stephen T. Vetters            Vs.    Daimler Chrysler Corporation
                       James R. Lock

**Page 18**

1  here, it's a Collision Research Associates slip listing,
2  and the document I have is dated 9/28/05.  Is that the
3  -- the document that lists all the time that you and
4  others have put into working on the Vetters --
5      A.   Yes.
6      Q.   -- file?  Okay.
7      A.   Every time any activity that was done on the
8  case that was billable to the case, the person would
9  write down the time they spent on it.  When that goes in
10 the computer, it puts their name, the date it was done,
11 what the activity was, the associated charges for that
12 activity.
13     Q.   Okay.
14     A.   And, so, any of them that have the initials J.
15 R. L. --
16     Q.   That's you?
17     A.   -- are mine.
18     Q.   Okay.  And at the end here, you kind of
19 summarize the -- actually the -- a total in terms of --
20          MR. DOTIN:  Hey, Robert?
21          MR. SONNIER:  Yeah?  Can you hear me?
22          MR. DOTIN:  Yeah.  Okay.  I'm sorry.  I --
23 I just -- I lost audio there for one second.
24          MR. SONNIER:  Okay.
25          MR. DOTIN:  Okay.  I'm back.

**Page 19**

1          MR. SONNIER:  Good.
2      Q.   (BY MR. SONNIER)  Mr. Lock, at the end you
3  total how much you have billed Mr. Sico and his firm for
4  time and expenses that you have in this matter; is that
5  correct?
6      A.   Yes, sir.
7      Q.   And according to this document, it's, you know,
8  a little over $9900?
9      A.   That's correct.
10     Q.   Okay.  Now, there's also in your file a table
11 of contents --
12     A.   Yes, sir.
13     Q.   -- document.  I'm assuming this is a table of
14 contents of your file?
15     A.   It is.  It kind of organizes what's behind each
16 one of these tabs.
17     Q.   Okay.  Number -- let me -- let me ask you this:
18 No. 15, DVD of testing received from attorney 8/10/05,
19 is that part of your file?
20     A.   Yes, sir, it is.
21     Q.   And -- and do you know -- have you looked at
22 that DVD?
23     A.   I have.
24     Q.   And is -- is that the testing that Mr. Sico and
25 members of his firm participated in that was recorded?

**Page 20**

1      A.   Yes, sir.
2      Q.   Okay.  At -- at the accident scene?
3      A.   Yes, using the -- the accident involved
4  vehicle.
5      Q.   Okay.  I know you -- you have reviewed that, as
6  you've just indicated to us; but my question to you is
7  have you relied upon anything in that DV in support of
8  your opinions that you're giving in this case?
9      A.   I suppose that I have because what I did with
10 that DVD is to digitize it and -- and look at the amount
11 of time that it took the vehicle to back out of the
12 driveway.  And knowing the wheelbase of the vehicle, I
13 calculated acceleration rates and speeds of the vehicle
14 for each of their six passes; and then I was able to use
15 those numbers to get some general estimate of how long
16 it would take this vehicle to move across the roadway.
17     Q.   Okay.  So, your ultimate goal is to reach a
18 conclusion as to how long it takes the vehicle to move
19 across a driveway to its point of rest?
20     A.   To get a range of time and not a precise time
21 because there -- between -- in the six runs, there's a
22 considerable difference.
23     Q.   Because it depends on where the vehicle is
24 positioned when it begins to move rearward, correct?
25     A.   Correct.

**Page 21**

1      Q.   Okay.  In each one of those six, I don't know
2  if all six are completely different; but they are from
3  different locations, generally, correct?
4      A.   Yes, and I have -- under Tab 4 of my notebook,
5  I have the times and the calculations associated with
6  that.
7      Q.   Okay.  Now, you've inspected the vehicle,
8  correct?
9      A.   I did.
10     Q.   What was the date of your vehicle inspection?
11     A.   May 3rd, 2005.
12     Q.   And my understanding is your vehicle inspection
13 took place down at Mr. Sico's warehouse in Corpus
14 Christi; is that right?
15     A.   That's correct.
16     Q.   Okay.  Now, you've also been to the accident
17 scene itself, right?
18     A.   Yes, on the same day.
19     Q.   Same day?  Other than your inspection of the
20 vehicle on May 3rd of '05, have you din -- done any
21 further inspection of this subject vehicle?
22     A.   I have not.
23     Q.   Okay.  Have you inspected an exemplar vehicle?
24     A.   I have not.
25     Q.   Okay.  Have you been back to the scene after

6 (Pages 18 to 21)

October 14, 2005

Stephen T. Vetters                    Vs.    Daimler Chrysler Corporation
                              James R. Lock

| Page 22 | Page 23 |
|---|---|

**Page 22**

1   May 3rd of '05?

2       A.   No, sir.

3       Q.   Okay.   I told you earlier that Mr. Stilson is

4   addressing some issues in this case.   Have you talked to

5   Mr. Stilson?

6       A.   I have not.

7       Q.   Okay.   You told us earlier there were numerous

8   depositions that you've reviewed in this case.   Have you

9   talked -- have you personally talked to any of those

10  witnesses?

11      A.   I have not.

12      Q.   Have you talked to Mr. Vetters?

13      A.   No, sir.

14      Q.   Okay.   Never met him before?

15      A.   No, sir.   I read his depo, and it seemed that

16  the inquisition was thorough.

17      Q.   Now, I notice in your file here that you

18  have -- looks like some weather data of U.S. National

19  Observatory Astronomical Applications Department.   It's

20  weather data.   It's like sunrise, sunset information.

21  Do you know what I'm talking about?

22      A.   Yes, sir.

23      Q.   Is that something you typically do in -- in

24  every reconstruction that you work on?

25      A.   Yes, we'll do that on every case to look at the

**Page 23**

1   ambient lighting conditions; and if there's any weather

2   that's not dry and relatively low humidity, then we'll

3   look at the precipitation, as well.

4       Q.   Okay.   Now, it was dark outside when this

5   accident occurred; is that accurate?

6       A.   Yes, sir.

7       Q.   Okay.   And it was not raining, correct?

8       A.   That's correct.

9       Q.   Okay.   Now, I -- I mentioned weather a second

10  ago.   You've -- you've also pulled some information

11  regarding temperatures for the day of the accident,

12  which was December 10th, 2004; is that right?

13      A.   Yes, sir.

14      Q.   Okay.   And in bay -- and where did you pull

15  that data from?

16      A.   I'll have to look at it because I have numerous

17  places for -- that I pull data on different files.   This

18  comes from just The Weather Underground Web site where

19  you can put in a particular location and any historical

20  date and it'll give you the information.

21      Q.   Okay.   So, what you pulled up from this

22  particular Web site, it'll -- it'll give you, like, the

23  maximum temperature for that date, the minimum

24  temperature for that date, correct?

25      A.   Yes, sir.

| Page 24 | Page 25 |
|---|---|

**Page 24**

1       Q.   Okay.   And looking at that, what was the --

2   what was the low temperature for that date?

3       A.   Well, the low temperature was 46; and then on

4   the second page, you can see that the temperature is

5   given on an hour-by-hour basis.

6       Q.   Okay.   And that -- that's where I was going

7   next.   This -- this particular incident occurred, what,

8   6:00, 6:30 a.m. --

9       A.   Yes, sir.

10      Q.   -- in the morning, correct?   And looking at

11  this information that you've pulled, does it reflect the

12  temperature in Corpus Christi, Texas, around the hour

13  that this accident happened?

14      A.   I believe it was right at that minimum

15  temperature at the time this collision occurred.

16      Q.   So, around, give or take a couple of degrees,

17  46?

18      A.   Yes, sir.

19      Q.   That was probably pretty chilly down there for

20  when you --

21      A.   Well, actually --

22      Q.   -- consider the humidity?

23      A.   Actually, what they're showing at -- at 5:51

24  they're showing a temperature of 51 degrees.   At 6:51,

25  they're showing a temperature of 49 degrees.   So --

**Page 25**

1       Q.   Okay.   So, it actually drops a little bit?

2       A.   Yes.

3       Q.   Okay.   So, that's a -- that's a fair range,

4   somewhere between 48, 51 degrees?

5       A.   Yes.

6       Q.   Do you know whether Mrs. Vetters had the heater

7   on of her vehicle when this accident occurred?

8       A.   I don't know.

9       Q.   If she did, would it surprise you that she had

10  it on given the temperatures outside?

11      A.   No.

12      Q.   Okay.   Let's kind of -- I want to go through a

13  couple of things with you real quick on your CV.   Have

14  you ever worked for an automotive manufacturer, and I'm

15  talking about being an employee of an automotive

16  manufacturer?

17      A.   No, sir.

18      Q.   Okay.   You've already told us earlier that

19  you're not addressing the transmission design issues in

20  this case, but I just kind of wanted to ask you whether

21  you have ever been involved in the design of a

22  transmission system on a production vehicle?

23      A.   Well, I -- I have rebuilt many automatic

24  transmissions as a mechanic.

25      Q.   Okay.

October 14, 2005
(979) 774-4000      A AA Werlinger & Associates      Firm Number: 328

Stephen T. Vetters          Vs.    Daimler Chrysler Corporation
                    James R. Lock

| Page 26 | Page 27 |
|---|---|
| 1   A.   But I've never been involved in the design or | 1   depo. |
| 2   setup, testing, or anything of that nature. | 2   Q.   Okay.  So, it would be safe to assume that -- |
| 3   Q.   Okay.  Go ahead and turn to your report and | 3   and I think you've also testified they close the garage |
| 4   let's kind of -- kind of look at that, if we could, and | 4   door every night.  So, at some point Mrs. Vetters goes |
| 5   I've marked that as Exhibit 2, but you've got a copy in | 5   in the garage, opens the garage door to allow her to |
| 6   front of you; is that right? | 6   take the vehicle out, correct? |
| 7   A.   I do. | 7   A.   Yes. |
| 8   Q.   Okay.  According to the cover page here on the | 8   Q.   Pretty safe assumption? |
| 9   report, it was prepared September 15th, 2005, correct? | 9   A.   That's pretty typical, too. |
| 10   A.   Yes, sir. | 10   Q.   Okay.  It -- is it also safe to assume and do |
| 11   Q.   In your report -- and I'm looking at the second | 11   you agree that she put the vehicle in reverse in order |
| 12   -- at the first page of the re -- summary report -- | 12   to back the Durango out of the garage? |
| 13   you'll put personal information about yourself, correct? | 13   A.   Oh, I think that's safe to assume. |
| 14   A.   Yes, just background information. | 14   Q.   Okay.  Now, have you learned through |
| 15   Q.   Okay.  And you have general information | 15   depositions in this case -- I guess, primarily that of |
| 16   regarding who retains you and, in this case, like, when | 16   Mr. Vetters -- that Mrs. Vetters was waiting on some |
| 17   some file materials were first received, correct? | 17   mail and she likely did intend to go to the mailbox that |
| 18   A.   Yes, sir. | 18   morning before she actually left the house? |
| 19   Q.   And you also have a brief summary of the | 19   A.   Yes, she was looking for a postcard from her |
| 20   accident itself and the vehicle involved; is that right? | 20   daughter that had pictures of her grandchild on it and |
| 21   A.   That's correct. | 21   -- |
| 22   Q.   Now, is it your understanding that at some | 22   Q.   Okay. |
| 23   point before this accident, the Dodge Durango was | 23   A.   -- that's what she was really interested in |
| 24   actually parked in the Vetters' garage? | 24   seeing. |
| 25   A.   That's what Mr. Vetters testified to in his | 25   Q.   Okay.  So, you -- it's your understanding |

| Page 28 | Page 29 |
|---|---|
| 1   through Mr. Vetters that she had a particular interest | 1   know. |
| 2   to see if that Christmas card had arrived? | 2   Q.   Okay.  So, whether it was -- you're aware there |
| 3   A.   Yes, sir. | 3   was another -- like, a small pickup truck parked in the |
| 4   Q.   Okay.  And, in fact, as part of the -- some of | 4   driveway that morning? |
| 5   the debris that was at the accident scene, there was | 5   A.   It was their son's pickup that -- the dad had |
| 6   actually that postcard and some other mail addressed to | 6   traded pickups with the son and parked that on the left |
| 7   her that was found in the area, correct? | 7   side of the driveway. |
| 8   A.   Yes, it was. | 8   Q.   Okay.  So, whether she stopped up there by that |
| 9   Q.   And -- and based on that, do you assume that | 9   vehicle or down where part of the vehicle was in the |
| 10   at -- at some point after she walked out of her house | 10   street, you just -- you don't know and don't have an |
| 11   that morning, that she did make it to the mailbox -- | 11   opinion of exactly where it was stopped, correct? |
| 12   A.   Yes. | 12   A.   No, there's no evidence to indicate where that |
| 13   Q.   -- to retrieve that mail? | 13   was. |
| 14   A.   Yes, I think that's a safe assumption. | 14   Q.   Okay.  And -- and -- and more specifically, you |
| 15   Q.   Okay.  Now, you don't know exactly where | 15   don't have an opinion as to exactly where she stopped -- |
| 16   Mrs. Vetters stopped her vehicle on the driveway or | 16   A.   I don't. |
| 17   street before she exited to go to the mailbox; is that | 17   Q.   -- correct? |
| 18   correct? | 18   A.   That's correct. |
| 19   A.   I don't know where relative to the lateral | 19   Q.   All you do know is that it came out back and |
| 20   location of her house; but because of the path of travel | 20   first and it -- and it did, generally speaking, back |
| 21   of the vehicle, we know it was most probably lined up | 21   across the street and eventually ended up in the |
| 22   with the -- the backing out path of travel, you know, | 22   neighbor's yard across the street? |
| 23   along that -- that axis that you would have there. | 23   A.   That's correct. |
| 24   Whether it was parked in the front of the driveway, | 24   Q.   Okay.  Now, also -- and I think I alluded to |
| 25   middle of the driveway, bottom of the driveway, I don't | 25   this earlier -- in -- in terms of what Mrs. Vetters did, |

                                        8 (Pages 26 to 29)

Stephen T. Vetters          Vs.    Daimler Chrysler Corporation
James R. Lock

## Page 30

1  whether she moved the shift lever or how she moved the
2  shift lever after she brought the vehicle to a stop, you
3  don't have an opinion about that and have no information
4  about that.  Would that be correct?
5      A.   I don't have any information about that.  I
6  think we can logically assume if she was going to exit
7  the vehicle that she would put the vehicle in park since
8  she left the engine running.
9      Q.   Okay.  Now, as -- as part of your focus in this
10 case -- well, let -- let me back up for a second.  You
11 assume that she put it in park or wanted to put it in
12 park, correct?
13     A.   Yes.
14     Q.   Okay.  And have you -- or can you point to, you
15 know, any statement, any eyewitness testimony, anything
16 of that nature, any direct evidence that indicates what
17 she did, if anything, with the shift lever that morning
18 before she exited the vehicle?
19     A.   No, we can't.  All we know is temporally, she
20 had time to go to the mailbox and then make it back to
21 the vehicle as the vehicle was moving across the roadway
22 while it was still on her side of the road.
23     Q.   Okay.  Let me ask you this:  I tell you, you
24 didn't do any testing yourself of the transmission
25 system on this vehicle?  That wasn't your focus,

## Page 31

1  correct?
2      A.   That's correct.
3      Q.   Okay.  Do you agree, Mr. Lock, that operators
4  of motor vehicles can make mistakes in the operation of
5  their vehicle?
6      A.   Yes.
7           MR. SONNIER:  Can you hear us?
8           MR. DOTIN:  Yes.
9           MR. SONNIER:  Okay.  I heard a little
10 squeaking.  I wanted to make sure we didn't lose you.
11     Q.   (BY MR. SONNIER)  I think you've given numerous
12 depositions before as an accident reconstruction expert,
13 and you've testified before in other matters that
14 operators can and do make mistakes in the operation of
15 their vehicle; is that right?
16     A.   Yes.
17     Q.   Okay.  Can you rule out, based on any direct
18 evidence that you've seen in this case, that
19 Mrs. Vetters left the vehicle in reverse before she
20 exited?
21     A.   Yes, it -- I can rule that out because we know
22 that if she would've left the vehicle in reverse with
23 the incline on the driveway and the vehicle in reverse,
24 the vehicle would've continued to roll backwards and she
25 would've had a difficult, if not impossible, time

## Page 32

1  exiting the vehicle and she certainly wouldn't have been
2  able to exit the vehicle, walk to the mailbox in front
3  of the house and pick up her mail, and then make it back
4  to the vehicle before the vehicle made it all the way
5  across the street.
6      Q.   Okay.  Now -- and -- and when you say that,
7  you're assuming that all four of the tires of this Dodge
8  Durango were on the sloped part of the driveway,
9  correct?
10     A.   Well, it -- no, it -- the testing that I saw
11 also indicates that if the rear tires are in the flow
12 line of the curb, that the vehicle will still
13 immediately begin rearward movement when the brakes are
14 released and the vehicle is in reverse.
15     Q.   And are you talking about the plaintiffs'
16 attorneys' testing that they supplied you with?
17     A.   Yes, sir.
18     Q.   You didn't take the vehicle to the accident
19 scene, did you?
20     A.   I did not.
21     Q.   You didn't test this vehicle by putting the
22 rear tires in that flow line or that little trough at
23 the end of the driveway, leave it in reverse to see
24 whether it would back up --
25     A.   Oh, I did --

## Page 33

1      Q.   -- in reverse?
2      A.   I did not personally do it, no.  I just
3  observed the -- the videotapes of somebody else doing
4  that.
5      Q.   Okay.  If someone were to come in and show you
6  that the rear tires were in that flow line or in that
7  trough at the end of the driveway and that it -- it was
8  left in reverse and they took their -- the foot off the
9  service brake and the vehicle remained stationary and
10 did not back up, would you have any reason to dispute
11 that?
12     A.   I would say it differs considerably from what I
13 saw on the video and I would want to know a little bit
14 more about both test conditions or perhaps I would feel
15 compelled to take the vehicle there and do some testing
16 myself with it.
17     Q.   Okay.  So, if -- if you wanted to come to a
18 definitive conclusion about this issue on your own, that
19 being whether the vehicle can remain in reverse when the
20 rear wheels are in that trough or flow line, you'd want
21 to do that testing yourself to make that determination,
22 correct?
23     A.   Well, if I chose not to rely on the testing
24 that was supplied to me, that would be correct.
25     Q.   Okay.  Did you direct the testing that Mr. Sico

9 (Pages 30 to 33)

Stephen T. Vetters        Vs.    Daimler Chrysler Corporation
James R. Lock

## Page 34

1  and -- and his people did on this vehicle?  Did you tell
2  them what to do or how to do it?
3      A.   No, sir.
4      Q.   You would agree with me that if -- if you leave
5  this vehicle in reverse and there is an obstruction
6  behind the rear tires and you take your foot off the
7  service brake that, depending on the circumstances, that
8  obstruction can prevent that vehicle from moving
9  rearward in reverse?  Would you agree with that?
10     A.   Well, that's obviously a true statement; but
11  the -- the key to the statement is depending upon the
12  circumstances or what's behind the rear wheels.
13     Q.   Okay.  So, it would be dependent on what the
14  obstruction is?
15     A.   Yes.
16     Q.   Okay.  And -- and where I'm going with this is
17  you can't rule out the possibility that the vehicle
18  would remain stationary in reverse when there's an
19  obstruction behind the tires?
20     A.   Well, it depends on what type of hypothetical
21  obstruction you're talking about.  I can tell you that
22  no witnesses or the police or anybody else found any
23  obstructions or -- or objects of any type out in the
24  driveway or in the street.
25     Q.   Okay.  Did you do a survey of the scene?

## Page 35

1      A.   I did.
2      Q.   Okay.  You mentioned this flow line or trough.
3  This is something that's kind of part of the street at
4  the very end of -- of the Vetters' driveway, correct?
5      A.   Yes.
6      Q.   And it -- it's -- I mean, is it, like, for
7  drainage or something when it rains?
8      A.   Yes.  You know how water runs along the curb
9  when it drains because the roadway has a slight crown to
10  it.
11     Q.   Okay.  So --
12     A.   So, water will drain off the roadway.
13     Q.   Okay.  So, the driveway coming from the
14  Vetters' garage door down to the street is sloped,
15  correct?
16     A.   Yes, sir.
17     Q.   Did you measure the slope?
18     A.   Yes, sir.
19     Q.   Okay.  Does it -- does it vary depending on
20  where you measure it?
21     A.   Yes, it did.
22     Q.   And what -- give me a range of the slope of
23  that driveway?
24     A.   There's two different slopes on the driveway.
25  The average slope is minus 0.69, 6.9 percent and I don't

## Page 36

1  -- I don't have it identified what the -- what the two
2  individual ones are, but I -- I have data in the
3  computer.  I could certainly develop those numbers.
4      Q.   Okay.  Now, when you get to the flow line or
5  that trough, that's -- that's the low point in this
6  area, correct?
7      A.   It is.
8      Q.   Okay.  And then the street itself is asphalt;
9  is that right?
10     A.   Yes, sir.
11     Q.   And as you come out of that flow line or trough
12  and go more towards the center of the street, there's an
13  up slope because the roadway itself is crowned?
14     A.   That's correct.
15     Q.   Okay.  Did -- did you measure the slope on the
16  street side of this flow line or trough that we've been
17  talking about?
18     A.   Yes, sir, I have a positive six percent for the
19  first three feet there.
20     Q.   Explain to the jury what -- what you mean by
21  positive six percent.
22     A.   Well, if you went a hundred feet, it would go
23  up 6 feet.  If you go 3 feet, it goes up six tenths of a
24  foot -- or six hundredths of a foot.  It's a very, very
25  gradual slope.

## Page 37

1      Q.   If I walked out there in that street and I put
2  a -- for instance, a golf ball -- maybe that's a bad
3  example.  Let's just take a basketball and I put it at
4  the street side edge of this trough or flow line and I
5  let that basketball go, is it going to roll towards the
6  Vetters' driveway?
7      A.   Yes, everything on both sides of that flow line
8  will move into the flow line just like water would when
9  it's raining because that flow line along the curb is
10  where we want to channelize the water.
11     Q.   Okay.
12     A.   So, there's enough slope there to have the
13  gravity move things towards that area.
14     Q.   Okay.  So, because of the slope on the street
15  side there due to gravity, water, basketball, tennis
16  ball, I mean, take your pick, is going to want to go
17  towards the driveway until it reaches the bottom of that
18  trough or flow line, correct?
19     A.   Yes, sir.
20     Q.   Okay.  Would you agree with me that a slope
21  like this can be an obstruction to movement of an object
22  that would have a force going towards the center of the
23  street?
24     A.   It will be some obstruction.  It'll create some
25  resistance; and depending on the inertia of the object

October 14, 2005
(979) 774-4000    A AA Werlinger & Associates    Firm Number: 328

Stephen T. Vetters                    Vs.    Daimler Chrysler Corporation
                              James R. Lock

## Page 38

1  and whether or not the object is operating totally under
2  power of gravity or is being propelled by, in this case,
3  an internal combustion engine, that's -- that will make
4  a difference.
5      Q.   Okay.  Did you measure how much torque is in
6  this vehicle when you have it in reverse at idle speed?
7      A.   No.
8      Q.   Let's go over back to your report if we can,
9  and I'm going to turn over to page 4 where we get into
10 the summary of your opinion.  So, I'll just --
11     A.   Okay.
12     Q.   -- direct your attention there.  Point No. 1 --
13 and I'll just kind of go through this.  I may have
14 particular questions, but you say here:  "The facts
15 indicate that Mrs. Vetters backed her vehicle out of the
16 garage and came to a stop in the driveway."
17          And when -- when you say "backed out of
18 the garage," you are -- you are saying she backed out in
19 reverse, correct?
20     A.   Yes.
21     Q.   Okay.  Also in that sentence you say:  "Came to
22 a stop with all -- where the front end of the
23 vehicle --"
24     A.   It should be "of" instead of "or."
25     Q.   Okay.  "Came to a stop with all the front end

## Page 39

1  of the vehicle on the driveway."
2          So, it's -- it's your opinion that -- that
3  the front end, the forward portion of this vehicle, came
4  to a stop somewhere in that driveway?
5      A.   Yes.
6      Q.   Okay.  And I think, like you indicated earlier,
7  you -- you do not have an opinion as to exactly where
8  the vehicle came to a stop where you could say, "Okay.
9  Here's where each of those four tires came to a -- to a
10 stop"?
11     A.   No, there's no markings or no evidence that
12 would indicate that.
13     Q.   Okay.  So, you -- you can't rule out the rear
14 tires of this vehicle being positioned in the bottom of
15 that flow line or trough.  Would that be correct?
16     A.   That's correct.  The only -- the only part of
17 that that would be somewhat negative would be that with
18 the rear overhang of this vehicle, it would mean that
19 she would -- would've stopped her vehicle with a portion
20 of the vehicle being out in the roadway.
21     Q.   Okay.  And did -- did you go out there, put
22 this vehicle at the scene to determine how far it would
23 extend -- the rear and would extend out in the roadway?
24     A.   No, I -- I don't have to.  We know that the --
25 from the rear bumper to the rear axle is 3.67 feet or

## Page 40

1  44 inches; and, so, what we would have would be
2  44 inches of the vehicle out in the roadway if it was
3  stopped in that position.
4      Q.   So -- so, getting back to the point then, in
5  terms of where the rear tires came to a stop before she
6  exited the vehicle, you -- you cannot rule out, based on
7  the direct evidence you've seen in this case, that the
8  rear wheels came to rest at the bottom of that trough or
9  flow line?
10     A.   No, I can't.  I -- like I said, there's no
11 evidence available of any kind that would indicate
12 exactly where in that driveway she stopped the vehicle.
13     Q.   Okay.  Now, you say Mrs. Vetters exited the
14 vehicle and walked 17 to 22 feet to her mailbox.  Where
15 did you take that measurement, from what point to what
16 point?
17     A.   From the center of the driveway to the mailbox.
18     Q.   Okay.  So, that -- that's just a -- a general
19 measurement from the center of the driveway to the front
20 of the mailbox?
21     A.   Right.  And that's why I have a range.
22     Q.   Okay.  And, obviously, the exact distance she
23 would've traveled just depends on where the vehicle is
24 stopped, correct?
25     A.   That's true.

## Page 41

1      Q.   Okay.  Now, you stated next that Mrs. Vetters
2  left the engine running.  I assume you come to that
3  conclusion because the vehicle was found in the
4  neighbor's yard with the engine running, correct?
5      A.   Yes.  It was found in the neighbor's yard with
6  the transmission in reverse and the engine running and
7  the door closed.
8      Q.   Okay.
9      A.   And the witnesses stated that nobody had
10 touched the vehicle from the time it was first seen
11 until the time the police officers arrived.
12     Q.   Okay.  And getting back here, you also say in
13 that same sentence -- and I'll just read it again:
14 "Mrs. Vetters left the engine running and likely put the
15 gear selector in park."
16          And -- and that's just an opinion that you
17 reach because you don't believe she could've left it in
18 reverse if the vehicle came to a stop with all four
19 tires up on the sloped part of the driveway, correct?
20     A.   Well, it's more than that.  Mrs. Vetters --
21 excuse me -- is an experienced driver.  She had -- was
22 the primary driver of this vehicle and drove it on a
23 daily basis.  Prior to having this Durango, she owned
24 another Durango, a '99 model, I believe, or '98, and put
25 many miles on those.  She was familiar with how to

Stephen T. Vetters          Vs.     Daimler Chrysler Corporation
James R. Lock

---

**Page 42**

1  operate the vehicle; and anybody that drives a vehicle
2  with -- the same vehicle on a daily basis and one with
3  an automatic transmission, pretty much knows that if
4  you're going to stop the vehicle and get out of the
5  vehicle, especially with the engine running, you have to
6  put it in park.
7      Q.   But you agree with me that operators of motor
8  vehicles can make mistakes, correct?
9      A.   Yes.
10     Q.   Okay.
11     A.   Anybody can make a mistake in any activity.
12     Q.   Now, you mention in Point No. 2:  "One of
13 Mrs. Vetters' shoes was found in the roadway
14 approximately 4 feet from the end of the driveway."
15          You're talking about the Vetters'
16 driveway, correct?
17     A.   Yes.
18     Q.   So, that -- that shoe -- or I think it's
19 actually a sandal -- is actually closer.  It -- it's on
20 the Vetters' half of the street as opposed to the other
21 side of the street?
22     A.   Yes, her left shoe was approximately 4 feet
23 from the end of the Vetters' driveway.
24     Q.   Is -- is there anything about the location
25 where that shoe was found that -- that tells you

---

**Page 43**

1  anything about her interaction with that vehicle?
2      A.   What it seemed to suggest to me is that there
3  was some activity between her and the vehicle at that
4  location or a little bit prior to that location since
5  the vehicle was moving rearward that would cause some
6  instability in her -- in her step or foot placement and
7  would cause this sandal to slip off her foot.  If she
8  had her foot pointed in any way towards her house and
9  there is a rearward movement of her leg, then that
10 sandal is going to slide off of her foot because it
11 didn't have a heel on it and that was her left foot.
12     Q.   Okay.  Point No. 3, you say:  "Based on the
13 path of travel of the vehicle, it is most probable that
14 Mrs. Vetters partially entered the vehicle."
15          What physical evidence can you point to to
16 tell us that Mrs. Vetters partially entered the vehicle?
17     A.   Well, the physical evidence I saw shows
18 photographs of the vehicle at final rest in which the
19 driver's side window was rolled up; and we know that
20 Mrs. Vetters somehow remained with this vehicle most
21 probably from the point around where her left shoe was
22 found and to a point where she ultimately fell down in
23 the driveway across the -- from hers while the vehicle
24 was still in motion.
25          And at the point she fell down, she would

---

**Page 44**

1  have been, for lack of a better way of saying it,
2  further along the path of travel than the -- than the
3  front wheels of that vehicle because we know that once
4  she fell down, the left-front wheel of the vehicle
5  rolled over her upper torso, abdominal area, sternum,
6  area, and then over her head as it was going to final
7  rest.
8      Q.   Okay.  Now -- so, when you -- you say that she
9  "partially entered the vehicle," what you're saying is
10 you believe that she did have some interaction with the
11 vehicle before she fell to the street?
12     A.   Yes.
13     Q.   Okay.  And do you believe or -- or do you have
14 an opinion as to whether or not she got to the point
15 where she opened the door to the vehicle to reenter?
16     A.   That seems the logical thing to me based on
17 where she ended up and where the vehicle ended up, and
18 we know that there's some markings where the dust is
19 knocked off on the passenger door --
20     Q.   The driver's door?
21     A.   -- on the left side, right behind the driver's
22 door.
23     Q.   All right.
24     A.   And there are also on the bottom of the
25 driver's door.  It's also somewhat consistent with her

---

**Page 45**

1  falling to the ground or getting knocked down if somehow
2  or another the door is opened or partially opened and it
3  obstructs her or -- or strikes her body.
4      Q.   Okay.  The degree to which she may have entered
5  the vehicle, like where she put her hands or whether she
6  got a foot in or anything like that, you don't know or
7  have an opinion about that; is that -- would that be
8  correct?
9      A.   Yeah, there's no way to tell that.  You know,
10 we also know that for the vehicle to follow the path of
11 travel that it took, there had to be some steering of
12 the vehicle, not -- ultimately not the steering that we
13 see with the vehicle at final rest because it is more
14 probable than not that the steering angle increased as
15 it was running over her body; but there was some
16 steering of the vehicle before it entered that driveway
17 to allow it to take that curved path that it took to
18 final rest position.
19     Q.   The vehicle itself passing over Mrs. Vetters,
20 you would agree or what you're saying is that can affect
21 the angle of the -- of the wheels?
22     A.   Oh, certainly.
23     Q.   Okay.  I take it you don't know whether
24 Mrs. Vetters fell in the street before she reached the
25 neighbor's driveway.  Would that be correct?

---

12 (Pages 42 to 45)

Stephen T. Vetters          Vs.    Daimler Chrysler Corporation
James R. Lock

## Page 46

1    A.   Well, if the vehicle was in motion and she fell
2  in the street, she would have to then catch back up with
3  the vehicle in order to be further along the path of
4  travel than the left-front tire because ultimately the
5  left-front tire is what ran over her body; and we know
6  we had -- we had some abrasions on her -- on her knees,
7  abrasions on other parts of her body, and a few bruises,
8  her left leg, which --
9    Q.   Well, let me ask you this:  Would you agree
10  that -- that she could be dragged under that vehicle for
11  a distance?
12    A.   She could be dragged under the vehicle or drug
13  under the vehicle, for example, with the -- with the
14  driver's door, holding onto the driver's door or being
15  propelled by the driver's door.  I don't believe that
16  she would be totally under the vehicle.
17          She was a rather large woman at 252
18  pounds, and we don't have any fractures or significant
19  contusions in the iliac crest or any region from the
20  pelvis down.  We have a lacerated liver, a few things
21  like that that would indicate that she suffered some --
22  some trauma there.  So, it wasn't like she went
23  underneath the vehicle, I don't believe.  I think the
24  front tires would've rolled over her lower extremities
25  that -- in that case.

## Page 47

1    Q.   Okay.  I take it in -- in this particular case,
2  you didn't do a -- a biomechanical evaluation to
3  determine her exact position throughout this accident
4  sequence.  Would that be correct?
5    A.   No, I didn't; and I'm not sure that there is
6  enough physical evidence to do that reliably.
7    Q.   Okay.  And let me ask you this:  In terms of
8  getting in this vehicle, you -- you've told us you don't
9  really know how she interacted with the vehicle in terms
10  of touching certain components or certain parts of the
11  vehicle.  Are you aware or -- does this vehicle have
12  a handle on the A-pillar that can be used by persons to
13  assist them to get in and out of this vehicle?
14    A.   I don't recall.  I'd have to look at the
15  photographs --
16    Q.   Okay.
17    A.   -- to see.
18    Q.   Do you have your pictures in front of you?
19    A.   I do.
20    Q.   Or are they on the CD?
21    A.   I have -- I have my photographs and many others
22  that -- that were provided to me.
23    Q.   See if you can look through there real quick
24  and -- and see if there's a picture of the A-pillar on
25  the driver's side, and maybe you can answer that for us.

## Page 48

1    A.   I'll give it a try.  If you want to take a
2  break, we can do that; and I'll look for it.
3    Q.   Yeah.  Take a look right there.  I think you
4  already found it.
5    A.   Okay.  I did find one.  I found two photographs
6  that were provided to me.  There are four photographs on
7  this page.  It says:  "Vetters, S, 1527-000622."  It
8  shows the interior and a grab handle located on the left
9  A-pillar, and there's also one on the right A-pillar.
10    Q.   Okay.  So, those handles, the -- the handle
11  right there on the A-pillar, that's typically used by
12  persons if -- if they, you know, choose to use it or
13  need assistance to -- to help them get in and out of the
14  vehicle, correct?
15    A.   Yes.
16    Q.   Okay.  You've seen that in other vehicles, I
17  take it?
18    A.   I have it on my vehicle.
19    Q.   Okay.  Okay.  So, kind of getting back to this
20  initial line of questioning, we were talking about her
21  entering the vehicle.  As we sit here today, you just
22  can't tell us in -- in any -- any detail to what degree
23  or what extent she may have gotten in or interacted with
24  the vehicle before it ran over her --
25    A.   No, I --

## Page 49

1    Q.   -- correct?
2    A.   -- I can't.
3    Q.   Okay.  The next -- in terms of -- well, let me
4  ask you this:  Is it your opinion that she did in any
5  way manipulate the steering wheel or turn the steering
6  wheel when she tried to get back in the vehicle?
7    A.   I believe she did.
8    Q.   Okay.  And that's based on the -- the angle of
9  the roll path that you've determined along with the rest
10  position of the vehicle?
11    A.   Yeah, primarily the trajectory of the vehicle.
12  The fact that it -- that based on the vehicle's final
13  rest position with the headed angle that it had, it
14  would've had to have had a right steering input at some
15  point when it was in the street that the turning radius,
16  even in reverse, wouldn't be tight enough for all of the
17  steer input to be put in when the front tires were in
18  the neighbor's driveway and then for it to make the
19  turn.
20    Q.   Okay.  So, you -- would it be your opinion,
21  then, that she may have induced steering input in this
22  vehicle after the vehicle was already moving rearward?
23    A.   Yes.
24    Q.   Would you agree that the vehicle passing over
25  or running over Mrs. Vetters alone could account for the

13 (Pages 46 to 49)

Stephen T. Vetters          Vs.   Daimler Chrysler Corporation
James R. Lock

## Page 50

1  angle and the path where this vehicle took on its way to
2  the final rest position?
3      A.   It could account for what we see as the
4  steering angle with the vehicle at final rest, but it
5  could not account for the path of travel that the
6  vehicle took.
7      Q.   Okay.  So, then the -- the -- the steering
8  input that you believe was induced by Mrs. Vetters
9  occurred after the vehicle was already moving rearward
10  in the street?
11      A.   Correct.
12      Q.   Okay.  I understand.  Now, I'm reading here
13  again on No. 3 in your opinions:  "This is based on the
14  fact that the front wheels were steered to the right
15  approximately 18 degrees."
16          What -- where did the 18 degrees come
17  from, exactly?
18      A.   18 degrees is just a -- number that I kind of
19  scaled off of one of the police photographs that showed
20  the front wheels; and that's what the photograph shows.
21  I don't believe the wheels are actually at 18 degrees.
22  I think they're less than 18 degrees; and that's -- but
23  that's what my scaling showed.
24          The reason is when we look at the vehicle
25  at its final rest position, the steering wheel is turned

## Page 51

1  slightly over 180 degrees and not close to -- to 350
2  degrees and, so, the steering angle with the vehicle at
3  final rest doesn't really correspond with the angle that
4  the tires appear to be at in one of the photographs, but
5  the photograph is not taken, you know, in -- in the best
6  way for evaluating that.
7      Q.   Have you calculated what percentage of the
8  steering input or what degree of steering input occurred
9  as a result of the vehicle rolling over Mrs. Vetters?
10      A.   No, I haven't.  I did a little bit of work with
11  steering inputs where I just looked at what it would
12  take to have the vehicle follow that arc and I -- I set
13  it up for a 15-degree and then an 18-degree steer angle
14  to see the arc that it would follow and with those steer
15  angles over some time, it turns to the proper final rest
16  position.
17          And, so, that's why I know that it had
18  some steer angle in the street; and, in fact, when the
19  vehicle ran over Mrs. Vetters, it most probably had a
20  higher steer angle than what we see at final rest
21  position.  I think it's -- the steer angle was kind of
22  dynamic over time.  It's --
23      Q.   It kind of straightened out there at the very
24  end before the vehicle came to a stop?
25      A.   Yes, sir.

## Page 52

1      Q.   Okay.  What brought this vehicle to a stop?
2      A.   It just ran out of energy.  It was moving up
3  the hill into the front yard of the neighbor's house.
4  It got on a higher friction surface going uphill.  Of
5  course, it's -- it's going against gravity; and I don't
6  know if -- you know, the engine RPM's may have changed
7  slightly.  It dropped the engine RPM's so the engine
8  torque converter wasn't quite as effective but
9  apparently, it just ran out of energy and the torque of
10  the wheels was not enough to overcome the inertia of the
11  vehicle.
12      Q.   Okay.  So, when you talk about what's
13  overcoming the inertia of the vehicle, number one -- I
14  picked up on two things -- the -- the hill, because
15  there's a slope as you go up the neighbor's driveway and
16  yard, correct?
17      A.   Well, it's certainly going to slow down a lot
18  when it runs over Mrs. Vetters.  So, that's going to
19  take a lot of the energy out; but then it's going up the
20  hill after that.
21      Q.   Now, also, you mentioned a higher friction
22  surface.  Are you talking about the grass?
23      A.   Yeah.  Well, not really high friction, but
24  higher rolling resistance, I should say.
25      Q.   So, the -- the grass, the soft yard there

## Page 53

1  that -- that you found in the neighbor's yard, that
2  offers resistance to the vehicle moving in -- in that
3  direction?
4      A.   The vehicle whose inertia is already degraded
5  somewhat by running over Mrs. Vetters and then going up
6  the -- the hill, you know, from the drive -- street into
7  the driveway and then up into the yard.
8      Q.   Okay.  And it's your understanding, based on
9  the witness statements, that this vehicle was found with
10  the engine still running and the transmission in
11  reverse?
12      A.   And the headlights on.
13      Q.   And the headlights on.  And it was not moving
14  because there was something offering resistance to the
15  vehicle?
16      A.   Yes.
17      Q.   And it would not allow it to continue to -- to
18  move in a rearward direction under power?
19      A.   That's my understanding.
20      Q.   Okay.  Now, you say here -- this is Point No 7.
21      A.   Oh.
22      Q.   "The cause of the injuries received by
23  Mrs. Vetters was the inadvertent movement of her
24  vehicle."
25          You're talking about the vehicle moving

14 (Pages 50 to 53)

Stephen T. Vetters            Vs.    Daimler Chrysler Corporation
                    James R. Lock

---

Page 54

1  when she didn't expect it to move?
2      A.  Right.
3      Q.  Okay.
4      A.  She was -- she was outside of the vehicle, and
5  the vehicle was moving.  That's --
6      Q.  Okay.  And what I'm getting at -- you're not
7  getting into opining about the design and performance of
8  the transmission system.  You're just taking it from a
9  general standpoint that she's approaching and -- and
10 didn't expect the vehicle would be moving?
11     A.  That's correct.
12     Q.  Okay.  And to go on here, you say:  "Her
13 diligent effort in attempting to stop the out of control
14 vehicle --" you think she tried to stop the vehicle?
15     A.  I do.
16     Q.  And -- and -- and what, in your opinion, did
17 she try to do to stop the vehicle?
18     A.  I don't know what she tried to do; but I know
19 that she was out of the vehicle, away from the vehicle,
20 the vehicle was in motion, and then she interacted with
21 the vehicle in such a way that ultimately it overran
22 her.  So, she was most probably attempting to -- to stop
23 the vehicle or regain control or do something with it.
24     Q.  Okay.  But whether she got in there and tried
25 to put the brake on or her apply the park brake, we just

---

Page 55

1  don't know that information, correct?
2      A.  No, there -- there's nothing that we could do
3  except speculate on that.
4      Q.  Do you agree it's -- it's not a good idea for a
5  person to chase down a moving vehicle from the outside?
6          MR. DOTIN:  Objection, form.
7      A.  I know that it happens on a regular basis, and
8  it's something that probably shouldn't be done.
9      Q.  (BY MR. SONNIER)  Okay.  There's a -- going
10 through your file here, there's a little drawing or
11 diagram that -- that I think you prepared.
12     A.  Yes, sir.
13     Q.  And go ahead and turn to that page in your
14 file, if you could.
15     A.  Okay.
16     Q.  You actually have a couple of diagrams in here;
17 is that right?  There's --
18     A.  Yes, sir.
19     Q.  -- there's another one.  Well, there's several
20 more.  I'll get to them in -- this is the one.  How
21 would you describe or how do you identify this
22 particular document?
23     A.  It's just a geometric layout of the roadway
24 with the vehicles in the final rest position.
25     Q.  Okay.

---

Page 56

1      A.  And another vehicle showing the front wheels
2  exiting the driveway and it's laid out in a way that it
3  has X, Y coordinates to -- so you see what the distances
4  are that the vehicle traveled.
5      Q.  Okay.  I'm going to mark this one as Exhibit
6  No. 5.
7          (The following exhibit was marked for
8          identification:  Exhibit No. 5)
9      Q.  (BY MR. SONNIER)  This is that diagram that you
10 just explained.  That particular one, you have the --
11 the vehicle on the top here.  This -- this is the
12 Vetters' driveway, the one without the tree beside it,
13 correct?
14     A.  Yes, sir.
15     Q.  And you have the -- the Vetters' son vehicle
16 parked in the driveway there.  You have that depicted on
17 this diagram, correct?
18     A.  I do.
19     Q.  Okay.  And then at the bottom of the driveway,
20 you have the Durango, correct?
21     A.  Yes, sir.
22     Q.  Now, this position of the Durango at -- at the
23 Vetters' driveway, that is not meant to depict where you
24 believe the vehicle was stopped when she exited to go to
25 the mailbox.  Would that be correct?

---

Page 57

1      A.  That's correct.  I just wanted to show that
2  there with the centerline of the axles at the bottom of
3  driveway just so you'd get some idea of what those
4  distances are.
5      Q.  Okay.  The -- the little circle right here
6  beside the -- the vehicle in the street, what is that
7  meant to represent?
8      A.  That's a -- just a marking that was in the
9  roadway that's a light colored piece of asphalt just to
10 use when you're looking at the photograph to get some
11 reference.
12     Q.  Okay.  So, you use that as a reference point?
13     A.  Yes.
14     Q.  Okay.  There's also some pages in here, it
15 looks like calculations of the Durango backing.
16 Describe for us what these are.
17     A.  Those are the ones I just discussed where I
18 just put in the steer input to see what kind of steer
19 inputs could be done to get this Durango to its final
20 rest position, and it's from that series of runs when I
21 see that the Durango had to have a steer input when it
22 was in the street.
23     Q.  Now, do you make an assumption as to where the
24 vehicle starts from when you calculate these steering
25 inputs?

---

15 (Pages 54 to 57)

Stephen T. Vetters        Vs.    Daimler Chrysler Corporation
                     James R. Lock

---

### Page 58

1    A.   Well, based on this hypothetical run, I just
2  started it where the vehicle is shown on the diagram
3  that you just marked.
4    Q.   With the front tires essentially in that trough
5  or flow line at the edge of the street?
6    A.   That's correct.
7    Q.   You assume that the vehicle, as it comes out of
8  this driveway and into the street, is pretty much
9  straight out as you have depicted in Exhibit No. 5?
10   A.   Yes.
11   Q.   Okay.  Which means if -- if, for example, she
12 stopped to exit the vehicle in this position as shown on
13 Exhibit No. 5, both the -- the front tires would be in
14 the -- in the bottom of that trough or flow line that
15 you've talked about?
16   A.   Right.  But this isn't meant to show where --
17 where she left the vehicle.  It's just meant to show a
18 position of the vehicle.
19   Q.   No, I understand that.  What I'm getting at is
20 just the -- the orientation of the vehicle to the
21 driveway, as you believe it -- it's coming out.
22   A.   Straight down the driveway.
23   Q.   Okay.  So, if -- if the vehicle were further up
24 and, say, the rear tires were in that flow line, both of
25 the rear tires would be in that flow line?

---

### Page 59

1    A.   That's correct.
2    Q.   And do you have an opinion as to where the
3  vehicle was in the roadway when there was steering input
4  by Mrs. Vetters?
5    A.   No.  All -- all these runs tell me is the
6  steering input had to occur when the vehicle -- well,
7  when the front fires were basically on her side of the
8  road because I didn't try to estimate what kind of
9  additional steer angle the vehicle would have when it
10 runs over her body.  That would have been a guess and
11 not even engineering judgment; and, so, I just wanted to
12 see if the vehicle needed a steer input to get to its
13 final rest position and if the steer input would have to
14 occur when the vehicle is in the street or if it
15 could've totally occurred once the vehicle ran over her
16 body.
17   Q.   Okay.  So -- so, what you can -- although --
18 well, let me take this part by part.  You can't say
19 exactly where the vehicle was in the street when that
20 steering in -- input by Mrs. Vetters occurred, correct?
21   A.   No, I can say that it occurred on her side of
22 the street.
23   Q.   Okay.  Meaning from the -- the very center of
24 the street towards her side of the street?
25   A.   Yes.

---

### Page 60

1    Q.   Where her house is?
2    A.   Correct.
3    Q.   Okay.  And we know -- and the other thing that
4  you do conclude is that when that steering input by her
5  was -- was induced, the vehicle was moving rearward?
6    A.   Yes.
7    Q.   Okay.  I think I understand.  Now, let me show
8  you this other diagram here; and it's the one that's
9  kind of colored where you have green, I guess, for the
10 grass and -- and whatnot.  I'll get you to turn to that
11 one, and I'm going to mark it as Exhibit No. 6.
12            (The following exhibit was marked for
13            identification:  Exhibit No. 6)
14   A.   Would this be a good time to take a little
15 break --
16   Q.   You know --
17   A.   -- and run down the hall?
18   Q.   It sure would.  Because our videographer said
19 we only have five minutes left on the tape, anyway.  So,
20 why don't we do that?
21   A.   Okay.
22            MR. SONNIER:  Matt, do you just want to
23 hang on?
24            MR. DOTIN:  Yeah, I'll just -- I'll stay
25 on the line.  I'll just --

---

### Page 61

1            MR. SONNIER:  Just do that, we don't --
2            MR. DOTIN:  -- grab a cup of coffee, and
3  I'll be right back in.
4            MR. SONNIER:  You know, we don't have a
5  whole lot left.  So --
6            MR. DOTIN:  Good deal.
7            THE VIDEOGRAPHER:  We're off the record at
8  10:18.  End of Tape 1.
9            (Recess from 10:18 a.m. to 10:24 a.m.)
10           THE VIDEOGRAPHER:  We're on the record at
11 10:24.  Beginning of Tape 2.
12   Q.   (BY MR. SONNIER)  Mr. Lock, I'm going to hand
13 you Exhibit No. 6.  It's that diagram I started to ask
14 you about.
15   A.   I have a copy in front of me.
16   Q.   Okay.  What are you showing here?
17   A.   Just trying to show the layout of the -- of the
18 roadway, the houses, and the vehicles, showing that
19 there's the blue truck up in the driveway, that
20 Mrs. Vetters' vehicle was, at some point, in the
21 driveway and it moved to its final rest position where
22 we show it.  Show the shoe in the road.  I show the
23 trash can.
24   Q.   That's that little box at the end of the
25 Vetters' driveway?

---

October 14, 2005
(979) 774-4000    A AA Werlinger & Associates    Firm Number: 328

Stephen T. Vetters          Vs.   Daimler Chrysler Corporation
                    James R. Lock

| Page 62 | Page 63 |
|---|---|
| 1  A. Yes. | 1  Q. Okay. I understand. |
| 2  Q. Okay. | 2  (The following exhibit was marked for |
| 3  A. And I show where the mailbox is that | 3  identification: Exhibit No. 7) |
| 4 Mrs. Vetters would've traveled to. | 4  Q. (BY MR. SONNIER) Exhibit No. 7, this looks |
| 5  Q. Okay. Now, with respect to the rest position | 5 like a cross section that you've drawn here. Why don't |
| 6 of the Durango, do you try to accurately depict the | 6 you describe for us what that is? |
| 7 final rest position in this diagram, correct? | 7  A. It just gives the lengths of various parts of |
| 8  A. Yes. | 8 the driveway and the roadway and also gives the slope of |
| 9  Q. And -- and also with respect to Mrs. Vetters | 9 those. |
| 10 where -- where she came to rest? | 10  Q. Okay. On the right-hand side of this, you have |
| 11  A. That's correct. | 11 6714 Pintail. That's the Vetters' driveway, correct? |
| 12  Q. Okay. Obviously, the -- the shoe, the mailbox, | 12  A. That's correct. |
| 13 and the trash can, you also try to pinpoint those exact | 13  Q. Now, on here you have slope minus 0.069. What |
| 14 locations where those items were located? | 14 exactly is that? |
| 15  A. Yes, sir. | 15  A. Right. That's that 6.9 percent slope. |
| 16  Q. Now, with respect to the Durango in the | 16  Q. Okay. Does -- does that equate -- I mean, |
| 17 Vetters' driveway, what you're telling me is that | 17 if -- if I wanted to know the degree of that slope, |
| 18 position of the Durango in this diagram is not meant to | 18 can -- |
| 19 depict where the vehicle was stopped before she exited | 19  A. Well, you've got -- |
| 20 to get the mail? | 20  Q. -- can I -- can I figure that out from what |
| 21  A. That's correct. It's just meant to show and | 21 you've done here? |
| 22 indicate to the jury that the Vetters vehicle was in the | 22  A. Yes. |
| 23 driveway when this event started. | 23  Q. Okay. What -- what is the degree of that |
| 24  Q. Okay. Somewhere in that driveway? | 24 slope? |
| 25  A. Yes, sir. | 25  A. Well, you've got 6.9 percent. Say you've |

| Page 64 | Page 65 |
|---|---|
| 1 got -- .069 is the degree. You take the slope and | 1  Q. Okay. What -- what is 0 feet? Where -- where |
| 2 divide it by a hundred. | 2 is the reference -- |
| 3  Q. So, is -- is it 6.9 degrees? | 3  A. That's just an arbitrary number. |
| 4  A. I believe so. I'd have to look at that. | 4  Q. Okay. |
| 5  Q. Okay. Whereas, say, on a -- on a scale, if you | 5  A. I -- I said let's just call something zero |
| 6 assume the surface is flat, straight up is 90 degrees, | 6 here, and then you can scale off to see how much the |
| 7 correct? | 7 driveway rises or the street rises from any position. |
| 8  A. Correct. | 8  Q. Okay. Did you calculate -- well, I think you |
| 9  Q. Okay. Okay. And I -- and I think on this | 9 told us this earlier. You -- you did calculate the |
| 10 diagram, there's -- there's two little lines on the 6714 | 10 slope of the -- of the flow line on the street side, |
| 11 Pintail driveway depiction. Is that meant to represent | 11 correct? And that was also right around six -- 6 |
| 12 the sidewalk? | 12 degrees? |
| 13  A. Yes, sir. | 13  A. Yeah, it shows up on this -- on the diagram |
| 14  Q. Okay. After -- as you go down from the house | 14 here. Now, I've got -- the way it's drawn, I don't go |
| 15 toward the street after you pass the sidewalk, the slope | 15 in and show -- for example, at that 2.4 feet, you can |
| 16 actually levels out somewhat, doesn't it? | 16 see, it's got a little bit higher rise at that -- |
| 17  A. Yes, it begins to level out at the edge of the | 17  Q. Okay. So, the -- the -- |
| 18 sidewalk that is away from the street. So, it's a | 18  A. -- small piece and really that's the concrete. |
| 19 constant slope from the sidewalk to the street. | 19 You know, when you come down from the face of the curb, |
| 20  Q. Okay. You have elevation here on both the | 20 there's concrete that runs out for several feet and then |
| 21 right and the left side, 4 feet, 2 feet, 0 feet. | 21 the asphalt of the roadway starts. |
| 22  A. Yes -- | 22  Q. Okay. |
| 23  Q. Do you see that? | 23  A. And, so, at the edge of the concrete the start |
| 24  A. -- that's just to give you some indication of | 24 of the asphalt, there's a little hump right there; and |
| 25 what the rise is. | 25 you can see that the -- that height and that distance is |

17 (Pages 62 to 65)

Stephen T. Vetters          Vs.    Daimler Chrysler Corporation
                        James R. Lock

## Page 66

1  represented by the 2.4 and the 0.155.
2      Q.   Okay.  The 0.115 slope is that little narrow
3  concrete section of the flow line?
4      A.   The concrete and then the lip of the asphalt as
5  it begins to move up.
6      Q.   Okay.  The .0602 is what?
7      A.   That's the initial slope of the asphalt as we
8  move to the area where it really takes the parabolic
9  curve that the rest of the roadway has.
10     Q.   Okay.  If -- if -- if I -- if I look at the
11 slope, then, of the street side of this flow line or
12 trough, is it 15 and a half degrees?
13     A.   It's -- at that -- in the one section there,
14 yes.
15     Q.   Okay.  And then you go on to -- to calculate
16 slope and distances on the other side of this street
17 opposite of where the Vetters' home is, correct?
18     A.   Yes.
19     Q.   And those figures are also depicted on your --
20 your diagram here?
21     A.   Right.
22     Q.   Okay.  I got you.  Here's a -- let me mark this
23 sheet.  I don't know what it is.  I'm going to get you
24 to identify it.  Mark it Exhibit No. 8.
25              *

## Page 67

1          (The following exhibit was marked for
2              identification:  Exhibit No. 8)
3      Q.   (BY MR. SONNIER)  It's angles and calculations.
4  What is Exhibit No. 8?
5      A.   It's just the same thing that -- as we have on
6  this police drawing here where I scaled off
7  approximately the center of the tire and the front of
8  the vehicle and tried to estimate the steer angle of the
9  vehicle; and these are just the calculations to estimate
10 that steer angle.
11     Q.   And that's what you were looking at?
12     A.   Yes, sir.
13     Q.   Okay.  Now, this -- these calculations here,
14 the next page there in your file, what is that?
15     A.   That's the raw data from the survey instrument
16 where all the points were shot --
17     Q.   Okay.
18     A.   -- in terms of X, Y, and Z coordinates.
19     Q.   Okay.  So, you -- you have a point of
20 reference, correct?
21     A.   Yes, the instrument is the point of reference.
22     Q.   Okay.  And then you have actually 73 different
23 points that you've identified, correct?
24     A.   Yes.
25     Q.   Okay.  You have in here a little page,

## Page 68

1  SparkCharts physics formulas -- two pages.  What are
2  these?
3      A.   Those are just the basic physics equations that
4  are used worldwide to show that any calculations I did
5  are consistent with what's normally used and accepted.
6      Q.   Now, you have some information in here
7  regarding a description of the vehicle.  Where did that
8  information come from?
9      A.   That's a little computer program we have that
10 breaks down the VIN.
11     Q.   So, looking at the VIN, you can tell the
12 country of origin, manufacturer, vehicle type, things of
13 that nature, correct?
14     A.   Yes.
15     Q.   Okay.  You also have some information from
16 Expert AutoStats; is that correct?
17     A.   Yes, sir.
18     Q.   And -- and what is -- what are -- what are
19 these?
20     A.   That's a database that we buy every year that
21 has the specifications for all makes and models of
22 vehicles.
23     Q.   And this specific one is on the Durango, the
24 '02 Durango?
25     A.   Yes, sir.

## Page 69

1      Q.   Lastly here, you have a couple of pages -- the
2  bottom says:  "Gasoline Truck Index."  What is this?
3      A.   It's, again, a series of books that we buy on
4  gasoline trucks, diesel trucks, and import trucks that
5  lists all the specifications and describes some of the
6  components of the vehicle.
7      Q.   Okay.  This -- okay.  This is a publication you
8  have in your office?
9      A.   Yes, sir.
10     Q.   And what's the title of it?
11     A.   Just Gasoline Truck Index.
12     Q.   Okay.  And in that you can turn to a particular
13 vehicle and get information regarding wheelbase, you
14 know, length, height, and other details regarding the
15 vehicle, correct?
16     A.   That's correct.
17     Q.   On the second page of this, there's actually
18 a -- a little section regarding the transmission of the
19 vehicle.  Do you see that?
20     A.   Yes.
21     Q.   And on what you have here, it says:
22 "Transmission Chrysler 42RE, four-speed automatic."  Did
23 I read that correctly?
24     A.   Yes, sir.
25     Q.   Okay.  Do you know whether the Vetters vehicle

18 (Pages 66 to 69)

Stephen T. Vetters          Vs.   Daimler Chrysler Corporation
James R. Lock

## Page 70

1 had a 42RE transmission?

2    A.   I didn't confirm it, but that's what the specs

3 say that it has for that year.  I know there was a

4 change in transmissions sometime around 2002, 2003; but

5 I didn't get underneath the vehicle and try to confirm

6 it.

7    Q.   Okay.  So, if -- if other persons were to tell

8 us that this vehicle had a 45RFE transmission, you

9 wouldn't disagree with that?

10   A.   No.

11   Q.   Okay.  Your vehicle inspection back in May of

12 '05, let me ask you a couple of more questions about

13 that, if I could.  Did you check the transmission fluid

14 and engine oil levels?

15   A.   I did not.

16   Q.   Okay.  You didn't check any of the oil levels

17 in the vehicle?

18   A.   No, I -- I wasn't asked to evaluate anything

19 in -- as far as mechanical components on the vehicle.

20 So, I did not.

21   Q.   Okay.  Did you take some video of the vehicle

22 during your inspection?

23   A.   I did.

24   Q.   Okay.  Did you have an assistant with you, or

25 did you do all that by yourself?

## Page 71

1    A.   I did it myself.

2    Q.   Okay.  And the purpose of doing this -- the

3 video is just to document different parts of the vehicle

4 and show -- show certain things, correct?

5    A.   Yes.  It's much more efficient and -- and

6 better than taking just photographs because the video

7 has capability of -- of zooming in to get very fine

8 details.

9    Q.   Okay.  I think I was asking you about oil

10 levels.  So, on your inspection, you didn't check engine

11 oil level, transmission oil level, anything like that?

12   A.   I did not.

13   Q.   Okay.  Didn't even -- didn't pull the dipstick

14 out?

15   A.   I did not.

16   Q.   Who was with you during your inspection, by the

17 way?

18   A.   Well, nobody was with me.  There were --

19   Q.   And I'm talking about whether Mr. Sico or

20 Mr. Dotin --

21   A.   They were present in the -- I believe Mr. Dotin

22 was present in the building at some point in time.

23   Q.   Okay.  Now, I notice that you had taken some

24 photographs and -- and video of different markings on

25 the vehicle.  You specifically had referenced earlier in

## Page 72

1 the deposition that there were some handprints or

2 fingerprints on certain portions of the vehicle.

3    A.   Yes.

4    Q.   Okay.  Do you remember finding handprints or

5 fingerprints on the rear lift gate of the vehicle?

6    A.   I have a distinct recollection of a photograph

7 of that showing where the dirt had cleaned off -- been

8 cleaned off the tailgate area.

9    Q.   Okay.  And what you saw, is that consistent

10 with someone that at -- at some point in time closed the

11 lift gate of the vehicle?

12   A.   Yes.

13   Q.   Okay.  Now, you also found some -- some prints

14 on the driver's door itself, correct?

15   A.   Yes.

16   Q.   And where were those prints located

17 specifically?

18   A.   The photographs and the video show -- they show

19 some, I believe, above the door handle, some in other

20 areas; and especially on the video, what I did was I

21 would -- I would zoom out and then zoom in and show the

22 distinct detail and then zoom back out to show, again,

23 where physically that was located.

24   Q.   Okay.  In reference to the other parts of the

25 vehicle?

## Page 73

1    A.   Yes.

2    Q.   Okay.  Obviously, you can't tell us when those

3 prints on the door got there?

4    A.   No.

5    Q.   And you don't know whose they are?

6    A.   I don't, but I know the police officers -- one

7 of the investigators looked at them and documented some

8 of those marks; and, so, I looked at his photographs and

9 looked to see what the marks looked like myself.

10   Q.   Okay.  The -- the prints on the -- or the

11 markings on the -- driver's door, you said there

12 were some just above or -- or around the -- or handle,

13 the handle that you use to open the door?

14   A.   Yes, sir.

15   Q.   Were there also some right on the edge, kind of

16 below the handle area?

17   A.   I believe there were.

18   Q.   And those prints that are kind of right on the

19 edge of the -- the -- the back end of the driver's door

20 below the handle there, would those be marks consistent

21 with someone touching the door and shutting it?

22   A.   From the outside?

23   Q.   Yes.

24   A.   Yes.

25   Q.   All right.

Stephen T. Vetters          Vs.    Daimler Chrysler Corporation
                    James R. Lock

## Page 74

1    A.   They could be.

2    Q.   Now, you also mentioned earlier that there were

3 some other marks on the forward end of the left-rear

4 passenger door.

5    A.   Yes.

6    Q.   Ex -- explain to us where you found those marks

7 exactly.

8    A.   Well, they show up in these photographs; and

9 they are on the rub strip, on the door impact rub strip

10 area at the leading edge of the rear door and --

11   Q.   And do you have a -- if you can just --

12   A.   Sure.

13   Q.   -- find a photograph for me real quick.  I want

14 make sure I know exactly where you're talking about.

15   A.   I can -- on Photograph 1527-000103 you can see

16 the area in the upper portion of that photo.

17   Q.   What -- what caused those marks, or do you

18 know?

19   A.   I don't know.  It's some contact with the

20 vehicle that wiped away the dirt.

21   Q.   Okay.  But whether it's a hand, a leg, or some

22 other object, there's no way to tell just by looking at

23 those marks?

24   A.   No, the marks didn't have a -- any kind of

25 characteristic shape or pattern like -- for example, a

## Page 75

1 pedestrian impact where, you know, pedestrians hit at 40

2 miles an hour, you can match up clothing contacts and

3 skin contacts, things like that.  This didn't have any

4 of that.

5    Q.   Okay.  So, those marks may or may not be

6 related to Mrs. Vetters' contact with the vehicle at

7 some point during this accident sequence?

8    A.   That's true.

9    Q.   Okay.  You also shot some video on -- of the

10 undercarriage of the vehicle?

11   A.   Yes.

12   Q.   Did you find any marks on the undercarriage?

13   A.   I did not.

14   Q.   Did you find any marks around the tire or wheel

15 area, any of the tires or wheels, that you believe may

16 be the result of contact to Mrs. Vetters?

17   A.   No, I didn't see anything on -- on the tire.

18   Q.   I'm assuming when you did your inspection of

19 the vehicle, you cranked the engine to see if it would

20 run?

21   A.   I didn't personally crank the engine, but the

22 people at the warehouse cranked it and pulled the

23 vehicle into a clearer area so I could look at it.

24   Q.   Okay.  Did -- did you ever at any time get in

25 and operate the vehicle with the engine running?

## Page 76

1    A.   No.

2    Q.   Okay.  So, you didn't -- you didn't get in

3 there and shift the lever into different gears?

4    A.   No, I didn't want to cause any contamination to

5 the evidence at all.

6    Q.   Okay.  Did you test or examine the park brake

7 of the vehicle?

8    A.   I didn't look at the park brake.  I looked

9 primarily at the outside of the vehicle and measured the

10 heights of different objects and looked for contact

11 markings.

12   Q.   Okay.  I saw where you had taken some

13 photographs of the steering column up underneath the

14 dash there --

15   A.   Yes.

16   Q.   -- near the pedals.  Is that just for

17 documenting that part of the vehicle --

18   A.   Yes.

19   Q.   -- and just --

20   A.   And to see if anything was -- had moved or was

21 loose or the shear capsules had been at some point

22 slipped or moved, you know, that would tell us maybe

23 this vehicle had been involved in a frontal collision or

24 something at some point in time.

25   Q.   Did you find anything out of the ordinary when

## Page 77

1 you looked --

2    A.   No, it looked --

3    Q.   -- at that?

4    A.   It looked clean and -- and in an as

5 manufactured condition.

6    Q.   I'm going to show you a photograph here.

7 I'd -- I'll represent to you that's something either

8 Mr. Sico took or Mr. Stilson.  This is something Craig

9 gave me yesterday; but that's a photograph of the area

10 underneath the dash near the -- the accelerator pedal,

11 brake pedal, in that area of the vehicle, correct?  Do

12 you recognize that?

13   A.   Yeah, it's right there next to the OBD2 plug.

14   Q.   Which is what?

15   A.   The electronic connection to talk to the

16 vehicle.

17   Q.   Okay.  There's something circled on that

18 photograph, looks like a little cylinder type object

19 around a wire.

20   A.   Yes.

21   Q.   Do you remember seeing that?

22   A.   I don't have a recollection of seeing it.

23   Q.   Do you know what that is?

24   A.   Well, it looks like it's a -- it's a piece that

25 may be used to isolate that wire from -- from something

20 (Pages 74 to 77)

Stephen T. Vetters          Vs.   Daimler Chrysler Corporation
James R. Lock

| Page 78 | Page 79 |
|---|---|
| 1 else or just to contain it.  I'd have to look at it and<br>2 see what it's used for.<br>3    Q.  Okay.  So, as we sit here today, you -- you --<br>4 you just can't identify what that is for us?<br>5    A.  No, I can't.<br>6         MR. DOTIN:  Hey, Robert, just for<br>7 clarification, is that a photo taken after the steering<br>8 columns --<br>9         MR. SONNIER:  Yeah, and -- and what I'm<br>10 asking, Matt, is -- Craig gave me this photograph --<br>11 it's that little aluminum --<br>12         MR. DOTIN:  A little aluminum cylinder?<br>13         MR. SONNIER:  -- cylinder that everybody<br>14 is trying to figure out what it is.<br>15         MR. DOTIN:  Okay.<br>16         MR. SONNIER:  So, I was asking him if he<br>17 knew what it is.<br>18         MR. DOTIN:  Right.  No problem.<br>19    Q.  (BY MR. SONNIER)  Mr. --<br>20    A.  Those are put on there sometimes just for<br>21 vibration dampening, just -- if you have a cable and it<br>22 gets -- it vibrates at a certain frequency, if you put a<br>23 weight on it, it doesn't vibrate anymore.<br>24    Q.  Okay.  Is that something put on, like, an after<br>25 market deal; or is it -- | 1    A.  No, it's --<br>2    Q.  -- something by the manufacturers?<br>3    A.  It's by the manufacturer.  I have another photo<br>4 of it here.  That appears what that -- that may be<br>5 something like that.  I'll show you this photo I have of<br>6 it.<br>7    Q.  Yeah.  Do you -- okay.  First of all, do you<br>8 know what wire that's on or cable?<br>9    A.  Let me see that photo again.  I don't know.<br>10 I'd have to get underneath the dash and look at it.<br>11    Q.  Okay.  Do you have any plans to -- to do any<br>12 further inspections of this vehicle?<br>13    A.  I didn't have any when I came in here this<br>14 morning, but some of your questions seem to raise a flag<br>15 or two.<br>16    Q.  Okay.  And now that we've -- we've kind of gone<br>17 through this deposition process this morning, is<br>18 there -- is there some things you're curious about or --<br>19 or may inquire about further?<br>20    A.  Well, I have some curiosity about your<br>21 questions about the vehicle with the rear tires placed<br>22 in the flow line and the movement of that vehicle and<br>23 whether or not I could prove up that the vehicle would<br>24 roll or wouldn't roll or there -- if there's some<br>25 argument about it, then certainly that's something that |

| Page 80 | Page 81 |
|---|---|
| 1 should be looked at by somebody that can swear to it.<br>2    Q.  Okay.  So, I guess another way of saying that,<br>3 if -- if Mr. Sico and plaintiff's attorneys ask you to<br>4 do that, that may be something you'd want to look at<br>5 yourself?<br>6    A.  Yeah, if they choose to have that done.<br>7    Q.  Okay.  Is there -- is there anything that<br>8 you've reviewed or relied upon that is not part of your<br>9 file that's with you here today?<br>10    A.  No, sir.<br>11    Q.  Let me check my notes because we may very well<br>12 be -- be done here.  During your inspection, did you<br>13 ever rotate the key to see if the electronic system<br>14 works on the vehicle?<br>15    A.  I did not; but since the engine was started and<br>16 the vehicle was moved, I think we can assume that some<br>17 of the electronics at least worked.<br>18    Q.  Okay.  One more thing, I -- I think I forgot to<br>19 ask you this earlier; but you're -- you're not a human<br>20 factors expert in this case; is that correct?<br>21    A.  That's correct.<br>22    Q.  Okay.  Meaning you're -- you're not going to<br>23 offer any testimony regarding actions or habits or<br>24 whatnot of Mrs. Vetters' other than what you've already<br>25 told us about here today? | 1    A.  That's right.<br>2    Q.  Okay.  You indicated that during your<br>3 inspection, someone with Mr. Sico's firm actually<br>4 started the vehicle, moved it to a location where you<br>5 could get to it and do your examination, correct?<br>6    A.  Yes.<br>7    Q.  It seems, from photographs of yours that I<br>8 reviewed, the inspection, for the most part, was done<br>9 inside the warehouse?<br>10    A.  It was.  The vehicle was moved maybe 10 feet<br>11 forward.<br>12    Q.  Okay.  And you were present when they moved it?<br>13    A.  I was.<br>14    Q.  Okay.  And I'm assuming when they moved it,<br>15 they stopped the vehicle, put it in park, turned the<br>16 engine off to allow you to go about doing your<br>17 inspection?<br>18    A.  Yes.<br>19    Q.  Okay.  And during that sequence -- or let me<br>20 ask you this:  During your inspection at any time, did<br>21 the vehicle ever move or roll out of a parked position?<br>22    A.  Oh, the engine was turned off on the vehicle.<br>23    Q.  Okay.<br>24    A.  And the floor was flat and level.<br>25    Q.  Okay.  So, the answer would be the vehicle |

21 (Pages 78 to 81)

Stephen T. Vetters          Vs.    Daimler Chrysler Corporation
                    James R. Lock

---

### Page 82

1  never did move during your inspection?

2      A.   That's correct.

3      Q.   Did you evaluate the brake inter -- the brake

4  shift interlock device or the key interlock device?

5      A.   No, that would've required me to get in the

6  vehicle and -- and to move things repeatedly and I

7  wasn't asked to do that and I didn't think that would be

8  a good thing to do since I wasn't in the process of

9  evaluating those --

10     Q.   Okay.

11     A.   -- components.

12     Q.   So, you -- you didn't take the shroud or the

13  cover off the steering column during your inspection,

14  did you?

15     A.   No, I did not.

16     Q.   Okay.  Another thing just to make sure that

17  you're not addressing in this case, you -- you're not

18  going to address any other similar incidents with a

19  Durango, are you?

20     A.   Not unless I'm provided with information about

21  similar incidents and I have a chance to review all that

22  information and I'm asked the question, "Are you

23  familiar with any similar incidents?"

24     Q.   Okay.  So, as of right now, you're not familiar

25  with any?

---

### Page 83

1      A.   I'm not familiar with the specifics of any.

2  I've -- obviously, I've looked on the internet and I can

3  see that there's other -- there are other similar

4  incidents, but I don't have any information about any of

5  them.

6      Q.   Okay.  When you say you looked on the internet,

7  did you go to NHTSA's Web site?

8      A.   I went to NHTSA, Auto Safety; and then there's

9  quite a few Web sites out there by various plaintiff

10  attorneys that have some information on that sort of

11  thing.

12     Q.   Okay.  And you looked at these Web sites just

13  regarding other incidents involving a 2002 Durango?

14     A.   Just to get a feel for whether or not that's

15  something that -- that happens.

16     Q.   Okay.  And what -- and what -- what you saw,

17  then, were notations or whatever, entries on these Web

18  sites where persons have complained or made a complaint

19  about a vehicle moving rearward?

20     A.   Yes, I -- I did see that.

21     Q.   But in terms of any of those that you looked

22  at, you didn't do any independent investigation such as

23  calling the persons involved, talking to them, or

24  inspecting any of those vehicles?

25     A.   Oh, absolutely not.  I'm, I mean -- and -- and

---

### Page 84

1  they're not very specific.  For example, this one says,

2  you know, prior -- prior to the recall on a Jeep, 860

3  people complained, 359 crashes, 184 injuries, and 5

4  deaths on that particular transmission.

5      Q.   Okay.  Well --

6      A.   And -- and there's other stuff about Dodge Rams

7  and the Chrysler recalls, 583,000.  I didn't follow up

8  on any of that.

9      Q.   Okay.  So, that -- that's just not part of your

10  analysis or your opinions in this case?

11     A.   No.  I was just curious.

12     Q.   Okay.  And before you would ever want to offer

13  any opinions relating to any of those matters that you

14  looked at, you'd want to do a more in depth

15  investigation into --

16     A.   I need --

17     Q.   -- the vehicles and the accident and -- and

18  other details, correct?

19     A.   I'd have to have some factual information

20  that -- that was reliable that I could use, not -- not

21  summary information that's of questionable origin.

22     Q.   Mr. Lock, I think that's all the questions I

23  have for you this morning.  I appreciate your time.

24          MR. DOTIN:  I'll reserve my questions

25  until time of trial.

---

### Page 85

1              THE WITNESS:  Thank you.

2              MR. SONNIER:  We're done.

3              MR. DOTIN:  Good deal.

4              THE VIDEOGRAPHER:  We're off the record at

5  10:55.  End of deposition.  End of Tape 2.

6          (Proceedings concluded at 10:55 a.m.)

7                    *

8                    *

9                    *

10                   *

11                   *

12                   *

13                   *

14                   *

15                   *

16                   *

17                   *

18                   *

19                   *

20                   *

21                   *

22                   *

23                   *

24                   *

25                   *

October 14, 2005
(979) 774-4000    A AA Werlinger & Associates    Firm Number: 328

Stephen T. Vetters          Vs.   Daimler Chrysler Corporation
James R. Lock

## Page 86

CHANGES AND SIGNATURE

PAGE LINE CHANGE              REASON

1
2
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## Page 87

1      I, JAMES RAYMOND LOCK, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5      _____
6              JAMES RAYMOND LOCK
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10
11     Before me, _____, on this day
12 personally appeared JAMES RAYMOND LOCK, known to me or
13 proved to me on the oath of _____ or through
14 _____ (description of identity card
15 or other document) to be the person whose name is
16 subscribed to the foregoing instrument and acknowledged
17 to me that he/she executed the same for the purpose and
18 consideration therein expressed.
19     Given under my hand and seal of office on this _____
20 day of _____, _____.
21
22     _____
23             NOTARY PUBLIC IN AND FOR
24             THE STATE OF _____
25 My Commission Expires: _____

## Page 88

1          UNITED STATES DISTRICT COURT
2          SOUTHERN DISTRICT OF TEXAS
              CORPUS CHRISTI DIVISION
3  STEPHEN T. VETTERS,         )
   INDIVIDUALLY AND AS         )
4  REPRESENTATIVE OF THE ESTATE )
   OF SHARON G. VETTERS,       )
5  DECEASED, AND FOR AND ON    )
   BEHALF ALL THOSE ENTITLED TO )
6  RECOVER FOR THE DEATH OF    )
   SHARON G. VETTERS UNDER THE )
7  TEXAS WRONGFUL DEATH AND    )
   SURVIVAL ACTS, ERIN VETTERS )
8  RUEL, STEVEN B. VETTERS, JOHN)
   W. STOCKTON, AND HAZEL L.   )
9  STOCKTON,                   )
   PLAINTIFFS,                 )
10                             )
                               )
11 vs.                         )   CIVIL ACTION
                               )   NO.2:05-CV-00003
   DAIMLER CHRYSLER            )
12 CORPORATION,                )
   DEFENDANT.                  )   JURY
13
14          REPORTER'S CERTIFICATE
15 ORAL VIDEOTAPED DEPOSITION OF JAMES RAYMOND LOCK
16             October 14, 2005
17
18     I, Laurin Rainer, Certified Shorthand Reporter in
19 and for the State of Texas, hereby certify to the
20 following:
21     That the witness, JAMES RAYMOND LOCK, was duly sworn
22 and that the transcript of the deposition is a true
23 record of the testimony given by the witness;
24     That the deposition transcript was duly submitted on
25 October 17, 2005 to the witness for examination,

## Page 89

1  signature, and return to me by November 3, 2005.
2      That pursuant to information given to the deposition
3  officer at the time said testimony was taken, the
4  following includes all parties of record and the amount
5  of time used by each party at the time of the
6  deposition:
7      Mr. G. Robert Sonnier (1h48m)
           Attorney for Defendant
8      Mr. Matt Dotin (0h0m)
           Attorney for Plaintiffs
9
10     That a copy of this certificate was served on all
11 parties shown herein on _____ and filed
12 with the Clerk.
13     I further certify that I am neither counsel for,
14 related to, nor employed by any of the parties in the
15 action in which this proceeding was taken, and further
16 that I am not financially or otherwise interested in the
17 outcome of this action.
18     Certified to by me on this 16th day of
19 October, 2005.
20
           _____
21         Laurin Rainer, CSR, RPR
           TX CSR 8307
22         Expiration Date:  12/31/2007
           A AA Werlinger & Associates
23         1716 Briarcrest Drive
           Suite 601
24         Bryan, Texas 77802
           Phone:  (979)774-4000
25         Fax:  (979)846-1600
           Firm No. 328

23 (Pages 86 to 89)

Stephen T. Vetters                Vs.   Daimler Chrysler Corporation
                        James R. Lock

```
                                        Page 90
 1          FURTHER CERTIFICATION UNDER TRCP RULE 203
 2
 3          The original deposition was/was not returned to the
 4     deposition officer on _____.
 5          If returned, the attached Changes and Signature
 6     page(s) contain(s) any changes and the reasons therefor.
 7          If returned, the original deposition was delivered
 8     to Mr. G. Robert Sonnier, Custodial Attorney.
 9          $_____ is the deposition officer's charges to the
10     Defendant for preparing the original deposition and any
11     copies of exhibits;
12          The deposition was delivered in accordance with Rule
13     203.3, and a copy of this certificate, served on all
14     parties shown herein, was filed with the Clerk.
15          Certified to by me on this _____ day of
16     _____, _____.
17
18
19                           _____
                             Laurin Rainer, CSR, RPR
20                           TX CSR 8307
                             Expiration Date:  12/31/2007
21                           A AA Werlinger & Associates
                             1716 Briarcrest Drive
22                           Suite 601
                             Bryan, Texas 77802
23                           Phone:  (979)774-4000
                             Fax:  (979)846-1600
24                           Firm No. 328
25
```

                        October 14, 2005
(979) 774-4000      A AA Werlinger & Associates      Firm Number: 328